UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. ANDREW COOKE, ON BEHALF OF )<br>THE ANDREW R. COOKE 1998 )<br>TRUST, Individually and on Behalf of )<br>All Others Similarly Situated, )<br>)<br>                    Plaintiff, )<br>        vs. )<br>)<br>1. EQUAL ENERGY LTD., )<br>2. PETROFLOW ENERGY )<br>    CORPORATION, )<br>3. PETROFLOW CANADA )<br>    ACQUISITION CORP., )<br>4. MICHAEL DOYLE, )<br>5. DON KLAPKO, )<br>6. LEE CANAAN, )<br>7. MICHAEL COFFMAN, )<br>8. VICTOR DUSIK, )<br>9. KYLE TRAVIS and )<br>10. ROBERT WILKINSON, )<br>)<br>                    Defendants. )<br>) | Case No. CIV-14-87-F |

## CLASS ACTION COMPLAINT

PLAINTIFF, BY HIS ATTORNEYS, ALLEGES AS FOLLOWS:

1.      This is a class action brought by plaintiff: (i) alleging breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims against Equal Energy Ltd. ("Equal" or the "Company"), the Board of Directors of Equal ("Board"), and Petroflow Energy Corporation and Petroflow Canada Acquisition Corp. (collectively defined as "Petroflow") in connection with the proposed sale

- 1 -

909164_2

of Equal to Petroflow (the "Proposed Acquisition"); and (ii) alleging violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 14a-9 promulgated thereunder ("Rule 14a-9") in connection with the Schedule 14A preliminary information circular and proxy statement filed by Equal with the United States Securities and Exchange Commission ("SEC") on December 31, 2013 (the "Preliminary Proxy").

2.      Equal is an oil and gas exploration and production company incorporated in Alberta Canada and based in Oklahoma City, Oklahoma.  On December 9, 2013, Equal announced it had entered into a definitive arrangement agreement with Petroflow (the "Arrangement Agreement") under which Petroflow will acquire the Company for a mere $5.43 per share in cash.

3.      The Proposed Acquisition is the product of a hopelessly flawed process that is designed to ensure the sale of Equal to Petroflow on terms preferential to defendants and other Equal insiders and to subvert the interests of plaintiff and the other stockholders of the Company.  The Board failed to undertake a full and fair sales process designed to maximize shareholder value as their fiduciary duties require.

4.      Over the last five years, the Company's management and Board have received negative public attention for decimating the Company's value and attempting to enrich themselves through lucrative compensation programs and proposals designed to entrench themselves and limit shareholder action. The Company's management and Board knew that their jobs and their

909164_2

reputations were at risk. This improperly incentivized the Company's management and Board to sell the Company in a rush (and receive millions in financial benefits) instead of pursuing viable strategic alternatives to a sale of the Company that were potentially more valuable for the Company's shareholders but would likely require new management and directors. Ultimately, the Company's management and Board tilted the sales process against potential bidders to ensure a quick sale to their preferred buyer without adequate consideration of the merits of the transaction and without the best interests of the Company's shareholders in mind.

5.      The unfair process has resulted in an unfair offer to the Company's shareholders. The Proposed Acquisition price of $5.43 per share drastically undervalues the Company and fails to value Equal's growth potential. The transaction will result in little to no premium for Equal shareholders, as Equal stock has traded above the sale price at $5.50 per share as recently as December 5, 2013 and traded at $4.89 per share on January 9, 2012. Moreover, Equal recently reported on November 7, 2013, that its 2013 drilling program continued during the quarter ended September 30, 2013 at a 100% success rate. With Equal, Petroflow – and not the Company's current shareholders – will get the benefit of the Company's prospects and growth. Numerous shareholders, including one of Equal's largest shareholders, have expressed concern about the Company's handling of the strategic process and the inadequacy of the Proposed Acquisition consideration.

909164_2

6.     To protect against the threat of alternate bidders out-bidding Petroflow after the announcement of the Proposed Acquisition, defendants implemented preclusive deal protection devices to guarantee that Petroflow will not lose its preferred position.  These deal protection devices include: (i) a Lock-Up and Support Agreement (the "Lock-Up Agreement"), pursuant to which the directors and officers of Equal agreed, among other things, to vote in favor of the Proposed Acquisition and against any alternative proposals; (ii) a no-shop clause with an illusory "fiduciary out" provision in the Arrangement Agreement that is too narrowly circumscribed to provide an effective "fiduciary out" for superior offers; (iii) an "information" and "matching rights" provision in the Arrangement Agreement giving Petroflow the cheap option to piggyback on the efforts of any alternative bidder; and (iv) a termination fee provision in the Arrangement Agreement requiring the Company to pay Petroflow $2 million if the Proposed Acquisition is terminated in favor of a superior proposal.  These onerous and preclusive deal protection devices individually and collectively preclude any other potential bidders from consummating an offer for the Company, and make even more egregious the Board's utter failure to obtain the best price possible for shareholders before agreeing to the Proposed Acquisition.

7.     On December 31, 2013, defendants caused the Company to file the false and misleading Preliminary Proxy with the SEC advising shareholders to approve the Arrangement Agreement and vote in favor of the Proposed

909164_2

Acquisition. The Preliminary Proxy contains false and misleading statements about: (i) the Company's current and future value; (ii) benefits that will flow to Company insiders only as a result of the Proposed Acquisition; (iii) details about the sales process and the conflicts of interests faced by the persons involved; and (iv) the financial analysis conducted by the Company's financial advisor. Unless defendants provide full and fair disclosure of information regarding the Proposed Acquisition in the Preliminary Proxy, the Company's public shareholders will not be able to make an informed decision on the Proposed Acquisition.

8.    Defendants are moving quickly to consummate the Proposed Acquisition. Consequently, judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's shareholders. Plaintiff seeks equitable relief to enjoin the Proposed Acquisition or, alternatively, rescind the Proposed Acquisition in the event it is consummated.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act because the claims asserted herein arise under §§14(a) and 20(a) of the 1934 Act and Rule 14a-9.

10.    This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this

District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.   Venue is proper under 28 U.S.C. §1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

12.   Plaintiff Andrew Cooke, on behalf of the Andrew R. Cooke 1998 Trust, is and has been a shareholder of Equal at all relevant times.

13.   Defendant Equal is incorporated under the laws of the Alberta, Canada and its principal executive offices are located at 4801 Gaillardia Parkway, Suite 325, Oklahoma City, Oklahoma.   All of Equal's assets are located in the United States, two thirds of the shareholders are American and most of the Company's shares trade on the NYSE.   Defendant Equal is sued herein as an aider and abettor.

14.   Defendant Petroflow Energy Corporation is a Delaware corporation headquartered in Tulsa, Oklahoma.   Defendant Petroflow Energy Corporation is sued herein as an aider and abettor.

15.   Defendant Petroflow Canada Acquisition Corporation is an Alberta, Canada corporation and a wholly-owned subsidiary of Petroflow Energy Corporation, existing solely to facilitate the Proposed Acquisition.   Defendant Petroflow Canada Acquisition Corporation is sued herein as an aider and abettor.

- 6 -

909164_2

16.    Defendant Michael Doyle has been the Chairman and a director of Equal at all relevant times.

17.    Defendant Don Klapko ("Klapko") has been Equal's CEO and President and a director of Equal at all relevant times.

18.    Defendant Lee Canaan has been a director of Equal at all relevant times.

19.    Defendant Michael Coffman has been a director of Equal at all relevant times.

20.    Defendant Victor Dusik has been a director of Equal at all relevant times.

21.    Defendant Kyle Travis has been a director of Equal at all relevant times.

22.    Defendant Robert Wilkinson has been a director of Equal at all relevant times.

23.    The defendants named ¶¶16-22 are referred to herein as the "Individual Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

24.    Under Canadian law, the Individual Defendants, as directors of Equal are required (a) to act honestly and in good faith with a view to the best interests of the corporation, and (b) in doing so, to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

- 7 -

909164_2

25.     Moreover, in any situation where the directors of a corporation undertake a transaction that puts the corporation "in play" (*i.e.*, where it is apparent there will be a sale of equity and/or voting control), directors are required to take active and reasonable steps to maximize shareholder value. To diligently comply with these duties and ensure the shareholders receive a significant premium, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

26.     In addition, the Individual Defendants, as directors of Equal, are obligated under Canadian law to:

(a)     refrain from engaging in acts or omissions, exercising their powers as directors, or carry on or conduct, or threaten to carry on or conduct,

the business and affairs of Equal in a manner that is oppressive or unfairly prejudicial to the interests of shareholders;

(b)     ensure that proper mechanisms are in place when participating in any transaction where the directors' or officers' loyalties are divided so that shareholders are treated fairly;

(c)     provide shareholders with enough information to make a reasoned judgment about the issues presented to them;

(d)     refrain from participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation;

(e)     exercise the care, diligence, and skill that a reasonable prudent person with their knowledge and experience would exercise in a comparable circumstance;

(f)     refrain from unjustly enriching themselves at the expense or to the detriment of the public shareholders; and/or

(g)     refrain from unjustly entrenching themselves as managers and/or officers of the Company by failing to give adequate consideration to legitimate bids for the Company.

27.     The Individual Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties and aiding and abetting such breaches, including their duties of

- 9 -

care, loyalty, good faith, and independence owed to plaintiff and other public shareholders of Equal.

28.     The Individual Defendants, separately and together, have violated and are continuing to violate the reasonable expectation of the Company's shareholders by oppressive, unfairly prejudicial conduct, and have violated and are continuing to violate the reasonable expectation of the Company's shareholders by oppressive, unfairly prejudicial conduct insofar as they have deprived plaintiff and the Class of their reasonable expectation to receive fair value for the shares.

## SUBSTANTIVE ALLEGATIONS

### Summary of Equal's History

29.     Equal is an oil and gas company incorporated in Alberta, Canada and based in Oklahoma City, Oklahoma.  Equal's largest asset consists of the Hunton formation in Oklahoma, a large limestone formation that is currently extremely undervalued in the market despite having very attractive economics due to its unique production profile.

30.     In 1998, Equal started as a company called Enterra Energy Corp. In 2003, Enterra Energy Corp. converted into an energy trust structure and changed its name to Enterra Energy Trust (the "Trust").

31.     Between 2004 and 2007, the Trust undertook a series of acquisitions.  In early 2006, for example, the Trust acquired the Hunton formation in Oklahoma from a group of private sellers.  This group included

- 10 -

individuals who are now: (i) shareholders of Montclair Energy, LLC ("Montclair"), a holder of approximately 5% of Equal's common shares; and (ii) shareholders of Petroflow.  In addition, in 2007, the Trust acquired Trigger Resources Ltd. – a company that was, at the time, headed by defendant Klapko.

32.   On June 30, 2008, the Trust announced the appointment of defendant Klapko as President and CEO.   Subsequently, under Klapko's leadership, the Trust experienced a sharp deterioration in a number of key metrics (including shareholder equity per share, gross reserves per share, and average production per share).   Furthermore, during this period, the Trust suspended cash distributions paid to shareholders and experienced substantial increases in debt levels.   In fact, within the first three years of defendant Klapko's management, the debt to cash flow ratio increased over **150%**.

33.   On January 18, 2010, the Trust announced its intention to convert to corporation.   Defendant Klapko retained his position at the helm of the Company.  The Company continued its dismal performance over the next three years under defendant Klapko's mismanagement, consistently and significantly underperforming its peers.

**Summary of Relationship Between
Equal and Petroflow**

34.   Around the time the Trust bought the Hunton property, it entered into a farmout arrangement with Petroflow Energy Ltd., the predecessor to the current Petroflow, with respect to the Hunton property ("Farmout

909164_2

Arrangement"). The Farmout Arrangement established that Petroflow would fund 100% of the drilling and completion costs on the undeveloped areas to earn a 70% working interest, and the Trust would retain a 30% working interest. The Farmout Arrangement also established that Petroflow was required to maintain a certain pace of drilling to continue its right to drill.

35.   On December 15, 2009, the Trust announced that it had delivered a notice of termination for non-performance under the terms of the Farmout Agreement, for Petroflow's failure to maintain a certain pace of drilling.

36.   On May 25, 2010, Petroflow announced that two of its subsidiaries had filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

37.   In June 2010, Petroflow took certain actions to prevent Equal from conducting its drilling program on the Hunton property, negatively affecting Equal.

38.   In July 2010, Petroflow and its Chapter 11 debt affiliates filed a suit against Equal to, among other things, determine the parties' respective rights and obligations under the Farmout Agreement and to recover certain allegedly fraudulently transferred payments.

39.   In January 2011, Equal and Petroflow agreed to a settlement whereby the Farmout Agreement was terminated and Equal could recommence its drilling of the Hunton property – which Equal started in March 2011.

40.    In February 2011, the Bankrupcty Court issued its findings of fact and conclusions of law, quantifying the "financial obligations" owed by Equal to Petroflow. Defendants have not disclosed this amount in the Preliminary Proxy.

41.    On March 18, 2011, Equal announced that it and Petroflow had agreed to a temporary stay of the litigation in the Bankruptcy Court.

42.    On April 26, 2011, Equal announced that it had entered into a settlement agreement and a purchase and sale agreement with Petroflow pursuant to which the litigation would be settled and Equal would acquire Petroflow's interests in Hunton assets which were developed under the Farmout Agreement for $93.5 million.  Additionally, the parties agreed that Equal and Petroflow would equalize the  interests in zones above the Hunton in sections of land that were earned during the life of the Farmout Agreement on a 50/50 basis, and Petroflow would operate a development program over these "uphole assets."

43.    On May 17, 2011, the Bankruptcy Court entered an order approving the agreements between the parties.

44.    On June 1, 2011, Equal announced the completion of the acquisition of the Petroflow interests in the Hunton assets.

**The 2012 Process**

45.    By early 2012, some of the Company's shareholders began publicly expressing concerns with the Company's undervalued stock price and management's subpar performance.

- 13 -

46.    In April 2012, the Company announced certain changes to the Company's senior management and Board, including the departures of the Company's Chief Operating Officer and the Company's Chairman of the Board.

47.    On May 3, 2012, the Company announced that the Board had initiated a strategic review (the "2012 Process").   The Company formed a special committee (the "2012 Special Committee") and the 2012 Special Committee retained Scotiabank and Desjardins Securities as financial advisors. Defendants have not disclosed the nature, authority and/or mandate of the 2012 Special Committee in the Preliminary Proxy.

48.    During the 2012 Process, many parties expressed interest in purchasing Equal's assets, including at least 26 U.S.-based companies that expressed interest in Equal's U.S. assets.  The Board also received significant interest specifically in its Hunton asset.  According to defendants, the Board received four separate proposals on the Hunton formation, which the Board all rejected.  Defendants have not disclosed any information about these proposals and/or the basis for the rejections in the Preliminary Proxy.

49.    On November 27, 2012, the Company announced that it had sold the following Company assets: (i) Northern Oklahoma; (ii) Halkirk, Alliance, Wainwright, Clair and major abandonment liabilities; (iii) Lochend Cardium; and (iv) Canadian royalties and fee title lands.  The Company also announced that the 2012 Process was over.

50.

- 14 -

**Equal v. Its Company's Shareholders**

51.    Numerous Company shareholders publicly expressed concerns with the 2012 Process.   For example, Montclair Energy, LLC ("Montclair"), a shareholder with approximately 5% of Equal's common shares stated:

> Collectively, the principals of Montclair are the Company's largest shareholder and most of the Company's assets in the Hunton formation of Oklahoma (which constitute the principal assets of the Company) were initially explored, owned and operated by Montclair's principals.   Following the conclusion of the 2012 strategic review, Montclair recognized that existing ***management was not effectively operating the Company's assets*** and that there was considerable room for the creation of value by taking the Company private.

52.    On January 17, 2013, the Company announced that its Chief Financial Officer would be departing the Company and would be replaced with another individual.

53.    On January 24, 2013, Equal filed suit against certain of its own shareholders (the "Disagreeing Shareholders") alleging violations of U.S. securities laws in connection with certain publications and statements the shareholders made concerning their views about Equal and its management.

54.    On or around January 24, 2013, the Board approved an amendment to Equal's bylaw (the "Bylaw Amendment") that would add provisions to the following effect:

> (a)    Nominations of persons for election as directors of Equal at any meeting of shareholders may only be made: (a) by or at the direction of the board of directors of Equal, (b) by or at the direction or request of one or more shareholders pursuant to a proposal submitted to Equal in accordance with applicable law or a requisition of meeting submitted to the directors in accordance with

- 15 -

applicable law, or (c) by any person who, at the close of business on the date of the giving of the applicable notice and on the record date for determining shareholders entitled to vote at such meeting, is a registered holder or beneficial owner of shares that are entitled to be voted at such meeting and complies with the notice and other procedures set forth in Division 4 of the Amendment;

(b)     Subject to certain exception, any nomination to the board of directors must be in the proper written form and delivered in the manner required by the Amendment and must be received by Equal no less than 30 days and no more than 65 days prior to the annual meeting of shareholders.  In the case of a special meeting of shareholders that is not also an annual meeting, nominations must be received no later than 15 days after the announcement of the special meeting; and

(c)     Notwithstanding anything to the contrary, if the management information circular for an annual meeting of shareholders nominates fewer than the number of directors to be elected at the meeting, a nominating shareholder's notice required by the Amendment will also be considered timely, but only regarding nominees for the additional directorships that are to be filled by election at such annual meeting, if it is received by the Corporate Secretary of Equal not later than the close of business on the 15th day following the date on which such management information circular was first mailed to the shareholders by Equal.

55.     The Bylaw Amendment would also revise the minimum quorum requirement for shareholder meetings to be at least two shareholders holding shares representing not less than 25% of the shares entitled to be voted at the meeting.  Before the Bylaw Amendment, the minimum quorum for such meetings consisted of two shareholders holding not less than 5% of the shares entitled to be voted at the meeting.

56.     The purpose and effect of the Bylaw Amendment was to permit the Board to limit shareholder action.

- 16 -

57.   On February 14, 2013, Dan Botterill ("Botterill"), the Chairman of the Board at the time, and two other Company directors provided notice to the Company of their intent to step down from the Company and not stand for reelection at the Company's 2013 annual shareholder meeting on May 13, 2013.

58.   On March 19, 2013, Equal announced that it had entered into a settlement agreement with the Disagreeing Shareholders.  As part of the settlement, the Disagreeing Shareholders were required to abstain from voting at the Company's 2013 annual shareholder meeting.  The only exception was that the Disagreeing  Shareholders could vote for the Company's director nominees and could vote in favor of proposals supported by the Board.

59.   The settlement further restricted the Disagreeing Shareholders in the following manner:

Further, the [Disagreeing Shareholders] have agreed to observe certain standstill provisions during the period commencing on the date of the Settlement Agreement and ending on the 15-month anniversary of the date of the Settlement Agreement (the "Standstill Period").  During the Standstill Period and subject to certain exceptions, the [Disagreeing Shareholders] are restricted from, among other things, effecting or seeking to effect any significant corporate transactions with respect to the Company, forming, joining or participating in a partnership or group with respect to any securities of the Company, making or engaging in any proxy or consent solicitations, making or being the proponent of any stockholder proposal, seeking to call a meeting of stockholders, seeking representation on the Board **or the removal of any member of the Board**, communicating with the Company in a manner reasonably expected to require public disclosure of such communication and selling any shares of Common Stock other than on a recognized exchange on which the Company's Common Stock is listed or selling voting rights decoupled from the

909164_2

underlying Common Stock. In addition, the [Disagreeing Shareholders] are restricted from taking any action that constitutes advising, controlling, changing or influencing the Board or the management or policies of the Company, any material change in the capitalization or dividend policy of the Company or seeking to amend the Company's Articles of Incorporation or Bylaws.

60. On April 2, 2013, Lawndale Capital Management ("Lawndale"), the Company's third largest shareholder, issued a letter to the Board urging that the Board consider independent U.S. resident nominees rather than the "current legacy board members who all reside in Canada." Lawndale also wrote about its concerns regarding the Board's attempts to force Lawndale into signing a standstill. Lawndale wrote:

> Candidly, Lawndale was dismayed at your initial refusal to bring our nominees into a process for new directors that included only insider-sourced nominees. Our understanding is that the board's initial process began shortly before we identified the potential new candidates, and that the board process was conducted at the same time that Equal's board amended the Company's by-laws in a manner which potentially entrenches the current board and limits shareholders from proposing new nominees.

> We are glad you learned to appreciate the independence and qualifications of the nominees we suggested. Likewise, through dialogue and interviews, we became comfortable enough with your insider-sourced prospective nominees to reduce our shareholder representation request to include just one of the two nominees we submitted for the Company's upcoming May Annual Meeting slate. You and your committee initially chose Mr. Robert Parkey.

> Unfortunately, according to the preliminary Proxy, you apparently have now chosen to not nominate Mr. Parkey to Equal's board of directors. We can only assume that the reason for your actions – despite your admission that he would be a good independent director, whose presence would benefit all shareholders – is because ***Lawndale is unwilling to enter into the overly broad and wholly improper "standstill" agreement proposed by your counsel. As you know, the standstill agreement you***

909164_2

*proposed would effectively prohibit Lawndale from communicating with the Company's other shareholders about issues of mutual concern*.   As a general matter, requesting that Lawndale enter into such a standstill was inappropriate given that Mr. Parkey is an independent director with no prior affiliation with Lawndale.

However, your request is especially egregious in these circumstances insofar as it was made at a time when you obviously knew about the issues raised in the March 25th Releases, but did not inform Lawndale or the public of this information prior to urging Lawndale to enter into the standstill agreement. Attempting to induce a significant shareholder to enter into a standstill without disclosing material information such as the fact that a third party has made a premium bid to acquire the Company and may be planning to run a proxy contest against the Company's nominees is, to say the least, not what Lawndale considers to be a model of good corporate governance.

Some of the Company's other recent actions also give us great cause for concern. For example, it is now clear that Equal's board issued several hundred thousand shares of new stock, authorized stock options with grant date pricing potentially not reflecting Montclair's offer and/or others interest in the Company, and apparently did not take steps to preclude insiders from purchasing shares of stock in the open market from sellers who did not have the benefit of this undisclosed information.   We believe independent directors more focused on shareholders and good governance would have raised the obvious governance and possible legal liability issues created by the above transactions.

All of these actions make it critical for Equal to elect highly qualified and engaged independent directors whose interests and actions are solely aligned with shareholders and who are free of conflicts under both the letter and spirit of listing regulations.   Lawndale has provided Equal with the names and background information of such individuals-individuals who, quite frankly, we believe Equal would be fortunate to have as directors and who have no prior affiliation with Lawndale.

In addition to including Mr. Parkey amongst the nominees for Equal's board, we believe the Board should also reconsider and revise its recently adopted advance notice by-laws and other recent by-law amendments. We believe that these actions may have been taken in haste, going beyond what is customary and necessary,

- 19 -

and send an improper message to the market that Equal is not interested in engaging with its shareholders.  We note that the preliminary Proxy recently filed for the May 13, 2013 Annual Meeting asks shareholders to approve all your by-law changes as part of one bundled measure.  While some of the changes adopted by the Board may have been minor, bundling those in one proposal along with other unacceptably entrenching amendments, in particular, certain aspects of the advance notice by-law, may not be changes that Lawndale can support as it is presently drafted.

At this time, while Equal is about to engage in a process to determine the future of the Company, it is particularly important for the board to have the confidence of the Company's shareholders and for the shareholders to believe that the board is acting in an informed and independent manner.  The board can start this process by eliminating many of the barriers it recently adopted to shareholder participation in the election process, adding some strong new independent nominees to the board and then conducting a full, and fair and thorough evaluation of all alternatives to maximize shareholder value.

We believe it is in the best interests of the Company and its shareowners for all of us to work together to expeditiously improve the Board's composition and the Company's corporate governance practices.  I would appreciate it if you would contact me at the earliest opportunity to move forward addressing the concerns we have previously discussed and as outlined above.

61.    On April 11, 2013, the Company filed a definitive proxy statement

for the May 13, 2013 annual shareholder meeting, recommending, among other

things, that the Company's shareholders:

- vote in favor of the Bylaw Amendment;

- cast an advisory vote in favor of the compensation of Equal's executive officers as described in the proxy;

- vote in favor of approving and issuing unallocated entitlements under the Company's security based compensation arrangements; and

- vote in favor of a special resolution to amend the Company's articles to implement a stock dividend program.

62.   On May 13, 2013, the Company held its annual shareholder meeting.  The Company's shareholders **rejected** all four proposals indicated in the above paragraph.

63.   With respect to executive compensation, as noted by at least one shareholder, as of April 2012, Equal shares declined by over 74% since defendant Klapko assumed his CEO position in 2008, while defendant Klapko received 424% pay increase, or a total of $10.37 million in compensation during the same period:



64.   The Company's shareholders' message was clear.  "The overall voting results reinforce comments **we have heard that shareholders are frustrated**," admitted defendant Doyle, the Chairman of the Board.   The Company's management and Board knew that their titles/positions jobs and their reputations were at risk.  This improperly incentivized the Company's management and Board to sell the Company in a rush instead of pursuing

- 21 -

viable strategic alternatives to a sale of the Company that were potentially more valuable for the Company's shareholders but would likely require new management and directors. Accordingly, as discussed further below, the Company's management and Board agreed to sell the Company to Petroflow for the unfairly low price of $5.43 per share without adequate consideration of the merits of the transaction and without the best interests of the Company's shareholders in mind.

**The 2013 Process**

65.     Shortly after the Board terminated the 2012 Process, on January 31, 2013, Equal received a proposal regarding a potential business combination from Company A. The Board rejected this proposal. Defendants have not disclosed the circumstances under which Equal received this proposal, the terms of the proposal or the basis of the Board's rejection in the Preliminary Proxy.

66.     On March 25, 2013, Montclair publicly announced that it delivered a letter to the Board on February 27, 2013 in which Montclair proposed to acquire all of the current outstanding shares of common stock of Equal at $4.00 per share and that on March 15, 2013, the Board rejected the proposal.

67.     On March 25, 2013, the Company announced that the Board had formed a special committee in early March (the "2013 Special Committee") and that the 2013 Special Committee had retained Global Hunter Securities, LLC ("GHS") and Scotiabank. Defendants have not disclosed what, if anything,

- 22 -

Scotiabank did for the Company, what it was paid, or why it was hired in the Preliminary Proxy.

68.     In late March and April 2013, the Company received interest from a number of parties.  Equal established a virtual data room and entered into confidentiality agreements with various parties.  Defendants have not disclosed whether any party is currently restricted by a standstill provision by virtue of entering into these confidentiality agreements.

69.     On April 1, 2013, Company A presented a revised business combination proposal which was below Montclair's $4.00 per share proposal. Defendants have not disclosed the terms of the proposal in the Preliminary Proxy.

70.     On April 23, 2013, Company A presented a revised proposal to the Company.  Company A also requested to make a presentation to the Special Committee to outline the merits of its proposal.  The Board rejected Company A's overtures and refused to meet with Company A.  Defendants have not disclosed the terms of the proposal or the basis of the Board's rejection in the Preliminary Proxy. Additionally, this is the last time Company A is mentioned in the Preliminary Proxy – defendants have not disclosed whether there were further communications with Company A.

71.     On May 1, 2013, Company B provided an indication of interest. Defendants have not disclosed the circumstances under which Equal received this proposal or the terms of the proposal in the Preliminary Proxy.

909164_2

72.   On May 13, 2013, as discussed above, the Company held its annual shareholder meeting where the Company's shareholders **rejected** the proposals and signaled their deep dissatisfaction with the Company's management and Board.

73.   On May 27, 2013, Equal forwarded a counter-proposal to Company B.  Defendants have not disclosed the origin, basis or the terms of this counter-proposal in the Preliminary Proxy.

74.   On May 28, 2013, Company B provided two alternatives to the counter-proposal.   Defendants have not disclosed the terms of these alternatives in the Preliminary Proxy.

75.   On June 13, 2013, Company B provided a proposal of $5.00 cash per Equal share.

76.   On June 14, 2013, instead of using Company B's proposal to generate a competitive bidding process and without adequately informing itself whether a higher offer was possible, the Board agreed to grant exclusivity to Company B for the next 45 days.   The Board immediately terminated discussions with other parties and revoked access to the data room, including the five parties that had signed confidentiality agreements and had been participating in the process.

77.   The exclusivity period for Company B ended on July 28, 2013 without a execution of a definitive agreement.  The Board made no effort to use this opportunity to negotiate a higher price from Company B, or generate a

competitive bidding process with other bidders, and instead, merely waited around for Company B.

78.   On August 14, 2013, Montclair submitted a written proposal for $4.75 per share.

79.   On August 20, 2013, Equal sent a letter to Montclair rejecting its proposal.

80.   On August 20, 2013, Equal sent a letter to Company B indicating that it was terminating discussions and closing the data room to Company B. This is the last time Company B is mentioned in the Preliminary Proxy – defendants have not disclosed whether there were further communications with Company B.

81.   On August 21, 2013, Petroflow indicated in interest in interested in negotiating a confidentiality agreement so that it could gain access to the virtual data room and potentially make a proposal.

82.   On or around August 23, 2013, Montclair indicated that it was working on a revised proposal but would need to re-access the data room to conduct due diligence.

83.   On August 28, 2013, Equal forwarded letters to Montclair, Petroflow and two other parties that were still expressing some interest in a transaction with Equal.  Equal told the four parties that if interested, they would need to provide a proposal by September 6, 2013.  Equal also told the parties that such proposals would need to be developed from publicly available information about

Equal. Defendants have not disclosed whether the parties had access to any non-public information earlier in the process, and the basis of the Board's decision to limit access to non-public information when the Company's internal information could have supported a higher offer from the parties.

84.   On September 6, 2013, Montclair submitted an offer of $4.85 per share, and Petroflow submitted an offer at a price of $5.25 per share. Montclair, while making its offer, told the Board that there was potential to increase the bid substantially based on the fact that Equal had recently published new information in regards to the valuation of its oil and gas reserves.

85.   The Company subsequently executed confidentiality agreements with Montclair and Petroflow and granted both parties access to the data room. Petroflow gained access on September 19, 2013.  Montclair gained access on September 23, 2013.  Equal told both parties that their proposals would be due September 29, 2013.

86.   On September 24, 2013, Equal management and GHS gave a presentation to Petroflow management and its financial advisors which permitted Petroflow to largely conclude its diligence.  There is no indication that Equal's management provided the same to Montclair.  Defendants have not disclosed why the Board agreed to tilt the process unfairly in favor of Petroflow.

909164_2

87.    On September 29, 2013, Montclair submitted an offer at an increased price of $5.25 per share and Petroflow reconfirmed its previous offer price of $5.25 per share.

88.    GHS informed the two parties that they would need to submit revised bids by October 3, 2013.

89.    On October 3, 2013, Montclair submitted an offer at an increased price of $5.40 per share and Petroflow indicated aggregate consideration of $200 million for all of the issued and outstanding Equal shares, on a fully-diluted basis, which equated to $5.43 per share.

90.    That same day, the Board agreed to cut the sales process short – at the cost of maximizing shareholder value – and decided to reject Montclair and negotiate exclusively with Petroflow for the next sixty days.  In so doing, the Board, in bad faith, failed to adequately consider whether Petroflow or Montclair was more likely to be able to finance and complete the transaction – especially in light of the the Company's experience with Petroflow and the bankruptcy proceedings in connection with the Farmout Agreement.

91.    On October 6, 2013, Equal and Petroflow entered into a 60 day exclusivity period (ending December 5, 2013).

92.    On December 6, 2013, the Board approved the Arrangement Agreement and Proposed Acquisition.

- 27 -

909164_2

**The Proposed Acquisition**

93.    On December 9, 2013, Equal issued a press release announcing the

Proposed Acquisition.  The press release stated:

### Equal Energy Enters Definitive Agreement to Be Acquired by Petroflow Energy

. . . Equal Energy Ltd. ("Equal" or the "Company") is pleased to announce that the Company has entered into a definitive agreement ("Arrangement Agreement") with Petroflow Energy Corporation and Petroflow Canada Acquisition Corp. (collectively defined as "Petroflow") for the cash purchase of all of the issued and outstanding common shares of Equal at a price of US$5.43 per share, on a fully-diluted basis.  The total transaction value, including net debt and transaction costs, is approximately US$230 million.  The transaction received unanimous approval by Equal's board of directors and will be completed by way of a plan of arrangement under the Business Corporations Act (Alberta) (the "Arrangement").

The US$5.43 per share offered represents a 56% premium to the US$3.49 closing price on March 22, 2013, the trading day prior to the Company's announcement that it was pursuing a strategic alternatives process.  The consideration is also a 23% premium to the US$4.43 closing price on November 18, 2013, the trading day prior to Equal's announcement that the strategic alternatives process successfully resulted in exclusive negotiations for a proposed transaction.

Equal's board of directors, with input from the Company's advisors and management team, unanimously determined that the Arrangement with Petroflow is in the best interest of the Company's shareholders. In light of this determination, the Board has resolved to recommend that its shareholders vote their shares in favor of the Arrangement.  All members of management of the Company and its board of directors have indicated their intention to vote their shares in favor of the Arrangement.

The Arrangement must be approved by a vote of 66 2/3% of the votes cast by shareholders at a special meeting.

As per the Arrangement Agreement and subject to certain fiduciary exceptions, the Company has agreed that it will not solicit

909164_2

or initiate discussions with respect to any other business combination or sale of material assets. In the Arrangement Agreement, Equal also made customary representations, warranties and covenants to Petroflow.

Pursuant to the Arrangement Agreement, a termination fee of US$2 million will be payable by the Company in certain circumstances. These circumstances include if the Company terminates the Arrangement Agreement to enter into an agreement with a party other than Petroflow, in response to a superior proposal, or if the board of directors of the Company withdraws or modifies its recommendation in favor of the Arrangement with Petroflow. Alternatively, a termination fee of US$2 million will be payable to the Company if Petroflow is unable to complete the Arrangement.

Following the effective date of the Arrangement, Petroflow will make an offer to purchase Equal's entire outstanding CAD $45 million of convertible debentures within 30 days. In accordance with the terms of the indenture, cash consideration equal to 101% of the face value, plus accrued and unpaid interest, will be offered to holders of the convertible debentures.

Global Hunter Securities acted as the primary financial advisor to Equal in connection with the strategic alternatives process. Scotia Waterous also provided certain advisory services to Equal. Stikeman Elliott LLP and Dorsey & Whitney LLP acted as Canadian and US legal counsel, respectively, to the Company.

GMP Securities LLC and Kinetic Advisors LLC acted as financial advisors to Petroflow. Kirkland & Ellis LLP and McMillan LLP acted as US and Canadian legal counsel, respectively, to Petroflow.

94. As discussed above, the Proposed Acquisition was driven by and was the result of an unfair process contrary to the best interests of the Company's shareholders.

95. Also as discussed above, the Proposed Acquisition was also tainted by the conflicts of interest faced by the Company's management and Board who had self-interested reasons in pushing the transaction through. The Company's

909164_2

officers and directors were additionally motivated to secure monetization for their illiquid equity holdings in the Company, and to secure other change-in-control benefits that was only available to them if the Company was acquired by a third-party. If the Proposed Acquisition closes, members of the Board and Company management will receive over $12 million in financial benefits. Defendant Klapko stands to receive $3.4 million as a "golden parachute" compensation upon the completion of the Proposed Acquisition.

96.    These financial benefits are not shared by the Company's non-insider public stockholders. Thus, Board members are conflicted and putting ahead their own financial interests rather than those of Equal's other shareholders. Because defendants dominate and control the business and corporate affairs of Equal and are in possession of private corporate information concerning the Company's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Equal, which makes it inherently unfair for them to favor their own personal interests to the exclusion of maximizing stockholder value.

97.    If the Proposed Acquisition is completed, Equal will then become an indirect wholly owned subsidiary of Petroflow and its public shareholders will lose all equity interest in the Company and the opportunity to share in Equal's future growth.

- 30 -

909164_2

98.    The Proposed Acquisition price of $5.43 per share, however, will not adequately compensate the Company's shareholders for their ownership interests in the Company.  The price drastically undervalues the Company.  The transaction will result in little to no premium for Equal shareholders, as Equal stock has recently traded above the sale price at $5.50 per share as recently as December 5, 2013 and traded at $4.89 per share on January 9, 2012.

99.    In addition, the Proposed Acquisition price fails to value Equal's growth potential.  For example, on November 7, 2013, the Company announced its financial and operational results for its third quarter of 2013, ended September 30, 2013.  Equal's revenues for the third quarter of 2013 totaled $16.6 million, *up 40%* from $11.9 million a year earlier. Commenting on these results, defendant Klapko, Equal's President and CEO said, "'Our drilling continues to deliver higher than budgeted reserves and production at an attractive cost. . . .  Having averaged over 6,700 barrels for the third quarter, we are confident we will exceed our target production of 6,400 boe/d on average for the full year 2013.'" In addition, during the third quarter of 2013, Equal drilled three Hunton wells with a *100% success rate*.

100.  Defendants timed the announcement of the Proposed Acquisition to occur before the December financials and reserve reports in order to ensure that the Company's stock price would be tethered around the Proposed Acquisition price and defendants would be able to consummate the transaction at the unfair $5.43 price.  With the Proposed Acquisition, Petroflow – and not

- 31 -

the Company's current shareholders – will get the benefit of the Company's

prospects and growth.

101.  A number of the Company's shareholders have indicated that the

Proposed Acquisition is wholly inadequate, including as to price.

102.  A December 6, 2013 press release issued by Montclair stated:

### Montclair Energy Notes Deficiencies of Equal Energy Ltd. Sale Agreement with PetroFlow

. . . Montclair Energy, LLC ("Montclair") today expressed its concerns about the terms of the December 6, 2013 Arrangement Agreement entered into by Equal Energy Ltd. (NYSE: EQU; TSX: EQU) ("Equal Energy" or the "Company") and PetroFlow Energy Corporation ("PetroFlow") providing for the acquisition of Equal Energy by a subsidiary of PetroFlow pursuant to a plan of arrangement at a price of US$5.43 per common share. Collectively, the principals of Montclair hold approximately 5% of Equal Energy's common shares.

Montclair and its principals view the PetroFlow transaction as wholly inadequate on numerous grounds, including value, the uncertainty of financing and process.  Montclair agrees with the analysis of Lawndale Capital Management in its December 10, 2013 press release which noted, with improved operational efficiency, the Company could afford increased borrowings to fund a sizable stock buyback and generate a higher sustainable dividend, creating more value for shareholders than the $5.43 per share proposed in the PetroFlow transaction.

Chip Hazelrig, a principal of Montclair, stated, "As long suffering shareholders of Equal Energy, we have for some time recognized that the market has undervalued the Company. However, we know that our fellow shareholders are patient investors who are willing to support changes that will restore the value of the Company's shares and give them the opportunity to realize the full potential value of their investment. ***Shareholders should not have to sell out in a transaction that undervalues the Company***.  Like Lawndale, we are prepared to reject the PetroFlow transaction in favor of restoring more astute managers

- 32 -

who can maximize the value of the Company's Hunton properties and take the right steps with the Company's balance sheet."

Montclair expressed an interest in acquiring Equal Energy in February, 2013.  Montclair's expression of interest followed the conclusion of the strategic review process carried out by the Equal Energy Board in 2012 that had failed to result in a sale transaction for the Company.  Most of the Company's assets are in the Hunton formation of Oklahoma (which constitute the principal assets of the Company) were initially explored, owned and operated by Montclair's principals through their former company Altex Resources Inc.  Following the conclusion of the 2012 strategic review, Montclair recognized that existing management was not effectively operating the Company's assets and that there was considerable room for the creation of value by taking the Company private.  These efforts to acquire the Company, were rejected by the Board and in addition, some Equal Energy shareholders, including Lawndale, expressed their view that Montclair's proposed offer price undervalued the Company.

Montclair notes the following deficiencies in the PetroFlow transaction:

**Undervaluing the Company**:  The price of US$5.43 would deprive shareholders of significant inherent value in their shares that could be realized through proper management.  Montclair believes that the better alternative for Equal Energy shareholders is to replace the current board of directors and management of the Company with directors and managers who have proven records of operating in the Hunton formation profitably and efficiently and giving such directors a mandate to take the steps necessary with respect to the Company's balance sheet to enhance shareholder value.  Such steps could include a substantial share buy-back that could be financed through modest increased borrowings and which would allow for a sustainable increase to the Company's dividend while still meeting the higher debt service payments.

**Cancellation of Dividends**:  The Arrangement Agreement provides for the cancellation of all undeclared dividends prior to closing.  This means that shareholders will not receive the value of the dividends that they would otherwise receive in the first and potentially second quarter of 2014, in effect subsidizing the acquisition cost for PetroFlow.

**Highly Conditional on Financing**:   The PetroFlow transaction is subject to a very high level of uncertainty with respect to the ability of PetroFlow to finance the transaction.  The Arrangement Agreement requires only that PetroFlow use "commercially reasonable efforts" to obtain financing for the transaction.   Should those efforts prove to be unsuccessful, PetroFlow has no obligation to close and would suffer no penalty (contrary to the Company's suggestion otherwise in its December 9, 2013 press release).  Moreover, PetroFlow (a private company whose financial resources are unknown) has made no representation regarding its own financial resources or the amount of equity that it will commit to the acquisition.  In Montclair's experience, this is a negligible commitment to the transaction.  This is particularly disappointing in light of PetroFlow's history as a corporate entity that only emerged from bankruptcy proceedings in late 2011.

Given the difficulty that Equal Energy would have in proving that PetroFlow had not used commercially reasonable efforts to obtain financing, the Equal Energy Board has effectively granted PetroFlow a free six-month option to acquire the Company.  The highly conditional nature of the PetroFlow transaction is important information that was not disclosed in the Company's December 9th press release.

**Preclusive Exclusivity Provisions**:   The Arrangement Agreement unduly restricts Equal Energy from seeking superior offers.  Such restrictions are inappropriate given the conditional nature of PetroFlow's obligations.  Moreover, although PetroFlow would be able to walk from the transaction without penalty if it is unable to obtain the necessary financing, Equal Energy is required to pay a US$2 million break-up fee to PetroFlow if the Company accepts a better offer.

**Timing of Transaction**:  After an extremely long strategic review process that followed a failure to sell the Company in 2012, the Company has given PetroFlow more than six months to complete the acquisition.  This length of time cannot be justified on the basis of regulatory approvals.  The length of time allowed for the completion of the transaction could result in further erosion to the consideration that shareholders will receive for their shares.

**Convertible Debentures**:   The Company's convertible debentureholders should be particularly concerned about the ability of PetroFlow to finance the required follow-on offer for their

- 34 -

debentures.  Such offer would only be made after the closing of the acquisition of the common shares by PetroFlow.  This leaves convertible debentureholders at the risk that PetroFlow will be unable to finance the follow-on offer.  Moreover, the obligation to make the follow-on offer will be an obligation of a subsidiary of PetroFlow and not PetroFlow itself.

**Insider Participation and Enrichment**:  In light of the long standing relationships between PetroFlow, its former subsidiary North American Petroleum Corporation USA (NAPCUS) and the Company and its predecessor Enterra Energy Trust, Montclair believes that Equal Energy must provide greater transparency into the process that resulted in the PetroFlow transaction to assure shareholders that the transaction was negotiated on an arm's length basis.  The Company has not yet disclosed to shareholders to what extent existing management will have an ongoing role or receive collateral benefits in connection with PetroFlow's acquisition.  In addition, Montclair is concerned that the PetroFlow transaction presents management with an opportunity to realize a quick profit from the acceleration of options and opportunistic share purchases and grants.   In particular, Montclair notes that following its February 27, 2013 offer to acquire the Company, but prior to any public disclosure of its offer which did not occur until March 25, 2013, the Company granted 153,090 restricted shares to Don Klapko, the Company's Chief Executive Officer, all of which will vest in connection with the closing of the PetroFlow transaction.  At the time of the grant the price of the Company's common shares traded at a significant discount to the price offered by Montclair and the proposed acquisition price in the PetroFlow transaction.

### ADDITIONAL INFORMATION

Montclair may decide to nominate a slate of independent directors that would exercise their independent judgement and duties as directors of Equal Energy and consider all alternatives to the PetroFlow transaction that would maximize value for the shareholders.  If so, Montclair would file a proxy statement with the U.S. Securities and Exchange Commission ("SEC").  Any definitive proxy statement will also be mailed to stockholders of Equal Energy.   Additional information regarding the interests of these participants in the proxy solicitation and a description of their direct and indirect interests, by security holdings or otherwise, would then also be included in any proxy statement and other relevant

909164_2

materials to be filed with the SEC when they become available. INVESTORS AND SECURITY HOLDERS OF EQUAL ENERGY ARE URGED TO READ THESE AND OTHER DOCUMENTS FILED WITH THE SEC CAREFULLY IN THEIR ENTIRETY IF AND WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT ANY PROPOSED NOMINEES. Investors and security holders will be able to obtain free copies of these documents (if and when available) and other documents filed with the SEC by Montclair through the web site maintained by the SEC at http://www.sec.gov.

## CERTAIN INFORMATION REGARDING PARTICIPANTS

Montclair, W. Cobb (Chip) Hazelrig and Frederick G. Wedell may be deemed to be participants in any proxy solicitations that may be made by Montclair. Mr. Hazelrig and Mr. Wedell own 100% of the equity interests in Montclair. Collectively Mr. Hazelrig and Mr. Wedell are the beneficial owners of approximately 5% of the outstanding common shares of Equal Energy.

103.       A December 10, 2013 press release issued by Lawndale stated:

**Lawndale Capital Management Expresses Concerns Over Equal Energy Sale Agreement**

Lawndale Capital Management, LLC and its affiliate funds ("Lawndale") own more than 1.7 million shares, or more than 4.8%, of the outstanding shares of Equal Energy, Ltd. (N-EQU) ("Equal" or the "Company,"), making Lawndale one of Equal's largest shareholders. Lawndale has reviewed the December 9, 2013 press release issued by Equal, announcing that the Company had entered into a definitive agreement to be acquired by Petroflow at a price of $5.43/share.

Lawndale feels a synergistic buyer should be able to easily grow Equal's cash flow. This higher cash flow should safely support modest increased borrowings that could fund a sizable stock buyback, a higher sustainable dividend on the lower share count and still be able to support substantial production and reserves growth. The resulting distribution combined with the remaining higher yielding Equal shares should combine in value to more than Petroflow's $5.43/share.

- 36 -

Lawndale's analysis notes that the proposed transaction is all-cash, squeezing out public shareholders from all benefits of Equal's future growth and value creation from its vast and valuable reserves and growing production streams. Lawndale also notes that Petroflow is a former operating partner of Equal's Oklahoma assets and the Company's current management. When such dangerous combinations occur Lawndale's policy is to request more thorough disclosure and apply greater scrutiny of the alternatives process for any value being transferred from Equal Energy shareholders to the buying group for which shareholders are not being compensated.

Equal's December 9 press release emphasizes the "fairness" of the transaction price and no longer discusses the company's bright economic prospects in light of substantial increases in industry propane prices and export capacity and Equal's own reserves and production outlook.

Andrew Shapiro, President of Lawndale, stated, "Proponents of transactions often try to argue the strength or 'fairness' of their bid by highlighting a purported 'premium' they are offering to pre-offer 'trading' prices. Price premium to historical trading is the weakest and most flawed measure of 'fairness.' Especially in small companies, pre-bid trading takes place in an inefficient vacuum, without any expectation of a definitive transaction or even a sleepy board and management being woken up. Thus, such 'trading' levels are very poor proxy to base an appropriate premium for transfer of a company's control."

Shapiro added, "We think better measures for fair takeover and change of control value are tested against net present value of discounted cash flows and/or valuation multiples to assets or prospective cash flows. Courts in appraisal actions take a similar view."

Lawndale's policy is to view any so-called "deal protections," which impede higher and better offers providing greater value to Equal shareholders, with great suspicion. This is especially so when there is legacy management continuation or sizable severance payouts. "No-shop" clauses and "break-up" fees are examples of such deal protections that may not serve selling shareholders well and require great scrutiny.

Shapiro said, "Instead of focusing on price 'premiums,' we believe Equal's disclosure to shareholders, should have, and must, in the near future, detail the scope and extent of the bidding process

along with Equal's reserves and production forecast provided to Petroflow. Furthermore, Equal needs to provide to its shareholders, all the strategic alternatives considered and not considered, along with rationale for their rejection. Finally, Equal should broadly disseminate how any interested alternative bidders may 'top' the agreed purchase price, rather than highlighting the impediments for such a superior bid that would provide greater value."

**The Deal Protection Devices**

104. Defendants implemented and agreed to a number of draconian deal protection devices to guarantee that Petroflow will not lose its preferred position. These devices, discussed below, operate together to ensure that no competing offers to acquire the Company will emerge in the period between the announcement and closing of the Proposed Acquisition.

105. First, in connection with the Proposed Acquisition, the Company and Petroflow entered into the Lock-Up Agreement with the directors and officers of Equal. Under the Lock-Up Agreement, the directors and officers of Equal agreed, among other things, to vote their Equal holdings (i) in favor of the adoption of the Arrangement Agreement and approval of the Proposed Acquisition and the other transactions contemplated by the Arrangement Agreement, and (ii) against any alternative proposals to acquire Equal.

106. Second, defendants included several deal protection devices in the Arrangement Agreement designed to strongly discourage competing bidders.

107. Section 6.1 of the Arrangement Agreement, for example, contains a strict no-shop clause that prohibits Equal from providing confidential Company information to, communicating with, or otherwise seeking a superior offer for its

- 38 -

shareholders from, any potentially interested third-party bidder.  Section 6.1 states:

**Non-Solicitation**

(a)    Except as otherwise provided in this Article 6, the Company shall not, directly or indirectly through any Representative of the Company, and shall cause each of its Subsidiaries not to, directly or indirectly through any Representative:

(i)    make, solicit, assist, encourage, initiate, promote or otherwise facilitate (including by way of furnishing non-public information, permitting any visit to any facilities or properties of the Company or any of its Subsidiaries or entering into any form of written or oral agreement, arrangement or understanding) any inquiries, proposals, offers or expressions of interest regarding or constituting any Acquisition Proposal or which could reasonably be expected to lead to an Acquisition Proposal;

(ii)    encourage or engage in any discussions or negotiations (other than with the Parent, the Acquiror or any of their respective Representatives) regarding, or provide any information with respect to, any Acquisition Proposal or potential Acquisition Proposal;

(iii)    make a Change in Recommendation;

(iv)    withdraw, modify, change or qualify (or publicly propose to or publicly state that it intends to withdraw, modify or qualify), in any manner adverse to the Parent or the Acquiror, the approval or recommendation of the Board or any committee thereof of this Agreement or the Arrangement, including, without limitation, failing to include in the Circular such approval or recommendation in accordance with Section 2.4(c);

(v)    release any Person from, terminate, waive, amend or modify any provision of or otherwise forbear the enforcement of, any confidentiality or standstill agreement to which it or any of its Subsidiaries is a party, provided that, for avoidance of doubt, any release or deemed waiver from the standstill provisions of any such agreement in accordance with its terms without further agreement or action by the Company or any of its Subsidiaries shall not constitute a breach of this Section 6.1(a)(v); or

909164_2

(vi)   accept, approve, endorse, recommend or enter into a letter of intent, agreement in principle, agreement, arrangement, understanding or undertaking related to any Acquisition Proposal (other than a confidentiality agreement as contemplated under Section 6.3).

(c)   The Company shall immediately cease, and ensure that its Representatives cease, and cause to be terminated, any existing solicitation, assistance, activity, discussion, encouragement, process or negotiation, with any Person (other than the Parent, the Acquiror or any of their Representatives) by the Company, any of its Subsidiaries or any of their respective Representatives with respect to or that could reasonably be expected to lead to an actual or potential Acquisition Proposal, whether or not initiated by the Company, and, in connection therewith, the Company will discontinue access to any data rooms (virtual and otherwise) previously provided to any such Person and will immediately request the return or destruction of all information regarding the Company and its Subsidiaries previously provided to any such Person and shall use commercially reasonable efforts to ensure that such requests are honored.

The Company shall enforce the provisions of any confidentiality and standstill agreement to which it or any of its Subsidiaries is a party, including by seeking injunctions to prevent any such breaches and to enforce specifically the terms and provisions thereof.

108.   Though section 6.3 of the Arrangement Agreement contains a purported "fiduciary out" provision which allows the Company to negotiate with other bidders in certain circumstances, this provision is entirely illusory. Indeed, for the Company to negotiate with other suitors following the execution of the Arrangement Agreement, those suitors would have had to first submit an entirely unsolicited offer that was "superior" on its face to the Acquisition. And defendants have agreed to define "superior proposal" in such a restrictive way in order to make it virtually impossible for any competing offer to be considered one. For instance the "superior proposal" cannot be conditioned on due

diligence or on financing and the Board **must** conclude that failure to accept the

proposal as "superior" would be inconsistent with their fiduciary duties:

"Superior Proposal" means a bona fide Acquisition Proposal made by any Person other than the Parent or the Acquiror that:

(a)    is made in writing to the Board after the date hereof;

(b)    did not result from the breach of Section 6.1 by the Company, any of its Affiliates or any of their respective Representatives;

(c)    is made for all or substantially all of the assets of the Company and its Subsidiaries or all of the Common Shares, on a fully-diluted basis, and Convertible Debentures not owned by the Person making such Acquisition Proposal;

(d)    is reasonably likely to be completed on a timely basis after taking into account all the terms and conditions of such proposal and this Agreement (including any required approvals and any proposal by either party to amend the terms of this Agreement);

(e)    is **not subject to a due diligence condition**;

(f)    in the good faith determination of the Board, after receipt of advice from its financial and legal advisors:

(i)    **failure to recommend to its Shareholders that they accept such Acquisition Proposal would be inconsistent with the Board's fiduciary duties; and**

(ii)    would, if consummated in accordance with its terms (but expressly taking into account any risk of non-completion), result in a transaction that provides for greater consideration per Common Share and would be more favorable to the Shareholders, from a financial point of view, than the Arrangement; and

(g)    is **not conditional on obtaining financing**, and for which financing is then available to the Person making such Acquisition Proposal, and is committed, at least to the extent that the financing for the transactions contemplated by this Agreement is so available and committed as at the date hereof;

109. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

110. Moreover, other provisions further protect against the possibility of a competing bidder submitting an unsolicited superior offer to acquire the Company.

111. Section 6.3 (a)(vi) of the Arrangement Agreement severely limits the time that any company making a superior proposal has to finalize the transaction terms: "access to information with respect to the Company and its Subsidiaries in respect of one or more Acquisition Proposals made by that Person or persons acting jointly or in concert with such Person shall not continue for a period in excess of thirty days in the aggregate."

112. Section 6.3(b) of the Arrangement Agreement conveys to Petroflow "information" and "matching rights" pursuant to which the Company provide all material information and terms concerning any competing offer it receives and all documents regarding the Company's valuation of the offer to Petroflow and Petroflow receives at least five business days to match (without having to beat) the offer.

113. Section 10.2 of the Arrangement Agreement further obligations the Company to pay Petroflow a $2 million "termination fee" in the event that the

- 42 -

909164_2

Acquisition is terminated in favor of a superior proposal received by the Company.

114. The onerous and preclusive deal protection devices operate conjunctively to make the Proposed Acquisition a fait accompli and ensure that no competing offers will emerge for the Company. The Lock Up Agreement and the deal protection provisions in the Arrangement Agreement effectively preclude any other potential bidders from consummating a better offer for the Company, and make even more egregious the Board's utter failure to obtain the best price possible for shareholders before agreeing to the Proposed Acquisition.

**The Preliminary Proxy**

115. In order to secure shareholder approval of the unfair Proposed Acquisition, defendants filed the false and materially misleading Preliminary Proxy. The Preliminary Proxy, which recommends that Equal shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information necessary for the Company's shareholders to make an informed decision on the Proposed Acquisition, as set forth below, in contravention of §§14(a) and 20(a) of the 1934 Act and/or defendants' duty of candor and full disclosure under state law.

116. ***Strategic alternatives***. The Preliminary Proxy states on page 12:

> The Arrangement is the culmination of a strategic review process which was initiated when Montclair Energy, LLC . . . made an unsolicited proposal to acquire Equal on February 27, 2013 for USD$4.00 per Equal Share. Equal formed the Special Committee of

909164_2

three independent directors to consider a full range of strategic alternatives, including continuing as a going concern, a corporate sale and return of capital to shareholders through share buybacks and dividends, in order to maximize shareholder value.

117.  The Preliminary Proxy also states on page 32:

On May 3, 2012, Equal announced that its Board had initiated a strategic review process to identify, examine and consider alternatives with the view to enhancing shareholder value. The Board indicated that strategic alternatives could include, but were not limited to, the sale of all or a portion of Equal's assets, the outright sale of the corporation, a merger or other business combination, a recapitalization, acquisitions, as well as continued execution of its business plan, or any combination thereof.

118.  The Preliminary Proxy also states on page 33:

The Board acknowledged at the end of the 2012 strategic review that it had given serious consideration to other corporate structures, such as a U.S. MLP and a Canadian trust, but based on its views and expert advice on market and commodity price conditions at the time and certain tax implications to a significant portion of its shareholder base it deemed such structures not to be prudent steps for Equal at that time.

119.  The Preliminary Proxy also states on page 35:

On June 7, 2013, the Board met to discuss the proposal relating to a transaction with Company B and get an update from the Special Committee and GHS on the status of the strategic process and go-forward alternatives. After extensive discussions the Board resolved that the proposal required further study and directed Equal management and advisors to continue with diligence, but not proceed with further negotiation of a definitive agreement at that time.

120.  The Preliminary Proxy also states on page 41:

**Reasons for the Recommendation of our Board and Special Committee**

In evaluating the Arrangement and the transactions contemplated thereby, our Board and Special Committee considered and evaluated a number of factors, including:

909164_2

- • Review of Strategic Alternatives. The belief of the Board and Special Committee, after consultation with Equal's financial and legal advisors and management, and after review of the other strategic opportunities reasonably available to Equal, including continuing to operate as an independent company, a management buyout, capital acceleration, a corporate sale, an increased return of capital to shareholders by a dividend distribution or share buyback, a foreign asset income trust and a master limited partnership, in each case taking into account the potential benefits, risks and uncertainties associated with those other opportunities (including the risks associated with future investments in our oil and gas exploration and production business), that the Arrangement represents Equal's best and most certain prospect for maximizing shareholder value in a volatile and unpredictable financial and economic environment.

- • Prospects of Equal. The Board's and Special Committee's assessment of the current and anticipated future opportunities and risks associated with the business, operations, assets, financial performance and condition of Equal should it continue without entering into the Arrangement.

121. In the above context, the Preliminary Proxy fails to disclose the value(s) of strategic alternatives in comparison with the Proposed Acquisition and the nature and extent of the Board's understanding of these values.

122. The omission of this information is material because without it, shareholders could not assess: (i) the information that supports the viability of strategic alternatives more valuable than the Proposed Acquisition; (ii) the extent of the Board's involvement in and knowledge of material decisions during the sales process; and (iii) the extent of the Board's efforts in securing the best price possible for the Company's shares and/or acting in the shareholders' best interests.

- 45 -

123. The omission of this information renders the statements identified in ¶¶115-119 misleading because without the omitted information, the statements create the misleading impression that the Board made a fully informed decision that the Proposed Acquisition was a better deal for the Company's shareholders than other strategic alternatives, and that the Board carefully considered strategic alternatives, including the value of these strategic alternatives in comparison with the Proposed Acquisition, before and in connection with making their recommendation to the Company's shareholders that the Proposed Acquisition is in the best interests of the Company and its shareholders. As set forth herein, the Board did neither of these things.

124. **2012 Process.** The Preliminary Proxy states on page 32 that the Board formed a "special committee" in April 2012 and "initiated a strategic review process." The Preliminary Proxy states on page 32:

> As part of the 2012 strategic process, 1988 parties received the "teaser" via email and of those parties 166 were contacted in person by Scotiabank, including Petroflow. A total of 69 parties, including Petroflow, entered into confidentiality agreements, 26 were U.S.-based companies that were interested in Equal's U.S. assets. Equal and Scotiabank conducted 62 formal presentations or "face-to-face" meetings with interested parties prior to the first bid date which was August 8, 2012. In the first round of bids, Equal received 21 proposals five of which were for all of Equal's U.S. assets and one additional bid on the Hunton assets only. Following the first round of bids, Scotiabank went back to certain interested parties that had initially made competitive bids and indicated that their offers should be revised and resubmitted by August 22, 2012. On August 22, 2012, Equal received nine proposals with one being for the Hunton assets only and one being for certain assets that Equal held in Northern Oklahoma. The remaining bids were in relation to Canadian assets that Equal had at the time. Following this second round of bids, Equal and its advisors began working on

909164_2

closing the bid in relation to the Northern Oklahoma assets and another transaction for certain Canadian assets. Scotiabank also went back to certain parties that had made competitive bids or expressed further interest regarding certain assets and requested that such parties resubmit bids on such assets by October 12, 2012. On that date, Equal received a total of ten bids, four of which related to the Lochend Cardium assets and six of which related to Canadian royalties and fee title lands. Negotiations relating to the sale of the Lochend Cardium assets were commenced at this stage and certain parties that had bid on the Canadian royalties were asked to resubmit bids by November 14, 2012.

125. The Preliminary Proxy also states on page 33:

> During the 2012 strategic process, the Board had received significant interest on the Central Oklahoma Hunton assets culminating in four separate proposals on such assets. One party had a superior offer and entered into negotiations with Equal regarding the potential sale of such assets, but the Board ultimately made the decision to retain the assets and build Equal around those assets on a go-forward basis.

126. In the above context, the Preliminary Proxy fails to disclose: (i) the nature, membership and authority of the 2012 Special Committee; and (ii) the terms and value(s) of the proposals received during the 2012 Process regarding the assets not sold during the 2012 Process, including the Hunton property, the nature and extent of the Board's understanding of these values, and the basis for rejecting any proposals or attempts at discussion.

127. The omission of this information is material because without it, shareholders are unable to assess: (i)  the inadequacy of the Proposed Acquisition consideration; (ii) the likelihood of a better deal for shareholders than the Proposed Acquisition; (iii) the extent of the Board's involvement in and knowledge of material decisions during the sales process; and (iv) the extent of

the Board's efforts in securing the best price possible for the Company's shares and/or acting in the shareholders' best interests.

128.   The omission of this information renders the following statements in the Preliminary Proxy misleading: (i) the statements identified in ¶¶123-124; and (ii) the statements in the Preliminary Proxy that the Board "after careful consideration" determined that the Arrangement Agreement and the Proposed Acquisition to be in the "best interests" of the Company and the Proposed Acquisition consideration to be "fair" to the Company's shareholders (on pages 5-6, 13, 22, 40-41).  Without the omitted information, these statements create the misleading impression that the Board actively pursued a sales process tailored to secure the best deal and that the Proposed Acquisition consideration is the result of a competitive bidding process.  As set forth herein, the Board pursued a rushed and tilted sales process for self-interested reasons without adequate consideration of the merits of the transaction and the unfair Proposed Acquisition consideration is the result of that flawed process.

129.   *2013 Process.*  The Preliminary Proxy states on page 33:

> On January 31, 2013, Equal received a proposal from an interested party ("Company A") relating to a potential business combination. The Board and management of Equal reviewed the proposal and decided that it was inadequate and, as such, on February 11, 2013, Equal indicated to Company A that it was not interested in pursuing further negotiations.

130.   The Preliminary Proxy also states on page 34:

> Following the public nature of the announcement by Montclair, Equal received increased interest from a number of parties and between March 26 and March 27, 2013, engaged in

- 48 -

discussions with Montclair and its advisors as well as six other parties that had approached Equal and expressed interest about potential transactions and/or business combinations.

131.  The Preliminary Proxy also states on page 34:

On April 9, 2013, Equal established a virtual data room with information and GHS identified and began contacting an additional 12 potential interested parties, some of whom had participated in the 2012 strategic review process in relation to the Hunton assets and had previously expressed interest in such assets.

132.  The Preliminary Proxy also states on page 34:

Following contact by GHS, in the last half of April 2013, an additional seven parties, including Montclair, entered into confidentiality agreements with Equal and gained access to the data room.

133.  The Preliminary Proxy also states on page 34:

On April 23, 2013, Equal received a revised non-binding proposal from Company A. Company A requested to make a presentation to the Special Committee, GHS and Equal management to outline the merits of its proposal. After review by the Special Committee, Equal management and GHS, Equal's Board decided that the proposal remained unacceptable in its current form. Equal communicated this to representatives from Company A and indicated that representatives from Equal were not prepared to meet until a more reasonable proposal was put forward.

134.  The Preliminary Proxy also states on page 34-35:

On May 1, 2013, Equal received an indication of interest from one of the party's involved in the process ("Company B"). The Special Committee met on May 7, 2013 to further discuss the proposal from Company B and assess various financial modeling scenarios that were prepared by GHS. The Special Committee, after discussing the matter with Equal management and GHS decided that while the proposal from Company B had certain aspects that were not acceptable to Equal there were certain aspects of such proposal that were compelling. Following the meeting, GHS indicated to the financial advisors for Company B that Equal and its representatives were working on a counter-proposal. GHS and Equal management conducted extensive financial modeling and due

- 49 -

diligence on potential transaction structures with Company B over the next three weeks and maintained a constant dialogue with representatives from Company B.

On May 27, 2013, the Special Committee met with Equal management, GHS and its legal advisors to discuss the counter-proposal and get an update on other parties involved in the strategic process. Following extensive discussion among the attendees in that meeting the Special Committee approved a counter-proposal to be presented to Company B. Equal forwarded a counter-proposal to representatives from Company B later on May 27, 2013. Representatives from Company B responded on May 28, 2013 and noted that a number of the changes proposed in the counter-proposal from Equal were acceptable, but there were some aspects of the counter-proposal that needed to be revised to be acceptable to Company B. On May 28, 2013, Company B provided two further alternatives to the counter-proposal and asked Equal to respond as soon as possible. Between May 28 and May 31, GHS held numerous teleconferences with the financial advisors of Company B to clarify certain aspects of the two options in the revised proposal presented by Company B.   GHS worked on revising the financial models in relation to the options outlined in the revised proposal as well as various other go-forward scenarios for Equal.

On June 1, 2013, the Special Committee met with Equal management, GHS and its legal advisors to discuss the revised proposal from Company B, the go-forward scenarios, the status of other interested parties participating in the process and the timing of the strategic process. The Special Committee concluded that the revised proposal from Company B still had certain provisions that were unacceptable to Equal, but the Special Committee instructed representatives from Equal's management and GHS to engage in discussions with Company B as soon as possible to determine if the parties could come to an acceptable arrangement and execute a letter of intent. On June 3, 2013, Mr. Klapko had a direct negotiation with the Chief Executive Officer from Company B and the parties agreed upon the general terms and conditions of a transaction and noted that such transactions would be subject to, among other things, a comprehensive due diligence review and tax structuring. Mr. Klapko further noted that the terms agreed upon needed to be reviewed and approved by the Special Committee and the Board prior to signing any letter of intent. On June 4, 2013, the Special Committee met to discuss the proposal and the status of

909164_2

the process in general. On June 7, 2013, the Board met to discuss the proposal relating to a transaction with Company B and get an update from the Special Committee and GHS on the status of the strategic process and go-forward alternatives. After extensive discussions the Board resolved that the proposal required further study and directed Equal management and advisors to continue with diligence, but not proceed with further negotiation of a definitive agreement at that time. Following the meeting of the Board, GHS and Equal management contacted representatives from Company B to outline the determinations of the Board. Representatives of the two parties maintained constant contact over the next week. On June 12, 2013, the Special Committee met with GHS, Equal management and legal advisors and discussed the terms of a potential proposal with Company B that would be acceptable to Equal. On June 13, 2013, Mr. Klapko and the Chief Executive Officer for Company B discussed various deal terms and Mr. Klapko outlined the views of the Special Committee. Later that day, Company B sent Equal a revised indication of interest and requested a response by June 14, 2013. The Board met again with Equal management, GHS and its legal advisors on June 13, 2013, to discuss the latest proposal, being a USD$5.00 per Equal Share cash offer from Company B. The Board agreed that the revisions to the proposal were acceptable to Equal and that the indication of interest could be counter-signed by Equal. The proposal required that Equal negotiate exclusively with Company B for the next 45 days and work towards the execution of a definitive agreement within that time period. Later on June 14, 2013, Equal executed the indication of interest and entered into an exclusive negotiation with Company B. Following the execution of the indication of interest Equal engaged in no further contact with any other parties and on June 26, 2013, Equal sent correspondence to the five other parties that had executed confidentiality agreements informing them that access to the virtual data room was being revoked immediately. One party that was participating in the process contacted representatives of Equal for further clarity on the closure of the data room and were told that Equal could not comment further on the reasoning behind the closure of the data room.

135.  The Preliminary Proxy also states on page 36:

Also, on August 20, 2013, Equal delivered a letter to Company B indicating that it was terminating discussions and closing the data room to Company B.

136. The Preliminary Proxy also states on page 36:

On August 28, 2013, Equal forwarded letters to Montclair, Petroflow and two other parties that were still expressing some interest in a transaction with Equal outlining a specific set of guidelines for companies interested in submitting an expression of interest. Equal advised each of the four potential bidders that the framework was necessary given recent extensive, but non-conclusive discussions with various interested parties.

137. The Preliminary Proxy also states on page 36:

On September 24, 2013, Equal management and GHS gave a presentation to Petroflow management and its financial advisors which allowed Petroflow to verify diligence information and largely conclude its diligence.

138. The Preliminary Proxy also states on page 41, under "Reasons for the Recommendation of our Board and Special Committee":

Fair Value. The Board's and the Special Committee's belief that the Arrangement Consideration of USD$5.43 per Equal Share represents fair value for the Equal Shares, taking into account the Board's and the Special Committee's familiarity with our business, operations, prospects, business strategy, properties, assets, and financial condition, and the Board's and the Special Committee's belief that the Arrangement Consideration represents the highest consideration per Equal Share value obtainable on the date of signing the Arrangement Agreement.

139. In the above context, the Preliminary Proxy fails to disclose: (i) the terms and value(s) of all the proposals received by or sent by the Company in 2013, including those to and from Company A, Company B and the "number of parties" that expressed interest; (ii) the nature and extent of the Board's understanding of the proposals received by or sent by the Company in 2013 and the basis for rejections of any proposals; (iii) whether any company is currently under a standstill provision prohibiting it from taking certain actions in

connection with any potential competing bid; (iv) information necessary to assess whether any party was under the impression that additional discussions would ensue at the time the Company terminated discussions, including Company A and Company B; (v) information necessary to assess how many of the parties that approached or were approached Equal in 2013 were strategic versus financial buyers; (vi) whether all four parties that received August 28, 2013 letters from Equal had access to any non-public information earlier in the process, and the basis of the Board's decision to limit access to non-public information when the Company's internal information could have supported a higher offer from the parties; (vii) the basis of the decision to not give a management presentation to Montclair, when one was provided to Petroflow management; and (viii) a comparison of the due diligence made available and received by the potential parties in the 2013 process.

140.   The omission of the above information is material because without it, shareholders are unable to assess: (i) the likelihood of a better deal; (ii) the impact of the deal protection provisions in the Arrangement Agreement on the ability of other companies to submit a superior offer; (iii) the existence of additional impediments, beyond the deal protection provisions, that preclude companies from making a superior offer; (iv) the extent of the Board's involvement in and knowledge of material decisions during the sales process; (v) the extent of the Board's efforts in securing the best price possible for the Company's shares and/or acting in the shareholders' best interests; and (vi)

- 53 -

the extent of the Board's oppressive and bad faith conduct during the sales process.

141.  The omission of the above information renders the following statements in the Preliminary Proxy misleading: (i) the statements identified in ¶¶128-137; and (ii) the statements in the Preliminary Proxy that the Board "after careful consideration" determined that the Arrangement Agreement and the Proposed Acquisition to be in the "best interests" of the Company and the Proposed Acquisition consideration to be "fair" to the Company's shareholders (on pages 5-6, 13, 22, 40-41).   Without the omitted information, these statements create the misleading impression that the Board actively pursued a sales process tailored to secure the best deal, the Proposed Acquisition consideration is the result of a competitive bidding process, and the Proposed Acquisition is, in fact, the best deal possible for the Company and its shareholders.  As set forth herein, the Board pursued a rushed and tilted sales process for self-interested reasons without adequate consideration of the merits of the transaction, the Proposed Acquisition consideration is the result of that flawed process and the Proposed Acquisition consideration does not adequately compensate the Company's shareholders for their ownership of Equal.

142.  In addition to the above, the omission of the above information also renders the statement in the "Reasons for the Recommendation of our Board and Special Committee" on page 41 of the Preliminary Proxy misleading – that the Board considered: "Terms of Arrangement Agreement; Ability to Respond to

Unsolicited Proposals. The terms and conditions of the Arrangement Agreement, including our ability to consider and respond, under certain circumstances specified in the Arrangement Agreement, to an unsolicited proposal for a business combination from a third party prior to approval of the Arrangement Resolution by the Equal Shareholders, and the right of the Board after complying with the terms of the Arrangement Agreement to terminate the Arrangement Agreement in order to accept a superior proposal subject to payment of a termination payment of USD$2,000,000." Without the omitted information, this statement creates the misleading impression that the deal protection devices in the Arrangement Agreement are reasonable. As set forth herein, these deal protection provisions are not; the deal protection provisions improperly lock up an inadequately-priced deal that is result of an unfair sales process.

143. ***Favoritism towards Petroflow.*** The Preliminary Proxy states on page 31:

> On May 25, 2010, Petroflow announced that two of its wholly-owned subsidiaries had filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

144. The Preliminary Proxy also states on page 31-32:

> In June 2010, Petroflow took certain actions to prevent Equal from conducting its drilling program on its properties in the Oklahoma Hunton play that were related to the Farmout Agreement, which had a significant impact on the pace of the exploration and development activities of Equal on such properties. In July 2010, Petroflow and its Chapter 11 debtor affiliates filed a

- 55 -

complaint against Equal to, among other things, determine the parties' respective rights and obligations under the Farmout Agreement and certain other agreements and arrangements between the parties and to recover certain allegedly fraudulently transferred payments.

145.  The Preliminary Proxy also states on page 32:

In mid-February 2011, the Bankruptcy Court issued its findings of facts and conclusions of law and in early March 2011, an order memorializing those findings, which quantified certain material financial obligations owed by Equal to Petroflow.

146.  The Preliminary Proxy also states on page 37:

On September 30, 2013, the Special Committee met with Equal management, GHS and Equal's legal advisors to discuss the revised proposals from Montclair and Petroflow. The Special Committee indicated that it was of the view that while the price was identical in each of the bids, the Petroflow bid was slightly stronger on the basis of the non-financial terms and execution risk, including the reciprocal break fee and the treatment of holders of Convertible Debentures. Specifically, the break fee in the Petroflow bid was set at USD$2,000,000 and was reciprocal, while the break fee in the Montclair bid was set at USD$5,000,000 was payable only by Equal and was payable in the event that Equal should fail to close the transaction for certain reasons, including accepting a superior proposal from another party. Under Montclair's proposal, Montclair was not subject to any break fee, even for failure to obtain the financing necessary to close the transaction.

147.  The Preliminary Proxy also states on page 37-38:

The Board met on the evening of October 3, 2013, with Equal management, GHS and Equal's legal advisors to discuss the revised proposals and came to the conclusion that the offer from Petroflow was not only better on price, but again was stronger on the basis of the non-financial terms and execution risk. The Board indicated that it would like some minor revisions to the Petroflow offer, but generally were in agreement that the bid was acceptable. The Board also instructed GHS to inform Montclair that it was not the successful bidder. The Board agreed to meet on the evening of October 4, 2013, following discussions between GHS and

- 56 -

Petroflow's financial advisor regarding the proposed minor revisions to the Petroflow bid.

On October 4, 2013, GHS advised Montclair that it was not the successful bidder. GHS also discussed with Petroflow potential revisions to its proposal. Petroflow agreed to certain revisions and submitted a slightly revised offer. On the evening of October 4, 2013, the Board met with Equal management, GHS and Equal's legal advisors to discuss the revised proposal from Petroflow. The Board approved the revised offer, subject to some minor revisions being made.

On October 5, 2013, GHS advised Petroflow that the Board had approved the revised proposal subject to some minor revisions being made. Legal counsel to Petroflow provided comments on the revised proposal that reflected the revisions requested by the Board and Petroflow agreed to such revisions. On October 6, 2013, the final letter of intent was executed by Petroflow and Equal and the parties entered into a 60 day exclusivity period to work towards the execution of a definitive agreement and to allow Petroflow to conduct further due diligence.

148.  In the above context, the Preliminary Proxy fails to disclose: (i) the value(s) of Equal's claims against Petroflow in connection with the Farmout Agreement and the nature and extent of the Board's understanding of these values; and (ii) the nature and extent of the Board's understanding of the Petroflow's ability to finance the Proposed Acquisition in light of their history in connection with the Farmout Agreement.

149.  The omission of the above information is material because without it, shareholders are unable to assess: (i) the extent of the Board's favoritism towards Petroflow; (ii) the likelihood of a better deal, including a better offer from Montclair; (ii) the impact of the deal protection provisions in the Arrangement Agreement on the ability of other companies to submit a superior

- 57 -

offer, including the impact on Montclair; (iii) the extent of the Board's efforts in securing the best price possible for the Company's shares and/or acting in the shareholders' best interests; and (iv) the extent of the Board's oppressive and bad faith conduct during the sales process.

150.   The omission of the above information renders the following statements in the Preliminary Proxy misleading: (i) the statements identified in ¶¶142-146; and (ii) the statements in the Preliminary Proxy that the Board "after careful consideration" determined that the Arrangement Agreement and the Proposed Acquisition to be in the "best interests" of the Company and the Proposed Acquisition consideration to be "fair" to the Company's shareholders (on pages 5-6, 13, 22, 40-41).   Without the omitted information, these statements create the misleading impression that the Board gave adequate and fair opportunity to all potential bidders, and that there was good reason to agree to a 60-day exclusivity with Petroflow without seeking obtain a higher price from Montclair.  As set forth herein, the Board for self-interested reasons agreed to cut the sales process short – at the cost of maximizing shareholder value – and, in bad faith, failed to adequately consider whether Petroflow or Montclair was more likely to be able to finance and complete the transaction before agreeing to the Proposed Acquisition.

151.   In addition to the above, the omission of the above information also renders the statement in the "Reasons for the Recommendation of our Board and Special Committee" on page 41 of the Preliminary Proxy misleading – that

909164_2

the Board considered: "Terms of Arrangement Agreement; Ability to Respond to

Unsolicited Proposals. The terms and conditions of the Arrangement Agreement,

including our ability to consider and respond, under certain circumstances

specified in the Arrangement Agreement, to an unsolicited proposal for a

business combination from a third party prior to approval of the Arrangement

Resolution by the Equal Shareholders, and the right of the Board after

complying with the terms of the Arrangement Agreement to terminate the

Arrangement Agreement in order to accept a superior proposal subject to

payment of a termination payment of USD$2,000,000."  Without the omitted

information, this statement creates the misleading impression that the deal

protection devices in the Arrangement Agreement are reasonable.  As set forth

herein, these deal protection provisions are not, especially in light of the the

Board's failure to provide a level playing field for all potential bidders.

152. ***Conflicts of interest***.  The Preliminary Proxy states on page 15:

Q:    Do any Equal directors or executive officers have interests in
the Arrangement that may differ from those of Equal Shareholders
generally?

A:    Yes. Certain directors and executive officers of Equal may
have interests in the Arrangement that are different than those of
Equal Shareholders generally. Equal's Board and the Special
Committee were aware of and considered these interests, among
other matters, in evaluating and negotiating the Arrangement
Agreement and the Arrangement and recommending that the
Arrangement Resolution be approved by the Equal Shareholders.
See the section of the Circular entitled "Interests of our Directors
and Executive Officers in the Arrangement" beginning on page 71
and "Minority Approval" beginning on page 69 for a description of
those interests.

909164_2

153.  The Preliminary Proxy states on page 33:

Notwithstanding the success of the 2012 strategic review in transforming Equal's financial condition, upon conclusion of the review, a particular shareholder group, led by Mr. Nawar Alsaadi and Dr. Adam Goldstein publicly disagreed with the outcome. The shareholder group demanded Equal engage in certain transactions that would return a significant amount of cash to then current shareholders, but would also significantly increase the debt levels of Equal and, in the view of the Board, threaten the preservation and enhancement of long-term shareholder value. On January 24, 2013, Equal announced it had initiated legal proceedings against Mr. Nawar Alsaadi and Dr. Adam Goldstein in the United States District Court, Southern District of New York, alleging violation of disclosure requirements under US securities laws. On March 19, 2013, Equal announced it had entered into a settlement agreement with Mr. Nawar Alsaadi and Dr. Adam Goldstein. Pursuant to the settlement agreement, Equal withdrew its pending suit and the shareholders, without admitting or conceding liability or wrongdoing, agreed to remove certain publications and statements concerning their views about Equal and its management and refrain from publishing or republishing other similar material. The settlement allowed the Board to move forward on governance priorities and for management to fully concentrate on building value for shareholders with emphasis on a balanced and prudent approach to the development of its assets.

154.  The Preliminary Proxy states on page 34:

In response to the public announcement by Montclair, on March 25, 2013, Equal advised that it had previously formed the Special Committee in early March 2013 to investigate and evaluate all proposals presented to Equal, including the Montclair proposal for USD$4.00 per Equal Share. The Special Committee further advised that it had retained GHS and Scotiabank to assist in considering such expressions of interest in a deliberate and thoughtful manner with a view to the best interests of Equal before undertaking any specific course of conduct.

155.  The Preliminary Proxy states on page 43:

The Board determined it was advisable to obtain a fairness opinion with respect to the Arrangement Consideration. The Board asked GHS to review the fairness, from a financial point of view, of

the Arrangement Consideration to be received by the Equal Shareholders (excluding holders exercising Dissent Rights and Excluded Holders).

156.  The Preliminary Proxy states on page 44:

> On December 6, 2013, GHS rendered its oral opinion to our Board (which was subsequently confirmed in writing by delivery of its final written Fairness Opinion dated as of the same date) to the effect that, as of December 6, 2013, and based upon and subject to the various assumptions and limitations set forth therein, the consideration of USD$5.43 per share in cash to be received by the Equal Shareholders (other than those referenced above) in the Arrangement was fair, from a financial point of view, to such Equal Shareholders.

157.  In the above context, the Preliminary Proxy fails to disclose: (i) the standstills enforced or attempted to be enforced against Equal shareholders by the Company, including against the Disagreeing Shareholders, Montclair and/or Lawndale; (ii) the cost incurred by the pursuit of proposals rejected by the Company's shareholders at the May 13th, 2013 annual meeting; (iii) the circumstances of the retainment of Scotiabank in 2013, what it was hired to do, what it did, and what it was paid; and (iv) what specific services GHS and Scotiabank have provided to Equal and Petroflow (or any of their affiliates) in the last two years and the compensation received.

158.  The omission of the above information is material because without it, shareholders are unable to assess the potential and actual conflicts of interests faced by the Company's management, Board and financial advisor at the time they were supposed to be working on behalf of the Company and its shareholders.

909164_2

159. The omission of the above information renders the following statements in the Preliminary Proxy misleading: (i) the statements identified in ¶¶151-155; and (ii) the statements in the Preliminary Proxy that the Board "after careful consideration" determined that the Arrangement Agreement and the Proposed Acquisition to be in the "best interests" of the Company and the Proposed Acquisition consideration to be "fair" to the Company's shareholders (on pages 5-6, 13, 22, 40-41). Without the omitted information, these statements create the misleading impression that the sales process was not tainted by potential and actual conflicts of interests faced by the Company's management, Board and financial advisor.

160. ***GHS's Selected Public Companies Analysis***. The Preliminary Proxy states on pages 45-47 that GHS performed a *Selected Public Companies Analysis* in connection with its fairness opinion, and its analysis concluded that "the implied enterprise valuation multiples of Equal based on the per share Arrangement Consideration were within the range of or exceeded implied enterprise valuation multiples of the selected public companies." The Preliminary Proxy also states on page 44 that based on its analyses, GHS provided the Board the opinion that the Proposed Acquisition consideration "was fair, from a financial point of view, to such Equal shareholders."

161. In the above context, the Preliminary Proxy fails to disclose (i) the following multiples for each of the following selected comparable public companies observed by GHS in its analysis: TEV to Projected EBITDA FY 2013;

- 62 -

TEV to Projected EBITDA FY 2014; and TEV to Most Recently Reported PV-10; and (ii) information necessary to assess whether GHS perform any form of benchmarking analysis for Equal in relation to its selected comparable public companies.

162.   The omission of this information is material because the usefulness and reliability of this analysis is dependent on the comparability of the Company to the selected companies, but without the omitted multiples, shareholders do not have the information to determine how the selected companies actually compared to Equal.

163.   The omission of this information renders the statements in ¶159 misleading because without this information, those statements create the misleading impression that GHS's *Selected Public Companies Analysis* is a reliable benchmark for the Proposed Acquisition and supports the fairness of the Proposed Acquisition Consideration.

164.   ***GHS's Selected Asset Transaction Analysis.*** The Preliminary Proxy states on page 47 that GHS performed a *Selected Asset Transaction Analysis* in connection with its fairness opinion, and its analysis concluded that: "the transactions had a mean production value of USD$38,920 per daily BOE (median value of $35,944 per daily BOE) and mean proved reserves value of USD$8.60 per BOE (median value of USD$7.77 per BOE). The mean and median implied enterprise values of Equal, using its proved reserves of 24.7 MMBoe, as stated in the HAAS Petroleum Engineering Services, Inc. ('HAAS')

- 63 -

mid-year reserves evaluation dated August 5, 2013 as of July 1, 2013 prepared in accordance with SEC guidelines (the 'Reserves Evaluation'), and applying the selected transactions information above, are USD$212.4 million and USD$191.9 million respectively. The mean and median implied value of Equal, using its production, 6.7 MBoe/d as of September 30, 2013, and applying the selected transaction information above, is USD$261.2 million and USD$241.6 million respectively." The Preliminary Proxy also states on page 44 that based on its analyses, GHS provided the Board the opinion that the Proposed Acquisition consideration "was fair, from a financial point of view, to such Equal shareholders."

165.  In the above context, the Preliminary Proxy fails to disclose: (i) the individual transactions and the transaction dates reviewed by GHS in this analysis; and (ii) the following metrics for each of the selected asset transactions observed by GHS in its analysis: Transaction Value; Proved Reserves; USD/ Proved BOE; Production (MBOE/d); USD/ Daily BOE; and Percent of Oil of Proved Reserves.

166.  The omission of this information is material because the usefulness and reliability of this analysis is dependent on the comparability of selected transactions, but without the individually observed multiples, shareholders do not have the information to determine how the selected transactions actually compared to the Proposed Acquisition.

- 64 -

167.   The omission of this information renders the statements in ¶163 misleading because without this information, those statements created the misleading impression that GHS's *Selected Asset Transaction Analysis* was a reliable benchmark for the Proposed Acquisition and supported the fairness of the Proposed Acquisition Consideration.

168.   ***GHS's Implied Shareholder Rate of Return Analysis.***   The Preliminary Proxy states on pages 47-48 that GHS performed a *Implied Shareholder Rate of Return Analysis* in connection with its fairness opinion, and its analysis concluded that: "Using such information, two ranges of future well performance (estimated ultimate recoveries ('EUR') of 517 MBoe and 600 MBoe) and the forward pricing curves of oil and gas commodity prices as reported on the NYMEX as of December 4, 2013, with a range of realizations as to the pricing of natural gas liquids ('NGLs') relative to West Texas Intermediate ('WTI') as indicated in the table below, GHS then calculated what price per Equal Share an Equal Shareholder would be willing to pay if a 10-25% range of returns were to be required. Future returns to Equal Shareholders were calculated through December 31, 2016, to include a $0.05 per share per quarter dividend plus a terminal net asset value per share. The range of returns evaluated reflects GHS' experience for companies of similar size and risk, and considering the aggressiveness of the projected information and assumptions used."

| | EUR[1] (MBoe) | NGL % of WTI | Realized Oil[2] | Realized NGL[2] | Realized Gas[2] | Implied Share Price Based on ROR% | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | 10% (USD$) | 15% (USD$) | 20% (USD$) | 25% (USD$) |
| 1 | 517 | 35.0% | 96.0% | 89.0% | 87.0% | 3.61 | 3.17 | 2.79 | 2.48 |
| 2 | 517 | 38.5% | 96.0% | 89.0% | 87.0% | 4.21 | 3.68 | 3.24 | 2.87 |
| 3 | 517 | 43.0% | 96.0% | 89.0% | 87.0% | 5.09 | 4.45 | 3.91 | 3.46 |
| 4 | 517 | 53.0% | 96.0% | 89.0% | 87.0% | 6.92 | 6.03 | 5.28 | 4.66 |
| 5 | 600 | 35.0% | 96.0% | 89.0% | 87.0% | 4.29 | 3.75 | 3.30 | 2.93 |
| 6 | 600 | 38.5% | 96.0% | 89.0% | 87.0% | 4.93 | 4.31 | 3.79 | 3.35 |
| 7 | 600 | 43.0% | 96.0% | 89.0% | 87.0% | 5.88 | 5.13 | 4.50 | 3.98 |
| 8 | 600 | 53.0% | 96.0% | 89.0% | 87.0% | 7.83 | 6.81 | 5.97 | 5.26 |
| Mean | | | | | | 5.35 | 4.67 | 4.10 | 3.62 |

**Note:**

(1) As indicated by the footnote in the section of this Circular entitled "*Certain Unaudited Prospective Financial and Operating Information*" beginning on page 51, the 517 EUR matches the average gross well EUR as estimated in the Reserves Evaluation; the 600 Mboe EUR scenarios represent top decile performance sensitivities and are not representative of historic average well performance.

(2) Realized Oil, Realized NGL and Realized Gas are based on assumptions of WTI, Propane at Conway Kansas and Henry Hub gas, respectively."

169. The Preliminary Proxy also states on page 44 that based on its analyses, GHS provided the Board the opinion that the Proposed Acquisition consideration "was fair, from a financial point of view, to such Equal shareholders."

170.   In the above context, the Preliminary Proxy fails to disclose: (i) the basis that GHS used for determining the percent of Realized Oil, Realized NGL, and Realized Gas; (ii) information necessary to assess which of the eight scenarios set forth by GHS was seen as most realistic by Equal management; (iii) information necessary to assess what metric was discounted to present value in this analysis (*e.g.,* free cash flow, unlevered free cash flow, etc.); (iv) information necessary to assess on what basis GHS calculated a terminal net asset value per share for Equal; (v) information necessary to assess, if a terminal NAV was calculated as of 2016, what were the capitalized G&A and net debt figures used to convert enterprise value to NAV; (vi) information necessary to assess on what basis GHS selected 10% to 25% rates of return for

use in this analysis; and (vii) information necessary to assess the propriety of using equity rates of return instead of the typical WACC estimate.

171.   The omission of this information is material because the usefulness and reliability of this analysis is dependent on the transparency of the steps and assumptions GHS took in this nontraditional analysis.  Without this information, shareholders do not have the information to determine the value of a standalone scenario compared to the Proposed Acquisition.

172.   The omission of this information renders the statements in ¶¶167-168 misleading because without this information, those statements create the misleading impression that GHS's *Implied Shareholder Rate of Return Analysis* analysis is reliable and supports the fairness of the Proposed Acquisition consideration.

173.   **The Company Projections**.  The Preliminary Proxy states on page 47 that "Equal management provided selected information necessary to evaluate certain scenarios" to GHS.

174.   The Preliminary Proxy states on page 49 that: "Without limiting the generality of the foregoing, for the purpose of the Fairness Opinion, GHS assumed that with respect to financial projections, estimates and other forward-looking information reviewed by GHS, that such information was reasonably prepared based on assumptions reflecting the best currently available estimates and judgments as to the expected future results of

- 67 -

operations and financial condition of Equal to which such financial projections, estimates and other forward-looking information relate."

175.  The Preliminary Proxy states on page 51 that: "However, Equal is including the following summary of the unaudited prospective financial and operating information because it was made available to the Board and GHS, in connection with their respective evaluations of the Arrangement, and GHS was authorized to rely upon such information for purposes of its analysis and opinion."

176.  The Preliminary Proxy states on pages 51-52:

| Selected Projected Information Provided by Management | 2013(1) | 2014(2) |
|---|---|---|
| (USD$ in millions) | | |
| Revenues | 66.3 | 78.3 |
| EBITDA | 32.0 | 44.0 |

(1) Management financial estimates based on NYMEX forward strip pricing as of November 26, 2013
(2) Management financial estimates based on NYMEX forward strip pricing as of December 4, 2013

| | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|
| Ranges Across Implied Shareholder Rate of Return Scenario* | Low | High | Low | High | Low | High |
| (USD$ in millions) | | | | | | |
| *Assuming 517 Mboe EURs:* | | | | | | |
| Equivalent daily production (Boe/day) | 7,411 | 7,411 | 8,326 | 8,326 | 9,128 | 9,128 |
| Net cash flow | (13.1) | (5.2) | (0.6) | 0.5 | 0.1 | 5.8 |
| PV-10 of Reserves at end of period | 220.7 | 313.7 | 241.4 | 341.2 | 254.9 | 358.5 |
| Revenues | 70.2 | 89.2 | 77.0 | 97.0 | 83.4 | 104.5 |
| EBITDA | 41.9 | 59.7 | 46.0 | 64.8 | 50.0 | 67.3 |
| *Assuming 600 Mboe EURs:* | | | | | | |
| Equivalent daily production (Boe/day) | 7,814 | 7,814 | 8,981 | 8,981 | 10,003 | 10,003 |
| Net cash flow | (10.7) | (2.3) | (2.9) | 5.4 | (0.5) | 12.8 |
| PV-10 of Reserves at end of period | 236.5 | 335.3 | 263.5 | 371.4 | 278.7 | 391.1 |
| Revenues | 73.2 | 93.0 | 82.4 | 103.8 | 90.9 | 113.9 |
| EBITDA | 44.0 | 62.6 | 49.7 | 69.9 | 55.1 | 76.8 |

* Assumes that (1) Equal drills 15 wells per year and (2) through forced pooling, Equal is able to increase its working interest from approximately 35% on average (used in Equal's Reserves Evaluation) to an assumed 95%. Production forecast is based on the Reserves Evaluation for producing reserves plus new wells which produce based on the forecasted EUR well production performance. The 517 Mboe EUR matches the average gross well EUR as estimated in the Reserves Evaluation. The 600 Mboe EUR scenarios represent top decile performance sensitivities and are not representative of historic average well performance. The ranges shown also reflect the NGL pricing variations (35-53% of WTI) shown in the section of this Circular entitled "The Arrangement – Fairness Opinion – Implied Shareholder Rate of Return Analysis".

909164_2

| Realized Pricing Assumptions* | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Oil Price (USD$/Bbl) | 98.89 | 91.52 | 85.19 | 81.26 |
| Gas Price (USD$/Mcf) | 2.98 | 3.56 | 3.67 | 3.73 |

\* Based on Equal realized forward pricing curve of oil and gas commodity prices as reported on the NYMEX as of December 4, 2013.

177.   In the above context, the Preliminary Proxy fails to disclose the following critical financial projections for Equal provided by Equal management and relied upon by GHS for purposes of its analysis, for fiscal years 2014-2016, under both 517 MBoe EUR and 600 MBoe EUR, for the following items: (i) EBIT (or DD&A); (ii) exploration costs; (iii) capital expenditures; (iv) changes in net working capital; and (v) the income measure(s) discounted to present value as part of the Implied Shareholder ROR Analysis.

178.   The omission of this information is material because there is no more material information to shareholders in a merger than the information underlying or supporting the purported "fair value" of their shares. Shareholders are entitled to the information necessary to inform a decision as to the adequacy of the merger consideration, which includes the underlying data including management's projections.

179.   The omission of this information renders ¶175 misleading. Without the omitted projections, the partially disclosed numbers are rendered materially incomplete.

180.   Collectively, the omitted information regarding GHS's financial analyses and opinion renders the misleading the statement under the section "Reasons for the Recommendation of our Board and Special Committee" on

- 69 -

page 42 in the Preliminary Proxy – that the Board considered GHS's financial analyses and fairness opinion as supporting the Proposed Acquisition. Without the omitted information regarding GHS's analyses, this statement created the misleading impression that GHS fairness analyses and fairness opinion was reliable and the Board was reasonable on relying on it.

181.  Without the omitted information, the Company's shareholders were unable to assess the reliability of GHS's analyses and all shareholders were left with was the conclusion of "fair value" with no meaningful way to reject that conclusion at the shareholder vote on the Proposed Acquisition.

182.  Collectively, the false and misleading statements in the Preliminary Proxy prevent the Company's shareholders from making an informed decision on whether to accept the Proposed Acquisition consideration, seek appraisal of their shares, or vote "no" on the Merger and retain the opportunity to pursue strategic alternatives on a standalone basis.

## SELF-DEALING

183.  By reason of their positions with Equal, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Equal, and especially the true value and expected increased future value of Equal and its assets, which they have not disclosed to Equal's public stockholders.  Moreover, despite their duty to maximize shareholder value, the defendants have clear and material conflicts of interest and are

- 70 -

acting to better their own interests at the expense of Equal's public shareholders.

184.   The Proposed Acquisition is wrongful, unfair and harmful to Equal's public stockholders, and represents an effort by defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members.  Specifically, defendants are attempting to deny plaintiff and the Class their shareholder rights via the sale of Equal on terms that do not adequately value the Company.  Accordingly, the Proposed Acquisition will only benefit the Individual Defendants and Petroflow.

185.  By abusing their power as directors and/or by the aiding and abetting thereof, the defendants are attempting to strategically subvert the interests of plaintiff on behalf of the Company.  In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- withdraw their consent to the sale of Equal and allow the shares to trade freely, without impediments;

- act independently so that the interests of Equal's public stockholders will be protected;

- adequately ensure that no conflicts of interest exist between defendants' own interests, and/or their advisors, and defendants' fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Equal's public stockholders;

- conduct a fair and open sales process for the Company without impingement from the preclusive deal protection devices in the Arrangement Agreement;

- rescind any unlawful terms in the Arrangement Agreement, including, without limitation, the termination fee and no solicitation terms; and

- 71 -

- disclose all material information to the Company's shareholders about the Proposed Acquisition.

186.  In essence, the Proposed Acquisition is the product of a flawed process that was designed to ensure the sale of Equal to Petroflow, and Petroflow only, on terms preferential to Petroflow insiders, and detrimental to plaintiff and the other public stockholders of Equal.  Plaintiff seeks to enjoin the Proposed Acquisition.

187.  As a result of defendants' actions, plaintiff and the Class will suffer irreparable injury in that, as a result of an unfair process, they will not receive their fair portion of the value of Equal's assets and businesses, they will be prevented from obtaining a fair price for their common stock, and they will be prevented from being able to make an informed decision on whether to accept the Proposed Acquisition consideration, seek appraisal of their shares, or vote "no" on the Proposed Acquisition and retain the opportunity to pursue strategic alternatives on a standalone basis.

188.  As a result of defendants' conduct, Equal's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company.  In order to meet their fiduciary duties, the Individual Defendants are obligated to maximize shareholder value, not structure a preferential deal for themselves. The Proposed Acquisition, as structured, does not represent the maximized value that Equal shareholders are entitled to.

909164_2

189.  Unless enjoined by this Court, the defendants will continue to breach their fiduciary duties owed to plaintiff and the Class, and may consummate the Proposed Acquisition which will exclude the Class from its fair share of Equal's valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Class, as aforesaid.

## CLASS ACTION ALLEGATIONS

190.  Plaintiff brings this action individually and as a class action on behalf of all holders of Equal common stock who are being and will be harmed by defendants' actions described herein (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

191.  This action is properly maintainable as a class action.

192.  The Class is so numerous that joinder of all members is impracticable.  According to the Company's U.S. Securities and Exchange Commission ("SEC") filings, as of November 4, 2013, there were over 35.8 million shares of Equal common stock outstanding.

193.  There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)    whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to

909164_2

plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(b)   whether defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(c)   whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(d)   whether defendants are unjustly enriching themselves and other insiders or affiliates of Equal and Petroflow;

(e)   whether the Individual Defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, honesty and fair dealing;

(f)   whether the Individual Defendants have breached their fiduciary duties of candor to plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(g)   whether defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

(h)   whether plaintiff and the other members of the Class would be irreparably harmed as a result of defendants' conduct; and

(i)     whether defendants acted in contravention of §§14(a) and 20(a) of the 1934 Act or Rule 14a-9.

194.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

195.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

196.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

197.  Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

198.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Class Claim for Violation of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants

199.  Plaintiff repeats and realleges each allegation set forth herein.

- 75 -

909164_2

200. Individually and in concert, the Individual Defendants disseminated the false and misleading Preliminary Proxy specified above, which contained statements that, in violation of §14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary in order to make the statements therein not materially false or misleading.

201. The Preliminary Proxy was prepared, reviewed and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Preliminary Proxy.

202. The Individual Defendants were at least negligent in filing the Preliminary Proxy with these materially false and misleading statements.

203. The omissions and false and misleading statements in the Preliminary Proxy are material in that a reasonable shareholder will consider them important in deciding how to vote on the Proposed Acquisition. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Preliminary Proxy and in other information reasonably available to shareholders.

204. The Preliminary Proxy is an essential link in causing plaintiff and the Company's shareholders to approve the Proposed Acquisition.

- 76 -

205.  By reason of the foregoing, defendants violated §14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

206.  Because of the false and misleading statements in the Preliminary Proxy, plaintiff and the other members of the Class are threatened with irreparable harm.

## COUNT II

### Class Claim for Violation of §20(a) of the 1934 Act
### Against the Individual Defendants, Petroflow Energy Corporation
### and Petroflow Canada Acquisition Corporation

207.  Plaintiff repeats and realleges each allegation set forth herein.

208.  The Individual Defendants, Petroflow Energy Corporation and Petroflow Canada Acquisition Corporation acted as controlling persons of Equal within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Equal and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Preliminary Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

209.  Each of the Individual Defendants, Petroflow Energy Corporation and Petroflow Canada Acquisition Corporation was provided with or had unlimited access to copies of the Preliminary Proxy and other statements

- 77 -

alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

210. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Preliminary Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were thus directly involved in the making of the Preliminary Proxy.

211. Petroflow Energy Corporation and Petroflow Canada Acquisition Corporation also had direct supervisory control over the composition of the Preliminary Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Preliminary Proxy.

212. By virtue of the foregoing, the Individual Defendants, Petroflow Energy Corporation and Petroflow Canada Acquisition Corporation violated §20(a) of the 1934 Act.

213. As set forth above, the Individual Defendants, Petroflow Energy Corporation and Petroflow Canada Acquisition Corporation had the ability to exercise control over and did control a person or persons who have each violated §14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as

alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.   As a direct and proximate result of defendants' conduct, Equal shareholders are threatened with irreparable harm.

## COUNT III

### Breach of Fiduciary Against the Individual Defendants

214.   Plaintiff repeats and realleges each allegation set forth herein.

215.   The Individual Defendants have violated the fiduciary duties of care, loyalty, candor, good faith, and independence owed to the public shareholders of Equal and have acted to put their personal interests ahead of the interests of the Company's shareholders.

216.   By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiff and other members of the Class of the true value inherent in and arising from Equal.

217. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Equal because, among other reasons:

      (a)   they failed to take steps to maximize the value of Equal to its public shareholders; and

909164_2

(b)    they ignored and did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships in connection with the Proposed Acquisition; and

(c)    they failed to disclose material information to the Company's shareholders when recommending the Proposed Acquisition.

218. Because the Individual Defendants dominate and control the business and corporate affairs of Equal, and are in possession of private corporate information concerning the Company's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Equal which makes it inherently unfair for them to pursue a course of conduct that will benefit them to the exclusion of maximizing stockholder value.

219. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

220. Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiff and the Class, all to the irreparable harm of the Class.

221. The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the

Class. Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT IV

### Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty Against Equal, Petroflow Energy Corporation and Petroflow Canada Acquisition Corporation

222. Plaintiff repeats and realleges each allegation set forth herein.

223. Defendants Equal, Petroflow Energy Corporation and Petroflow Canada Acquisition Corporation knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.

224. Defendants Equal, Petroflow Energy Corporation and Petroflow Canada Acquisition Corporation were active and knowing participants in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class. As a result of their conduct, plaintiff and the other members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts. Plaintiff and the members of the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in his favor and in favor of the Class and against defendants as follows:

909164_2

A.    Declaring that this action is properly maintainable as a class action;

B.    Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from placing their own interests ahead of those of plaintiff and the Class, unless and until defendants adopt and implement a procedure or process to maximize shareholder value;

C.    Directing the Individual Defendants to exercise their fiduciary duties to act in a manner that maximizes shareholder value;

D.    Directing the Individual Defendants to file a proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make statements contained in it not misleading;

E.    Rescinding, to the extent already implemented, any barriers to the maximization of shareholder value;

F.    Declaring that defendants herein, and each of them, violated §§14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

G.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

909164_2

## JURY DEMAND

Plaintiff hereby demands trial by jury.

DATED:  January ___, 2014

/s/ Darren B. Derryberry
DARREN B. DERRYBERRY,
OBA NO. 14542
dderryberry@derryberrylaw.com

DERRYBERRY & NAIFEH, LLP
4800 North Lincoln Boulevard
Oklahoma City, OK 73105
Telephone:  405/528-6569
Facsimile:  405/528-6462

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
A. RICK ATWOOD, JR.
DAVID T. WISSBROECKER
EDWARD M. GERGOSIAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
Facsimile:  619/231-7423
randyb@rgrdlaw.com
ricka@rgrdlaw.com
dwissbroecker@rgrdlaw.com
egergosian@rgrdlaw.com

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE
8150 N. Central Expressway,
  Suite 1575
Dallas, TX  75206
Telephone:  214/239-4568
Facsimile:  281/254-7789
wbriscoe@thebriscoelawfirm.com

909164_2

POWERS TAYLOR LLP
PATRICK W. POWERS
Campbell Centre II
8150 N. Central Expressway,
 Suite 1575
Dallas, TX  75206
Telephone:  214/239-8900
Facsimile:  214/239-8901
patrick@powerstaylor.com

**ATTORNEYS FOR PLAINTIFF**

909164_2