# EXHIBIT 1

DEFM14A 1 d740143ddefm14a.htm DEFINITIVE PROXY STATEMENT

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934
(Amendment No.     )**

Filed by the Registrant ☒          Filed by a party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material under §240.14a-12

# Equal Energy Ltd.
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if Other Than The Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   (1)   Title of each class of securities to which transaction applies:

   (2)   Aggregate number of securities to which transaction applies:

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)   Proposed maximum aggregate value of transaction:

   (5)   Total fee paid:

☒   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)    Amount Previously Paid:

_____

    (2)    Form, Schedule or Registration Statement No.:

_____

    (3)    Filing Party:

_____

    (4)    Date Filed:

_____

**Table of Contents**



NOTICE OF SPECIAL MEETING OF SHAREHOLDERS

of

EQUAL ENERGY LTD.

to be held on July 8, 2014

and

NOTICE OF ORIGINATING APPLICATION TO

THE COURT OF QUEEN'S BENCH OF ALBERTA

and

INFORMATION CIRCULAR AND PROXY STATEMENT

with respect to a proposed

PLAN OF ARRANGEMENT

involving

EQUAL ENERGY LTD.

and

THE SHAREHOLDERS OF EQUAL ENERGY LTD.

and

PETROFLOW ENERGY CORPORATION

and

PETROFLOW CANADA ACQUISITION CORP., a wholly-owned subsidiary of PETROFLOW ENERGY CORPORATION.

The accompanying information circular and proxy statement is dated June 10, 2014 and is first being mailed to shareholders of Equal Energy Ltd. on or about June 11, 2014.

> These materials are important and require your immediate attention. They require holders of common shares of Equal Energy Ltd. ("**Equal Shareholders**") to make important decisions. If you are in doubt as to how to make such decisions, please contact your financial, legal or other professional advisors. The board of directors of Equal Energy Ltd. recommends that Equal Shareholders vote **FOR** the Arrangement Resolution, as described in this Information Circular and Proxy Statement, at the special meeting of Equal Shareholders. If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-581-1479 or email contactus@kingsdaleshareholder.com.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the Arrangement, passed upon the merits or fairness of the Arrangement or passed upon the adequacy or accuracy of the disclosure in this document or the Circular. Any representation to the contrary is a criminal offense.**

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

Table of Contents

**EQUAL ENERGY LTD.**
**LETTER TO SHAREHOLDERS**

Dear Shareholder of Equal Energy Ltd.:

You are cordially invited to attend a special meeting (the "**Meeting**") of the common shareholders (the "**Equal Shareholders**") of Equal Energy Ltd. ("**Equal**"), a corporation amalgamated under the laws of Alberta, which will be held on July 8, 2014 at, 10:30 a.m. local time, at the Wildrose South Ballroom at the Sheraton Suites Calgary Eau Claire, 255 Barclay Parade Southwest, Calgary, Alberta.

At the Meeting, you will be asked to consider and vote upon a special resolution (the "**Arrangement Resolution**") approving a statutory plan of arrangement (the "**Arrangement**") under section 193 of the *Business Corporations Act* (Alberta) involving Equal, the Equal Shareholders, Petroflow Energy Corporation ("**Petroflow**") and Petroflow Canada Acquisition Corp., a wholly-owned subsidiary of Petroflow ("**Petroflow Sub**"), to be carried out pursuant to an arrangement agreement dated December 6, 2013 among Equal, Petroflow and Petroflow Sub, as amended **(**the "**Arrangement Agreement**"). The purpose of the Arrangement is to enable Petroflow Sub to acquire all of the issued and outstanding common shares of Equal (the "**Equal Shares**") while providing the Equal Shareholders with consideration that is fair from a financial point of view.

The Arrangement is the culmination of a strategic review process which was initiated when Montclair Energy, LLC ("**Montclair**") made an unsolicited proposal to acquire Equal on February 27, 2013 for USD$4.00 per share. Equal formed a special committee of three independent directors to consider a full range of strategic alternatives, including continuing as a going concern, a corporate sale, and return of capital to shareholders through share buybacks and dividends, in order to maximize shareholder value. In a press release dated March 25, 2013, Equal announced that the special committee would investigate and evaluate all proposals presented to Equal. The special committee, assisted by its advisors, communicated with 19 potential arm's length bidders, entered into confidentiality agreements with seven, and ultimately received final proposals from two bidders. Of these, the proposal submitted by Petroflow was superior. The other proposal, which was submitted by Montclair, was inferior, not only in terms of price and other financial terms but also with respect to the conditions of the proposal. On November 18, 2013, Equal publicly announced that it was pursuing exclusive negotiations with the party presenting this superior proposal, which culminated in the announcement of the Arrangement Agreement with Petroflow and Petroflow Sub on December 9, 2013.

Under the Arrangement, pursuant to the terms of the Arrangement Agreement, Equal Shareholders (who have not validly exercised their right to dissent) will be entitled to receive consideration of USD$5.43 per Equal Share they own immediately prior to the effective time of the Arrangement (the "**Effective Time**"), in cash, subject to adjustment pursuant to the terms of the Arrangement Agreement (the "**Arrangement Consideration**"), less applicable withholding taxes and deductions.

Under the Arrangement, pursuant to the terms of the Arrangement Agreement, Equal will pay a dividend in the amount of USD$0.05 per Equal Share (other than on those Equal Shares held by Equal Shareholders who have validly exercised their right to dissent) to Equal Shareholders on the Equal Shares they hold at the Effective Time (the "**Arrangement Dividend**").

Pursuant to the Arrangement Agreement, if, on or after the date of the Arrangement Agreement, Equal declares, sets aside or pays any dividend or other distribution, other than a dividend designated as a permitted dividend by the Arrangement Agreement ("**Permitted Dividend**"), payable in cash, securities, property or otherwise with respect to the Equal Shares, or sets a record date therefor that is prior to the Effective Time, then the Arrangement Consideration will be adjusted to reflect each such dividend or other distribution by way of a reduction in the Arrangement Consideration by an amount equal to the amount of such dividend or distribution per Equal Share. Pursuant to the Arrangement Agreement, a Permitted Dividend means any of (a) the USD$0.05 per Equal Share ordinary course dividend declared on November 14, 2013 and paid on December 20, 2013 to holders of record on December 2, 2013, (b) the USD$0.05 per Equal Share dividend declared on May 1, 2014 and paid on May 28, 2014 to Equal Shareholders of record at the close of business on May 15, 2014, and (c) the Arrangement Dividend.

Under the Arrangement, each option to acquire Equal Shares ("**Option**") outstanding immediately prior to the Effective Time (whether vested or unvested), shall be transferred from the holder thereof ("**Optionholder**") to Equal. Upon such transfer, if the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, exceeds the exercise price per Equal Share of such Option, the Optionholder will receive cash consideration equal to such difference, subject to applicable withholding taxes and deductions. Where the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, does not exceed the exercise price per Equal Share of such Option, the Optionholder will not receive any payment in respect of such Option. All Options will be cancelled immediately after transfer to Equal. Pursuant to the Arrangement

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

Table of Contents

Agreement, Equal has agreed to take all steps necessary or desirable to give effect to the foregoing, including entering into option cancellation agreements with each Optionholder in respect of all Options and to obtain necessary consents from Optionholders to the transfer and cancellation of the Options as described above.

At the Effective Time, each Equal Share in respect of any restricted share of Equal issued pursuant to Equal's restricted share and performance share incentive plan (the "**RSP Plan**") and including all restricted shares issuable pursuant to any dividend equivalent rights resulting from dividends paid by Equal ("**Restricted Share**"), not already issued, will be issued (subject to applicable tax withholdings and other source deductions) to the RSP Plan participants, and any share grant agreement under the RSP Plan and the RSP Plan will be terminated notwithstanding the terms thereof. RSP Plan participants who are holders of Restricted Shares at the Effective Time will be entitled to receive the Arrangement Consideration in exchange for their Equal Shares issued pursuant to Restricted Shares on the same basis as other Equal Shareholders.

Pursuant to the Arrangement Agreement, the Arrangement is subject to customary closing conditions for a transaction of this nature, including court approval and approval of at least 66⅔% of the votes cast by Equal Shareholders present in person or represented by proxy at the Meeting. In addition, the Arrangement is subject to approval of a simple majority of the votes cast by Equal Shareholders, excluding the votes of those persons whose votes may not be included in determining minority approval of a business combination under Multilateral Instrument 61-101 *Protection of Minority Security Holders in Special Transactions.*

The directors and officers of Equal and its subsidiaries have signed lock-up and support agreements under which they have agreed, among other things, to vote their Equal Shares in favour of the Arrangement at the Meeting or any adjournment thereof, subject to the terms of such lock-up agreements. As of May 15, 2014, such persons beneficially owned or controlled 848,814 Equal Shares, representing 2.4% of the issued and outstanding Equal Shares. The form of lock-up agreement is attached to the accompanying information circular and proxy statement ("**Circular**") as Appendix E.

Our board of directors, after consulting with its financial and legal advisors, and after careful consideration of, among other things, the unanimous recommendation of a special committee of our board of directors, unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. **Accordingly, the board of directors of Equal unanimously recommends that the Equal Shareholders vote "FOR" the Arrangement Resolution.**

In addition, the United States Securities and Exchange Commission has adopted rules that require us to seek a non-binding, advisory vote with respect to certain payments that will or may be made to Equal's executive officers by Equal based on or otherwise relating to the Arrangement. **The board of directors of Equal unanimously recommends that Equal Shareholders vote "FOR" the Arrangement related compensation proposal described in the Circular.**

Included with this letter is a notice of special meeting, Circular, form of proxy and notice of originating application to the Court of Queen's Bench of Alberta. We encourage you to read the Circular carefully and in its entirety because it explains the Arrangement, the documents related to the Arrangement and the Meeting.

Your vote is important regardless of the number of Equal Shares you own. If you are a registered Equal Shareholder (i.e. your name appears on the register of Equal Shares maintained by or on behalf of Equal) and you are unable to attend the Meeting in person or even if you plan to attend the Meeting, we encourage you to take the time now to complete, sign, date and return the accompanying form of proxy so that your Equal Shares can be voted at the Meeting (or at any adjournments or postponements thereof) in accordance with your instructions. To be effective, the enclosed proxy must be received by Olympia Trust Company, 2300, 125 – 9th Avenue S.E., Calgary, Alberta, T2G OP6 by mail or by fax at (403) 265-1455 or Kingsdale Shareholder Services, The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by mail or by fax at (416) 867-2271 or 1 (866) 545-5580 no later than 2:00 p.m. (Calgary time) on July 4, 2014 or at least 48 hours (other than a Saturday, Sunday or holiday in Alberta) prior to the time set for any adjournment or postponement of the Meeting. Registered Equal Shareholders may also use the internet site at https://secure.olympiatrust.com/proxy/, using their Web Voting ID Number on their form of proxy to complete an electronic proxy form to transmit their voting instructions or send a completed scanned proxy form to proxy@olympiatrust.com. The time limit for the deposit of proxies may be waived by the chairman of the Meeting at his discretion, without notice. Also, if you are a registered Equal Shareholder, in order to receive the cash consideration that you are entitled to upon the completion of the Arrangement and the Arrangement Dividend, you must complete and sign the applicable letter(s) of transmittal (which will be sent at a later date) and return such letter(s) of transmittal, together with your share certificate(s) and any other required documents and instruments to the depositary named in the letter of transmittal, in accordance with the procedures set out in the letter of transmittal.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

Table of Contents

If you are a non-registered Equal Shareholder and hold your Equal Shares through a broker, investment dealer, bank, trust company, custodian, nominee or other intermediary, you should carefully follow the instructions of your intermediary to ensure that your Equal Shares are voted at the Meeting in accordance with your instructions, to arrange for your intermediary to complete the necessary transmittal documents and to ensure that you receive payment for your Equal Shares and the Arrangement Dividend if the Arrangement is completed. An Equal Shareholder that has questions or requires more information with regard to the voting of Equal Shares should contact Kingsdale Shareholder Services either by mail at The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by toll-free telephone in North America at 1-866-581-1479 or collect call outside North America at 416-867-2272, or by e-mail at contactus@kingsdaleshareholder.com.

Thank you in advance for your continued support.

Sincerely,

/s/ Michael Doyle
Michael Doyle
Director, Chairman
EQUAL ENERGY LTD.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

**Table of Contents**



**EQUAL ENERGY LTD.**
Suite 325, 4801 Gaillardia Parkway
Oklahoma City, Oklahoma 73142

**NOTICE OF SPECIAL MEETING OF SHAREHOLDERS
TO BE HELD ON JULY 8, 2014**

To the Shareholders of Equal Energy Ltd.:

NOTICE IS HEREBY GIVEN THAT pursuant to an order (the "**Interim Order**") of the Court of Queen's Bench of Alberta dated June 10, 2014, a special meeting (the "**Meeting**") of holders ("**Equal Shareholders**") of common shares (the "**Equal Shares**") of Equal Energy Ltd. ("**Equal**"), a corporation amalgamated under the laws of Alberta, will be held on July 8, 2014 at 10:30 a.m., local time, at the Wildrose South Ballroom at the Sheraton Suites Calgary Eau Claire, 255 Barclay Parade Southwest, Calgary, Alberta:

1.  to consider and vote upon, pursuant to the Interim Order, and, if deemed advisable, to pass, with or without variation, a special resolution (the "**Arrangement Resolution**"), the full text of which is set forth in Appendix C to the accompanying information circular and proxy statement (the "**Circular**"), approving a plan of arrangement (the "**Arrangement**") pursuant to section 193 of the *Business Corporations Act* (Alberta) (the "**ABCA**"), upon the terms and conditions set out in the arrangement agreement dated December 6, 2013 among Equal, Petroflow Energy Corporation ("**Petroflow**") and Petroflow Canada Acquisition Corp. ("**Petroflow Sub**"), a wholly-owned subsidiary of Petroflow, as amended (the "**Arrangement Agreement**"), pursuant to which Petroflow Sub will acquire all of the outstanding Equal Shares, all as more particularly described in the Circular;

2.  to consider and vote upon a non-binding, advisory proposal to approve the compensation that may become payable to Equal's named executive officers in connection with the completion of the Arrangement (the "**Compensation Proposal**"); and

3.  to transact such other business as may properly come before the Meeting or any adjournments of the Meeting.

At least $66\frac{2}{3}$% of the votes cast by Equal Shareholders present in person or represented by proxy at the Meeting must be voted in favour of the Arrangement Resolution. In addition, the Arrangement is subject to approval of a simple majority of the votes cast by Equal Shareholders, excluding the votes of those persons whose votes may not be included in determining minority approval of a business combination under Multilateral Instrument 61-101 *Protection of Minority Security Holders in Special Transactions*. The vote on the Compensation Proposal is advisory and, therefore, will not be binding on Equal; however, Equal's board of directors will consider the affirmative vote of a majority of the votes cast on the Compensation Proposal by Equal Shareholders present in person or represented by proxy at the Meeting as advisory approval of the Compensation Proposal.

**After careful consideration, the board of directors of Equal has unanimously approved the Arrangement and the Arrangement Agreement and recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution. The board of directors of Equal also recommends that the Equal Shareholders vote "FOR" the Compensation Proposal.**

Only Equal Shareholders of record at 5:00 p.m. (Calgary time) on June 8, 2014 (the "**Record Date**") are entitled to notice of the Meeting and to vote at the Meeting or any adjournment thereof, except to the extent that a registered Equal Shareholder transfers Equal Shares after the Record Date and the transferee produces properly endorsed share certificates evidencing the transferred Equal Shares, or otherwise establishes that it owns the transferred Equal Shares, and demands, not later than 10 days before the Meeting, that the transferee's name be included before the Meeting in the list of registered Equal Shareholders, in which case the transferee will be entitled to vote the transferred Equal Shares at the Meeting.

Pursuant to and in accordance with the plan of arrangement attached as Schedule A to the Arrangement Agreement attached to the Circular as Appendix A, as amended (the "**Plan of Arrangement**"), the Interim Order and the provisions of section 191 of the ABCA (as modified or supplemented by the Interim Order, the Plan of Arrangement and any other order of the Court of Queen's Bench of Alberta), registered Equal Shareholders have a right to dissent in respect of the Arrangement Resolution and, if the Arrangement Resolution is passed, to be paid the fair value of their Equal Shares. A registered Equal

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

Table of Contents

Shareholder's right to dissent is more particularly described in the Circular. **The dissent procedures require that a registered Equal Shareholder who wishes to validly exercise his or her right to dissent ("Dissenting Shareholder") must send to Equal a written objection to the Arrangement Resolution, which written objection must be received by Equal, c/o Stikeman Elliott LLP, 4300 Bankers Hall West, 888 – 3rd Street S.W., Calgary, AB, T2P 5C5, Attention: Geoffrey D. Holub, not later than 5:00 p.m. (Calgary time) on June 27, 2014, or the day that is five business days (as such term is defined in the Plan of Arrangement) immediately preceding the date that any adjournment or postponement of the Meeting is reconvened or held, as the case may be. Failure to strictly comply with the requirements set forth in section 191 of the ABCA, as modified or supplemented by the Plan of Arrangement and Interim Order, may result in the loss of any right of dissent. Persons who are beneficial owners of Equal Shares registered in the name of a broker, investment dealer, bank, trust company, custodian, nominee or other intermediary who wish to dissent should be aware that only registered Equal Shareholders are entitled to dissent. A Dissenting Shareholder may only dissent with respect to all Equal Shares held on behalf of any one beneficial holder and registered in the name of such Dissenting Shareholder. Accordingly, a non-registered shareholder who desires to exercise the right of dissent must make arrangements for the Equal Shares beneficially owned by such holder to be registered in the holder's name prior to the time the written objection to the Arrangement Resolution is required to be received by Equal or, alternatively, make arrangements for the registered holder of such Equal Shares to dissent on the holder's behalf. It is recommended that you seek independent legal advice if you wish to exercise your right of dissent. A copy of section 191 of the ABCA is attached to the Circular as Appendix D and a summary of those provisions can be found under "*Dissent Rights*" beginning on page 97 of the Circular.**

As an Equal Shareholder, you have the right to vote upon the proposals listed above. Please read the accompanying Circular carefully because it contains important information for you to consider when deciding how to vote. Your vote is very important.

An Equal Shareholder may attend the Meeting in person or may be represented by proxy. Both registered Equal Shareholders who are unable to attend the Meeting and registered Equal Shareholders planning to attend the Meeting are each encouraged to complete, sign, date, and return the accompanying applicable form of proxy so that such Equal Shareholder's Equal Shares can be voted at the Meeting (or at any adjournments or postponements thereof) in accordance with such Equal Shareholder's instructions. To be effective, the enclosed proxy must be received by Olympia Trust Company, 2300, 125 – 9th Avenue S.E., Calgary, Alberta, T2G OP6 by mail or by fax at (403) 265-1455 or Kingsdale Shareholder Services, The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by mail or by fax at (416) 867-2271 or 1 (866) 545-5580 no later than 2:00 p.m. (Calgary time) on July 4, 2014 or at least 48 hours (other than a Saturday, Sunday or holiday in Alberta) prior to the time set for any adjournment or postponement of the Meeting. Registered Equal Shareholders may also use the internet site at https://secure.olympiatrust.com/proxy/, using their Web Voting ID Number on their form of proxy to complete an electronic proxy form to transmit their voting instructions or send a completed scanned proxy form to proxy@olympiatrust.com. The time limit for the deposit of proxies may be waived by the chairman of the Meeting at his discretion, without notice. A proxy by an Equal Shareholder may be revoked as to any matter on which a vote has not already been cast.

In order for registered Equal Shareholders to receive the cash consideration that they are entitled to upon the completion of the Arrangement ("**Arrangement Consideration**") and amounts to be paid as a dividend on the issued and outstanding Equal Shares to Equal Shareholders who are entitled to receive the Arrangement Consideration ("**Arrangement Dividend**"), such registered Equal Shareholders must complete and sign the applicable letter(s) of transmittal (which will be sent at a later date) and return such letter of transmittal, together with their share certificate(s) and any other required documents and instruments to the depositary named in the letter of transmittal, in accordance with the procedures set out in the letter of transmittal.

Non-registered Equal Shareholders who hold their Equal Shares through a broker, investment dealer, bank, trust company, custodian, nominee or other intermediary, should carefully follow the instructions of their intermediary to ensure that their Equal Shares are voted at the Meeting in accordance with such Equal Shareholder's instructions, to arrange for their intermediary to complete the necessary transmittal documents and to ensure that they receive the Arrangement Consideration and the Arrangement Dividend if the Arrangement is completed. An Equal Shareholder that has questions or requires more information with regard to the voting of Equal Shares should contact Kingsdale Shareholder Services either by mail at The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by toll-free telephone in North America at 1-866-581-1479 or collect call outside North America at 416-867-2272, or by e-mail at contactus@kingsdaleshareholder.com.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

Table of Contents

**DATED** at the City of Calgary, in the Province of Alberta, this 10th day of June, 2014.

**BY ORDER OF THE BOARD OF DIRECTORS OF EQUAL ENERGY LTD.**

/s/ Michael Doyle
Michael Doyle
Director, Chairman
EQUAL ENERGY LTD.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

Table of Contents

**IN THE COURT OF QUEEN'S BENCH OF ALBERTA**

**JUDICIAL DISTRICT OF CALGARY**

**IN THE MATTER OF SECTION 193 OF THE *BUSINESS CORPORATIONS ACT*, R.S.A. 2000, C. B-9, AS AMENDED;**

**AND IN THE MATTER OF A PROPOSED ARRANGEMENT INVOLVING EQUAL ENERGY LTD., THE SHAREHOLDERS OF EQUAL ENERGY LTD., PETROFLOW ENERGY CORPORATION AND PETROFLOW CANADA ACQUISITION CORP.**

**NOTICE OF ORIGINATING APPLICATION**

**NOTICE IS HEREBY GIVEN** that an originating application ("**Application**") has been filed by Equal Energy Ltd. ("**Equal**" or the "**Applicant**") for an order approving a proposed plan of arrangement (the "**Arrangement**") pursuant to section 193 of the *Business Corporations Act*, R.S.A. 2000, c. B-9, as amended (the "**ABCA**"), which Arrangement is described in greater detail in the information circular and proxy statement ("**Circular**') of Equal dated June 10, 2014, involving Equal, the holders of common shares of Equal ("**Equal Shareholders**"), Petroflow Energy Corporation ("**Petroflow**") and Petroflow Canada Acquisition Corp., a wholly-owned subsidiary of Petroflow, which accompanies this Notice of Originating Application. At the hearing of the Application, the Applicant intends to seek:

    (a)    a declaration that the terms and conditions of the Arrangement, and the procedures relating thereto, are fair to the persons affected;

    (b)    a declaration that the Arrangement will, upon the filing of articles of arrangement pursuant to section 193 of the ABCA, become effective in accordance with its terms and will be binding on and after the Effective Date (as defined in the Circular);

    (c)    an order approving the Arrangement pursuant to section 193 of the ABCA; and

    (d)    such other and further orders, declarations and directions as the Court (as defined herein) may deem just.

**AND NOTICE IS FURTHER GIVEN** that the Application is directed to be heard at the Court House, 601 – 5th Street, Calgary, Alberta, on the 9th day of July, 2014, at 4:00 p.m. (Calgary time), or so soon thereafter as counsel may be heard. Any Equal Shareholder, holder of options to acquire Equal Shares ("**Optionholder**"), holder of restricted shares of Equal, holder of convertible debentures of Equal ("**Debentureholder**") or any other interested party who wishes to support or oppose the Application may appear at the time of the hearing in person or by counsel for that purpose. **Any Equal Shareholder, Optionholder, holder of restricted shares of Equal, Debentureholder or any other interested party who wishes to appear at the hearing is required to file with the Court of Queen's Bench of Alberta, Judicial District of Calgary (the "Court"), and serve upon the Applicant, on or before 5:00 p.m. (Calgary time) on July 3, 2014, a notice of his/her/its intention to appear, including an address for service in Calgary, Alberta (or alternatively, a telecopier number for service by telecopy), indicating whether such interested party intends to support or oppose the Application or make submissions at the application, together with a summary of the position such interested party intends to advocate before the Court, and any evidence or materials which are to be presented to the Court.** Service on the Applicant is to be effected by delivery to the solicitors for the Applicant at Stikeman Elliott LLP, 4300 Bankers Hall West, 888 – 3rd Street, S.W., Calgary, Alberta, T2P 5C5, Attention: Geoffrey D. Holub.

**AND NOTICE IS FURTHER GIVEN** that, at the hearing, Equal Shareholders, Optionholders, holders of restricted shares of Equal, Debentureholders and other interested parties will be entitled to make representations as to, and the Court will be requested to consider, the fairness and reasonableness of the Arrangement. If you do not attend, either in person or by counsel, at that time, the Court may approve the Arrangement as presented, or may approve the Arrangement subject to such terms and conditions as the Court shall deem fit, without any further notice.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

Table of Contents

**AND NOTICE IS FURTHER GIVEN** that no further notice of the Application will be given by Equal and that, in the event the hearing of the Application is adjourned, only those persons who have appeared before the Court at the hearing and those interested parties who have served a notice of intention to appear as set out above shall be served notice of the adjourned date.

**AND NOTICE IS FURTHER GIVEN** that the Court, by an order dated June 10, 2014, has given directions as to the calling of the special meeting of Equal Shareholders to have the Equal Shareholders vote upon a resolution to approve the Arrangement and, in particular, has directed that such Equal Shareholders shall have the right to dissent under section 191 of the ABCA upon compliance with the terms of such order.

**AND NOTICE IS FURTHER GIVEN** that a copy of the said Application and other documents in the proceedings will be furnished to any Equal Shareholder or other interested party requesting the same from the solicitors for the Applicant at the address set out above.

**DATED** at Calgary, Alberta, this 10th day of June, 2014.

**BY ORDER OF THE BOARD OF DIRECTORS OF EQUAL ENERGY LTD.**

By:  /s/ Michael Doyle
_____
Michael Doyle
Director, Chairman

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

**Table of Contents**

## TABLE OF CONTENTS

| | |
|---|---|
| SUMMARY TERM SHEET | 1 |
| QUESTIONS AND ANSWERS ABOUT THE ARRANGEMENT AND THE MEETING | 14 |
| GENERAL | 21 |
| CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION AND STATEMENTS | 23 |
| THE MEETING | 24 |
| GENERAL PROXY MATTERS | 28 |
| THE ARRANGEMENT | 30 |
| THE PLAN OF ARRANGEMENT | 61 |
| THE ARRANGEMENT AGREEMENT | 66 |
| MINORITY APPROVAL | 79 |
| INTERESTS OF OUR DIRECTORS AND EXECUTIVE OFFICERS IN THE ARRANGEMENT | 80 |
| GOLDEN PARACHUTE COMPENSATION | 92 |
| INTERESTS OF CERTAIN PERSONS OR COMPANIES IN MATTERS TO BE ACTED UPON | 93 |
| MARKET PRICE AND DIVIDEND DATA | 94 |
| REGULATORY MATTERS | 97 |
| DISSENT RIGHTS | 97 |
| CERTAIN CANADIAN FEDERAL INCOME TAX CONSIDERATIONS | 99 |
| CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS | 103 |
| RISK FACTORS | 108 |
| LEGAL PROCEEDINGS RELATED TO THE ARRANGEMENT | 109 |
| PROCEDURES FOR THE RECEIPT OF CONSIDERATION AND ARRANGEMENT DIVIDEND PURSUANT TO THE ARRANGEMENT | 110 |
| INTEREST OF EXPERTS | 112 |
| INTEREST OF INFORMED PERSONS IN MATERIAL TRANSACTIONS | 112 |
| INFORMATION CONCERNING EQUAL | 113 |
| INFORMATION CONCERNING PETROFLOW | 115 |
| INFORMATION CONCERNING PETROFLOW SUB | 115 |
| PROPOSAL NO. 1: THE ARRANGEMENT | 115 |
| PROPOSAL NO. 2: THE COMPENSATION PROPOSAL | 115 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 116 |
| SHAREHOLDER PROPOSALS | 118 |
| "HOUSEHOLDING" OF PROXY MATERIALS | 118 |
| AUDITORS, TRANSFER AGENT AND REGISTRAR | 118 |
| OTHER MATTERS | 119 |
| CERTAIN INFORMATION REGARDING EQUAL, PETROFLOW AND PETROFLOW SUB | 119 |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( i )

**Table of Contents**

| | |
|---|---|
| WHERE YOU CAN FIND ADDITIONAL INFORMATION | 119 |
| MISCELLANEOUS | 119 |
| CONSENTS | 120 |

**ADDENDA**

APPENDIX A ARRANGEMENT AGREEMENT AND AMENDING AGREEMENT
APPENDIX B INTERIM ORDER
APPENDIX C ARRANGEMENT RESOLUTION
APPENDIX D SECTION 191 OF THE *BUSINESS CORPORATIONS ACT* (ALBERTA)
APPENDIX E FORM OF LOCK-UP AGREEMENT
APPENDIX F FAIRNESS OPINION

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( ii )

Table of Contents

**SUMMARY TERM SHEET**

*This information circular and proxy statement ("**Circular**") contains information related to our special meeting of shareholders ("**Meeting**") to be held on July 8, 2014, at 10:30 a.m., local time, at the Wildrose South Ballroom at the Sheraton Suites Calgary Eau Claire, 255 Barclay Parade Southwest, Calgary, Alberta, and at any adjournments or postponements thereof. We are furnishing this Circular to the shareholders of Equal Energy Ltd. as part of the solicitation of proxies by management of Equal Energy Ltd. on behalf of our board of directors (the "**Board**") for use at the Meeting.*

*Unless the context requires otherwise, throughout this Circular we refer to Equal Energy Ltd, including the subsidiaries through which it conducts business, as "Equal" and as "we," "our," "us" and similar words.*

*In this Circular, unless otherwise specified, all dollar amounts are expressed in U.S. dollars and references to "dollars", "USD$" or "$" are to U.S. dollars and references to "CDN$" are to Canadian dollars.*

*This summary highlights the most material terms of the proposed statutory plan of arrangement (the "**Arrangement**") under section 193 of the Business Corporations Act (Alberta) ("**ABCA**") involving Equal, the holders ("**Equal Shareholders**") of common shares of Equal ("**Equal Shares**"), Petroflow Energy Corporation ("**Petroflow**") and Petroflow Canada Acquisition Corp., a wholly-owned subsidiary of Petroflow ("**Petroflow Sub**") upon the terms and conditions of an arrangement agreement dated December 6, 2013 (the "**Arrangement Agreement**"), as amended by an arrangement agreement amending agreement dated May 1, 2014 (the "**Amending Agreement**"). Unless the context indicates otherwise, references to the "Arrangement Agreement" in this circular refer to the Arrangement Agreement as amended by the Amending Agreement.*

*While this summary describes the principal terms of the Arrangement, this summary may not contain all of the information that is important to you. To understand the Arrangement fully and for a more complete description of the legal terms of the Arrangement, you should carefully read this entire Circular and the documents to which we have referred you. In particular, you should read the appendices attached to this Circular, including the Arrangement Agreement and the Amending Agreement, attached to the Circular as Appendix A and the plan of arrangement attached as Schedule "A" to the Arrangement Agreement (which Plan of Arrangement has been amended pursuant to the Amending Agreement) ("**Plan of Arrangement**"). We have included page references in parentheses to direct you to a more complete description of the topics presented in this summary. See the section of this Circular entitled "Where You Can Find Additional Information" beginning on page 119.*

**The Parties to the Arrangement (See Page 30)**

*Equal*

Equal, a corporation amalgamated under the laws of Alberta, is engaged in the exploration for, and acquisition, development and production of, petroleum and natural gas with operations in Oklahoma. Equal also reviews new drilling opportunities and potential property acquisitions in Oklahoma to supplement its exploration and development activities. Equal's head office is located at 4801 Gaillardia Parkway Suite 325 Oklahoma City, OK 73142 and its telephone number is (405) 242-6000. Equal's registered office is located at 4300 Bankers Hall West, 888 – 3rd Street S.W., Calgary, Alberta, Canada T2P 5C5. The Equal Shares are traded on the Toronto Stock Exchange ("**TSX**") and the New York Stock Exchange ("**NYSE**") under the symbol "EQU". The convertible, unsecured, junior, subordinated debentures of Equal issued February 9, 2011 bearing interest at 6.75% per annum (the "**Convertible Debentures**") are traded on the TSX under the symbol "EQU.DB.B". Additional information regarding Equal is contained in our filings on EDGAR at www.sec.gov and SEDAR at www.sedar.com. See the section of this Circular entitled "*Where you can find Additional Information*" beginning on page 119.

*Petroflow*

Petroflow, a corporation existing under the laws of Delaware, a wholly owned subsidiary of TexOak Petro Holdings LLC ("**TexOak**"), is an oil and natural gas company involved in the exploration, development and production of oil and natural gas in Oklahoma, Kansas and Illinois. It is based in Tulsa, Oklahoma. Its focus is to apply new exploration, completion and

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

Table of Contents

development techniques to old fields to unlock previously untapped reserves that were either passed over or never fully exploited. Petroflow's historical and current assets and cash flow from operations are insignificant relative to the size of the transaction and as such they are insufficient to fund the cost of the acquisition contemplated by the Arrangement and immaterial to your consideration of the Arrangement Resolution (as defined below). The funding of the payment to you for your Equal Shares will be derived entirely from third-party financing. See "*The Arrangement - Financing of the Arrangement*" on page 60 and "*The Plan of Arrangement — Sources of Funds for the Arrangement*" on page 63.

On December 30, 2013, Petroflow executed an Agreement and Plan of Merger with TexOak, TexOak Merger Sub, Inc., US Oil & Gas Co. LLC, and certain individual representatives named therein. On the same date, TexOak Merger Sub, Inc. merged with and into Petroflow, with Petroflow surviving as a wholly-owned subsidiary of TexOak. Notwithstanding this transaction, TexOak is not a party to the Arrangement Agreement, has no direct or indirect obligation with respect to efforts to obtain the financing and is not a guarantor of any obligation of Petroflow Sub or Petroflow under the Arrangement Agreement.

The head offices of TexOak and Petroflow are located at 525 S. Main Street, Suite 1120, Tulsa Oklahoma 74103 and the telephone number for each is (918) 592-1010.

*Petroflow Sub*

Petroflow Sub is an Alberta corporation and a wholly owned subsidiary of Petroflow. Petroflow Sub exists solely to facilitate the Arrangement and has not engaged in any operations other than in connection with its formation and the negotiation and execution of the Arrangement Agreement and related agreements. Petroflow Sub has not conducted any activities to date other than those incident to its formation and its execution of the Arrangement Agreement and, upon the completion of the Arrangement it will be merged with and into Equal and the separate existence of Petroflow Sub will cease and Equal will continue as the surviving corporation. The address for Petroflow Sub's head office is 525 S. Main Street, Suite 1120, Tulsa Oklahoma 74103 and its telephone number is (918) 592-1010.

**The Meeting (See Page 24)**

*Time, Date and Place*. In accordance with an order of the Court of Queen's Bench of Alberta, dated June 10, 2014, a copy of which is attached to the Circular as Appendix B (the "**Interim Order**"), the Meeting will be held on July 8, 2014, at 10:30 a.m**.**, local time, at the Wildrose South Ballroom at the Sheraton Suites Calgary Eau Claire, 255 Barclay Parade Southwest, Calgary, Alberta, and at any adjournments or postponements thereof, to consider and vote upon a special resolution approving the Arrangement (the "**Arrangement Resolution**"), the full text of which is set forth in Appendix C, with or without variation and to consider and vote upon a non-binding, advisory proposal to approve the compensation that may become payable to Equal's executive officers named in the table entitled "*Golden Parachute Compensation*" on page 92 (the "**Named Executive Officers**") in connection with the completion of the Arrangement (the "**Compensation Proposal**").

*Purpose*. At the Meeting, you will be asked to consider and vote upon the Arrangement Resolution, the Compensation Proposal and such other proposals as may properly come before the Meeting.

*Record Date and Voting Power*. Only Equal Shareholders of record at the record date of June 8, 2014 (the "**Record Date**") will be entitled to vote at the Meeting or any adjournment thereof, except to the extent that a registered Equal Shareholder transfers Equal Shares after the Record Date and the transferee produces properly endorsed share certificates evidencing the transferred Equal Shares, or otherwise establishes that it owns the transferred Equal Shares, and demands, not later than 10 days before the Meeting, that the transferee's name be included before the Meeting in the list of registered Equal Shareholders, in which case the transferee will be entitled to vote the transferred Equal Shares at the Meeting. On May 15, 2014, the latest practicable date prior to the date of the Circular, there were 36,100,788 Equal Shares outstanding and entitled to vote.

*Quorum*. A quorum of Equal Shareholders is necessary to hold the Meeting. A quorum at the Meeting in respect of Equal Shareholders shall be two or more persons present in person, each being an Equal Shareholder entitled to vote at the Meeting or a duly appointed proxy holder, and together holding or representing by proxy no less than 5% of the votes attaching to all outstanding Equal Shares entitled to be voted at the Meeting. If a quorum is present at the opening of the Meeting, the Equal

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 2 )

Table of Contents

Shareholders present or represented may proceed with the business of the Meeting notwithstanding that a quorum is not present throughout the Meeting. If a quorum is not present at the appointed time fixed for the holding of the Meeting, it shall stand adjourned to a fixed time and place as may be determined by the Chairman of the Meeting. No notice of the adjourned Meeting shall be required and, if at such adjourned Meeting a quorum is not present, the Equal Shareholders present in person or by proxy shall constitute a quorum for all purposes.

*Required Vote*. Pursuant to the Interim Order, at least 66 $\frac{2}{3}$% of the votes cast by Equal Shareholders present in person or represented by proxy at the Meeting must be voted in favour of the Arrangement Resolution in order for it to be approved. In addition, the Arrangement is subject to the approval of a simple majority of the votes cast by Equal Shareholders, excluding the votes of those persons whose votes may not be included in determining minority approval of a business combination under Multilateral Instrument 61-101 *Protection of Minority Security Holders in Special Transactions* ("**MI 61-101**"). Votes will be counted by the scrutineers appointed for the Meeting, who will count votes "For" and "Against".

Notwithstanding the foregoing, the Arrangement Resolution authorizes the Board, at its discretion and without further notice to or approval of the Equal Shareholders to (a) amend the Arrangement Agreement or the Plan of Arrangement to the extent permitted therein in any manner not inconsistent with an applicable order of the Court and (b) subject to the provisions of the Arrangement Agreement, not to proceed with the Arrangement.

The United States Securities and Exchange Commission ("**SEC**") has adopted rules that require us to seek a non-binding, advisory vote to approve the Compensation Proposal in connection with the completion of the Arrangement. This vote is advisory and, therefore, will not be binding on Equal. If the Arrangement is approved and completed, amounts payable to Equal's Named Executive Officers in connection with the completion of the Arrangement will be paid, regardless of whether the Compensation Proposal is passed. Equal's Board will consider the affirmative vote of a majority of the votes cast on the Compensation Proposal by Equal Shareholders present in person or represented by proxy at the Meeting as advisory approval of the Compensation Proposal. Votes will be counted by the scrutineers appointed for the Meeting, who will count votes "For" and "Against."

*Share Ownership of Directors and Executive Officers*. Our directors and executive officers have informed us that, as of the date of this Circular, they intend to vote all of their Equal Shares in favor of the Arrangement Resolution. As of May 15, 2014, the latest practicable date prior to the date of the Circular, our directors and executive officers beneficially owned or controlled, in the aggregate, 848,814 Equal Shares, representing approximately 2.4% of the outstanding Equal Shares. The directors and officers of Equal and its subsidiaries, have entered into lock-up agreements ("**Lock-Up Agreements**") with Petroflow and Petroflow Sub pursuant to which they have agreed, among other things, to vote the Equal Shares beneficially owned or controlled by them in favour of the approval of the Arrangement Resolution. The form of Lock-Up Agreement is attached to the Circular as Appendix E. See the section of this Circular entitled "*The Arrangement-Lock-Up Agreements*" beginning on page 60.

Equal Shares beneficially owned or controlled by Don Klapko, our President and Chief Executive Officer, will be excluded from a vote determining minority approval of the Arrangement by a simple majority of the votes cast by Equal Shareholders, required to approve the Arrangement, in accordance with MI 61-101. As of May 15, 2014, the latest practicable date prior to the date of the Circular, Don Klapko owned or controlled 438,098 Equal Shares.

See the section of this Circular entitled "*The Meeting*" beginning on page 24.

**The Arrangement (See Page 30)**

This Circular relates to the proposed acquisition of Equal by Petroflow Sub pursuant to the Arrangement among Petroflow, Petroflow Sub, Equal and the Equal Shareholders. We have attached the Arrangement Agreement and the Amending Agreement as Appendix A to this Circular and the Plan of Arrangement is attached to the Arrangement Agreement as Schedule "A" (which Plan of Arrangement has been amended by the Amending Agreement). We encourage you to read the Arrangement Agreement, the Amending Agreement and Plan of Arrangement, each in its entirety. Upon the terms and subject to the conditions of the Arrangement Agreement and pursuant to the Plan of Arrangement, Petroflow Sub will acquire Equal.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 3 )

Table of Contents

*Effect on Equal Shares*

Under the Arrangement pursuant to the terms of the Arrangement Agreement, Equal Shareholders (who have not validly exercised their right to dissent) will be entitled to receive the arrangement consideration of USD$5.43 per Equal Share they own immediately prior to the effective time of the Arrangement (the "**Effective Time**"), in cash, subject to adjustment pursuant to the terms of the Arrangement Agreement (the "**Arrangement Consideration**"), less applicable withholding taxes and deductions. Expressed in Canadian dollars for reference only, the Arrangement Consideration equals CDN$5.91 based on the Bank of Canada noon rate on May 15, 2014, the latest practicable date prior to the date of the Circular.

Under the Arrangement, pursuant to the terms of the Arrangement Agreement, Equal will pay a dividend in the amount of USD$0.05 per Equal Share (other than on those Equal Shares held by Equal Shareholders who have validly exercised their right to dissent) to Equal Shareholders on the Equal Shares they hold at the Effective Time (the "**Arrangement Dividend**").

Pursuant to the Arrangement Agreement, if, on or after the date of the Arrangement Agreement, Equal declares, sets aside or pays any dividend or other distribution, other than a dividend designated as a permitted dividend by the Arrangement Agreement ("**Permitted Dividend**"), payable in cash, securities, property or otherwise with respect to the Equal Shares, or sets a record date therefor that is prior to the Effective Time, then the Arrangement Consideration will be adjusted to reflect each such dividend or other distribution by way of a reduction in the Arrangement Consideration by an amount equal to the amount of such dividend or distribution per Equal Share. Pursuant to the Arrangement Agreement, a Permitted Dividend means any of (a) the USD$0.05 per Equal Share ordinary course dividend declared on November 14, 2013 and paid on December 20, 2013 to holders of record on December 2, 2013, (b) the USD$0.05 per Equal Share dividend declared on May 1, 2014 and paid on May 28, 2014 to Equal Shareholders of record at the close of business on May 15, 2014, and (c) the Arrangement Dividend.

*Effect on Options*

Under the Arrangement, each option to purchase Equal Shares ("**Option**") outstanding immediately prior to the Effective Time (whether vested or unvested), shall be transferred from the holder of the Option ("**Optionholder**") to Equal. Upon such transfer, if the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, exceeds the exercise price per Equal Share of such Option, the Optionholder will receive cash consideration equal to such difference, subject to applicable withholding taxes and deductions. Where the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, does not exceed the exercise price per Equal Share of such Option, the Optionholder will not receive any payment in respect of such Option. All Options will be cancelled immediately after transfer to Equal. Pursuant to the Arrangement Agreement, Equal has agreed to take all steps necessary or desirable to give effect to the foregoing, including entering into option cancellation agreements with each Optionholder in respect of all Options and to obtain necessary consents from Optionholders to the transfer and cancellation of the Options as described above.

*Effect on Restricted Shares*

At the Effective Time, each Equal Share in respect of any restricted share of Equal issued pursuant to Equal's restricted share and performance share incentive plan (the "**RSP Plan**") and including all restricted shares issuable pursuant to any dividend equivalent rights resulting from dividends paid by Equal ("**Restricted Share**"), not already issued, will be issued (subject to applicable tax withholdings and other source deductions) to the RSP Plan participants, and any share grant agreement under the RSP Plan and the RSP Plan will be terminated notwithstanding the terms thereof. RSP Plan participants who are holders of Restricted Shares at the Effective Time will be entitled to receive the Arrangement Consideration in exchange for their Equal Shares issued pursuant to Restricted Shares on the same basis as other Equal Shareholders.

*Effect on Convertible Debentures*

Pursuant to the Arrangement Agreement, Petroflow Sub has agreed to satisfy, or cause Equal to satisfy, all of Equal's obligations under the indenture in respect of the Convertible Debentures (the "**Indenture**") arising in connection with or at any time following the implementation of the Arrangement, including complying with Equal's obligations under the Indenture to make offers to holders of the Convertible Debentures ("**Debentureholders**") to purchase the Convertible Debentures as required in connection with a "change of control" or "cash change of control" (as such terms are defined in the Indenture), pursuant to the terms of the Indenture.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 4 )

Table of Contents

Pursuant to the Indenture, following the Arrangement, Equal will be required to make an offer to purchase any Convertible Debentures that remain outstanding in the amount of 101% of the principal amount of the Convertible Debentures plus accrued and unpaid interest up to a date that is 30 business days after the offer is mailed to Debentureholders in accordance with the terms of the Indenture.

Pursuant to the Indenture, following the Arrangement, each Debentureholder will no longer have the right to receive Equal Shares on conversion of its Convertible Debentures, but will have the right to receive in lieu of such Equal Shares, the Arrangement Consideration which such Debentureholder would have been entitled to receive had it been the holder of such number of Equal Shares at the Effective Time that it was entitled to acquire pursuant to its conversion right. The Convertible Debentures have a conversion price of CDN$8.47 per Equal Share as of May 15, 2014, the latest practicable date prior to the date of the Circular, which is greater than the Arrangement Consideration expressed in Canadian dollars of CDN$5.91 (based on the Bank of Canada noon rate on such date).

Pursuant to the Arrangement Agreement, Equal has agreed, if requested by Petroflow Sub prior to the effective date of the Arrangement (the "**Effective Date**"), to use its commercially reasonable efforts to obtain, at Petroflow Sub's expense, all waivers, consents and approvals from the Debentureholders to amend the obligations of Equal under the Indenture by way of a consent solicitation or otherwise. As at the date of the Circular, Petroflow and Petroflow Sub have not advised Equal of any intention to make a request that Equal take a specific action with respect to the Convertible Debentures and there is no certainty that any action or any particular action will be taken with respect to the Convertible Debentures prior to the Effective Time.

The Debentureholders, as such, will not vote with respect to the Arrangement.

**Fairness Opinion (See Page 47)**

The Board determined it was advisable to obtain a fairness opinion (the "**Fairness Opinion**") with respect to the Arrangement Consideration and Arrangement Dividend. The Board asked Global Hunter Securities, LLC ("**GHS**") to review the fairness, from a financial point of view, of the sum of the Arrangement Consideration and the Arrangement Dividend to be received by the Equal Shareholders (excluding holders exercising dissent rights and Excluded Holders). "**Excluded Holders**" include any officers, directors or employees of any parties to the Arrangement, or those parties within the scope of subsection 8.1(2) of MI 61 101, or any class of such persons.

GHS has been engaged since March 20, 2013 (announced on March 25, 2013) by the Special Committee ("**Special Committee**") of the Board of Equal. The Board retained GHS as Equal's financial advisor to review and analyze potentially available alternatives and transactions that ultimately led to the execution of the Arrangement Agreement in respect of the Arrangement (the "**Transaction**"). Services provided by GHS include, in addition to the Fairness Opinion, review of the business and operations of Equal, advice concerning other companies that might be available for acquisition, merger, partnership or other joint venture, and other acquisitive or dispositive transactions and such other investment banking services as are customary for similar transactions and as may from time to time be agreed upon by GHS and Equal.

In connection with the services provided as financial advisor with respect to this Transaction, GHS has received monthly advisory fees of USD$338,750 through May 28, 2014, creditable against the Transaction fee, and will receive a Transaction fee upon consummation of the Transaction of approximately USD$2 million (less the aggregate amount of monthly advisory fees paid through consummation). In addition, GHS received a fixed fee of USD$150,000 in connection with a prior fairness opinion issued to the Board on December 6, 2013. With respect to this Fairness Opinion, GHS shall receive a fixed fee of USD$100,000, upon rendering the Fairness Opinion, regardless of the conclusions contained in the Fairness Opinion or whether or not the Transaction is consummated. Also in connection with the above, Equal has agreed to reimburse GHS for its out-of-pocket and incidental expenses and to indemnify GHS for certain liabilities arising out of it being so engaged.

GHS issued a previous fairness opinion to the Board in connection with the Transaction on December 6, 2013 to the effect that as of December 6, 2013 and based upon and subject to the various assumptions and limitations set forth therein, the

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:* *contactus@kingsdaleshareholder.com*

( 5 )

Table of Contents

Arrangement Consideration to be received by the Equal Shareholders (other than certain Equal Shareholders referenced therein) was fair, from a financial point of view, to such Equal Shareholders. Such opinion can only be evaluated as of the date it is rendered, and GHS has no responsibility or obligation to update or revise the opinion based upon events or circumstances occurring after that date.

On May 29, 2014, GHS rendered its oral opinion to our Board (which was subsequently confirmed in writing by delivery of the final written Fairness Opinion dated as of the same date) to the effect that, as of May 29, 2014, and based upon and subject to the various assumptions and limitations set forth therein, the sum of the Arrangement Consideration and the Arrangement Dividend, to be received by the Equal Shareholders (other than those exercising Dissent Rights and Excluded Holders) in the Arrangement was fair, from a financial point of view, to such Equal Shareholders. Such opinion can only be evaluated as of the date it is rendered, and GHS has no responsibility or obligation to update or revise the opinion based upon events or circumstances occurring after that date. The oral opinion and final written Fairness Opinion delivered to Equal's Board were reviewed, discussed and approved by the fairness committee of GHS in accordance with GHS' customary practices prior to delivery.

**GHS' Fairness Opinion was addressed to our Board, and only addressed the fairness, from a financial point of view, to the Equal Shareholders (other than those exercising Dissent Rights and Excluded Holders) of the sum of the Arrangement Consideration and the Arrangement Dividend to be received by such Equal Shareholders in the Arrangement and did not address any other aspect or implication of the Arrangement. The summary of GHS' Fairness Opinion in this proxy statement is qualified in its entirety by reference to the full text of its written Fairness Opinion, which is included as Appendix F to this Circular and sets forth the factors considered, procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by GHS in preparing its Fairness Opinion. However, neither GHS' written Fairness Opinion nor the summary of its Fairness Opinion and the related analyses set forth in this Circular is intended to be, and they do not constitute, a recommendation to any Equal Shareholders as to how such Equal Shareholder should act or vote with respect to the Arrangement or any other matter.**

See Appendix F and the section of this Circular entitled "*The Arrangement – Fairness Opinion*" beginning on page 47.

### Recommendation of the Special Committee (See Page 45)

The Special Committee, consisting of Victor Dusik, Robert Wilkinson and Michael Doyle, formed on March 7, 2013, having undertaken a thorough review of, and carefully considered, the proposed Arrangement and the alternatives available to Equal, and having taken into account such other matters as it considered relevant (as described under the heading "*The Arrangement - Reasons for the Recommendation of our Board and Special Committee*" beginning on page 45), unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. Accordingly, the Special Committee unanimously approved the Arrangement and the Compensation Proposal and recommended that the Board approve the Arrangement and the Compensation Proposal and recommended that the Equal Shareholders vote "FOR" the Arrangement Resolution and Compensation Proposal.

See the section of this Circular entitled "*The Arrangement—Reasons for the Recommendation of our Board and Special Committee*" beginning on page 45.

### Recommendation of our Board of Directors (See Page 45)

After careful consideration, and taking into account the recommendation of the Special Committee and such other matters as it considered relevant (as described under the heading "*The Arrangement – Reasons for the Recommendation of the Board and Special Committee*" beginning on page 45), the Board unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement, and our Board unanimously recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution, the complete text of which is attached as Appendix C to this Circular.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 6 )

Table of Contents

Our directors and executive officers have informed us that, as of the date of this Circular, they intend to vote all of their Equal Shares in favor of the Arrangement Resolution. As of May 15, 2014, the latest practicable date prior to the date of the Circular, our directors and executive officers beneficially owned or controlled, in the aggregate, 848,814 Equal Shares, representing approximately 2.4% of the outstanding Equal Shares.

The directors and officers of Equal and its subsidiaries have entered into Lock-Up Agreements with Petroflow and Petroflow Sub pursuant to which they have agreed, among other things, to vote the Equal Shares beneficially owned or controlled by them in favour of the Arrangement Resolution. At May 15, 2014, the latest practicable date prior to the date of the Circular, the directors and officers of Equal and its subsidiaries beneficially owned or controlled 848,814 Equal Shares, representing approximately 2.4% of the Equal Shares outstanding. The form of Lock-Up Agreement is attached to the Circular as Appendix E.

The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

See the section of this Circular entitled "*The Arrangement—Reasons for the Recommendation of our Board and Special Committee*" beginning on page 45.

**The Plan of Arrangement (See Page 61)**

The Arrangement is proposed to be carried out pursuant to section 193 of the ABCA. The following procedural steps must be taken for the Arrangement to become effective:

- the Arrangement must be approved by the Equal Shareholders in the manner set forth in the Interim Order;

- the Court must grant the final order approving the Arrangement (the "**Final Order**");

- all conditions precedent to the Arrangement, as set forth in the Arrangement Agreement, must be satisfied or waived by the appropriate party; and

- the Final Order and articles of arrangement (the "**Articles of Arrangement**") in the form prescribed by the ABCA must be filed with the Registrar of Corporations for the Province of Alberta (the "**Registrar**").

*Equal Shareholder Approval*

At the Meeting, pursuant to the Interim Order, the Equal Shareholders will be asked to approve the Arrangement Resolution. Each Equal Shareholder shall be entitled to vote on the Arrangement Resolution, with the Equal Shareholders entitled to one vote per Equal Share. The requisite approval for the Arrangement Resolution is at least 66⅔% of the votes cast on the Arrangement Resolution by the Equal Shareholders present in person or represented by proxy at the Meeting and a simple majority of the votes cast on the Arrangement Resolution by the Equal Shareholders, excluding the votes of those persons whose votes may not be included in determining minority approval of a business combination under MI 61-101. The Arrangement Resolution must receive Equal Shareholder approval in order for Equal to seek the Final Order and implement the Arrangement on the Effective Date in accordance with the terms of the Final Order.

*Court Approval*

The Arrangement requires the Court's approval of the Final Order. Prior to the mailing of this Circular, Equal obtained the Interim Order authorizing and directing Equal to call, hold and conduct the Meeting and to submit the Arrangement to Equal Shareholders for approval. A copy of the Interim Order is attached as Appendix B to this Circular. Subject to the terms of the Arrangement Agreement and receipt of Equal Shareholder approval, Equal will make an application to the Court for the Final Order. The hearing in respect of the Final Order is expected to take place on July 9, 2014, at 4:00 p.m. (Calgary time) at the Calgary Courts Centre, 601 - 5th Street S.W., Calgary, Alberta. See "*The Plan of Arrangement - Court Approval*" beginning on page 65.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 7 )

Table of Contents

*Conditions Precedent*

The implementation of the Arrangement is subject to a number of conditions precedent being waived or satisfied by one or more of the parties to the Arrangement Agreement. See **"***The Arrangement Agreement –Conditions"** beginning on page 73.

**Timing (See Page 65)**

If the Meeting is held as scheduled and is not adjourned or postponed and Equal Shareholder approval is obtained, Equal will apply for the Final Order approving the Arrangement. Subject to receipt of the Final Order in form and substance satisfactory to Equal and Petroflow Sub, and satisfaction or waiver of all other conditions set forth in the Arrangement Agreement, Equal expects the Effective Date to occur before July 31, 2014. However, we cannot predict the exact timing of the Arrangement.

**The Arrangement Agreement (See Page 66)**

A summary description of the Arrangement Agreement is set out in the Circular in the section entitled "*The Arrangement Agreement*" beginning on page 66 and is qualified in its entirety by the full text of the Arrangement Agreement, which is attached as Appendix A to this Circular. The following is a brief summary of certain materials terms of the Arrangement Agreement and is qualified in its entirety by the more detailed summary contained elsewhere in this Circular.

*Covenants, Representations and Warranties*

The Arrangement Agreement contains customary covenants, representations and warranties for an agreement of this type. In addition, Equal has provided certain non-solicitation covenants in favour of Petroflow and Petroflow Sub. Summary information related to the covenants, representations and warranties set out in the Arrangement Agreement is provided in this Circular under the heading "*The Arrangement Agreement*" beginning on page 66.

*Termination of the Arrangement Agreement*

The Arrangement Agreement may be terminated at any time prior to the Effective Date of the Arrangement by mutual written consent of Equal, Petroflow and Petroflow Sub and by any of Equal, Petroflow or Petroflow Sub in certain other circumstances. A summary of the termination provisions of the Arrangement Agreement is provided in the section of this Circular entitled "*The Arrangement Agreement - Termination*" beginning on page 76.

*Termination Payment*

Under certain specified circumstances, Equal may be required to pay Petroflow a termination payment or Petroflow may be required to pay Equal a reverse termination payment, with respect to the termination of the Arrangement Agreement, as described under "*The Arrangement Agreement – Termination Payment*" beginning on page 77.

**Minority Approval (See Page 79)**

MI 61-101 is intended to regulate certain transactions to ensure equality of treatment among securityholders, generally requiring enhanced disclosure, approval by a majority of securityholders excluding interested or related parties, independent valuations and, in certain instances, approval and oversight of the transaction by a special committee of independent directors. The protections of MI 61-101 generally apply to "business combinations" that terminate the interests of securityholders without their consent. MI 61-101 provides that, in certain circumstances, where a related party of an issuer is entitled to receive a "collateral benefit" in connection with an arrangement transaction (such as the Arrangement), such transaction may be considered a "business combination" for the purposes of MI 61-101 and subject to minority approval requirements. See the sections of this Circular entitled "*Minority Approval*" beginning on page 79 and "*Interests Of Our Directors And Executive Officers In The Arrangement.*" beginning on page 80.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 8 )

Table of Contents

**Lock-Up Agreements (See Page 60)**

The directors and officers of Equal and its subsidiaries have entered into Lock-Up Agreements with Petroflow and Petroflow Sub pursuant to which they have agreed, among other things, to vote the Equal Shares beneficially owned or controlled by them in favour of the Arrangement Resolution. At May 15, 2014, the latest practicable date prior to the date of the Circular, the directors and officers of Equal and its subsidiaries beneficially owned or controlled 848,814 Equal Shares, representing approximately 2.4% of the Equal Shares outstanding. The form of Lock-Up Agreement is attached to the Circular as Appendix E.

**Financing of the Arrangement (See Page 60)**

It is a condition to the obligations of Petroflow and Petroflow Sub to complete the Arrangement that either Petroflow or Petroflow Sub has received the proceeds of debt financing for the purposes of financing the transactions contemplated by the Arrangement Agreement and related fees and expenses (the "**Financing**"). If the Financing is not completed due to Petroflow's breach of its covenant to use its commercially reasonable efforts to obtain the Financing and Equal is not then in breach of the Arrangement Agreement in a manner that would cause the conditions to the obligations of Petroflow Sub and Petroflow under the Arrangement Agreement to not be satisfied, the Arrangement may not be completed, in which case Petroflow would be required to pay a reverse termination payment to Equal in the amount of USD$2,000,000, pursuant to the Arrangement Agreement. The Board did not consider the financial statements of Petroflow or Petroflow Sub or rely on the financial condition of Petroflow or Petroflow Sub in determining that the transaction is in the best interests of Equal Shareholders. The Board relied upon the reverse termination payment as adequate assurance for Equal Shareholders and a sufficient inducement to Petroflow to obtain the Financing for the transaction and close the acquisition.

See Section 10.2(f) of the Arrangement Agreement, which is attached as Appendix A to this Circular, for full particulars relating to the Reverse Termination Payment.

See "*The Arrangement - Financing of the Arrangement*" on page 60 and "*The Plan of Arrangement - Sources of Funds for the Arrangement*" on page 63.

**Market Price and Dividend Data (See Page 94)**

The USD$5.43 per Equal Share Arrangement Consideration represents approximately a 22% premium over USD$4.44, the closing price of the Equal Shares on the TSX on November 18, 2013 (converted from Canadian dollars to U.S. dollars based on the Bank of Canada noon rate published for November 18, 2013), the trading day prior to the announcement that Equal's strategic alternatives process had successfully resulted in exclusive negotiations with another party and a 23% premium over USD$4.43, the closing price of the Equal Shares on the NYSE on November 18, 2013. The Arrangement Consideration also represents approximately a 54% premium over USD$3.53, the closing price of the Equal Shares on the TSX on March 22, 2013 (converted from Canadian dollars to U.S. dollars based on the Bank of Canada noon rate published for March 22, 2013), the trading day prior to Equal's announcement that it was pursuing a strategic alternatives process and a 56% premium over USD$3.49, the closing price of the Equal Shares on the NYSE on March 22, 2013. See the section of this Circular entitled "*Market Price and Dividend Data*" beginning on page 94. You are encouraged to obtain current market quotations for Equal Shares in connection with voting your Equal Shares.

Equal did not pay any dividends on the Equal Shares during calendar years 2010, 2011 or 2012. On November 27, 2012, Equal announced the initiation of a USD$0.20 per Equal Share annual dividend beginning January 1, 2013, payable at the end of each calendar quarter. A cash dividend of USD$0.05 per Equal Share was paid on March 31, 2013 to Equal Shareholders of record at the close of business on March 1, 2013. A cash dividend of USD$0.05 per Equal Share was paid on June 28, 2013 to Equal Shareholders of record at the close of business on June 3, 2013. A cash dividend of USD$0.05 per Equal Share was paid on September 25, 2013 to Equal Shareholders of record at the close of business on September 2, 2013. In accordance with the terms of the Arrangement Agreement, Equal declared the USD$0.05 per Equal Share Permitted Dividend on November 14, 2013 and paid such Permitted Dividend on December 20, 2013 to Equal Shareholders of record on December 2, 2013.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 9 )

Table of Contents

Pursuant to the Arrangement Agreement, if, on or after the date of the Arrangement Agreement, Equal declares, sets aside or pays any dividend or other distribution, other than a Permitted Dividend, payable in cash, securities, property or otherwise with respect to the Equal Shares, or sets a record date therefor that is prior to the Effective Time, then the Arrangement Consideration will be adjusted to reflect each such dividend or other distribution by way of a reduction in the Arrangement Consideration by an amount equal to the amount of such dividend or distribution per Equal Share. Pursuant to the Arrangement Agreement, a Permitted Dividend means any of (a) the USD$0.05 per Equal Share ordinary course dividend declared on November 14, 2013 and paid on December 20, 2013 to holders of record on December 2, 2013, (b) the USD$0.05 per Equal Share dividend declared on May 1, 2014 and paid on May 28, 2014 to Equal Shareholders of record at the close of business on May 15, 2014, and (c) the Arrangement Dividend.

See the section of this Circular entitled "*Market Price and Dividend Data*" beginning on page 94.

**Stock Exchange Delisting (See Page 64)**

If the Arrangement is completed, it is expected that the Equal Shares will be delisted from the TSX and NYSE in the days following its completion. It is expected that the Convertible Debentures will remain listed on the TSX immediately after the completion of the Arrangement, to the extent that Convertible Debentures remain outstanding following completion of the Arrangement. See "*The Arrangement – Treatment of Equal Securities Pursuant to the Arrangement - Convertible Debentures*" beginning on page 32**.**

**Certain Canadian Federal Income Tax Considerations (See Page 99)**

An Equal Shareholder who is resident in Canada and who holds Equal Shares as capital property will generally realize a net capital gain (or net capital loss) equal to the amount by which the Arrangement Consideration received by such Equal Shareholder exceeds (or is less than) their adjusted cost base of the Equal Shares and any reasonable costs of disposition, as a result of the transactions comprising the Arrangement or the exercise of dissent rights with respect to the Arrangement described under the heading "*Dissent Rights"* beginning on page 97 **("Dissent Rights")**. Equal Shareholders who are not resident in Canada generally will be subject only to withholding taxes under the *Income Tax Act* (Canada) (the "**Tax Act**") in respect of the Arrangement Dividend.

**The foregoing is a brief summary of certain Canadian federal income tax consequences only. Equal Shareholders should review the more detailed information under the heading "Certain Canadian Federal Income Tax Considerations" in the Circular, which qualifies the summary set forth above. Equal Shareholders are urged to consult their own tax advisors to determine the particular tax consequences to them of the Arrangement.**

**Certain United States Federal Income Tax Considerations (See Page 103)**

The Arrangement will be a taxable event to a U.S. Holder (as defined below in the section of the Circular entitled "*Certain United Sates Federal Income Tax Consideration*" beginning on page 103). A U.S. Holder of Equal Shares will recognize gain or loss equal to the difference, if any, between (i) the aggregate Arrangement Consideration and the Effective Date Permitted Dividends (as defined below) and (ii) the U.S. Holder's adjusted tax basis in the Equal Shares surrendered. For Equal Shareholders who hold their Equal Shares as capital assets, any gain or loss recognized by a U.S. Holder will be short-term capital gain or loss, unless the holding period for the Equal Shares surrendered was more than one year at the closing of the Arrangement, in which case any gain or loss recognized will be long-term capital gain or loss. Preferential tax rates for long-term capital gains are generally applicable to a U.S. Holder that is an individual, estate or trust. There are no preferential tax rates for long-term capital gains for a U.S. Holder that is a corporation. The deduction of capital losses is subject to limitation. The foregoing assumes that Equal has never been a passive foreign investment company.

**The foregoing is a brief summary of United States federal income tax consequences only. Equal Shareholders should read carefully the information in the Circular under the heading "Certain United States Federal Income Tax Considerations", which qualifies the summary set forth above. Equal Shareholders are urged to consult their own tax advisors to determine the particular tax consequences to them of the Arrangement.**

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 10 )

Table of Contents

**Regulatory Matters (See Page 97)**

Pursuant to the Arrangement Agreement, Equal has represented that the Arrangement is exempt from the United States Hart-Scott Rodino Antitrust Improvements Act of 1976 ("**HSR Act**") as a result of the aggregate fair market value of the non-exempt assets (as described therein) of Equal and its subsidiaries not exceeding USD$70.9 million.

The Arrangement is exempt from a mandatory filing requirement under the merger notification provisions of the *Competition Act* (Canada), on the basis that the relevant thresholds contained in Part IX of *Competition Act* (Canada) are not exceeded in the case of the Arrangement

See the section of this Circular entitled "*Regulatory Matters*" beginning on page 97.

**Dissent Rights (See Page 97)**

Pursuant to and in accordance with the Plan of Arrangement, the Interim Order and the provisions of section 191 of the ABCA (as modified or supplemented by the Interim Order, the Plan of Arrangement and any other order of the Court), registered Equal Shareholders have a right to dissent in respect of the Arrangement Resolution and, if the Arrangement Resolution is passed, to be paid the fair value of their Equal Shares. **The dissent procedures require that a registered Equal Shareholder who wishes to dissent must send to Equal a written objection to the Arrangement Resolution, which written objection must be received by Equal, c/o Stikeman Elliott LLP, 4300 Bankers Hall West, 888 – 3rd Street S.W., Calgary, AB, T2P 5C5, Attention: Geoffrey D. Holub, not later than 5:00 p.m. (Calgary time) on June 27, 2014 (or 5:00 p.m. (Calgary time) on the day that is five business days (as such term is defined in the Plan of Arrangement) immediately preceding the date that any adjournment or postponement of the Meeting is reconvened or held, as the case may be)**.

It is a condition to Petroflow and Petroflow Sub's obligation under the Arrangement Agreement to complete the Arrangement that Equal Shareholders holding no more than 5% of the Equal Shares on a fully diluted basis shall have exercised Dissent Rights as at the Effective Time.

The statutory provisions covering the right to dissent are technical and complex. Failure to strictly comply with the requirements set forth in section 191 of the ABCA, as modified or supplemented by the Interim Order and Plan of Arrangement, may result in the loss of any right to dissent. Persons who are beneficial owners of Equal Shares registered in the name of a broker, investment dealer, bank, trust company, custodian, nominee or other intermediary who wish to dissent should be aware that only registered Equal Shareholders are entitled to dissent. Accordingly, a non-registered Equal Shareholder desiring to exercise its Dissent Rights must make arrangements for such Equal Shares that are beneficially owned to be registered in such holder's name prior to the time the written objection to the Arrangement Resolution is required to be received by Equal or, alternatively, make arrangements for the registered holder to dissent on such holder's behalf. A dissenting Equal Shareholder may only dissent with respect to all Equal Shares held on behalf of any one beneficial holder and registered in the name of such dissenting Equal Shareholder. See the section of this Circular entitled "*Dissent Rights*" beginning on page 97.

**Depositary**

Computershare Investor Services Inc. ("**Computershare**") will act as the depositary in connection with the Arrangement (the "**Depositary**").

**Legal Proceedings Related to Arrangement (See Page 109)**

On December 26, 2013, Equal was served with a complaint related to a putative class action lawsuit that has been filed in the District Court of Oklahoma County in the State of Oklahoma. The complaint, which names as defendants Equal, members of the Board, Petroflow and Petroflow Sub, alleges that in connection with Arrangement, the members of the Board breached their fiduciary duties to the Equal Shareholders. The complaint further claims that Equal, Petroflow and Petroflow Sub aided and abetted those alleged breaches of fiduciary duties. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unfairly preclusive deal protection devices. The plaintiff in the action seeks injunctive relief, including to enjoin the Arrangement, and an award of attorneys' and other fees and costs. Equal and the other defendants have not yet responded to the complaint.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 11 )

Table of Contents

Subsequently, three other complaints related to putative class action lawsuits arising from the Arrangement were filed in the District Court of Oklahoma County in the State of Oklahoma.

One of these additional complaints names as defendants Equal, members of the Board, and Petroflow, and alleges that in connection with the Arrangement, the members of the Board breached their fiduciary duties to Equal's shareholders in connection with the Arrangement. The complaint further claims that Equal and Petroflow aided and abetted those alleged breaches of fiduciary duties. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unfairly preclusive deal protection devices. The plaintiff in the action seeks injunctive relief, including preliminary and final injunctions against completion of the Arrangement, compensatory damages suffered as a result of the defendants' wrongful conduct, and an award of attorneys' and other fees and costs.

The third of these additional complaints names as defendants Equal, members of Equal's Board, Petroflow and Petroflow Sub, and alleges that in connection with the Arrangement, the members of the Board (i) breached their fiduciary duties to the Equal Shareholders and (ii) "oppressed" the minority Equal Shareholders in violation of the ABCA. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unreasonable deal protection devices. The plaintiff in the action seeks injunctive relief, including preliminary and final injunctions against completion of the Arrangement or any step in furtherance of its completion, compensatory damages, and an award of attorneys' and other fees and costs.

The fourth of these additional complaints names as defendants Equal, members of Equal's Board, Petroflow and Petroflow sub, and alleges that in connection with the Arrangement, the members of the Board (i) breached their fiduciary duties to the Equal Shareholders and (ii) "oppressed" the minority Equal Shareholders in violation of the ABCA. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unreasonable deal protection devices. The plaintiff in the action seeks injunctive relief, including preliminary and final injunctions against completion of the Arrangement or any step in furtherance of its completion, compensatory damages, and an award of attorneys' and other fees and costs.

One of these four matters was voluntarily dismissed, while the other three were consolidated into one case. Equal, members of the Board, and other defendants have moved to dismiss the complaints, which motion is currently pending.

On April 24, 2014, Equal was served with four complaints related to putative class action lawsuits that had been filed in the U.S. District Court for the Western District of Oklahoma. These complaints, which name as defendants Equal, members of the Board, Petroflow and Petroflow Sub, allege that in connection with Arrangement, the members of the Board breached their fiduciary duties to the Equal Shareholders. The complaints further claim that Equal, Petroflow and Petroflow Sub aided and abetted those alleged breaches of fiduciary duties. Further, the complaints allege that Equal's Preliminary Proxy violated Sections 14(a) and 20(a) of the Securities Exchange Act, as well as SEC Rule 14a-9. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unfairly preclusive deal protection devices. The plaintiff in the action seeks injunctive relief, including to enjoin the Arrangement, and an award of attorneys' and other fees and costs.

The U.S. District Court for the Western District of Oklahoma has since consolidated the four complaints into one case. Equal and the other defendants have moved to dismiss the case, which motion is currently pending.

**Expenses (See Page 65)**

The estimated fees, costs and expenses of Equal in connection with the Arrangement contemplated herein including, without limitation, financial and strategic advisors' fees, filing fees, legal and accounting fees, proxy solicitation fees and printing and mailing costs are anticipated to be approximately USD$4.0 million based on certain assumptions.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 12 )

Table of Contents

**Board Resignations (See Page 61)**

It is anticipated that all of the current members of the Board will resign effective as of the Effective Date and Petroflow and/or Petroflow Sub will fill the vacancies created by such resignations.

**Risk Factors (See Page 108)**

There is a risk that the Arrangement may not be completed. If the Arrangement is not completed, Equal will continue to face the risks that it currently faces with respect to its affairs, business and operations and future prospects, plus additional risks relating to changes to the conduct of its business and operations resulting from interim restrictions under the Arrangement Agreement. Additionally, failure to complete the Arrangement could materially and negatively impact the trading price of the Equal Shares.

You should carefully consider the risk factors described in the section of the Circular entitled "*Risk Factors*" beginning on page 108 in evaluating how you should vote your Equal Shares.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 13 )

Table of Contents

### QUESTIONS AND ANSWERS ABOUT THE ARRANGEMENT AND THE MEETING

The following are some questions that you, as an Equal Shareholder, may have regarding the Meeting and Arrangement as well as brief answers to such questions. We urge you to read carefully the entirety of this Circular and the appendices attached thereto because the information in this section does not provide all the information that may be important to you with respect to the approval of the Arrangement. Additional important information is also contained in the appendices to this Circular.

**Q:   Why am I receiving this Circular?**

A:   The Arrangement is the culmination of a strategic review process which was initiated when Montclair Energy, LLC ("**Montclair**") made an unsolicited proposal to acquire Equal on February 27, 2013 for USD$4.00 per Equal Share. Equal formed the Special Committee of three independent directors to consider a full range of strategic alternatives, including continuing as a going concern, a corporate sale and return of capital to shareholders through share buybacks and dividends, in order to maximize shareholder value. In a press release dated March 25, 2013, Equal announced that the Special Committee would investigate and evaluate all proposals presented to Equal. The Special Committee, assisted by its advisors, communicated with 19 potential arm's length bidders, entered into confidentiality agreements with seven, and ultimately received final proposals from two bidders. Of these, the proposal submitted by Petroflow was superior. The other proposal, which was submitted by Montclair, was inferior, not only in terms of price and other financial terms but also with respect to the conditions of the proposal**.** On November 18, 2013, Equal publicly announced that it was pursuing exclusive negotiations with the party presenting this superior proposal, which culminated in the announcement of the Arrangement Agreement with Petroflow and Petroflow Sub on December 9, 2013**.**

**Q:   When and where is the Meeting?**

A:   The Meeting will take place on July 8, 2014, at 10:30 a.m., local time, at the Wildrose South Ballroom at the Sheraton Suites Calgary Eau Claire, 255 Barclay Parade Southwest, Calgary, Alberta.

**Q:   What matters will be voted on at the Meeting?**

A:   We have entered into an Arrangement Agreement with Petroflow, and Petroflow Sub. Under the Arrangement pursuant to the terms of the Arrangement Agreement, Equal Shareholders (who have not validly exercised their right to dissent) will be entitled to receive the Arrangement Consideration in the amount of USD$5.43 per Equal Share, in cash, subject to adjustment pursuant to the terms of the Arrangement Agreement, less applicable withholding taxes and deductions**.** Expressed in Canadian dollars for reference only, the Arrangement Consideration equals CDN$5.91 based on the Bank of Canada noon rate on May 15, 2014, the latest practicable date prior to the date of the Circular.

Pursuant to the Arrangement Agreement, if, on or after the date of the Arrangement Agreement, Equal declares, sets aside or pays any dividend or other distribution, other than a Permitted Dividend, payable in cash, securities, property or otherwise with respect to the Equal Shares, or sets a record date therefor that is prior to the Effective Time, then the Arrangement Consideration will be adjusted to reflect each such dividend or other distribution by way of a reduction in the Arrangement Consideration by an amount equal to the amount of such dividend or distribution per Equal Share. Pursuant to the Arrangement Agreement, a Permitted Dividend means any of (a) the USD$0.05 per Equal Share ordinary course dividend declared on November 14, 2013 and paid on December 20, 2013 to holders of record on December 2, 2013, (b) the USD$0.05 per Equal Share dividend declared on May 1, 2014 and paid on May 28, 2014 to Equal Shareholders of record at the close of business on May 15, 2014, and (c) the Arrangement Dividend.

Under the Arrangement, pursuant to the terms of the Arrangement Agreement, Equal will pay the Arrangement Dividend to Equal Shareholders on the Equal Shares they hold at the Effective Time.

Under the Arrangement, each Option outstanding immediately prior to the Effective Time (whether vested or unvested), shall be transferred from the Optionholder to Equal. Upon such transfer, if the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, exceeds the exercise price per Equal Share

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 14 )

Table of Contents

of such Option, the Optionholder will receive cash consideration equal to such difference, subject to applicable withholding taxes and deductions. Where the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, does not exceed the exercise price per Equal Share of such Option, the Optionholder will not receive any payment in respect of such Option. All Options will be cancelled immediately after transfer to Equal. Pursuant to the Arrangement Agreement, Equal has agreed to take all steps necessary or desirable to give effect to the foregoing, including entering into option cancellation agreements with each Optionholder in respect of all Options and to obtain necessary consents from Optionholders to the transfer and cancellation of the Options as described above.

At the Effective Time, each Equal Share in respect of any unvested Restricted Share, not already issued, will be issued (subject to applicable tax withholdings and other source deductions) to the RSP Plan participants, and any share grant agreement under the RSP Plan and the RSP Plan will be terminated notwithstanding the terms thereof. RSP Plan participants who are holders of Restricted Shares at the Effective Time will be entitled to receive the Arrangement Consideration in exchange for their Equal Shares issued pursuant to Restricted Shares on the same basis as other Equal Shareholders.

In order for us to complete the Arrangement, at least $66 \frac{2}{3}\%$ of the votes cast by Equal Shareholders present in person or represented by proxy at the Meeting must be voted in favour of the Arrangement Resolution, the full text of which is set forth in Appendix C, with or without variation. In addition, the Arrangement is subject to approval of a simple majority of the votes cast by Equal Shareholders, excluding the votes of those persons whose votes may not be included in determining minority approval of a business combination under MI 61-101.

In addition, you will be asked to consider and vote upon the Compensation Proposal to approve the compensation that may become payable to Equal's Named Executive Officers in connection with the completion of the Arrangement.

Equal knows of no other matters that will be presented for consideration at the Meeting. If any other matters are properly brought before the Meeting, it is the intention of the persons named in the accompanying proxy to vote on those matters in accordance with their best judgment.

Your vote is very important, regardless of the number of Equal Shares you hold. We encourage you to vote as soon as possible. For more specific information on how to vote, please see the questions and answers below and the section of this Circular entitled "*General Proxy Matters*".

**Q:    How does Equal's Board recommend I vote?**

A:    At a meeting held on December 6, 2013, the Board, after careful consideration, unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement. Accordingly, the Board unanimously recommends that you vote "FOR" the approval of the Arrangement Resolution. The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

**Q:    How will Equal's directors and executive officers vote on the Arrangement Resolution?**

A:    Our directors and executive officers have informed us that, as of the date of this Circular, they intend to vote all of their Equal Shares in favor of the Arrangement Resolution. As May 15, 2014, the latest practicable date prior to the date of the Circular, our directors and executive officers beneficially owned or controlled, in the aggregate, 848,814 Equal Shares, representing approximately 2.4% of the outstanding Equal Shares.

The directors and officers of Equal and its subsidiaries have entered into Lock-Up Agreements with Petroflow and Petroflow Sub pursuant to which they have agreed, among other things, to vote the Equal Shares beneficially owned or controlled by them in favour of the Arrangement Resolution. At May 15, 2014, the latest practicable date prior to

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 15 )

Table of Contents

the date of the Circular, the directors and officers of Equal and its subsidiaries beneficially owned or controlled 848,814 Equal Shares, representing approximately 2.4% of the Equal Shares outstanding. The form of Lock-Up Agreement is attached to the Circular as Appendix E.

Equal Shares beneficially owned or controlled by Don Klapko, our President and Chief Executive Officer, will be excluded from a vote determining minority approval of the Arrangement by a simple majority of the votes cast by Equal Shareholders, required to approve the Arrangement, in accordance with MI 61-101. As of May 15, 2014, the latest practicable date prior to the date of the Circular, Don Klapko owned or controlled 438,098 Equal Shares.

**Q:    How does the Arrangement Consideration compare to the market price of Equal Shares prior to the announcement of the Arrangement?**

A:    The USD$5.43 per Equal Share Arrangement Consideration represents approximately a 22% premium over USD$4.44, the closing price of the Equal Shares on the TSX on November 18, 2013 (converted from Canadian dollars to U.S. dollars based on the Bank of Canada noon rate published for November 18, 2013), the trading day prior to the announcement that Equal's strategic alternatives process had successfully resulted in exclusive negotiations with another party and a 23% premium over USD$4.43, the closing price of the Equal Shares on the NYSE on November 18, 2013. The Arrangement Consideration also represents approximately a 54% premium over USD$3.53, the closing price of the Equal Shares on the TSX on March 22, 2013 (converted from Canadian dollars to U.S. dollars based on the Bank of Canada noon rate published for March 22, 2013), the trading day prior to Equal's announcement that it was pursuing a strategic alternatives process and a 56% premium over USD$3.49, the closing price of the Equal Shares on the NYSE on March 22, 2013.

**Q:    Is the Arrangement expected to result in a tax liability for Canadian or U.S. federal income tax purposes?**

A:    The Arrangement will be taxable to Equal Shareholders for U.S. federal and Canadian income tax purposes. See the section of the Circular entitled *"Certain Canadian Federal Income Tax Considerations"* beginning on page 99 and the section of the Circular entitled "*Certain United States Federal Income Tax Considerations*" beginning on page 103.

**Q:    Should I send in my Equal Share certificates now?**

A:    No. Promptly after the Arrangement is completed, each holder of record immediately prior to the Effective Time will be sent a letter of transmittal (a "**Letter of Transmittal**"), together with written instructions for exchanging share certificates for the payment of the Arrangement Consideration in cash and the Arrangement Dividend. These instructions will tell you how and where to send your certificates in exchange for your Arrangement Consideration and the Arrangement Dividend. You will receive your Arrangement Consideration and the Arrangement Dividend after Computershare, the Depositary under the Arrangement receives your share certificates and any other documents and instruments as the Depositary reasonably requires.

**Q:    What should I do if I have lost my share certificates?**

A:    The materials you are sent after the completion of the Arrangement will include the procedures that you must follow if you cannot locate your share certificate. Such procedures will include signing an affidavit attesting to the loss of your share certificate. You may also be required to provide a bond in order to cover any potential loss or take such other steps as the Depositary, Petroflow or Petroflow Sub may require.

**Q:    What happens if I sell my shares before the Meeting?**

A:    The Record Date to receive notice of and vote at the Meeting of June 8, 2014 is earlier than the Meeting and the date that the Arrangement is expected to be completed. If you transfer your Equal Shares after the Record Date but before the Meeting, you will retain your right to vote at the Meeting, unless a transferee of the Equal Shares after the Record Date validly establishes a right to vote at the Meeting by providing evidence of ownership of such Equal Shares and demanding that his or her name be placed on the Equal Shareholder list for the Meeting in place of your

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:* *contactus@kingsdaleshareholder.com*

( 16 )

Table of Contents

name. If you transfer your Equal Shares before the Arrangement is completed you will have transferred the right to receive the Arrangement Consideration and the Arrangement Dividend. In order to receive the Arrangement Consideration and the Arrangement Dividend, you must hold your Equal Shares through completion of the Arrangement.

**Q:**    **When do you expect the Arrangement to be completed?**

A:    Equal expects the Effective Date to occur before July 31, 2014.

**Q:**    **Is Petroflow's and Petroflow Sub's obligation to complete the Arrangement subject to Petroflow's and Petroflow Sub's receipt of financing?**

A:    Yes. Pursuant to the Arrangement Agreement it is a condition to the obligations of Petroflow and Petroflow Sub to complete the Arrangement that either Petroflow or Petroflow Sub has received the proceeds of the Financing. If the Financing is not completed due to Petroflow's breach of its covenant to use commercially reasonable efforts to obtain the Financing and Equal is not then in breach of the Arrangement Agreement in a manner that would cause the conditions to the obligations of Petroflow Sub and Petroflow under the Arrangement Agreement to not be satisfied, the Arrangement may not be completed, in which case Petroflow would be required to pay a reverse termination payment to Equal in the amount of USD$2,000,000, pursuant to the Arrangement Agreement. The Board did not consider the financial statements of Petroflow or Petroflow Sub or rely on the financial condition of Petroflow or Petroflow Sub in determining that the transaction is in the best interests of Equal Shareholders. The Board relied upon the reverse termination fee as adequate assurance to Equal Shareholders and a sufficient inducement to Petroflow to obtain the Financing for the transaction and close the acquisition.

**Q:**    **Am I entitled to Dissent Rights?**

A:    Under the ABCA, as modified by the Plan of Arrangement and the Interim Order, holders of Equal Shares who do not vote in favour of the Arrangement Resolution will have the right to seek the fair value of their shares if the Arrangement is completed, but only if they strictly comply with the applicable provisions of the ABCA, as modified by the Plan of Arrangement and Interim Order, which are explained in this Circular. For additional information about Dissent Rights, see the section of Circular entitled "*Dissent Rights*" beginning on page 97 and Appendix D to the Circular.

**Q:**    **Do any Equal directors or executive officers have interests in the Arrangement that may differ from those of Equal Shareholders generally?**

A:    Yes. Certain directors and executive officers of Equal may have interests in the Arrangement that are different than those of Equal Shareholders generally. Equal's Board and the Special Committee were aware of and considered these interests, among other matters, in evaluating and negotiating the Arrangement Agreement and the Arrangement and recommending that the Arrangement Resolution be approved by the Equal Shareholders. See the section of the Circular entitled "*Interests of our Directors and Executive Officers in the Arrangement*" beginning on page 80 and "*Minority Approval*" beginning on page 79 for a description of those interests.

**Q:**    **Is the Arrangement subject to any conditions?**

A:    Yes. The Arrangement may not be effected unless a number of conditions are satisfied or, to the extent permitted by applicable law, waived. For a summary of the conditions that must be satisfied or waived prior to the completion of the Arrangement, see the section of the Circular entitled "*The Arrangement Agreement—Conditions*" beginning on page 73.

**Q:**    **What happens if the Arrangement is not completed?**

A:    If the Arrangement Resolution is not approved by the Equal Shareholders, or if the Arrangement is not completed for any other reason, you will not receive any payment for your Equal Shares in connection with the Arrangement

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 17 )

Table of Contents

and you will not receive the Arrangement Dividend. The Equal Shares will continue to be traded on the TSX and the NYSE. Under certain specified circumstances, we may be required to pay Petroflow a termination payment or Petroflow may be required to pay us a reverse termination payment, with respect to the termination of the Arrangement Agreement, as described under "*The Arrangement Agreement—Termination Payments*" beginning on page 77.

**Q:    What do I need to do now?**

A:    After you carefully read this Circular in its entirety, including its appendices thereto, consider how the Arrangement affects you and then vote or provide voting instructions as described in this Circular. We encourage you to read the Circular carefully and in its entirety, consider your options and please vote, as your vote is very important.

**Q:    Who can vote at the Meeting?**

A:    Only Equal Shareholders of record as of the Record Date of June 8, 2014 will be entitled to vote at the Meeting or any adjournment thereof, except to the extent that a registered Equal Shareholder transfers Equal Shares after the Record Date and the transferee produces properly endorsed share certificates evidencing the transferred Equal Shares, or otherwise establishes that it owns the transferred Equal Shares, and demands, not later than 10 days before the Meeting, that the transferee's name be included before the Meeting in the list of registered Equal Shareholders, in which case the transferee will be entitled to vote the transferred Equal Shares at the Meeting.

*Shareholders of Record: Shares Registered in Your Name*

If on the Record Date of June 8, 2014, your Equal Shares were registered directly in your name with Equal's transfer agent, Olympia Trust Company ("**Olympia**"), then you are an Equal Shareholder of record. As an Equal Shareholder of record, you may vote in person at the Meeting or vote by proxy. Whether or not you plan to attend the Meeting, Equal urges you to fill out and return the form of proxy mailed to you or on the internet to ensure your vote is counted. See the section of the Circular entitled "*General Proxy Matters*" beginning on page 28.

*Beneficial Owner: Shares Registered in the Name of a Broker or Bank*

If on the Record Date of June 8, 2014, your Equal Shares were not held in your name, but rather in an account at a brokerage firm, bank, dealer, or other similar organization, then you are the beneficial owner of Equal Shares held in "street name" and these proxy materials, if you have received them, are being forwarded to you by that organization. The organization holding your account is considered to be the Equal Shareholder of record for purposes of voting at the Meeting. As a beneficial owner, you have the right to direct your broker or other agent regarding how to vote the Equal Shares in your account. You will receive instructions from your broker or other agent that you must follow in order to direct the voting of your Equal Shares. If you have not received such voting instructions or require further information regarding such voting instructions, contact your broker. You are also invited to attend the Meeting. However, since you are not the Equal Shareholder of record, you may not vote your Equal Shares in person at the Meeting unless you request and obtain a valid proxy from your broker or other agent. See the section of the Circular entitled "*General Proxy Matters*" beginning on page 28.

**Q:    Can the Optionholders, Debentureholders or holders of Restricted Shares vote?**

A:    Optionholders, Debentureholders and holders of Restricted Shares may attend the Meeting, but will not be entitled to vote in such capacity at the Meeting.

**Q:    How do I vote?**

A:    For each of the matters to be voted on, you may vote "For" or "Against".

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 18 )

Table of Contents

The procedures for voting are fairly simple:

### Equal Shareholders of Record: Shares Registered in Your Name

An Equal Shareholder may attend the Meeting in person or may be represented by proxy. Both registered Equal Shareholders who are unable to attend the Meeting and registered Equal Shareholders planning to attend the Meeting are each encouraged to complete, sign, date, and return the accompanying form of proxy so that such Equal Shareholder's Equal Shares can be voted at the Meeting (or at any adjournments or postponements thereof) in accordance with such Equal Shareholder's instructions. To be effective, the enclosed proxy must be received by Olympia Trust Company, 2300, 125 – 9th Avenue S.E., Calgary, Alberta, T2G OP6 by mail or by fax at (403) 265-1455 or Kingsdale Shareholder Services, The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by mail or by fax at (416) 867-2271 or 1 (866) 545-5580 no later than 2:00 p.m. (Calgary time) on July 4, 2014 or at least 48 hours (other than a Saturday, Sunday or holiday in Alberta) prior to the time set for any adjournment or postponement of the Meeting. Registered Equal Shareholders may also use the internet site at https://secure.olympiatrust.com/proxy/, using their Web Voting ID Number on their form of proxy to complete an electronic proxy form to transmit their voting instructions or send a completed scanned proxy form to proxy@olympiatrust.com. The time limit for the deposit of proxies may be waived by the chairman of the Meeting at his discretion, without notice.

### Beneficial Owner: Shares Registered in the Name of Broker or Bank

Non-registered Equal Shareholders who hold their Equal Shares through a broker, investment dealer, bank, trust company, custodian, nominee or other intermediary, should carefully follow the instructions of their intermediary to ensure that their Equal Shares are voted at the Meeting in accordance with such Equal Shareholder's instructions, to arrange for their intermediary to complete the necessary transmittal documents and to ensure that they receive payment for their Equal Shares if the Arrangement is completed. An Equal Shareholder that has questions or requires more information with regard to the voting of Equal Shares should contact Kingsdale Shareholder Services either by mail at The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by toll-free telephone in North America at 1-866-581-1479 or collect call outside North America at 416-867-2272, or by e-mail at contactus@kingsdaleshareholder.com.

**Q:    How many votes do I have?**

A:    On each matter to be voted upon, you have one vote for each Equal Share you own as of the Record Date of June 8, 2014.

**Q:    What happens if I do not vote in person or by proxy at the Special Meeting?**

A:    The failure to vote will not affect the outcome of the vote with respect to the Arrangement Resolution or the Compensation Proposal.

**Q:    What if I return a proxy form or otherwise vote but do not make specific choices?**

A:    If you return a signed and dated proxy form or otherwise vote without marking voting selections, your Equal Shares will be voted, as applicable, "FOR" the Arrangement Resolution and "FOR" the Compensation Proposal. If any other matter is properly presented at the Meeting, your proxyholder (one of the individuals named on your proxy card) will vote your Equal Shares using his or her best judgment.

**Q:    Who is paying for this proxy solicitation?**

A:    Equal will pay for the entire cost of soliciting proxies. Equal has retained Kingsdale Shareholder Services to provide proxy solicitation and certain other advisory services with respect to the Arrangement. Kingsdale Shareholder Services' fees for providing proxy solicitation services shall be CDN$50,000 in addition to a per-call fee for shareholder calls and reimbursement for its reasonable out-of-pocket expenses. Kingsdale Shareholder Services will be indemnified against certain liabilities and expenses, including certain liabilities under the federal securities laws. Kingsdale Shareholder Services will solicit proxies from individuals, brokers, banks, bank nominees and other

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 19 )

Table of Contents

institutional holders. We may also reimburse brokerage firms, banks and other agents for the cost of forwarding proxy materials to beneficial owners. Directors and employees of Equal may also solicit proxies in person, by telephone, or by other means of communication.

**Q:    What does it mean if I receive more than one notice or more than one set of proxy materials?**

A:    If you receive more than one notice from your broker, bank or other agent or more than one set of proxy materials, your Equal Shares may be registered in more than one name or in different accounts. Please follow the voting instructions on the notices or the instructions on the proxy forms in the proxy materials to ensure that all of your Equal Shares are voted.

**Q:    Can I change my vote after submitting my proxy?**

A:    Yes. An Equal Shareholder who has given a form of proxy may revoke it as to any matter on which a vote has not already been cast pursuant to its authority by an instrument in writing executed by such Equal Shareholder or by his attorney duly authorized in writing or, if the Equal Shareholder is a corporation, by an officer or attorney thereof duly authorized, and deposited either at the office of Olympia Trust Company at 2300, 125 – 9th Avenue S.E., Calgary, Alberta, T2G OP6 or with Kingsdale Shareholder Services, The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by mail or by fax at (416) 867-2271 or 1 (866) 545-5580 on or before the last business day in Calgary, Alberta preceding the day of the Meeting or any adjournment or postponement thereof or with the chairman of the Meeting on the day of the Meeting or any adjournment or postponement thereof.

If your Equal Shares are held by your broker or bank as a nominee or agent, you should follow the instructions provided by your broker or bank.

**Q:    How are votes counted?**

A:    Votes will be counted by the scrutineers appointed for the Meeting, who will count votes "For" and "Against."

**Q:    How many votes are needed to approve the Arrangement Resolution?**

A:    At least $66\frac{2}{3}\%$ of the votes cast by Equal Shareholders present in person or represented by proxy at the Meeting must be voted in favour of the Arrangement Resolution. In addition, the Arrangement is subject to approval of a simple majority of the votes cast by Equal Shareholders, excluding the votes of Mr. Klapko, the President and Chief Executive Officer of Equal, whose votes may not be included in determining minority approval of the Arrangement under MI 61-101.

**Q:    How many votes are required to approve the Compensation Proposal?**

A:    The SEC has adopted rules that require us to seek a vote with respect to the Compensation Proposal. This vote is advisory and, therefore, will not be binding on Equal. If the Arrangement is approved and completed, amounts payable to Equal's Named Executive Officers in connection with the completion of the Arrangement will be paid, regardless of whether the Compensation Proposal is passed. Equal's Board will consider the affirmative vote of a majority of the votes cast on the Compensation Proposal by Equal Shareholders present in person or represented by proxy at the Meeting as advisory approval of the Compensation Proposal.

**Q:    What is the quorum requirement?**

A:    A quorum of Equal Shareholders is necessary to hold the Meeting. A quorum at the Meeting in respect of Equal Shareholders shall be two or more persons present in person, each being an Equal Shareholder entitled to vote at the Meeting or a duly appointed proxy holder, and together holding or representing by proxy no less than 5% of the votes attaching to all outstanding Equal Shares entitled to be voted at the Meeting. If a quorum is present at the opening of the Meeting, the Equal Shareholders present or represented may proceed with the business of the

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 20 )

Table of Contents

Meeting notwithstanding that a quorum is not present throughout the Meeting. If a quorum is not present at the appointed time fixed for the holding of the Meeting, it shall stand adjourned to a fixed time and place as may be determined by the Chairman of the Meeting. No notice of the adjourned Meeting shall be required and, if at such adjourned Meeting a quorum is not present, the Equal Shareholders present in person or by proxy shall constitute a quorum for all purposes. On May 15, 2014, the latest practicable date prior to the date of the Circular, there were 36,100,788 votes that could be cast. Those votes were represented by 36,100,788 Equal Shares outstanding and entitled to vote on May 15, 2014, the latest practicable date prior to the date of the Circular.

Your Equal Shares will be counted towards the quorum only if you submit a valid proxy (or one is submitted on your behalf by your broker, bank or other nominee) or if you vote in person at the Meeting.

**Q:    How can I find out the results of the voting at the Meeting?**

A:    Preliminary voting results will be announced at the Meeting. In addition, final voting results will be published (i) in a current report on Form 8-K that we expect to file on EDGAR at www.sec.gov and (ii) in a report of voting results on SEDAR at www.sedar.com**.** If final voting results are not available to us in time to file a Form 8-K within four business days after the Meeting, we intend to file a Form 8-K to publish preliminary results and, within four business days after the final results are known to us, file an additional Form 8-K to publish the final results.

**Q:    What proxy materials are available on the internet?**

A:    The Circular and proxy materials are available to view at:

SEDAR at www.sedar.com

or

on the SEC's website at www.sec.gov

or

on Equal's website at: http://www.equalenergy.ca

The information provided on Equal's website is not part of this Circular and is not incorporated herein by reference.

**Q:    Who can help answer my questions?**

A:    If you would like additional copies, without charge, of this Circular or if you have questions about the Arrangement, including the procedures for voting your shares, you should contact: Kingsdale Shareholder Services either by mail at The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by toll-free telephone in North America at 1-866-581-1479 or collect call outside North America at 416-867-2272, or by e-mail at contactus@kingsdaleshareholder.com.

**GENERAL**

This Circular is furnished in connection with the solicitation of proxies by and on behalf of the management of Equal on behalf of the Board for use at the Meeting and any adjournments or postponements thereof. No person has been authorized to give any information or make any representation in connection with the Arrangement or any other matters to be considered at the Meeting other than those contained in this Circular and, if given or made, any such information or representation must not be relied upon as having been authorized and should not be relied upon in making a decision as to how to vote on the Arrangement.

All summaries of, and references to, the Arrangement in this Circular are qualified in their entirety by reference to the complete text of the Arrangement Agreement as amended by the Amending Agreement, copies of which are attached as

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 21 )

Table of Contents

Appendix A to this Circular and the Plan of Arrangement, which is attached to the Arrangement Agreement as Schedule "A" (which Plan of Arrangement has been amended pursuant to the Amending Agreement). You are urged to carefully read the full text of the Arrangement Agreement, Amending Agreement and Plan of Arrangement.

Information contained in this Circular is given as of June 10, 2014, unless otherwise specifically stated.

### Information for U.S. Securityholders

The enforcement by Equal Shareholders of civil liabilities under United States federal securities laws may be affected adversely by the fact that Equal is organized under the laws of a jurisdiction outside the United States and that some of its officers and/or directors are residents of countries other than the United States and that some of the experts named in this Circular may be residents of countries other than the United States.

**Neither the Securities and Exchange Commission nor any state securities regulatory authority has approved or disapproved the Arrangement, passed upon the merits or fairness of the Arrangement or passed upon the adequacy or accuracy of the disclosure in this Circular. Any representation to the contrary is a criminal offense.**

### Notice to Reader

Data on oil and natural gas reserves contained in this Circular have been generally prepared in accordance United States Securities and Exchange Commission disclosure standards, which are not comparable in all respects to Canadian or other foreign disclosure standards.

### Abbreviations and Conversions

| **Oil and Natural Gas Liquids** | | **Natural Gas** | |
|---|---|---|---|
| NGLs | natural gas liquids | Mcf | thousand cubic feet |
| bbl | barrel | | |

**Other**

| | |
|---|---|
| BOE | barrel of oil equivalent of natural gas and crude oil on the basis of 1 BOE for 6 Mcf of natural gas (this conversion factor is an industry accepted norm and is not based on either energy content or current prices) |
| BOE/D | barrel of oil equivalent per day |
| MBOE | 1,000 barrels of oil equivalent |
| MBOE/D | thousand barrels of oil equivalent per day |
| MMBOE/D | Million barrels of oil equivalent per day |
| MM | Million |
| NYMEX | New York Mercantile Exchange |
| PV-10 | present value of estimated future oil and gas revenues, net of estimated direct expenses, discounted at an annual discount rate of 10% |
| ROR | rate of return |
| WTI | West Texas Intermediate, the reference price paid at Cushing, Oklahoma for crude oil of standard grade |

**Disclosure provided herein in respect of BOE's may be misleading, particularly if used in isolation. A BOE conversion ratio of 6 Mcf:1 bbl is based on an energy equivalency conversion method primarily applicable at the burner tip and does not represent a value equivalency at the wellhead.**

| To Convert From | To | Multiply By |
|---|---|---|
| Mcf | cubic meters | 28.1 |
| cubic meters | cubic feet | 35.4 |
| bbls | cubic meters | 0.1 |
| acres (Alberta) | hectares | 0.4 |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 22 )

Table of Contents

## Currency Exchange Rates

In this Circular, unless otherwise specified, all dollar amounts are expressed in U.S. dollars and references to "**dollars**", "**USD$**" or "**$**" are to U.S. dollars, references to "CDN$" are to Canadian dollars. The following table sets forth, for the periods indicated, the high, low, average and period-end noon spot rates of exchange for the U.S. dollar, expressed in Canadian dollars per U.S. dollar, based on the data published by the Bank of Canada.

|  | Year Ended December 31 | | |
| --- | --- | --- | --- |
|  | 2013 (CDN$) | 2012 (CDN$) | 2011 (CDN$) |
| Rate at end of Period | 0.9402 | 0.9949 | 1.0170 |
| Average rate during Period[1] | 1.0299 | 0.9996 | 0.9891 |
| High | 1.0697 | 1.0443 | 1.0658 |
| Low | 0.9839 | 0.9642 | 0.9407 |

**Note:**

(1)    Calculated as an average of the daily Bank of Canada noon rates for each day during the respective period.

On May 15, 2014, the Bank of Canada noon rate was CDN$1.0887 equals USD$1.00.

### CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION AND STATEMENTS

This Circular contains forward-looking statements and forward-looking information within the meaning of applicable securities laws. The use of any of the words "expect", "anticipate", "continue", "estimate", "objective", "ongoing", "may", "will", "project", "should'", "believe", "plans", "intends" and similar expressions are intended to identify forward-looking statements or information. In particular and without limitation, this Circular contains forward-looking statements and information concerning:

- the anticipated benefits of the Arrangement to the parties and the Equal Shareholders;

- the timing and anticipated receipt of required court and securityholder approvals for the Arrangement;

- the ability of Equal, Petroflow and the Petroflow Sub to satisfy the other conditions to, and to complete, the Arrangement; and

- the anticipated timing for the completion of the Arrangement and delisting of the Equal Shares from the TSX and NYSE.

In respect of the forward-looking statements and information concerning the anticipated benefits of the proposed Arrangement and the anticipated timing for completion of the Arrangement, Equal has provided such in reliance on certain assumptions that it believes are reasonable at this time, including assumptions as to the ability of the parties to the Arrangement Agreement to receive, in a timely manner and on satisfactory terms, the necessary court and securityholder approvals; the ability of the parties to satisfy, in a timely manner, the other conditions to the closing of the Arrangement; and other expectations and assumptions concerning the Arrangement. Anticipated dates provided may change for a number of reasons, such as the inability to secure the necessary securityholder and court approvals in the time assumed or the need for additional time to satisfy the other conditions to the completion of the Arrangement. Accordingly, Equal Shareholders should not place undue reliance on the forward-looking statements and information contained in this Circular.

Since forward-looking statements and information address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results could differ materially from those currently anticipated due to a number of factors, risks and uncertainties, including, without limitation, the following:

- the occurrence of any event, change or other circumstance that could give rise to the termination of the Arrangement Agreement, including a termination under circumstances that could require us to pay a termination payment;

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 23 )

Table of Contents

- Petroflow's and Petroflow Sub's failure to complete the necessary financing or the failure of that financing to be sufficient to complete the Arrangement and the other transactions contemplated by the Arrangement Agreement;

- the inability to complete the Arrangement due to the failure to obtain Equal Shareholder approval of the Arrangement Resolution or the failure to satisfy other conditions to the completion of the Arrangement;

- the failure of the Arrangement to become effective for any other reason;

- the possibility that alternative acquisition proposals will or will not be made;

- risks that the Arrangement disrupts current plans and operations and the potential difficulties in employee retention as a result of the Arrangement;

- the outcome of any legal proceedings or enforcement matters that have been or may be instituted against us or others relating to the Arrangement Agreement;

- diversion of management's attention from ongoing business concerns;

- the Arrangement Agreement's contractual restrictions on the conduct of our business prior to the completion of the Arrangement;

- the possible adverse effect on our business and the price of the Equal Shares if the Arrangement is not consummated in a timely manner or at all;

- the effect of the announcement of the Arrangement on our business relationships, operating results and business generally, including our ability to retain key employees; and

- the amount of costs, fees, expenses and charges related to the Arrangement.

Equal Shareholders are cautioned that the foregoing list of factors is not exhaustive. Additional information on other factors that could cause actual events or actual results to differ materially from those contemplated by the forward-looking statements and information contained in this Circular may be found in our filings with the Securities and Exchange Commission and with Canadian regulatory authorities on SEDAR, including the risk factors contained in Item 1A of our Annual Report on Form 10-K for the fiscal year ended December 31, 2013 and elsewhere in this Circular, including under the section entitled "*Risk Factors*" beginning on page 108. The forward-looking statements and information contained in this Circular are based on our expectations, estimates and projections as of the date hereof, and should not be relied upon as representing our estimates as of any subsequent date. Equal undertakes no obligation to update publicly or revise any forward-looking statements or information contained in this Circular, whether as a result of new information, future events or otherwise, unless so required by applicable securities laws.

## THE MEETING

### Date, Time and Place

We will hold the Meeting on July 8, 2014, at 10:30 a.m., local time, at the Wildrose South Ballroom at the Sheraton Suites Calgary Eau Claire, 255 Barclay Parade Southwest, Calgary, Alberta.

### Purpose of the Meeting

At the Meeting, we are asking holders of record of the Equal Shares at 5:00 p.m. (Calgary time) on the Record Date of June 8, 2014 to consider and vote on the following proposals:

- the approval of the Arrangement Resolution, the full text of which is set forth in Appendix C to this Circular;

- the Compensation Proposal; and

- to transact such other business as may properly come before the Meeting or any adjournments of the Meeting.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 24 )

Table of Contents

We do not expect a vote to be taken on any other matter at the Meeting. If any other matters are properly presented at the Meeting for consideration, however, the holders of the proxies, if properly authorized, will have discretion to vote on these matters in accordance with their best judgment.

**Recommendation of the Special Committee**

The Special Committee, having undertaken a thorough review of, and carefully considered, the proposed Arrangement and the alternatives available to Equal, and having taken into account such other matters as it considered relevant (as described in this Circular under the section entitled "*The Arrangement - Reasons for the Recommendation of our Board and Special Committee"* beginning on page 45), unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. Accordingly, the Special Committee unanimously approved the Arrangement and the Compensation Proposal and recommended that the Board approve the Arrangement and the Compensation Proposal and recommended that the Equal Shareholders vote "FOR" the Arrangement Resolution and Compensation Proposal.

**Recommendation of our Board of Directors**

After careful consideration, and taking into account the recommendation of the Special Committee and all of the factors described under the heading "*The Arrangement – Reasons for the Recommendation of our Board and Special Committee*", the Board unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement, and the Board unanimously recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution, the complete text of which is attached as Appendix C to this Circular.

The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

In considering such recommendations, you should be aware that some of our directors and executive officers have interests in the Arrangement that are different from, or in addition to, those of Equal Shareholders generally. See the sections of this Circular entitled "*Minority Approval*" beginning on page 79 and "*Interests of Our Directors and Executive Officers in the Arrangement*" beginning on page 80.

Our directors and executive officers have informed us that, as of the date of this Circular, they intend to vote all of their Equal Shares in favor of the Arrangement Resolution. As of May 15, 2014, the latest practicable date prior to the date of the Circular, our directors and executive officers beneficially owned or controlled, in the aggregate, 848,814 Equal Shares, representing approximately 2.4% of the outstanding Equal Shares.

The directors and officers of Equal and its subsidiaries have entered into Lock-Up Agreements with Petroflow and Petroflow Sub pursuant to which they have agreed, among other things, to vote the Equal Shares beneficially owned or controlled by them in favour of the Arrangement Resolution. At May 15, 2014, the latest practicable date prior to the date of the Circular, the directors and officers of Equal and its subsidiaries beneficially owned or controlled 848,814 Equal Shares, representing approximately 2.4% of the Equal Shares outstanding. The form of Lock-Up Agreement is attached to the Circular as Appendix E.

If your submitted proxy does not specify how you want to vote your shares, your shares will be voted "FOR" the proposal to approve the Arrangement Resolution and "FOR" the Compensation Proposal.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 25 )

Table of Contents

**Record Date; Equal Shares Entitled to Vote; Quorum**

Only holders of record of Equal Shares at the close of business on the Record Date of June 8, 2014 are entitled to notice of and to vote at the Meeting or any adjournment thereof, except to the extent that a registered Equal Shareholder transfers Equal Shares after the Record Date and the transferee produces properly endorsed share certificates evidencing the transferred Equal Shares, or otherwise establishes that it owns the transferred Equal Shares, and demands, not later than 10 days before the Meeting, that the transferee's name be included before the Meeting in the list of registered Equal Shareholders, in which case the transferee will be entitled to vote the transferred Equal Shares at the Meeting. On May 15, 2014, the latest practicable date prior to the date of the Circular, 36,100,788 Equal Shares were issued and outstanding.

A quorum of Equal Shareholders is necessary to hold the Meeting. A quorum at the Meeting in respect of Equal Shareholders shall be two or more persons present in person, each being an Equal Shareholder entitled to vote at the Meeting or a duly appointed proxy holder, and together holding or representing by proxy no less than 5% of the votes attaching to all outstanding Equal Shares entitled to be voted at the Meeting. If a quorum is present at the opening of the Meeting, the Equal Shareholders present or represented may proceed with the business of the Meeting notwithstanding that a quorum is not present throughout the Meeting. If a quorum is not present at the appointed time fixed for the holding of the Meeting, it shall stand adjourned to a fixed time and place as may be determined by the Chairman of the Meeting. No notice of the adjourned Meeting shall be required and, if at such adjourned Meeting a quorum is not present, the Equal Shareholders present in person or by proxy shall constitute a quorum for all purposes. On May 15, 2014, the latest practicable date prior to the date of the Circular, there were 36,100,788 votes that could be cast. Those votes were represented by 36,100,788 Equal Shares outstanding and entitled to vote.

**Attendance**

The only persons entitled to attend the Meeting shall be Equal Shareholders or their authorized proxy holders, Equal's directors and officers and its auditors, Equal's legal counsel, the executive director of the Alberta Securities Commission, Optionholders, holders of Restricted Shares, Debentureholders and such other persons who may be permitted to attend by the Chairman of the Meeting.

**Votes Required**

*Arrangement.* At least 66⅔% of the votes cast by Equal Shareholders present in person or represented by proxy at the Meeting must be voted in favour of the Arrangement Resolution. In addition, the Arrangement is subject to approval of a simple majority of the votes cast by Equal Shareholders, excluding the votes of those persons whose votes may not be included in determining minority approval of a business combination under MI 61-101.

*Compensation Proposal.* The vote to approve the Compensation Proposal is advisory and, therefore, will not be binding on Equal. If the Arrangement is approved and completed, amounts payable to Equal's Named Executive Officers in connection with the completion of the Arrangement will be paid, regardless of whether the Compensation Proposal is passed. Equal's Board will consider the affirmative vote of a majority of the votes cast on the Compensation Proposal by Equal Shareholders present in person or represented by proxy at the Meeting as advisory approval of the Compensation Proposal.

More information regarding the compensation that may become payable to Equal's executive officers in connection with the completion of the Arrangement is set forth in this Circular under the sections entitled "*Interests of Our Directors and Executive Officers in the Arrangement*" beginning on page 80 and "*Minority Approval*" beginning on page 79.

Votes will be counted by the scrutineers appointed for the Meeting, who will count votes "For" and "Against".

**Voting by Equal Directors, Executive Officers and Certain Equal Shareholders**

As at May 15, 2014, the latest practicable date prior to the date of the Circular, our directors and executive officers and their affiliates owned or controlled 848,814 Equal Shares, which represented approximately 2.4% of the Equal Shares outstanding on that date. Our directors and executive officers have informed us that, as of the date of this Circular, they intend to vote all of their Equal Shares in favor of the Arrangement Resolution. See the section of this Circular entitled "*Security Ownership of Certain Beneficial Owners and Management*" beginning on page 116.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 26 )

Table of Contents

The directors and officers of Equal and its subsidiaries have entered into Lock-Up Agreements with Petroflow and Petroflow Sub pursuant to which they have agreed, among other things, to vote the Equal Shares beneficially owned or controlled by them in favour of the Arrangement Resolution. The form of Lock-Up Agreement is attached to the Circular as Appendix E.

Equal Shares beneficially owned or controlled by Don Klapko, our President and Chief Executive Officer, will be excluded from a vote determining minority approval of the Arrangement by a simple majority of the votes cast by Equal Shareholders, required to approve the Arrangement, in accordance with MI 61-101. As of May 15, 2014, the latest practicable date prior to the date of the Circular, Don Klapko owned or controlled 438,098 Equal Shares.

### Timing

If the Meeting is held as scheduled and is not adjourned or postponed and Equal Shareholder approval is obtained, Equal will apply for the Final Order approving the Arrangement. Subject to receipt of the Final Order in form and substance satisfactory to Equal and Petroflow Sub, and satisfaction or waiver of all other conditions set forth in the Arrangement Agreement, Equal expects the Effective Date to occur before July 31, 2014.

The Arrangement will become effective upon the sending to the Registrar of the Articles of Arrangement and a copy of the Final Order, together with such other materials as may be required by the Registrar.

### Dissent Rights

Pursuant to and in accordance with the Plan of Arrangement, the Interim Order and the provisions of section 191 of the ABCA (as modified or supplemented by the Interim Order, the Plan of Arrangement and any other order of the Court), registered Equal Shareholders have a right to dissent in respect of the Arrangement Resolution and, if the Arrangement Resolution is passed, to be paid the fair value of their Equal Shares. **The dissent procedures require that a registered Equal Shareholder who wishes to dissent must send to Equal a written objection to the Arrangement Resolution, which written objection must be received by Equal, c/o Stikeman Elliott LLP, 4300 Bankers Hall West, 888 – 3rd Street S.W., Calgary, AB, T2P 5C5, Attention: Geoffrey D. Holub, not later than 5:00 p.m. (Calgary time) on June 27, 2014 (or 5:00 p.m. (Calgary time) on the day that is five business days (as such term is defined in the Plan of Arrangement) immediately preceding the date that any adjournment or postponement of the Meeting is reconvened or held, as the case may be).**

It is a condition to Petroflow's and Petroflow Sub's obligation under the Arrangement Agreement to complete the Arrangement that Equal Shareholders holding no more than 5% of the Equal Shares on a fully diluted basis shall have exercised Dissent Rights as of the Effective Time.

The statutory provisions covering the right to dissent are technical and complex. Failure to strictly comply with the requirements set forth in section 191 of the ABCA, as modified or supplemented by the Interim Order and Plan of Arrangement, may result in the loss of any right to dissent. Persons who are beneficial owners of Equal Shares registered in the name of a broker, investment dealer, bank, trust company, custodian, nominee or other intermediary who wish to dissent should be aware that only registered Equal Shareholders are entitled to dissent. Accordingly, a non-registered Equal Shareholder desiring to exercise its Dissent Rights must make arrangements for such Equal Shares that are beneficially owned to be registered in such holder's name prior to the time the written objection to the Arrangement Resolution is required to be received by Equal or, alternatively, make arrangements for the registered holder to dissent on such holder's behalf. A dissenting Equal Shareholder may only dissent with respect to all Equal Shares held on behalf of any one beneficial holder and registered in the name of such dissenting Equal Shareholder.

### Payment of Solicitation Expenses

Equal will pay for the entire cost of soliciting proxies. Equal has retained Kingsdale Shareholder Services to provide proxy solicitation and certain other advisory services with respect to the Arrangement. Kingsdale Shareholder Services' fees for

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 27 )

Table of Contents

providing proxy solicitation services shall be CDN$50,000 in addition to a per-call fee for shareholder calls and reimbursement for its reasonable out-of-pocket expenses. Kingsdale Shareholder Services will be indemnified against certain liabilities and expenses, including certain liabilities under the federal securities laws. Kingsdale Shareholder Services will solicit proxies from individuals, brokers, banks, bank nominees and other institutional holders. We may also reimburse brokerage firms, banks and other agents for the cost of forwarding proxy materials to beneficial owners. Directors and employees of Equal may also solicit proxies in person, by telephone, or by other means of communication.

### Assistance

If you would like additional copies, without charge, of the enclosed proxy materials or if you have questions about the Arrangement, including the procedures for voting your shares, you should contact: Kingsdale Shareholder Services either by mail at The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by toll-free telephone in North America at 1-866-581-1479 or collect call outside North America at 416-867-2272, or by e-mail at contactus@kingsdaleshareholder.com.

## GENERAL PROXY MATTERS

### Solicitation of Proxies

This Circular is furnished in connection with the solicitation of proxies by the management of Equal on behalf of the Board to be used at the Meeting. Solicitations of proxies will be primarily by mail, but may also be by newspaper publication, in person or by telephone, fax or oral communication by directors, officers, employees or agents of Equal. All costs of the solicitation will be borne by Equal.

Equal is not sending proxy related materials to registered or beneficial Equal Shareholders using the notice and access provisions of National Instrument 54-101 *Communications with Beneficial Holders of Securities of a Reporting Issuer* ("**NI 54-101**"). Equal has arranged for intermediaries to forward the proxy materials to beneficial owners of the Equal Shares held of record by those intermediaries and will pay for those intermediaries to forward the proxy materials to objecting beneficial owners as provided in NI 54-101.

### Appointment and Revocation of Proxies

Accompanying this Circular is a form of proxy. Registered Equal Shareholders may also use the internet site at https://secure.olympiatrust.com/proxy/, using their Web Voting ID Number on their form of proxy to complete an electronic proxy form to transmit their voting instructions or send a completed scanned proxy form to proxy@olympiatrust.com.

**The persons named in the enclosed form of proxy are directors and/or officers of Equal. An Equal Shareholder desiring to appoint a person (who need not be an Equal Shareholder) to represent such Equal Shareholder at the Meeting other than the persons designated in the accompanying form of proxy may do so by crossing out the names of the persons designated in the form of proxy and by inserting such person's name in the blank space provided in the form of proxy and returning the completed proxy to Olympia Trust Company, 2300, 125 – 9th Avenue S.E., Calgary, Alberta, T2G OP6 by mail or by fax at (403) 265-1455 or Kingsdale Shareholder Services, The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by mail or by fax at (416) 867-2271 or 1 (866) 545-5580 no later than 2:00 p.m. (Calgary time) on July 4, 2014 or at least 48 hours (other than a Saturday, Sunday or holiday in Alberta) prior to the time set for any adjournment or postponement of the Meeting.**

An Equal Shareholder who has given a form of proxy may revoke it as to any matter on which a vote has not already been cast pursuant to its authority by an instrument in writing executed by such Equal Shareholder or by his attorney duly authorized in writing or, if the Equal Shareholder is a corporation, by an officer or attorney thereof duly authorized, and deposited either at the above mentioned office of Olympia Trust Company or with Kingsdale Shareholder Services on or before the last business day in Calgary, Alberta preceding the day of the Meeting or any adjournment or postponement thereof or with the chairman of the Meeting on the day of the Meeting or any adjournment or postponement thereof.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 28 )

Table of Contents

The Board has fixed June 8, 2014 as the Record Date for the Meeting. Equal Shareholders of record as at 5:00 p.m. (Calgary time) on the Record Date are entitled to receive notice of, to attend and to vote at the Meeting on the Arrangement Resolution and the Compensation Proposal, except to the extent that a registered Equal Shareholder transfers Equal Shares after the Record Date and the transferee produces properly endorsed share certificates evidencing the transferred Equal Shares, or otherwise establishes that it owns the transferred Equal Shares, and demands, not later than 10 days before the Meeting, that the transferee's name be included before the Meeting in the list of registered Equal Shareholders, in which case the transferee will be entitled to vote the transferred Equal Shares at the Meeting.

### Signature of Proxy

The form of proxy must be executed by the Equal Shareholder, or if the Shareholder is a corporation, the form of proxy should be signed in its corporate name and its corporate seal must be affixed to the form of proxy or the form of proxy must be signed by an authorized officer whose title should be indicated. A proxy signed by a person acting as attorney, executor, administrator or trustee, or in some other representative capacity, should reflect such person's full title as such. The signatory must provide documentation evidencing his or her power to sign the form of proxy and this signing capacity must be acceptable to the chairman of the Meeting.

### Voting of Proxies

The persons named in the accompanying forms of proxy will vote the Equal Shares in respect of which they are appointed in accordance with the direction of the Equal Shareholder appointing them. **In the absence of such direction, such Equal Shares will be voted FOR the approval of the Arrangement Resolution and FOR the approval of the Compensation Proposal.**

### Exercise of Discretion of Proxy

The enclosed form of proxy confers discretionary authority upon the persons named therein with respect to amendments or variations to matters identified in the accompanying notice of meeting and this Circular and with respect to other matters that may properly come before the Meeting. At the date of this Circular, management of Equal knows of no amendments, variations or other matters to come before the Meeting other than the matters referred to in the notice of meeting.

### Advice for Non-Registered Shareholders

The information set forth in this section is of significant importance to many Equal Shareholders, as a substantial number of the Equal Shareholders do not hold their Equal Shares in their own name.

Equal Shareholders who do not hold their Equal Shares in their own name should note that only proxies deposited by the Equal Shareholders whose name appears on the records of Equal as a registered holder of Equal Shares can be recognized and acted upon at the Meeting. If Equal Shares are listed in an account statement provided to an Equal Shareholder by a broker, then in almost all cases those Equal Shares are held in "street name" and will not be registered in the Equal Shareholder's name on the records of Equal. Such Equal Shares will more likely be registered under the name of the Equal Shareholder's broker or an agent of that broker. For example, in Canada, the vast majority of such common shares are registered under the name of CDS & Co. (the registration name for CDS Clearing and Depository Services Inc., which acts as nominee for many Canadian brokerage firms).

If your Equal Shares are held in "street name," you will receive instructions from your broker, bank or other nominee that you must follow in order to have your shares voted. If you have not received such voting instructions or require further information regarding such voting instructions, contact your broker. Every intermediary/broker has its own mailing procedures and provides its own return instructions, which should be carefully followed by non-registered Equal Shareholders in order to ensure that their Equal Shares are voted at the Meeting. Often, the form of proxy supplied to a non-registered Equal Shareholder by its broker is identical to the form of proxy provided to registered Equal Shareholders; *however, a non-registered Equal Shareholder receiving a voting instruction form from a broker cannot use that form to vote Equal Shares directly at the Meeting and must follow the procedures and instructions set forth by their broker.*

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 29 )

Table of Contents

The majority of brokers now delegate responsibility for obtaining instructions from clients to Broadridge Financial Solutions, Inc. ("**Broadridge**"). Broadridge typically mails a scannable Voting Instruction Form in lieu of the form of proxy. The non-registered Equal Shareholder is requested to complete and return the voting instruction form to them by mail or facsimile. Alternatively, the non-registered Equal Shareholder can call a toll-free telephone number to vote the Equal Shares held by the non-registered Equal Shareholder or the non-registered Equal Shareholder can complete an on-line voting form to vote their Equal Shares. Broadridge then tabulates the results of all instructions received and provides appropriate instructions respecting the voting of the Equal Shares to be represented at the Meeting.

Brokers who hold shares of Equal Shares in "street name" for a beneficial owner of those shares typically have the authority to vote in their discretion on "routine" proposals when they have not received instructions from beneficial owners. However, brokers are not allowed to exercise their voting discretion with respect to the approval of matters that are "non-routine," such as approval of the Arrangement Agreement, without specific instructions from the beneficial owner. Broker non-votes are shares held by a broker or other nominee that are present in person or represented at the meeting, but with respect to which the broker or other nominee is not instructed by the beneficial owner of such shares to vote on the particular proposal and the broker does not have discretionary voting power on such proposal. Because all proposals for the Meeting are non-routine and non-discretionary, Equal anticipates that there will not be any broker non-votes in connection with any proposal. If your broker or other nominee holds your Equal Shares in "street name," your broker or other nominee will vote your shares only if you provide instructions on how to vote by filling out the voter instruction form sent to you by your broker with this proxy statement.

## THE ARRANGEMENT

*The following discussion summarizes the material terms of the proposed Arrangement and does not purport to be complete and is qualified in its entirety by reference to the Plan of Arrangement and Arrangement Agreement. Equal Shareholders should read the Arrangement Agreement and the Amending Agreement, which are attached as Appendix A to this Circular, and the Plan of Arrangement, which is attached as Schedule A to the Arrangement Agreement (which Plan of Arrangement has been amended by the Amending Agreement), each in its entirety as they are the legal documents that govern the Arrangement.*

### General Description of the Arrangement

Pursuant to the Plan of Arrangement, at the Effective Time, Petroflow Sub will acquire all the issued and outstanding Equal Shares from the Equal Shareholders. Following and as a result of the Arrangement, current holders of Equal Shares will no longer have any interest in, and will no longer be shareholders of, Equal, and will not participate in any of Equal's future earnings or growth. In addition, if the Arrangement is completed, it is expected that the Equal Shares will be delisted from the TSX and NYSE in the days following its completion. It is expected that the Convertible Debentures will remain listed on the TSX immediately after the completion of the Arrangement, to the extent that Convertible Debentures remain outstanding following completion of the Arrangement.

### Parties to the Arrangement

*Equal*

Equal, a corporation amalgamated under the laws of Alberta, is engaged in the exploration for, and acquisition, development and production of, petroleum and natural gas with operations in Oklahoma. Equal also reviews new drilling opportunities and potential property acquisitions in Oklahoma to supplement its exploration and development activities. Equal's head office is located at 4801 Gaillardia Parkway Suite 325 Oklahoma City, OK 73142 and its telephone number is (405) 242-6000. Equal's registered office is located at 4300 Bankers Hall West, 888 – 3rd Street S.W., Calgary, Alberta, Canada T2P 5C5. The Equal Shares are traded on the TSX and NYSE under the symbol "EQU". The Convertible Debentures are traded on the TSX under the symbol "EQU.DB.B". Additional information regarding Equal is contained in our filings on EDGAR at www.sec.gov and SEDAR at www.sedar.com. See the section of this Circular entitled "*Where you can find Additional Information*" beginning on page 119.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 30 )

Table of Contents

*Petroflow*

Petroflow, a corporation existing under the laws of Delaware, a wholly owned subsidiary of TexOak, is an oil and natural gas company involved in the exploration, development and production of oil and natural gas in Oklahoma, Kansas and Illinois. It is based in Tulsa, Oklahoma. Its focus is to apply new exploration, completion and development techniques to old fields to unlock previously untapped reserves that were either passed over or never fully exploited. Petroflow's historical and current assets and cash flow from operations are insignificant relative to the size of the transaction and as such they are insufficient to fund the cost of the acquisition contemplated by the Arrangement and immaterial to your consideration of the Arrangement Resolution. The funding of the payment to you for your Equal Shares will be derived entirely from third-party financing. See "*The Arrangement - Financing of the Arrangement*" on page 60 and "*The Plan of Arrangement - Sources of Funds for the Arrangement*" on page 63.

On December 30, 2013, Petroflow executed an Agreement and Plan of Merger with TexOak, TexOak Merger Sub, Inc., US Oil & Gas Co. LLC, and certain individual representatives named therein. On the same date, TexOak Merger Sub, Inc. merged with and into Petroflow, with Petroflow surviving as a wholly-owned subsidiary of TexOak. Notwithstanding this transaction, TexOak is not a party to the Arrangement Agreement, has no direct or indirect obligations with respect to efforts to obtain the Financing and is not a guarantor of any obligation of Petroflow Sub or Petroflow under the Arrangement Agreement.

The head offices of TexOak and Petroflow are located at 525 S. Main Street, Suite 1120, Tulsa Oklahoma 74103 and the telephone number for each is (918) 592-1010.

*Petroflow Sub*

Petroflow Sub is an Alberta corporation and a wholly owned subsidiary of Petroflow. Petroflow Sub exists solely to facilitate the Arrangement and has not engaged in any operations other than in connection with its formation and the negotiation and execution of the Arrangement Agreement and related agreements. The address for Petroflow Sub's head office is 525 S. Main Street, Suite 1120, Tulsa Oklahoma 74103 and its telephone number is (918) 592-1010. Petroflow Sub has not conducted any activities to date other than those incident to its formation and its execution of the Arrangement Agreement and upon the completion of the Arrangement, it will be merged with and into Equal and the separate existence of Petroflow Sub will cease and Equal will continue as the surviving corporation.

**Treatment of Equal Securities Pursuant to the Arrangement**

*Equal Shares*

Under the Arrangement, pursuant to the terms of the Arrangement Agreement, Equal Shareholders (who have not validly exercised their right to dissent) will be entitled to receive the Arrangement Consideration of USD$5.43 per Equal Share they own immediately prior to the Effective Time, in cash, subject to adjustment pursuant to the terms of the Arrangement Agreement, less applicable withholding taxes and deductions. Expressed in Canadian dollars for reference only, the Arrangement Consideration equals CDN$5.91 based on the Bank of Canada noon rate on May 15, 2014, the latest practicable date prior to the date of the Circular.

Pursuant to the Arrangement Agreement, if, on or after the date of the Arrangement Agreement, Equal declares, sets aside or pays any dividend or other distribution, other than a Permitted Dividend, payable in cash, securities, property or otherwise with respect to the Equal Shares, or sets a record date therefor that is prior to the Effective Time, then the Arrangement Consideration will be adjusted to reflect each such dividend or other distribution by way of a reduction in the Arrangement Consideration by an amount equal to the amount of such dividend or distribution per Equal Share. Pursuant to the Arrangement Agreement, a Permitted Dividend means any of (a) the USD$0.05 per Equal Share ordinary course dividend declared on November 14, 2013 and paid on December 20, 2013 to holders of record on December 2, 2013, (b) the USD$0.05 per Equal Share dividend declared on May 1, 2014 and paid on May 28, 2014 to Equal Shareholders of record at the close of business on May 15, 2014, and (c) the Arrangement Dividend.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 31 )

Table of Contents

Under the Arrangement, pursuant to the terms of the Arrangement Agreement, Equal will pay the Arrangement Dividend to Equal Shareholders on the Equal Shares they hold at the Effective Time.

*Options*

Under the Arrangement, each Option outstanding immediately prior to the Effective Time (whether vested or unvested), shall be transferred from the Optionholder to Equal. Upon such transfer, if the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, exceeds the exercise price per Equal Share of such Option, the Optionholder will receive cash consideration equal to such difference, subject to applicable withholding taxes and deductions. Where the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, does not exceed the exercise price per Equal Share of such Option, the Optionholder will not receive any payment in respect of such Option. All Options will be cancelled immediately after transfer to Equal. Pursuant to the Arrangement Agreement, Equal has agreed to take all steps necessary or desirable to give effect to the foregoing, including entering into option cancellation agreements with each Optionholder in respect of all Options and to obtain necessary consents from Optionholders to the transfer and cancellation of the Options as described above.

*Restricted Shares*

At the Effective Time, each Equal Share in respect of any unvested Restricted Share, not already issued, will be issued (subject to applicable tax withholdings and other source deductions) to the RSP Plan participants, and any share grant agreement under the RSP Plan and the RSP Plan will be terminated notwithstanding the terms thereof. RSP Plan participants who are holders of Restricted Shares at the Effective Time will be entitled to receive the Arrangement Consideration in exchange for their Equal Shares issued pursuant to Restricted Shares on the same basis as other Equal Shareholders.

*Convertible Debentures*

Pursuant to the Arrangement Agreement, Petroflow Sub has agreed to satisfy, or cause Equal to satisfy, all of Equal's obligations under the Indenture arising in connection with or at any time following the implementation of the Arrangement, including complying with Equal's obligations under the Indenture to make offers to Debentureholders to purchase the Convertible Debentures as required in connection with a "change of control" or "cash change of control" (as such terms are defined in the Indenture), pursuant to the terms of the Indenture.

Pursuant to the Indenture, following the Arrangement, Equal will be required to make an offer to purchase any Convertible Debentures that remain outstanding in the amount of 101% of the principal amount of the Convertible Debentures plus accrued and unpaid interest up to a date that is 30 business days after the offer is mailed to Debentureholders in accordance with the terms of the Indenture.

Pursuant to the Indenture, following the Arrangement, each Debentureholder will no longer have the right to receive Equal Shares on conversion of its Convertible Debentures, but will have the right to receive in lieu of such Equal Shares, the Arrangement Consideration which such Debentureholder would have been entitled to receive had it been the holder of such number of Equal Shares at the Effective Time that it was entitled to acquire pursuant to its conversion right. The Convertible Debentures have a conversion price of CDN$8.47 per Equal Share as of May 15, 2014, the latest practicable date prior to the date of the Circular, which is greater than the Arrangement Consideration expressed in Canadian dollars of CDN$5.91 (based on the Bank of Canada noon rate on such date).

Pursuant to the Arrangement Agreement, Equal has agreed, if requested by Petroflow Sub prior to the Effective Date, to use its commercially reasonable efforts to obtain, at Petroflow Sub's expense, all waivers, consents and approvals from the Debentureholders to amend the obligations of Equal under the Indenture by way of a consent solicitation or otherwise. As at the date of the Circular, Petroflow and Petroflow Sub have not advised Equal of any intention to make a request that Equal take a specific action with respect to the Convertible Debentures and there is no certainty that any action or any particular action will be taken with respect to the Convertible Debentures prior to the Effective Time.

The Debentureholders, as such, will not vote with respect to the Arrangement.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 32 )

Table of Contents

It is expected that the Convertible Debentures will remain listed on the TSX immediately after the completion of the Arrangement, to the extent that Convertible Debentures remain outstanding following completion of the Arrangement.

**Background to the Arrangement**

At its inception in 2003, the Enterra Energy Trust (predecessor to Equal) (the "**Trust**") was engaged in the business of acquiring crude oil and natural gas properties and developing and producing crude oil and natural gas in western Canada. The assets of the Trust were characterized as mature assets and were intended to be the cornerstone from which the Trust was to grow through continued acquisitions and to provide stable and predictable cash flow to generate monthly distributions for its unitholders. In early 2006, prior to any of the current management team being in place, the Trust doubled its size by acquiring the Hunton property and certain other assets in Oklahoma. The purchase price for the Oklahoma assets at that time was approximately USD$246 million. The assets were purchased from a group of private sellers, which included W. Cobb (Chip) Hazelrig and Frederick Wedell, who are now the principal shareholders of Montclair and Richard Azar and Donny Seay, who are currently shareholders of Petroflow. At the time of purchasing the Oklahoma assets, it was generally the Trust's operating principle that undeveloped land be farmed out to third parties for a carried interest that would keep production flat and support stable distributions to unitholders. As a result, the Trust entered into a farmout arrangement (the "**Farmout Agreement**") with Petroflow Energy Ltd. (a publicly traded entity that was the predecessor to the current Petroflow) and certain of its subsidiaries to develop the Oklahoma assets. Under the Farmout Agreement, Petroflow was obligated to fund 100% of the drilling and completion costs on the undeveloped lands to earn a 70% working interest. The Trust retained a 30% working interest from the day the additional production generated by Petroflow's drilling activities began. Petroflow was also required to maintain a certain pace of drilling to continue its right to drill on the lands covered by the Farmout Agreement.

On October 31, 2006, with no forewarning, the Minister of Finance (Canada) announced the Canadian federal government's plan to change the tax treatment of income trusts (the "**SIFT Tax Rules**"). Beginning in 2011, the SIFT Tax Rules resulted in a tax being applied at the trust level on distributions of certain income from publicly traded mutual fund trusts at rates of tax comparable to the combined Canadian federal and applicable Canadian provincial corporate tax and to treat such distributions as dividends to unitholders. The Minister of Finance (Canada) announced that existing trusts would have a four year transition period and generally would not be subject to the new rules until 2011, provided such trusts experienced only "normal growth" and no "undue expansion" before then. The SIFT Tax Rules had an immediate negative impact on the Canadian capital markets and resulted in a significant decline in trading prices for income trusts, including the Trust, royalty trusts and numerous other Canadian securities. On December 15, 2006, the Minister of Finance (Canada) issued guidelines (the "**Normal Growth Guidelines**") which established objective tests with respect to what would be considered "normal growth" for the purposes of determining how much existing trusts are permitted to grow without jeopardizing their transitional relief. The SIFT Tax Rules were enacted into legislation on June 22, 2007. The Normal Growth Guidelines were amended on December 4, 2008.

By late 2007, the Trust suffered significant losses and nearly became insolvent due primarily to the cost of the debt financing it had incurred combined with reductions in the market price of natural gas. These factors, and the change in tax treatment for Canadian income trusts referenced above, contributed to a 95% stock price decline during the period from 2005 to 2007.

On November 23, 2007, the Trust entered into a consulting agreement with Trigger Projects Ltd. for the provision of management services by Don Klapko as Senior Executive Management Consultant. On June 30, 2008, upon the expiration of the consulting agreement, the Trust announced that Mr. Klapko had been appointed as its President, Chief Executive Officer and a director.

On July 14, 2008, the Minister of Finance (Canada) released specific proposals to amend the Tax Act that were intended to facilitate the conversion of mutual fund trusts into corporations without any undue tax consequences. These proposals were proclaimed in force on March 12, 2009. Following the initial announcement of the SIFT Tax Rules, management and the board of the Trust continued to assess the potential impact and significance of the SIFT Tax Rules to the Trust, including the impact upon the Trust's strategic objectives and alternatives. The Trust's management and board recognized the vulnerability inherent with the weak balance sheet that the Trust had at the time and set a goal of reducing the Trust's net debt to ensure the Trust's, or its successor's, long-term viability and financial flexibility. During 2007, 2008 and 2009, management and the board of the Trust took significant steps to strategically restructure the operations of the Trust including, without limitation, suspending its monthly distributions in September 2007 in order to redirect its cash flow to the repayment of its outstanding debt.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 33 )

Table of Contents

On November 10, 2009, management and the board of the Trust held a regularly scheduled quarterly and strategic planning meeting to further review and discuss in depth the Trust's operations, opportunities for growth and strategic direction. As part of this meeting management presented a detailed operations review, analysis of short and long term market conditions and possible acquisitions and other growth opportunities. In conjunction with its analysis of the Trust's long term strategic planning, management put forward its recommendation that the Trust be reorganized into a corporate structure. Management's recommendation was based on extensive internal prospect inventory that had been developed over the previous two years, the reorganized and refined technical staffing of the Trust, the anticipated default of the Trust's primary farm out partner in Oklahoma and the desire to formalize a new strategic direction for the entity. The proposed conversion of the Trust into a growth-oriented exploration and production company was discussed at length, following which management was directed to continue it analysis of the proposed reorganization, address certain specific issues raised at the meeting and report back to the Trust's board.

Following the November 10, 2009 planning session, management, in consultation with the Trust's legal counsel, continued to analyze the proposed reorganization and matters related thereto. On December 10, 2009, management and the board of the Trust reconvened to review various matters including the proposed 2010 budget and to discuss the principal terms and conditions of the proposed reorganization of the Trust into a corporate structure. Management addressed the various issues that were raised at the November 10, 2009 meeting and recommended that the Trust proceed with the proposed reorganization as soon as possible. After duly considering the financial aspects and other considerations relating to the proposed reorganization, including the principal terms and conditions of the proposed conversion, the duties of the Trust's board, the responsibilities to unitholders and the advice of legal counsel, the board of the Trust unanimously approved proceeding with the proposed reorganization providing for a conversion of the Trust into a growth-oriented exploration and production company.

On December 15, 2009, the Trust announced that it had delivered a notice of termination for non-performance under the terms of the Farmout Agreement. Under the Farmout Agreement, Petroflow was required to maintain a certain pace of drilling to continue its right to drill on lands owned by the Trust in a seven county area in the Oklahoma Hunton play. In connection with its position that Petroflow had not performed its obligations under the Farmout Agreement, the Trust placed liens against the producing wells drilled under the Farmout Agreement. As a result of the liens, the third party purchasers of production from the wells began withholding revenues from Petroflow until the claims between Petroflow and the Trust were settled. On December 16, 2009, Petroflow announced that it was taking the position that it was not in default under the Farmout Agreement for a number of reasons which had been communicated to the Trust and that it maintained continuing rights under the Farmout Agreement.

The Trust announced its intention to convert to a corporation on January 18, 2010, after management confirmed certain logistical issues related to the conversion. Between January 18, 2010 and April 12, 2010 the terms of the definitive documentation relating to the conversion of the Trust were settled and on April 12, 2010 the definitive agreement regarding the Trust's conversion was entered into.

On May 25, 2010, Petroflow announced that two of its wholly-owned subsidiaries had filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). On May 27, 2010, the Trust acknowledged that it had received notice of the bankruptcy filing and announced that it estimated that its overall exposure to the farmout partners, at that time, was approximately USD$18.4 million, but it was management's belief that the Trust had taken appropriate steps to protect its interests and recover the amounts claimed by the Trust.

On May 31, 2010, the Trust, Equal, certain affiliates of the Trust and Equal and the holders of trust units of the Trust completed an arrangement pursuant to Section 193 of the ABCA. As part of the conversion, the trust units of the Trust were consolidated on the basis of 3 trust units for every one share of Equal. In connection with the conversion, Equal also assumed all of the covenants and obligations of the Trust under the debenture indentures and supplemental indentures of the Trust in place at the time and governing the terms and conditions of the Trust's then outstanding 8.0% convertible unsecured subordinated debentures of the Trust that were due on December 31, 2011 and the 8.25% convertible unsecured subordinated debentures of the Trust that were due on June 30, 2012.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 34 )

Table of Contents

In June 2010, Petroflow took certain actions to prevent Equal from conducting its drilling program on its properties in the Oklahoma Hunton play that were related to the Farmout Agreement, which had a significant impact on the pace of the exploration and development activities of Equal on such properties. In July 2010, Petroflow and its Chapter 11 debtor affiliates filed a complaint against Equal to, among other things, determine the parties' respective rights and obligations under the Farmout Agreement and certain other agreements and arrangements between the parties and to recover certain allegedly fraudulently transferred payments.

In January 2011, while the litigation commenced by Petroflow was still pending before the Bankruptcy Court, Equal and Petroflow reached a consensual arrangement pursuant to which, the parties agreed to terminate the Farmout Agreement.

On February 9, 2011, Equal completed its offering of the Convertible Debentures for gross proceeds of CDN$45 million. The net proceeds of that offering were used to redeem a portion of the then outstanding 8.0% convertible unsecured subordinated debentures with the balance of the redemption cost for such convertible debentures funded out of Equal's credit facility.

On February 15, 2011, final court approval was granted by the Bankruptcy Court, confirming the termination of the Farmout Agreement. This settlement cleared the way for Equal to recommence its drilling on the Hunton play and Equal again began drilling on its Hunton lands in March 2011. In mid-February 2011, the Bankruptcy Court issued its findings of facts and conclusions of law and in early March 2011, an order memorializing those findings, which quantified certain material financial obligations owed by Equal to Petroflow. At the time, the extent and amount of Equal's claims against Petroflow were still to be finalized in order to quantify its set-off rights and the net amount of the potential liability. On March 18, 2011, Equal announced that it and Petroflow had agreed to a temporary stay of proceedings involving the litigation between the parties in the Bankruptcy Court. On April 26, 2011, Equal announced that it had entered into a purchase and sale agreement with Petroflow and certain of Petroflow's subsidiaries and a settlement agreement with Petroflow and certain other parties pursuant to which Equal acquired Petroflow's interests in Hunton assets developed pursuant to the Farmout Agreement and concomitantly settle all outstanding legal matters and other claims between Equal, Petroflow and certain other parties to the litigation. Pursuant to the purchase and sale agreement Equal acquired Petroflow's interests in the Hunton assets which were developed under the Farmout Agreement for consideration of USD$93.5 million. Furthermore, as part of the transaction, Equal and Petroflow equalized, on a 50/50 basis, the interests in zones above the Hunton in sections of land that were earned during the life of the Farmout Agreement, and Petroflow would operate a development program over these uphole assets. Equal funded the acquisition through proceeds from a CDN$50 million offering of Equal Shares and its available credit facilities. Under the terms of the settlement agreement, all outstanding legal matters were settled and resolved. On May 17, 2011, the Bankruptcy Court entered an order approving the agreements between the parties. On June 1, 2011, Equal announced the acquisition of the Petroflow interests in the jointly developed Hunton assets had closed.

In April 2012, the Board met to discuss the business strategy of Equal. The Board resolved to form a special committee (the "**2012 Special Committee**") at that time and the 2012 Special Committee decided to retain the services of Scotiabank and Desjardins Securities as financial advisors. On May 3, 2012, Equal announced that its Board had initiated a strategic review process to identify, examine and consider alternatives with the view to enhancing shareholder value. The Board indicated that strategic alternatives could include, but were not limited to, the sale of all or a portion of Equal's assets, the outright sale of the corporation, a merger or other business combination, a recapitalization, acquisitions, as well as continued execution of its business plan, or any combination thereof.

As part of the 2012 strategic process, 1988 parties received the "teaser" via email and of those parties 166 were contacted in person by Scotiabank, including Petroflow. A total of 69 parties, including Petroflow, entered into confidentiality agreements, 26 were U.S.-based companies that were interested in Equal's U.S. assets. Equal and Scotiabank conducted 62 formal presentations or "face-to-face" meetings with interested parties prior to the first bid date which was August 8, 2012. In the first round of bids, Equal received 21 proposals five of which were for all of Equal's U.S. assets and one additional bid on the Hunton assets only. Following the first round of bids, Scotiabank went back to certain interested parties that had initially made competitive bids and indicated that their offers should be revised and resubmitted by August 22, 2012. On August 22, 2012, Equal received nine proposals with one being for the Hunton assets only and one being for certain assets that Equal held in Northern Oklahoma. The remaining bids were in relation to Canadian assets that Equal had at the time. Following

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 35 )

Table of Contents

this second round of bids, Equal and its advisors began working on closing the bid in relation to the Northern Oklahoma assets and another transaction for certain Canadian assets. Scotiabank also went back to certain parties that had made competitive bids or expressed further interest regarding certain assets and requested that such parties resubmit bids on such assets by October 12, 2012. On that date, Equal received a total of ten bids, four of which related to the Lochend Cardium assets and six of which related to Canadian royalties and fee title lands. Negotiations relating to the sale of the Lochend Cardium assets were commenced at this stage and certain parties that had bid on the Canadian royalties were asked to resubmit bids by November 14, 2012.

On November 27, 2012, Equal announced that it had concluded its strategic review process that was initiated in May 2012 and confirmed that the 2012 strategic process had resulted in the sale of the following assets:

1.    Northern Oklahoma;

2.    Halkirk, Alliance, Wainwright, Clair and major abandonment liabilities;

3.    Lochend Cardium; and

4.    Canadian royalties and fee title lands.

During the 2012 strategic process, the Board had received significant interest on the Central Oklahoma Hunton assets culminating in four separate proposals on such assets. One party had a superior offer and entered into negotiations with Equal regarding the potential sale of such assets, but the Board ultimately made the decision to retain the assets and build Equal around those assets on a go-forward basis. The Board acknowledged at the end of the 2012 strategic review that it had given serious consideration to other corporate structures, such as a U.S. MLP and a Canadian trust, but based on its views and expert advice on market and commodity price conditions at the time and certain tax implications to a significant portion of its shareholder base it deemed such structures not to be prudent steps for Equal at that time.

The 2012 strategic review and subsequent actions also brought substantial benefits to Equal, including:

•    proceeds from the asset sales total CDN$129.5 million;

•    a major reduction in corporate net debt from CDN$149 million at the onset of the review to an estimated CDN$23 million at the end of 2012 including a cash balance of CDN$22 million, which put Equal's debt-to-cash flow ratio in the top 10% of its competitor peer group at that time;

•    the retention of approximately 75% of the production and 80% of the reserves that existed at Equal at the onset of the 2012 strategic review;

•    cash reserves combined with an undrawn bank credit facility of CDN$125 million which could allow Equal to consider additional strategic growth strategies including acquisitions;

•    a reduction in asset retirement obligations from CDN$31 million to CDN$10 million; and

•    the implementation of a USD$0.20 per Equal Share annual dividend, that would begin on January 1, 2013 and be payable each calendar quarter.

Notwithstanding the success of the 2012 strategic review in transforming Equal's financial condition, upon conclusion of the review, a particular shareholder group, led by Mr. Nawar Alsaadi and Dr. Adam Goldstein publicly disagreed with the outcome. The shareholder group demanded Equal engage in certain transactions that would return a significant amount of cash to then current shareholders, but would also significantly increase the debt levels of Equal and, in the view of the Board, threaten the preservation and enhancement of long-term shareholder value. On January 24, 2013, Equal announced it had initiated legal proceedings against Mr. Nawar Alsaadi and Dr. Adam Goldstein in the United States District Court, Southern District of New York, alleging violation of disclosure requirements under US securities laws. On March 19, 2013, Equal

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 36 )

Table of Contents

announced it had entered into a settlement agreement with Mr. Nawar Alsaadi and Dr. Adam Goldstein. Pursuant to the settlement agreement, Equal withdrew its pending suit and the shareholders, without admitting or conceding liability or wrongdoing, agreed to remove certain publications and statements concerning their views about Equal and its management and refrain from publishing or republishing other similar material. The settlement allowed the Board to move forward on governance priorities and for management to fully concentrate on building value for shareholders with emphasis on a balanced and prudent approach to the development of its assets.

On January 31, 2013, Equal received a proposal from an interested party ("**Company A**") relating to a potential business combination. The Board and management of Equal reviewed the proposal and decided that it was inadequate and, as such, on February 11, 2013, Equal indicated to Company A that it was not interested in pursuing further negotiations.

On March 25, 2013, Montclair publicly announced that, on February 27, 2013, it had made an unsolicited proposal to acquire all of the outstanding Equal Shares, on a fully diluted basis, for USD$4.00 per Equal Share in cash.

In response to the public announcement by Montclair, on March 25, 2013, Equal advised that it had previously formed the Special Committee in early March 2013 to investigate and evaluate all proposals presented to Equal, including the Montclair proposal for USD$4.00 per Equal Share. The Special Committee further advised that it had retained GHS and Scotiabank to assist in considering such expressions of interest in a deliberate and thoughtful manner with a view to the best interests of Equal before undertaking any specific course of conduct. Equal advised at that time that it did not intend to disclose developments with respect to the process being undertaken by the Special Committee unless and until the Board had approved a definitive transaction or other course of action.

Following the public nature of the announcement by Montclair, Equal received increased interest from a number of parties and between March 26 and March 27, 2013, engaged in discussions with Montclair and its advisors as well as six other parties, all of which were strategic buyers, that had approached Equal and expressed interest about potential transactions and/or business combinations. While expressing an interest to participate in the process, some of these parties did not provide formal offers that included indicative values for Equal, but instead indicated they would require further time and information before providing a formal offer. One interested party did provide Equal with presentation materials indicating that it would be prepared to provide a formal offer involving a combination of equity and cash for an implied price of approximately CDN$3.34 per Equal Share.

On April 1, 2013, Company A presented Equal with another business combination proposal which was below the previous USD$4.00 offer price that Montclair had presented. In response to the proposal Equal indicated that the Special Committee would be considering the proposal and that Company A and Equal should enter into a confidentiality agreement regarding the mutual exchange of information.

On April 9, 2013, Equal established a virtual data room with information and GHS identified and began contacting an additional 12 potential interested parties, some of whom had participated in the 2012 strategic review process in relation to the Hunton assets and had previously expressed interest in such assets. Petroflow was contacted on April 9, 2013 regarding its interest and indicated that it would consider a potential transaction and reply to Equal in due course. Equal sent Petroflow a proposed form of confidentiality agreement on that same day. Montclair was contacted on April 10, 2013 and was sent a proposed form of confidentiality agreement on that same day.

Company A and Equal entered into a confidentiality agreement in mid-April 2013, and Company A received access to the data room.

Following contact by GHS, in the last half of April 2013, an additional seven parties, including Montclair, entered into confidentiality agreements with Equal and gained access to the data room. A number of other parties indicated that the solicitation by Equal did not match their current corporate objectives and they were not in a position to enter into a confidentiality agreement and engage in the process. On April 16, 2013, Petroflow indicated that it was not going to participate in the process and did not execute the confidentiality agreement that was previously sent over by Equal.

On April 23, 2013, Equal received a revised non-binding proposal from Company A. Company A requested to make a presentation to the Special Committee, GHS and Equal management to outline the merits of its proposal. After review by the

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 37 )

Table of Contents

Special Committee, Equal management and GHS, Equal's Board decided that the proposal remained unacceptable in its current form, as it significantly under-valued Equal and was not in the best interests of Equal. Equal communicated this to representatives from Company A and indicated that representatives from Equal were not prepared to meet until a more reasonable proposal was put forward.

On May 1, 2013, Equal received an indication of interest from one of the party's involved in the process ("**Company B**"). The financial terms presented in the indication of interest from Company B involved a combination of equity and cash for an implied price of approximately USD$5.20 per Equal Share at the time of such proposal. The Special Committee met on May 7, 2013 to further discuss the proposal from Company B and assess various financial modelling scenarios that were prepared by GHS. The Special Committee, after discussing the matter with Equal management and GHS decided that while the proposal from Company B had certain aspects, particularly in respect of certain non-financial terms, that were not acceptable to Equal there were certain aspects of such proposal that were compelling. Following the meeting, GHS indicated to the financial advisors for Company B that Equal and its representatives were working on a counter-proposal. GHS and Equal management conducted extensive financial modelling and due diligence on potential transaction structures with Company B over the next three weeks and maintained a constant dialogue with representatives from Company B.

On May 27, 2013, the Special Committee met with Equal management, GHS and its legal advisors to discuss the counter-proposal and get an update on other parties involved in the strategic process. Following extensive discussion among the attendees in that meeting the Special Committee approved a counter-proposal to be presented to Company B. Equal forwarded a counter-proposal to representatives from Company B later on May 27, 2013. Representatives from Company B responded on May 28, 2013 and noted that a number of the changes proposed in the counter-proposal from Equal were acceptable, but there were some aspects of the counter-proposal that needed to be revised to be acceptable to Company B. On May 28, 2013, Company B provided two further alternatives to the counter-proposal and asked Equal to respond as soon as possible. Between May 28 and May 31, GHS held numerous teleconferences with the financial advisors of Company B to clarify certain aspects of the two options in the revised proposal presented by Company B. GHS worked on revising the financial models in relation to the options outlined in the revised proposal as well as various other go-forward scenarios for Equal.

On June 1, 2013, the Special Committee met with Equal management, GHS and its legal advisors to discuss the revised proposal from Company B, the go-forward scenarios, the status of other interested parties participating in the process and the timing of the strategic process. The Special Committee concluded that the revised proposal from Company B still had certain provisions that were unacceptable to Equal, but the Special Committee instructed representatives from Equal's management and GHS to engage in discussions with Company B as soon as possible to determine if the parties could come to an acceptable arrangement and execute a letter of intent. On June 3, 2013, Mr. Klapko had a direct negotiation with the Chief Executive Officer from Company B and the parties agreed upon the general terms and conditions of a transaction and noted that such transactions would be subject to, among other things, a comprehensive due diligence review and tax structuring. Mr. Klapko further noted that the terms agreed upon needed to be reviewed and approved by the Special Committee and the Board prior to signing any letter of intent. On June 4, 2013, the Special Committee met to discuss the proposal and the status of the process in general. On June 7, 2013, the Board met to discuss the proposal relating to a transaction with Company B and get an update from the Special Committee and GHS on the status of the strategic process and go-forward alternatives. After extensive discussions the Board resolved that the proposal required further study and directed Equal management and advisors to continue with diligence, but not proceed with further negotiation of a definitive agreement at that time. Following the meeting of the Board, GHS and Equal management contacted representatives from Company B to outline the determinations of the Board. Representatives of the two parties maintained constant contact over the next week. On June 12, 2013, the Special Committee met with GHS, Equal management and legal advisors and discussed the terms of a potential proposal with Company B that would be acceptable to Equal. On June 13, 2013, Mr. Klapko and the Chief Executive Officer for Company B discussed various deal terms and Mr. Klapko outlined the views of the Special Committee. Later that day, Company B sent Equal a revised indication of interest and requested a response by June 14, 2013. The Board met again with Equal management, GHS and its legal advisors on June 13, 2013, to discuss the latest proposal, being a USD$5.00 per Equal Share cash offer from Company B. The Board agreed that the revisions to the proposal were acceptable to Equal and that the indication of interest could be counter-signed by Equal. The proposal required that Equal negotiate exclusively with Company B for the next 45 days and work towards the execution of a definitive agreement within that time period. Later on June 14, 2013, Equal executed the indication of interest and entered into an exclusive negotiation with Company B. Following the execution of the indication of interest Equal engaged in no further contact with any other parties and on

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 38 )

Table of Contents

June 26, 2013, Equal sent correspondence to the five other parties that had executed confidentiality agreements informing them that access to the virtual data room was being revoked immediately. One party that was participating in the process contacted representatives of Equal for further clarity on the closure of the data room and were told that Equal could not comment further on the reasoning behind the closure of the data room.

Between June 14, 2013 and July 28, 2013 (the 45 day period of exclusivity with Company B), representatives of each of Equal and Company B, including financial, tax and legal advisors, communicated extensively on due diligence and structuring matters. On July 26, 2013, at the direction of the Special Committee, Mr. Klapko contacted the Chief Executive Officer of Company B and advised that the 45 day exclusivity would be running out on July 28, 2013 and that there were certain transaction structuring matters that needed to be resolved quickly if a definitive agreement were to be reached. The Chief Executive Officer of Company B acknowledged that time was of the essence and reiterated that it was still the intention of Company B to try to negotiate a definitive agreement with Equal.

On August 7, 2013, the Board held its regularly scheduled quarterly meeting and as part of that meeting engaged in an extensive discussion regarding the potential transaction with Company B. Mr. Klapko advised the Board that representatives of Equal and Company B, including financial and tax advisors, were scheduled to meet with each other on August 8, 2013, in an attempt to resolve all outstanding matters in relation to the potential transaction. The Board indicated that it supported working with Company B until August 16, 2013 to address structuring issues. However, if by August 16, 2013, Company B did not give Equal a strong indication that it was highly confident of being able to negotiate and execute a definitive agreement on or before August 31, 2013 then Equal would cease further negotiations with Company B.

On August 8, 2013, representatives of Equal and Company B, including financial and tax advisors, met as previously scheduled to discuss various diligence and structuring matters. Mr. Klapko also provided Company B with a letter from the Chairman of Equal outlining the Board's position that Company B needed to confirm to Equal, by August 16, 2013, that it was highly confident of being able to negotiate and execute a definitive agreement on or before August 31, 2013.

On August 13, 2013, Montclair's financial advisor contacted GHS and indicated that it would be putting in a new proposal. On August 14, 2013, Montclair submitted a written proposal to Equal indicating that Montclair wished to purchase all of the outstanding shares of Equal, on a fully-diluted basis, for $4.75 per Equal Share in cash. The new Montclair proposal indicated that Equal needed to respond by August 20, 2013. On August 14, 2013, the Special Committee met with Equal management and Equal's legal and financial advisors to discuss the Montclair proposal. The attendees of the meeting discussed the proposal extensively and further discussed the status with certain other parties, including Company B. On August 15, 2013, Equal publicly confirmed receipt of the offer from Montclair and indicated that the Special Committee, along with Equal's financial and legal advisors were reviewing the new Montclair proposal. On August 15, 2013, Mr. Klapko also contacted the Chief Executive Officer of Company B to enquire as to the status of Company B's due diligence and structuring review. The Chief Executive Officer of Company B indicated that no significant progress had been made by Company B in regards to executing a transaction with Equal and he further noted that he was aware of the Montclair offer as it was publicly available. On August 16, 2013, Equal did not receive any confirmation from Company B that it was confident of negotiating a definitive transaction on or before August 31, 2013.

On August 19, 2013, the Special Committee met with Equal management and Equal's legal and financial advisors to further discuss the Montclair proposal and the status of negotiations with Company B. The Special Committee concluded that the revised offer of USD$4.75 was not acceptable and outlined the rationale underlying its decision. Also, the Special Committee advised that Equal send a formal letter to Company B indicating that it was terminating discussions and closing the data room to Company B. On August 20, 2013, Equal sent a formal response to Montclair rejecting the latest proposal submitted by Montclair and also filed a press release announcing the rejection of the proposal. Also, on August 20, 2013, Equal delivered a letter to Company B indicating that it was terminating discussions and closing the data room to Company B.

On August 21, 2013, the financial advisor for Petroflow contacted GHS indicating that notwithstanding Petroflow's decision not to participate in the process in April 2013, Petroflow was interested in negotiating a confidentiality agreement so that it could gain access to the virtual data room and potentially make a proposal.

On August 23, 2013, Equal contacted Montclair to determine if Montclair intended to submit a further revised proposal that addressed the deficiencies that Equal had noted in the previous offer. Montclair advised that it was working on a revised

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 39 )

Table of Contents

proposal, but would need to re-access the data room to conduct further due diligence on Equal. Legal advisors for Montclair contacted Equal's legal advisors on August 23, 2013 regarding certain amendments that were needed to the previously executed confidentiality agreement.

On August 28, 2013, Equal forwarded letters to Montclair, Petroflow and two other parties that were still expressing some interest in a transaction with Equal outlining a specific set of guidelines for companies interested in submitting an expression of interest. Equal advised each of the four potential bidders that the framework was necessary given recent extensive, but non-conclusive discussions with various interested parties. The framework required that, if interested, the parties would need to provide Equal with a proposal by September 6, 2013, and such proposals would need to be developed from publicly available information about Equal.

On September 6, 2013, Equal received non-binding proposals from Montclair and Petroflow. The two other parties that were invited to submit proposals chose not to submit bids. The Montclair offer indicated a price of USD$4.85 per Equal Share, but acknowledged that there was potential to increase the bid substantially based on the fact that Equal had recently published new information in regards to the valuation of its oil and gas reserves. The Petroflow offer indicated a price of USD$5.25. Both offers were subject to further due diligence.

On September 10, 2013, the Special Committee met with Equal management, GHS and Equal's legal advisors to determine how to respond to the offers. After extensive discussions and analysis in the meeting, the Special Committee determined that Equal should allow both parties to conduct further diligence in order to develop the proposals presented on September 6, 2013. As such, the Special Committee instructed Equal management to negotiate and execute a confidentiality agreement with Petroflow and, as per a request from Montclair, an amendment to the existing confidentiality agreement with Montclair.

On September 15, 2013, legal advisors for Petroflow and Equal engaged in negotiations regarding the confidentiality agreement over the next three days, culminating in the execution of a confidentiality agreement between Petroflow and Equal on September 18, 2013. Petroflow and certain of its representatives were granted access to the virtual data room on September 19, 2013 and were informed that revised proposals were due on September 27, 2013.

On September 20, 2013, Equal and Montclair negotiated an amendment to the confidentiality agreement and, on September 20, 2013, Montclair and certain of its representatives were granted access to the virtual data room which had been populated with updated information from the previous period that Montclair had access. Montclair was also informed that revised proposals were due on September 27, 2013. However, Montclair indicated that it had technical difficulties accessing the virtual data room and many of its representatives were not able to gain access until September 23, 2013. As a result of this delay, Equal extended the deadline for proposals for both Montclair and Petroflow to September 29, 2013. Equal and GHS also offered to make a presentation to the management of each of the remaining bidders, being Petroflow and Montclair, while Petroflow accepted Equal's offer for a presentation, Montclair declined.

On September 24, 2013, Equal management and GHS gave a presentation to Petroflow management and its financial advisors which allowed Petroflow to verify diligence information and largely conclude its diligence.

On September 27, 2013, Equal management and its legal advisors had a conference call with Montclair's legal advisors to provide further information on a number of diligence questions that Montclair had posed.

On September 29, 2013, Equal received revised, non-binding proposals from Montclair and Petroflow. The Montclair offer indicated an increased price of USD$5.25 per Equal Share. The Petroflow offer reconfirmed its previous offer price of USD$5.25 per Equal Share.

On September 30, 2013, the Special Committee met with Equal management, GHS and Equal's legal advisors to discuss the revised proposals from Montclair and Petroflow. The Special Committee indicated that it was of the view that while the price was identical in each of the bids, the Petroflow bid was slightly stronger on the basis of the non-financial terms and execution risk, including the reciprocal break fee and the treatment of holders of Convertible Debentures. Specifically, the break fee in the Petroflow bid was set at USD$2,000,000 and was reciprocal, while the break fee in the Montclair bid was set at USD$5,000,000 was payable only by Equal and was payable in the event that Equal should fail to close the transaction for certain reasons, including accepting a superior proposal from another party. Under Montclair's proposal, Montclair was not

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 40 )

Table of Contents

subject to any break fee, even for failure to obtain the financing necessary to close the transaction. The Special Committee further instructed GHS to communicate with each of Montclair and Petroflow that while their bids were compelling they were effectively tied with another bidder and thus would need to increase the bid to differentiate their proposal from other bids.

On October 1, 2013, the Board met with Equal management, GHS and Equal's legal advisors to review the proposals and discuss internal valuations on Equal. The attendees engaged in an extensive discussion on these points and instructed GHS to communicate with the two bidders and inform them that they had until October 3, 2013, to revise their respective bids. Following the meeting, GHS contacted each of the parties and communicated to them that they were effectively tied with another bidder and therefore needed to increase the offer price and remove as many contingencies and conditions as possible to differentiate their bid from other bidders. GHS also indicated that revised bids needed to be submitted by October 3, 2013 as the Board was meeting on that date to review the revised bids and likely make a final decision.

On October 3, 2013, Equal received revised, non-binding proposals from Montclair and Petroflow. The Montclair offer indicated an increased price of USD$5.40 per Equal Share. The Petroflow offer indicated aggregate consideration of USD$200 million for all of the issued and outstanding Equal Shares, on a fully-diluted basis, which equated to USD$5.43 per Equal Share. The Board met on the evening of October 3, 2013, with Equal management, GHS and Equal's legal advisors to discuss the revised proposals and came to the conclusion that the offer from Petroflow was not only better on price, but again was stronger on the basis of the non-financial terms and execution risk. The Board indicated that it would like some minor revisions to the Petroflow offer, but generally were in agreement that the bid was acceptable. The Board also instructed GHS to inform Montclair that it was not the successful bidder. The Board agreed to meet on the evening of October 4, 2013, following discussions between GHS and Petroflow's financial advisor regarding the proposed minor revisions to the Petroflow bid.

On October 4, 2013, GHS advised Montclair that it was not the successful bidder. GHS also discussed with Petroflow potential revisions to its proposal. Petroflow agreed to certain revisions and submitted a slightly revised offer. On the evening of October 4, 2013, the Board met with Equal management, GHS and Equal's legal advisors to discuss the revised proposal from Petroflow. The Board approved the revised offer, subject to some minor revisions being made.

On October 5, 2013, GHS advised Petroflow that the Board had approved the revised proposal subject to some minor revisions being made. Legal counsel to Petroflow provided comments on the revised proposal that reflected the revisions requested by the Board and Petroflow agreed to such revisions. On October 6, 2013, the final letter of intent was executed by Petroflow and Equal and the parties entered into a 60 day exclusivity period to work towards the execution of a definitive agreement and to allow Petroflow to conduct further due diligence.

On October 8, 2013, Petroflow and its representatives and Equal and its representatives, including financial and legal advisors for both sides, held a conference call to discuss the process to be followed to progress to the signing of a definitive agreement and the filing of a preliminary circular with the SEC. Legal counsel for Petroflow indicated that it would commence drafting the definitive agreement immediately and legal counsel for Equal indicated that it would commence drafting the information circular and proxy statement immediately.

On October 10, 2013, Equal management and Petroflow management met in Oklahoma City to review go-forward operational plans. On October 12, 2013, Equal forwarded a summary of cash and working capital positions along with the anticipated capital costs for various go-forward operational scenarios. During the week beginning on October 14, 2013, Equal engaged in various discussions with Petroflow and its financial advisors in order to clarify and provide further detail on the information provided.

On October 18, 2013, Petroflow and its representatives and Equal and its representatives, including financial and legal advisors for both sides, held a conference call to discuss the status of the documentation, transaction timing, operational matters and the status of Petroflow's financing efforts.

On October 23, 2013, legal counsel for Petroflow circulated the initial draft of the definitive agreement.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 41 )

Table of Contents

On October 24, 2013, Petroflow and its representatives and Equal and its representatives, including financial and legal advisors for both sides, held a conference call to discuss the status of the documentation, transaction timing, diligence matters, operational matters and the status of Petroflow's financing efforts.

On October 29, 2013, Equal management met with its legal and financial advisors and the attendees conducted a detailed review of the draft definitive agreement and discuss the preparation of schedules.

On October 31, 2013, Equal's legal advisors forwarded comments on the draft definitive agreement to Petroflow and its legal advisors. GHS also advised that it had been in contact with Petroflow's financial advisors regarding the status of Petroflow's diligence and financing efforts.

On November 4, 2013, Petroflow and its representatives and Equal and its representatives, including financial and legal advisors for both sides, held a conference call to discuss the status of the documentation, transaction timing, diligence matters, operational matters and the status of Petroflow's financing efforts. Petroflow indicated that it had was in the process of engaging Ernst & Young LLP ("**E&Y**") as special tax advisors to conduct extensive diligence on the tax impacts of a transaction between Petroflow and Equal. Later that day, Petroflow's legal advisors and Equal's legal advisors communicated on a number of structural and documentation points.

On November 12, 2013, GHS contacted Petroflow's financial advisor to get a status update. Petroflow's financial advisor indicated that the tax due diligence being conducted by E&Y was forecasted to take approximately two weeks to complete and further noted that due diligence on the oil and gas reserves was progressing well.

On November 13, 2013, Equal's legal counsel provided Petroflow's legal counsel with incremental comments on the definitive agreement.

On November 14, 2013, Equal held its regularly scheduled quarterly Board meeting at which, among other things, the Special Committee provided the Board with an update on the status of the negotiations with Petroflow. On that date, Petroflow's legal counsel forwarded Equal's legal counsel a revised draft of the definitive agreement. Equal management, GHS and Equal's legal counsel provided the Board with an extensive update on all aspects of the negotiation with Petroflow. The attendees engaged in an extensive discussion regarding the transaction timing and the Board indicated that it did not want the execution of a definitive agreement to be any later than December 6, 2013. The Board also decided that it would be prudent to provide the market with an update on the status of the process by disclosing that it is engaged in exclusive negotiations with a particular party and that the exclusive negotiation and diligence period would run into early December. The Board resolved to disseminate such press release after markets closed on November 18, 2013 or prior to market open on November 19, 2013.

On November 15, 2013, Equal management, GHS and Equal's legal counsel held a conference call to discuss the material outstanding points on the definitive agreement.

On November 18, 2013, Equal disseminated a press release after markets closed indicating that it was engaged in exclusive negotiations with a particular party and that the exclusive negotiation and diligence period would run into early December. Following the issuance of the press release, over the course of November 18, 2013 and November 19, 2013, Equal management conducted "town hall" meetings with its employees to provide a general status update on the process and inform employees that a company-wide trading blackout on Equal Shares has been implemented.

On November 19, 2013, Equal management, GHS and Equal's legal advisors conducted an extensive review of the definitive agreement.

On November 20, 2013, Equal's legal counsel provided Petroflow's legal counsel with incremental comments on the definitive agreement.

On November 21, 2013, Petroflow's counsel provided an initial draft of the form of Option Cancellation Agreement to Equal's legal advisors.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 42 )

Table of Contents

On November 22, 2013, GHS and Petroflow's financial advisor discussed the status of the tax diligence being conducted by E&Y and Petroflow's financial advisor indicated that progress had been made on this front, but it noted E&Y required further information from Equal and its tax advisors to complete the diligence review.

On November 25, 2013, Equal management, GHS and Equal's legal advisors conducted an extensive review of the schedules to the definitive agreement.

On November 26, 2013, the financial and legal advisors for each of Petroflow and Equal held a conference call to discuss outstanding legal and business points. The attendees settled the majority of outstanding points, but they noted that there were a few remaining business points and tax diligence by E&Y was not fully complete.

On November 27, 2013, Equal's legal advisors provided Petroflow's legal counsel with a draft of the extensive disclosure letter for review by Petroflow and its advisors.

On November 29, 2013, Equal's legal advisors provided Petroflow's legal counsel with some minor comments on the form of Option Cancellation Agreement. Also, on November 29, 2013, Mr. Klapko and the Chief Executive Officer of Petroflow had a telephone discussion to address outstanding business points and review transaction timing. Petroflow's legal counsel also forwarded a revised version of the definitive agreement to Equal and its representatives.

On November 30, 2013, Petroflow's counsel provided an initial draft of the form of Lock-Up Agreement to Equal's legal advisors.

On December 1, 2013, the Special Committee met with Equal management, GHS and Equal's legal advisors to discuss the outstanding business points relating to the Arrangement, including operational matters in the interim period between execution of the definitive agreement and closing, working capital requirements at closing and the certainty of financing for Petroflow.

On December 2, 2013, Equal's legal advisors provided Petroflow's legal counsel with further comments on the definitive agreement and also provided some minor comments on the form of Lock-Up Agreement. On this same date, Equal's management, GHS and Equal's tax advisors also had numerous discussions with Petroflow's financial advisors and E&Y to progress towards finalizing tax due diligence. Petroflow's legal counsel also provided comments on the disclosure letter schedules all of which were accepted by Equal.

On December 3, 2013, Petroflow's legal counsel advised Equal's legal counsel that it had accepted the comments from Equal's legal counsel on both the form of Lock-Up Agreement and the form of Option Cancellation Agreement and that such documents were in final form. Legal counsel for both of the parties also held a conference call to discuss the drafting of certain provisions in the definitive agreement and ensure they accurately reflected the business deal. Also, on such date, Mr. Klapko and the Chief Executive Officer of Petroflow had a telephone discussion to address certain operational matters and working capital requirements.

On December 4, 2013, Mr. Klapko and the Chief Executive Officer of Petroflow had further telephone discussions to address certain operational matters and working capital requirements.

On December 5, 2013, Petroflow's counsel provided a revised draft of the definitive agreement to Equal's legal advisors. Equal's legal advisors reviewed the document with Equal and GHS and provided further comments on the definitive agreement as well as an updated disclosure letter to Petroflow's counsel later that evening. On this same date, Equal's legal counsel provided the Board with a memo on the material terms of the Arrangement in preparation for the anticipated December 6, 2013 meetings of the Special Committee and the Board.

On December 6, 2013, Petroflow's counsel provided a revised draft of the definitive agreement as well as some incremental comments on the disclosure letter to Equal's legal advisors. Equal's legal advisors reviewed the document with Equal and GHS and provided further comments on the definitive agreement as well as an updated disclosure letter to Petroflow's counsel. The Special Committee met with Equal management, GHS and Equal's legal advisors to discuss the final terms of the definitive agreement and the Arrangement. The Special Committee resolved to recommend that the Board approve the

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 43 )

Table of Contents

definitive agreement and the Arrangement. Immediately following the meeting of the Special Committee, the Board met with Equal management, GHS and Equal's legal advisors to discuss the final terms of the definitive agreement and the Arrangement. At the meeting of the Board, GHS rendered its oral opinion to the Board (which was subsequently confirmed in writing by delivery of its final written opinion dated as of the same date) to the effect that, as of December 6, 2013, and based upon and subject to the various assumptions and limitations set forth therein, the consideration of USD$5.43 per share in cash to be received by the Equal Shareholders (other than those referenced in such opinion) in the Arrangement was fair, from a financial point of view, to such Equal Shareholders. The oral opinion and final written opinion delivered to the Board were reviewed, discussed and approved by the fairness committee of GHS in accordance with GHS' customary practices prior to delivery. Following extensive discussions among the attendees, the Board resolved to approve the definitive agreement and the Arrangement. Following conclusion of the meeting of the Board, legal counsel for both parties had a number of conference calls to execute definitive agreements on the evening of December 6, 2013.

On December 6, 2013, Montclair issued a press release stating its concerns about the strategic process.

On December 9, 2013, Equal disseminated a press release prior to markets opening announcing the execution of the definitive agreement and certain details of the transaction.

On May 1, 2014, Equal announced that it had entered into the Amending Agreement, which, among other things, extended the outside termination date of the Arrangement Agreement to July 31, 2014 from the previous date of May 1, 2014. The extension of the outside termination date was agreed to by Equal and Petroflow after Petroflow obtained financing commitments in the amounts necessary for it to complete the Arrangement and with the intention of providing sufficient time for the parties to meet the closing conditions to the Arrangement Agreement.

On May 29, 2014, the Board met with Equal management, GHS and Equal's legal advisors by teleconference to receive from GHS its oral opinion to the Board (which was subsequently confirmed in writing by delivery of its final written opinion dated as of the same date) to the effect that, as of May 29, 2014, and based upon and subject to the various assumptions and limitations set forth therein, the sum of the Arrangement Consideration and the Arrangement Dividend to be received by the Equal Shareholders (other than those referenced in such opinion) pursuant to the Arrangement was fair, from a financial point of view, to such Equal Shareholders. The oral opinion and final written opinion delivered to the Board were reviewed, discussed and approved by the fairness opinion committee of GHS in accordance with GHS' customary practices prior to delivery.

### Recommendation of the Special Committee

The Special Committee, having undertaken a thorough review of, and carefully considered, the proposed Arrangement and the alternatives available to Equal, and having taken into account such other matters as it considered relevant (as described below under the heading "*Reasons for the Recommendation of the Board and Special Committee*"), unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. Accordingly, the Special Committee unanimously approved the Arrangement and the Compensation Proposal and recommended that the Board approve the Arrangement and Compensation Proposal and recommended that the Equal Shareholders vote "FOR" the Arrangement Resolution and "FOR" the Compensation Proposal.

### Recommendation of our Board of Directors

After careful consideration, and taking into account the recommendation of the Special Committee and all of the factors described below, the Board unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement, and the Board unanimously recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution, the complete text of which is attached as Appendix C to this Circular.

The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 44 )

Table of Contents

Our directors and executive officers have informed us that, as of the date of this Circular, they intend to vote all of their Equal Shares in favor of the Arrangement Resolution. As of May 15, 2014, the latest practicable date prior to the date of the Circular, our directors and executive officers beneficially owned or controlled, in the aggregate, 848,814 Equal Shares, representing approximately 2.4% of the outstanding Equal Shares.

The directors and officers of Equal and its subsidiaries have entered into Lock-Up Agreements with Petroflow and Petroflow Sub pursuant to which they have agreed, among other things, to vote the Equal Shares beneficially owned or controlled by them in favour of the Arrangement Resolution. At May 15, 2014, the latest practicable date prior to the date of the Circular, the directors and officers of Equal and its subsidiaries beneficially owned or controlled 848,814 Equal Shares, representing approximately 2.4% of the Equal Shares outstanding. The form of Lock-Up Agreement is attached to the Circular as Appendix E.

**Reasons for the Recommendation of our Board and Special Committee**

In evaluating the Arrangement and the transactions contemplated thereby, our Board and Special Committee considered and evaluated a number of factors, including:

- *Review of Strategic Alternatives*. The belief of the Board and Special Committee, after consultation with Equal's financial and legal advisors and management, and after review of the other strategic opportunities reasonably available to Equal, including continuing to operate as an independent company, a management buyout, capital acceleration, a corporate sale, an increased return of capital to shareholders by a dividend distribution or share buyback, a foreign asset income trust and a master limited partnership, in each case taking into account the potential benefits, risks and uncertainties associated with those other opportunities (including the risks associated with future investments in our oil and gas exploration and production business), that the Arrangement represents Equal's best and most certain prospect for maximizing shareholder value in a volatile and unpredictable financial and economic environment.

- *Prospects of Equal*. The Board's and Special Committee's assessment of the current and anticipated future opportunities and risks associated with the business, operations, assets, financial performance and condition of Equal should it continue without entering into the Arrangement.

- *Approval Threshold*. Equal Shareholders will have an opportunity to vote on the Arrangement Resolution, which requires approval by at least 66⅔ of the votes cast by Equal Shareholders present in person or represented by proxy at the Meeting. In addition, the Arrangement is subject to approval of a simple majority of the votes cast by Equal Shareholders present in person or represented by proxy at the Meeting, excluding the votes of those persons whose votes may not be included in determining minority approval of a business combination under MI 61-101.

- *Fair Value*. The Board's and the Special Committee's belief that the Arrangement Consideration of USD$5.43 per Equal Share represents fair value for the Equal Shares, taking into account the Board's and the Special Committee's familiarity with our business, operations, prospects, business strategy, properties, assets, and financial condition, and the Board's and the Special Committee's belief that the Arrangement Consideration represents the highest consideration per Equal Share value obtainable on the date of signing the Arrangement Agreement.

- *Certainty of Value*. The fact that the Arrangement Consideration will consist entirely of cash, which will provide liquidity and certainty of value to the Equal Shareholders, compared to the risks and uncertainty associated with the operation of our business, including the risks inherent in, the costs associated with and the time required for oil and gas exploration and production activities.

- *Fairness Opinion.* The Board asked GHS to opine as to the fairness, from a financial point of view, of the sum of the Arrangement Consideration and the Arrangement Dividend to be received by the Equal Shareholders. The Fairness Opinion, delivered to the Board on May 29, 2014 states that based on and subject to the assumptions made, matters considered and qualifications and limitations on the scope of the review undertaken by GHS, as described in the Fairness Opinion, the sum of the Arrangement Consideration and the Arrangement Dividend, to be paid in connection with the Arrangement was fair, from a financial point of view, to the Equal Shareholders (excluding holders exercising Dissent Rights and Excluded Holders) as of the date of the Fairness Opinion, as more fully described under the heading "*The Arrangement – Fairness Opinion*" beginning on page 47.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 45 )

Table of Contents

- ***Premium to Prevailing Trading Price***. The USD$5.43 per Equal Share Arrangement Consideration represents approximately a 22% premium over USD$4.44, the closing price of the Equal Shares on the TSX on November 18, 2013 (converted from Canadian dollars to U.S. dollars based on the Bank of Canada noon rate published for November 18, 2013), the trading day prior to the announcement that Equal's strategic alternatives process had successfully resulted in exclusive negotiations with another party and a 23% premium over USD$4.43, the closing price of the Equal Shares on the NYSE on November 18, 2013. The Arrangement Consideration also represents approximately a 54% premium over USD$3.53, the closing price of the Equal Shares on the TSX on March 22, 2013 (converted from Canadian dollars to U.S. dollars based on the Bank of Canada noon rate published for March 22, 2013), the trading day prior to Equal's announcement that it was pursuing a strategic alternatives process and a 56% premium over USD$3.49, the closing price of the Equal Shares on the NYSE on March 22, 2013.

- ***Terms of Arrangement Agreement; Ability to Respond to Unsolicited Proposals.*** The terms and conditions of the Arrangement Agreement, including our ability to consider and respond, under certain circumstances specified in the Arrangement Agreement, to an unsolicited proposal for a business combination from a third party prior to approval of the Arrangement Resolution by the Equal Shareholders, and the right of the Board after complying with the terms of the Arrangement Agreement to terminate the Arrangement Agreement in order to accept a superior proposal subject to payment of a termination payment of USD$2,000,000.

- ***Reverse Termination Payment.*** If the Arrangement Agreement is terminated under certain circumstances, Petroflow will be required to pay Equal a reverse termination payment in the amount of USD$2,000,000 as described under "*The Arrangement Agreement – Termination Payment*" beginning on page 77. The Board relied upon the reverse termination payment as adequate assurance for Equal Shareholders and a sufficient inducement to Petroflow to obtain the Financing for the transaction and close the acquisition.

- ***Dissent Rights***. The availability under Alberta law of Dissent Rights to Equal Shareholders who do not vote in favour of the Arrangement Resolution and otherwise comply with all the required procedures under the ABCA, as modified by the Interim Order and Plan of Arrangement, which allows such Equal Shareholders to seek payment of the fair value of their Equal Shares.

The Board and the Special Committee also considered a variety of risks and other potentially negative factors concerning the Arrangement. These factors included the following:

- ***No Shareholder Participation in Potential Future Growth or Earnings***. The fact that the Equal Shareholders will cease to participate in Equal's potential future earnings growth or benefit from any future increase in its value following the Arrangement and the possibility that the price of the Equal Shares might have increased in the future to a price greater than the USD$5.43 per Equal Share Arrangement Consideration.

- ***Nonsolicitation Restrictions.*** The restrictions that the Arrangement Agreement imposes on our ability to solicit competing proposals.

- ***Financing.*** The risk that Petroflow and Petroflow Sub will not be able to obtain the Financing, which is a condition to their obligations to complete the Arrangement.

- ***Termination Payment.*** The possibility that the termination payment of USD$2,000,000 payable by Equal to Petroflow if the Arrangement Agreement is terminated in certain circumstances may discourage other bidders.

- ***Closing Conditions***. The fact that completion of the Arrangement requires the satisfaction of closing conditions that are not within our control.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 46 )

Table of Contents

- *Business Disruption Resulting from Transaction*. The possible disruption to our business, including the possible effect on our ability to attract and retain key personnel that may result from the announcement of the proposed Arrangement and the resulting distraction of the attention of our management and employees.

- *Potential Conflicts of Interest*. The fact that our executive officers and directors may have interests in the transaction that are different from, or in addition to, those of other Equal Shareholders. See the section of the Circular entitled "*Interests of Our Directors and Executive Officers in the Arrangement*" beginning on page 80 and "*Minority Approval*" beginning on page 79.

- *Cost*. The process leading up to the completion of the Arrangement will result in significant costs to Equal, even if the Arrangement is not completed.

- *Interim Restrictions on Business Pending the Completion of the Arrangement*. The restrictions imposed by the Arrangement Agreement that can affect the conduct of our business prior to completion of the Arrangement.

- *Risk Associated with Failure to complete the Arrangement*. The risks and costs to Equal if the Arrangement is not completed, including (i) the potentially adverse effect on Equal's trading price and the market's perception of Equal's prospects, (ii) diversion of management and employee attention, potential employee attrition and the potential disruptive effect on business relationships and (iii) the payment of our expenses associated with the transaction.

The foregoing discussion of the information and factors considered by the Board and Special Committee is not meant to be exhaustive, but includes the material information, factors and analyses considered by the Board and Special Committee in reaching their conclusions and recommendation in relation to the Arrangement Resolution and the transactions contemplated thereby. The members of the Board and Special Committee evaluated the various factors listed above in light of their knowledge of the business, financial condition and prospects of Equal, taking into account the advice of Equal's financial and legal advisors. In light of the variety of factors and amount of information that the Board and Special Committee considered, the members of the Board and Special Committee did not find it practicable to provide specific assessment of, quantify or otherwise assign any relative weights to, the factors considered in determining their recommendations. Rather, the recommendations of the Board and Special Committee were made after considering the totality of the information and factors involved. Individual members of the Board and Special Committee may have given different weight to different factors. In addition, in arriving at their recommendation, the Board and Special Committee were aware of the interests of certain officers and directors of Equal as described in the sections of this Circular entitled "*Interests of Our Directors and Executive Officers in the Arrangement*" beginning on page 80 and "*Minority Approval*" beginning on page 79.

**Fairness Opinion**

*Opinion of GHS*

The Board determined it was advisable to obtain the Fairness Opinion with respect to the Arrangement Consideration and Arrangement Dividend. The Board asked GHS to review the fairness, from a financial point of view, of the sum of the Arrangement Consideration and the Arrangement Dividend to be received by the Equal Shareholders (excluding holders exercising Dissent Rights and Excluded Holders). "**Excluded Holders**" include any officers, directors or employees of any parties to the Arrangement, or those parties within the scope of subsection 8.1(2) of MI 61 101, or any class of such persons.

GHS has been engaged since March 20, 2013 (announced on March 25, 2013) by the Special Committee. The Board retained GHS as Equal's financial advisor to review and analyze potentially available alternatives and transactions that ultimately led to the Transaction. Services provided by GHS include, in addition to the Fairness Opinion, review of the business and operations of Equal, advice concerning other companies that might be available for acquisition, merger, partnership or other joint venture, and other acquisitive or dispositive transactions and such other investment banking services as are customary for similar transactions and as may from time to time be agreed upon by GHS and Equal.

In connection with those services, GHS received a monthly advisory fee and will receive a fee based on the Arrangement Consideration paid by Petroflow Sub upon consummation of the Arrangement. In connection with the services provided as

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:* *contactus@kingsdaleshareholder.com*

( 47 )

Table of Contents

financial advisor with respect to this Transaction, GHS has received monthly advisory fees of USD$338,750 through May 28, 2014, creditable against the Transaction fee, and will receive a Transaction fee upon consummation of the Transaction of approximately USD$2 million (less the aggregate amount of monthly advisory fees paid through consummation). In addition, GHS received a fixed fee of USD$150,000 in connection with a prior fairness opinion issued to the Board on December 6, 2013. With respect to this Fairness Opinion, GHS shall receive a fixed fee of USD$100,000, upon rendering the Fairness Opinion, regardless of the conclusions contained in the Fairness Opinion or whether or not the Transaction is consummated. Also in connection with the above, Equal has agreed to reimburse GHS for its out-of-pocket and incidental expenses and to indemnify GHS for certain liabilities arising out of it being so engaged.

GHS issued a previous fairness opinion to the Board in connection with the Transaction on December 6, 2013 to the effect that as of December 6, 2013 and based upon and subject to the various assumptions and limitations set forth therein, the Arrangement Consideration to be received by the Equal Shareholders (other than certain Equal Shareholders referenced therein) was fair, from a financial point of view, to such Equal Shareholders. Such opinion can only be evaluated as of the date it is rendered, and GHS has no responsibility or obligation to update or revise the opinion based upon events or circumstances occurring after that date.

On May 29, 2014, GHS rendered its oral opinion to our Board (which was subsequently confirmed in writing by delivery of the final written Fairness Opinion dated as of the same date) to the effect that, as of May 29, 2014, and based upon and subject to the various assumptions and limitations set forth therein, the sum of the Arrangement Consideration and the Arrangement Dividend, to be received by the Equal Shareholders (other than Dissenting Shareholders and Excluded Holders) in the Arrangement was fair, from a financial point of view, to such Equal Shareholders. Such opinion can only be evaluated as of the date it is rendered, and GHS has no responsibility or obligation to update or revise the opinion based upon events or circumstances occurring after that date. The oral opinion and final written Fairness Opinion delivered to Equal's Board were reviewed, discussed and approved by the fairness committee of GHS in accordance with GHS' customary practices prior to delivery.

**The full text of GHS' written Fairness Opinion, which sets forth, among other things, the factors considered assumptions made, procedures followed, and limitations on the scope of the review undertaken by GHS in rendering its Fairness Opinion is attached as Appendix F and is incorporated in its entirety herein by reference. You are urged to, and should, carefully read the Fairness Opinion in its entirety and this summary is qualified in its entirety by reference to the Fairness Opinion. The Fairness Opinion addresses solely the fairness, from a financial point of view and as of the date of the Fairness Opinion, to the Equal Shareholders (excluding holders exercising Dissent Rights and Excluded Holders) of the sum of the Arrangement Consideration and the Arrangement Dividend to be paid pursuant to the Arrangement Agreement. The Fairness Opinion was directed to the Board of Equal and was not intended to be, and does not constitute, a recommendation as to how any of the Equal Shareholders should act or vote with respect to the Arrangement or any other matter. The Fairness Opinion is not intended to confer rights and remedies upon Petroflow, any shareholders of Petroflow or any affiliates thereof, any Equal Shareholder or Optionholders. The Fairness Opinion was reviewed, discussed and approved for issuance to Equal's Board by the fairness committee of GHS in accordance with GHS' customary practices. The Fairness Opinion can only be evaluated as of the date it is rendered, and GHS has no responsibility or obligation to update or revise the Fairness Opinion based upon events or circumstances occurring after that date.**

In connection with rendering the Fairness Opinion and performing its related financial analyses as of and through May 29, 2014, GHS, among other things:

- reviewed and analyzed the financial terms of the Arrangement Agreement;

- held discussions with certain officers, directors and other representatives and advisors of Equal concerning the business, operations and prospects of Equal;

- advised the Special Committee in connection with a strategic alternatives process described in the section of this Circular entitled "*Background to the Arrangement*" beginning on page 33;

- reviewed and analyzed certain financial and other data with respect to Equal that was publicly available;

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

Table of Contents

- reviewed and analyzed certain information, including unaudited prospective financial and operating information, relating to the business, earnings, cash flow, assets, liabilities and prospects of Equal that were publicly available, as well as those that were furnished to GHS by Equal;

- reviewed and compared the premium payable in the Arrangement over recent Equal Share trading prices to premiums or discounts implied by the consideration paid in selected merger and acquisition transactions;

- compared the financial performance of Equal with that of certain other publicly traded companies that GHS deemed relevant;

- reviewed the financial terms, to the extent publicly available, of certain asset transactions that GHS deemed relevant; and

- performed an implied shareholder rate of return analysis across a range of scenarios.

In addition, GHS conducted such other analyses, examinations and inquiries and considered such other financial, economic and market criteria as it deemed necessary in arriving at its opinion.

The following is a summary of the material financial analyses performed by GHS in connection with the preparation of the Fairness Opinion. The preparation of analyses and a fairness opinion is a complex analytic process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances. Therefore, this summary does not purport to be a complete description of the analyses performed by GHS or of its presentation to our Board on May 29, 2014.

This summary includes information presented in tabular format, which tables must be read together with the text of each analysis summary and considered as a whole in order to fully understand the financial analyses presented by GHS. The tables alone do not constitute a complete summary of the financial analyses. The order in which these analyses are presented below, and the results of those analyses, should not be taken as any indication of the relative importance or weight given to these analyses by GHS or our Board. Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before May 29, 2014, and is not necessarily indicative of current market conditions.

For the purposes of its analyses, GHS calculated our equity value implied by the Arrangement to be approximately USD$202 million for all of our outstanding common shares, outstanding Restricted Shares (including related dividend equivalent rights) under our RSP Plan and Options under our stock option plan. All Equal Shares in respect of Restricted Shares (including dividend equivalent rights) will be issued at the Effective Time and then will be acquired by Petroflow Sub in exchange for the Arrangement Consideration.

*Premiums Paid Analysis*

GHS reviewed publicly available information for selected completed merger and acquisition transactions in the United States exploration and production sector to determine the premiums paid in the transactions over recent trading prices of the target companies prior to announcement of the transaction. GHS selected from industry databases those merger and acquisition transactions in the exploration and production sector announced since February 1, 2009, in excess of USD$250 million in transaction value.

Based on the foregoing, 16 transactions were selected for analysis by GHS, and the table below shows a comparison of premiums paid in these transactions to the premium that would be paid to Equal Shareholders based on the per share Arrangement Consideration of USD$5.43, together with the per share Arrangement Dividend of USD$0.05.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 49 )

Table of Contents

The analysis indicated the following:

| | Equal[1] | Selected Transactions | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Equal[2] | Equal[3] | High | Mean | Median | Low |
| Premium 1 Day Prior (%) | 55.6% | 23.4% | 16.9% | 74.3% | 34.3% | 33.4% | 0.3% |
| Premium 1 Month Prior (%) | 61.1% | 13.4% | 14.3% | 86.0% | 34.4% | 36.6% | 5.8% |

**Notes:**

(1) Equal announced hiring investment bankers and launching Strategic Alternatives process and Montclair proposed a USD$4.00 per Equal Share takeover on March 25, 2013, thereby putting Equal "in play".

(2) After market close on November 18, 2013, Equal announced that the strategic alternatives process successfully resulted in exclusive negotiations for a proposed transaction.

(3) After market close on May 1, 2014, Equal announced the extension of the outside date of the Arrangement Agreement, debt commitment letters and the Arrangement Dividend, among other things.

The premiums paid analysis showed that, based on the estimates and assumptions used in the analysis, the premiums over the market prices at the selected dates for the shares implied by the sum of the per Equal Share Arrangement Consideration and the Arrangement Dividend to be paid in the Arrangement were within the range of premiums paid in the selected merger and acquisitions transactions.

*Selected Public Companies Analysis*

GHS reviewed selected historical financial data and reserve and production data of Equal for March 31, 2014 and compared them to corresponding historical financial data and reserve and production data for small market cap public companies engaged in exploration and production activities which GHS believed were comparable to Equal's financial profile. GHS selected companies, excluding royalty trusts, predominately operating in the exploration and production sector in the continental United States, based on information obtained by searching SEC filings, public company disclosures, press releases, industry and popular press reports, databases, professional judgment and other sources, and by applying the following general criteria:

- Regularly trading on an exchange and having market capitalization greater than USD$100 million and less than USD$400 million;

- Total enterprise value ("**TEV**") greater than USD$100 million and less than USD$700 million;

- Profitability (primarily measured by latest twelve months' ("**LTM**") earnings before interest, taxes, depreciation, depletion, amortization and certain other non-cash or unusual items ("**EBITDA**") divided by LTM net revenues ("**Revenue**")) in excess of 35%; and

- Leverage (primarily measured by net debt divided by LTM EBITDA) greater than 0.5x and less than 5.0x.

Based on these criteria, GHS identified and analyzed the following selected companies:

- Abraxas Petroleum Corp.

- Callon Petroleum Company

- Epsilon Energy Ltd. (Canada)

- Gastar Exploration, Inc.

- New Source Energy Partners L.P.

- PrimeEnergy Corp.

- PetroQuest Energy Inc.

- Warren Resources Inc.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 50 )

Table of Contents

For the selected public companies analysis, GHS compared TEV and projected implied enterprise valuation for calendar years ending 2013 and 2014 ("**FY 2013**" and "**FY 2014**", respectively) multiples for Equal derived from per Equal Share Arrangement Consideration and Equal's corresponding projected EBITDA and PV-10, on the one hand, to implied enterprise valuation multiples for the selected public companies derived from their closing prices per share on May 27, 2014 and corresponding EBITDA and PV-10, on the other hand.

The analysis indicated the following multiples for each of the selected public companies identified and analyzed by GHS:

| Company Name | Share Price | Shares Out | Market Cap | Cash | Total Debt | Net Debt | TEV | Total Proved Reserves (MMBOE) | Total Proved Reserves (MMBOE) (Adj.) | PV-10 | Current Production (MBOE/D) | Current Production (Mboe/d) (Adj.) | Proved Reserves % Oil/NGLs | Current Reserve Life (Years) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abraxas Petroleum Corp. | $ 5.16 | 92.6 | $ 477.8 | $ 0.3 | $ 70.6 | $ 70.2 | $548.0 | 31.0 | 23.7 | $425.2 | 4.2 | 3.0 | 72% | 20.3 |
| Callon Petroleum Company | 10.11 | 40.5 | 408.9 | 1.7 | 121.3 | 119.6 | 528.5 | 14.9 | 12.7 | 301.1 | 4.4 | 3.9 | 80% | 9.3 |
| Epsilon Energy Ltd. (Canada) | 3.79 | 50.3 | 190.6 | 5.2 | 39.1 | 33.9 | 225.1 | 29.3 | 7.6 | 182.0 | 8.7 | 2.2 | 0% | 9.3 |
| Gastar Exploration Inc. | 7.72 | 61.8 | 477.2 | 26.9 | 313.6 | 286.6 | 763.9 | 54.6 | 26.2 | 592.5 | 9.7 | 4.4 | 33% | 15.5 |
| New Source Energy Partners L.P. | 23.16 | 15.7 | 364.6 | 0.9 | 40.0 | 39.1 | 186.4 | 20.6 | 7.9 | 212.7 | 4.6 | 1.8 | 19% | 12.4 |
| PrimeEnergy Corp. | 57.85 | 2.4 | 136.9 | 10.5 | 117.7 | 107.2 | 252.7 | 30.2 | 20.2 | 335.8 | 4.2 | 2.6 | 65% | 19.9 |
| PetroQuest Energy Inc. | 6.00 | 66.0 | 395.9 | 12.0 | 425.0 | 413.0 | 879.6 | 50.3 | 15.9 | 474.8 | 18.1 | 6.9 | 19% | 7.6 |
| Warren Reources Inc. | 4.51 | 73.6 | 332.1 | 1.8 | 82.1 | 80.3 | 412.5 | 33.7 | 20.7 | 503.7 | 6.0 | 3.8 | 48% | 15.3 |
| **Equal Energy Ltd.(1)** | **$ 5.48** | **36.8** | **$ 201.7** | **$16.4** | **$ 40.7** | **24.3** | **$226.0** | **24.3** | **8.0** | **$228.0** | **7.0** | **2.4** | **55%** | **9.6** |

| Company Name | Revenue LTM | Revenue FY 14 | Revenue FY 14 | EBITDA LTM | EBITDA FY 13 | EBITDA FY 14 | TEV / EBITDA LTM | TEV / EBITDA FY 13 | TEV / EBITDA FY 14 | TEV / Proved Reserves | TEV / Proved (adj.) | TEV / PV-10 | TEV / Daily Production | TEV / Production (Aj.) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abraxas Petroleum Corp. | $ 99.0 | $ 94.3 | $128.2 | $ 50.3 | $ 49.6 | $ 79.0 | 10.9x | 11.1x | 6.9x | $ 17.69 | $ 23.07 | 1.3x | $ 130,926 | $ 180,233 |
| Callon Petroleum Company | 113.3 | 102.8 | 153.3 | 63.3 | 56.1 | 104.4 | 8.3 | 9.4 | 5.1 | 35.57 | 41.73 | 1.8 | 121,192 | 136,809 |
| Epsilon Energy Ltd. (Canada) | 50.2 | 46.5 | 66.9 | 29.5 | 28.1 | 47.3 | 7.6 | 8.0 | 4.8 | 7.67 | 29.59 | 1.2 | 25,969 | 100,135 |
| Gastar Exploration Inc. | 116.1 | 87.8 | 153.7 | 73.5 | 57.1 | 112.3 | 10.4 | 13.4 | 6.8 | 13.98 | 29.21 | 1.3 | 79,026 | 174,874 |
| New Source Energy Partners L.P. | 68.7 | 50.7 | 91.5 | 25.7 | 15.1 | 53.5 | 7.3 | 12.3 | 3.5 | 9.03 | 23.67 | 0.9 | 40,823 | 105,211 |
| PrimeEnergy Corp. | 131.4 | 122.7 | 128.8 | 43.3 | 34.6 | 36.3 | 5.8 | 7.3 | 7.0 | 8.35 | 12.53 | 0.8 | 60,789 | 98,111 |
| PetroQuest Energy Inc. | 206.9 | 182.9 | 269.9 | 134.7 | 108.7 | 184.6 | 6.5 | 8.1 | 4.8 | 17.49 | 55.44 | 1.9 | 48,622 | 127,161 |
| Warren Reources Inc. | 132.2 | 128.8 | 139.5 | 76.9 | 72.9 | 84.9 | 5.4 | 5.7 | 4.9 | 12.23 | 19.97 | 0.8 | 68,415 | 107,561 |
| **Equal Energy Ltd.** | **$ 70.4** | **$ 61.9** | **$ 79.5** | **$ 38.8** | **$ 33.8** | **$ 47.2** | **3.2x** | **6.7x** | **4.8x** | **$ 9.28** | **28.39** | **1.0x** | **32,412** | **$ 95,636** |
| **Mean** | | | | | | | **7.8x** | **9.4x** | **5.5x** | **$ 15.25** | **$ 29.40** | **1.2x** | **$ 71,970** | **$ 128,762** |
| **Median** | | | | | | | **7.4** | **8.8** | **5.0** | **$ 13.10** | **26.44** | **1.3** | **64,602** | **117,361** |
| **Maximum** | | | | | | | **10.9** | **13.4** | **7.0** | **$ 35.57** | **55.44** | **1.9** | **130,926** | **180,233** |
| **Minimum** | | | | | | | **5.4** | **5.7** | **3.5** | **$ 7.67** | **12.53** | **0.8** | **25,969** | **98,111** |
| **Equal Energy Implied TEV - Low** | | | | | | | **$ 208** | **$ 191** | **$ 164** | **$ 187** | **$ 100** | **$ 172** | **$ 181** | **$ 232** |
| **Equal Energy Implied TEV – Mean** | | | | | | | **302** | **318** | **257** | **371** | **234** | **281** | **502** | **304** |
| **Equal Energy Implied TEV – Medium** | | | | | | | **289** | **296** | **234** | **319** | **210** | **288** | **450** | **277** |
| **Equal Energy Implied TEV - High** | | | | | | | **423** | **452** | **329** | **866** | **441** | **422** | **913** | **426** |

**Notes:**

(1) Based on the per Equal Share Arrangement Consideration of USD$5.43, together with the USD$0.05 per Equal Share Arrangement Dividend (the total of which equals USD$5.48 per Equal Share), and a resulting TEV for Equal of USD$226 million. FY 2013 and FY 2014 EBITDA provided by Equal's management, as shown in the first table of the section of this Circular entitled "Certain Unaudited Prospective Financial and Operating Information" beginning on page 58.

(2) For the selected public companies, TEV, FY 2013 and FY 2014 EBITDA were based on S&P Capital IQ and public filing information as of May 27, 2014.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:* contactus@kingsdaleshareholder.com

( 51 )

Table of Contents

The selected public company analysis showed that, based on the estimates and assumptions used in the analysis, the implied enterprise valuation multiples of Equal based on the per share Arrangement Consideration were within the range of or exceeded implied enterprise valuation multiples of the selected public companies.

*Selected Asset Transaction Analysis*

GHS reviewed natural gas weighted domestic asset transactions which it believed were comparable to Equal's financial profile. GHS selected these transactions based on information obtained by searching SEC filings, public company disclosures, press releases, industry and popular press reports, databases, professional judgment and other sources and by applying the following criteria:

1.    Production consisting of less than 50% oil & natural gas liquids ("NGLs");

2.    Transactions announced after January 1, 2012; and

3.    Transactions with the following data available:

       (a)    Transaction Value;

       (b)    Proved Reserves;

       (c)    $/Proved Reserves;

       (d)    Production; and

       (e)    $/Daily BOE

Based on these criteria, the 56 transactions were selected, resulting in the following statistics:

| Announce Date | Buyers | Sellers | Deal Value ($MM) | Proved Reserves (MMBOE) | $/Proved BOE (Adv.Est.) | Production (MBOE/d) | $/Daily BOE (Adv.Est) | Net Undev Acres | $/Acre (Adv. Est) | Proved Reserves (% Oil)[1] | Production (% Oil) | US Region: Subregion |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/2/2014 | Cimarex; Devon Energy; EnerVest Management | QEP Resources Inc. | 772.5 | 77.2 | 10.01 | 18.2 | 42,520 | | | 37% | 37% | Midcontinent: Oklahoma |
| 5/2/2014 | Legacy Reserves LP | WPX Energy Inc. | 355.0 | 46.0 | 7.72 | 10.5 | 33,810 | | | 17% | 17% | Rockies: Colorado |
| 4/30/2014 | Indigo Minerals LLC | EP Energy Corp. | 150.0 | 14.0 | 10.71 | 3.5 | 42,857 | | | 15% | 15% | Multi Region: Diversified |
| 4/29/2014 | Hawkwood Energy; Covey Park Energy | EnCana | 530.0 | 33.3 | 12.93 | 17.9 | 24,123 | 45,000 | 2,200 | 3% | 7% | Ark-La-Tex: East TX |
| 3/31/2014 | Maverick American Natural Gas | EnCana | 1,800.0 | 248.8 | 7.23 | 58.5 | 30,752 | 100,000 | | 8% | 8% | Rockies: Wyoming |
| 3/7/2014 | Rooster Energy LLC | Cochon Properties LLC | 30.0 | 2.3 | 13.20 | 0.9 | 32,086 | | | 28% | 27% | Gulf of Mexico: Shelf |
| 3/4/2014 | Memorial Production Partners LP | Memorial Resource Development LLC | 35.0 | 2.6 | 13.63 | 0.7 | 48,815 | | | 46% | 46% | Gulf Coast: SE TX |
| 2/14/2014 | Atlas Resource Partners LP | Geomet | 107.0 | 11.7 | 9.17 | 3.7 | 29,179 | | | 0% | 0% | Eastern: West Virginia |
| 2/13/2014 | Merit Energy | Oxy | 1,400.0 | 68.0 | 15.50 | 18.3 | 57,500 | 1,429,000 | 242 | 30% | 30% | Midcontinent: Kansas |
| 12/23/2013 | Vanguard Natural Resources LLC | Anadarko | 581.0 | 141.2 | 4.11 | 18.9 | 30,713 | | | 21% | 20% | Rockies: Wyoming |
| 12/18/2013 | Undisclosed Buyer | Sabine Oil & Gas LLC | 177.0 | 28.1 | 6.31 | 2.5 | 70,800 | | | 45% | 45% | Midcontinent: Panhandle TX |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 52 )

Table of Contents

| Announce Date | Buyers | Sellers | Deal Value ($MM) | Proved Reserves (MMBOE) | $/Proved BOE (Adv.Est.) | Production (MBOE/d) | $/Daily BOE (Adv.Est) | Net Undev Acres | $/Acre (Adv. Est) | Proved Reserves (% Oil)[1] | Production (% Oil) | US Region: Subregion |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/11/2013 | EnerVest Management Partners | Undisclosed Seller | 22.0 | 2.8 | 7.77 | 1.0 | 22,000 | | | 0% | 0% | North Texas |
| 11/11/2013 | EnerVest Management Partners | Undisclosed Seller | 7.0 | 1.5 | 4.67 | 0.5 | 14,000 | | | 0% | 0% | Rockies: New Mexico |
| 11/5/2013 | EnerVest Management Partners | SM Energy | 343.0 | 33.7 | 10.17 | 8.5 | 40,353 | | | 14% | 25% | Midcontinent: Oklahoma |
| 10/22/2013 | EnerVest Management Partners | Bill Barrett Corporation | 371.5 | 44.1 | 8.42 | 11.4 | 32,662 | 19,904 | | 1% | 1% | Rockies: Utah |
| 9/30/2013 | EnerVest Management Partners | Noble Energy | 68.0 | 12.0 | 5.67 | 1.8 | 37,098 | | | 0% | 0% | Rockies: New Mexico |
| 9/11/2013 | Memorial Production Partners LP | Undisclosed Seller | 29.0 | 3.6 | 8.17 | 0.9 | 32,843 | | | 7% | 11% | Rockies: Wyoming |
| 8/9/2013 | Constellation Energy Partners | Sanchez Oil & Gas | 30.4 | 1.7 | 18.34 | 1.2 | 26,050 | | | 25% | 25% | Multi Region: Diversified |
| 7/29/2013 | Questar | Undisclosed Buyer | 106.4 | 19.7 | 5.41 | 3.6 | 29,955 | | | 0% | 0% | Rockies: Wyoming |
| 7/15/2013 | Memorial Production Partners LP | Boaz Energy Partners LLC; Crown Energy Partners | 606.0 | 45.9 | 13.20 | 7.6 | 80,265 | | | 51% | 37% | Multi Region: Diversified |
| 6/17/2013 | WildHorse Resources II; Cantera Energy | EP Energy LLC | 500.0 | 66.3 | 7.54 | 13.8 | 36,145 | | | 0% | 0% | Multi Region: Diversified |
| 6/9/2013 | Atlas Resource Partners LP | EP Energy LLC | 733.0 | 77.7 | 9.44 | 19.8 | 36,959 | | | 0% | 0% | Multi Region: Diversified |
| 6/9/2013 | Atlas Energy | EP Energy LLC | 67.0 | 7.5 | 8.93 | 2.2 | 30,918 | | | 0% | 0% | Midcontinent: Oklahoma |
| 5/28/203 | NorthWestern Energy | Devon Energy | 70.2 | 10.8 | 6.52 | 2.6 | 27,454 | | | 0% | 0% | Rockies: Montana |
| 4/29/2013 | Contango | Crimson Exploration Company | 390.0 | 19.4 | 16.39 | 6.0 | 52,601 | 28,579 | 2,542 | 47% | 43% | Gulf Coast: Multi Gulf Coast |
| 4/22/2013 | Cubic Energy | Gastar Exploration Ltd. | 46.0 | 4.6 | 10.05 | 2.1 | 22,439 | | | 0% | 3% | Ark-La-Tex: East TX |
| 4/1/2013 | Gastar Exploration Ltd. | Chesapeake; Arcadia Resources; Jamestown Resources | 75.2 | 2.8 | 11.66 | 0.8 | 40,786 | 157,000 | 261 | 27% | 28% | Midcontinent: Oklahoma |
| 3/18/2013 | Memorial Production Partners LP | Memorial Resource Development LLC | 200.0 | 27.1 | 7.39 | 3.5 | 57,143 | | | 34% | 34% | Ark-La-Tex: Multi Ark-La-Tex |
| 2/5/2013 | Caerus Oil and Gas LLP | PDC | 200.0 | 14.2 | 14.12 | 7.0 | 28,571 | | | 1% | 1% | Rockies: Colorado |
| 2/4/2013 | Castleton Commodities Internationa | Constellation Energy Partners | 63.0 | 15.0 | 4.20 | 2.0 | 31,500 | | | 0% | 0% | Gulf Coast: Multi Gulf Coast |
| 1/2/2013 | Hilcorp Energy Co | Forest Oil | 325.0 | 45.3 | 7.17 | 11.0 | 29,525 | | | 15% | 14% | Gulf Coast: South TX |
| 12/31/2012 | Undisclosed Buyer | Venoco | 250.0 | 44.9 | 5.57 | 8.9 | 27,967 | | | 0% | 0% | West Coast: California |
| 11/5/2012 | Ursa Resources Group LLC | Antero Resources LLC | 325.0 | 191.8 | 1.69 | 9.8 | 33,052 | | | 26% | 35% | Rockies: Colorado |
| 11/5/2012 | Harbinger Group Inc. | Exco | 540.1 | 65.6 | 8.23 | 12.4 | 43,450 | | | 16% | 19% | |

| Date | Buyer | Seller | | | | | | | | | | Region |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/1/2012 | Vanguard Natural Resources LLC | Bill Barrett Corporation | 335.0 | 50.1 | 5.86 | 10.9 | 27,040 | 208,100 | 200 | 22% | 14% | Ark-La-Tex: Multi Ark-La-Tex Rockies: Multi Rockies |
| 10/25/2012 | Magnum Hunter Resources Corp. | Viking International Resources Co Inc. | 106.7 | 3.7 | 5.14 | 0.5 | 40,000 | 51,500 | 1,703 | 24% | 24% | Eastern: Multi Eastern |
| 9/25/2012 | Summit Energy LLC | GMX | 69.0 | 11.5 | 6.00 | 1.9 | 35,994 | | | 9% | 9% | Multi Region: Diversified |
| 8/8/2012 | Abraxas | Undisclosed Seller | 7.2 | 1.2 | 6.00 | 0.2 | 30,000 | | | 5% | 5% | Pemian: West TX (#8) |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 53 )

Table of Contents

| Announce Date | Buyers | Sellers | Deal Value ($MM) | Proved Reserves (MMBOE) | $/Proved BOE (Adv.Est.) | Production (MBOE/d) | $/Daily BOE (Adv.Est) | Net Undev Acres | $/Acre (Adv. Est) | Proved Reserves (% Oil)[1] | Production (% Oil) | US Region: Subregion |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/8/2012 | NorthWestern Energy | NFR Energy LLC | 19.2 | 2.2 | 8.60 | 0.7 | 26,265 | | | 4% | 4% | Rockies: Montana |
| 8/6/2012 | Memorial Production Partners LP | Goodrich | 95.0 | 23.2 | 4.10 | 2.1 | 45,238 | | | 38% | 38% | Ark-La-Tex: East TX |
| 7/17/2012 | EnerVest Management Partners | Penn Virginia | 100.0 | 17.6 | 5.68 | 3.3 | 30,003 | | | 0% | 0% | Eastern: Multi Eastern |
| 6/21/2012 | Linn Energy LLC | BP | 1,025.0 | 121.7 | 8.42 | 24.3 | 42,124 | | | 27% | 27% | Rockies: Wyoming |
| 6/1/2012 | Vanguard Natural Resources LLC | Antero Resources Corp | 445.0 | 70.0 | 4.16 | 12.7 | 22,973 | 19,395 | 2,784 | 18% | 9% | Midcontinent: Oklahoma |
| 5/23/2012 | Argent Energy Trust | Denali Oil & Gas | 166.7 | 5.2 | 21.59 | 1.4 | 82,173 | 108,736 | 500 | 25% | 21% | Gulf Coats: South TX |
| 5/14/2012 | Memorial Production Partners LP | Memorial Resource Development LLC | 27.0 | 4.7 | 5.77 | 0.7 | 38,571 | | | 19% | 19% | Ark-La-Tex: East TX |
| 5/11/2012 | PDC | Merit Energy | 330.6 | 29.2 | 7.97 | 2.8 | 83,071 | 35,000 | 2,800 | 58% | 49% | Rockies: Colorado |
| 4/17/2012 | Memorial Production Partners LP | Undisclosed Seller | 38.0 | 3.7 | 10.27 | 0.6 | 65,180 | | | 39% | 39% | Ark-La-Tex: Multi Ark-La-Tex |
| 4/9/2012 | Hilcorp Energy Co | Marathon | 375.0 | 17.0 | 22.06 | 15.6 | 24,020 | | | 1% | 1% | Alaska: Alaska |
| 3/14/2012 | Undisclosed Buyer | Comstock | 128.0 | 10.5 | 12.15 | 1.9 | 67,977 | | | 16% | 19% | Multi Region: Diversified |
| 3/9/2012 | Linn Energy LLC | Southwestern Energy | 175.0 | 22.7 | 7.72 | 4.0 | 43,750 | | | 3% | 3% | Ark-La-Tex: East TX |
| 3/7/2012 | Memorial Production Partners LP | Memorial Resource Development LLC | 18.3 | 3.3 | 5.49 | 0.4 | 47,781 | | | 18% | 18% | Ark-La-Tex: East TX |
| 2/27/2012 | Linn Energy LLC | BP | 1,200.0 | 121.7 | 6.78 | 18.3 | 45,001 | | | 37% | 37% | Midcontinent; Kansas |
| 2/24/2012 | Apollo Global Management LLC; Riverstone | Kinder Morgan Inc. | 7,150.0 | 664.4 | 8.83 | 146.7 | 40,000 | 1,695,636 | 757 | 30% | 15% | Multi Region: Diversified |
| 2/24/2012 | Majeed S. Nami Personal Endowment Trust | Vanguard Natural Resources LLC | 52.8 | 6.2 | 7.86 | 1.3 | 38,760 | 43,716 | 100 | 8% | 16% | Eastern: Multi Eastern |
| 2/23/2012 | Wapiti Energy LLC | Gasco | 34.1 | 2.6 | 7.33 | 0.6 | 32,931 | 80,015 | 187 | 7% | 6% | Rockies: Utah |
| 2/15/2012 | PetroPoint Energy Partners LP | Rosetta Resources Inc. | 95.0 | 11.0 | 8.64 | 3.3 | 28,788 | | | 0% | 0% | Gulf Coast: South TX |
| **Min** | | | $ 7.0 | 1.2 | $ 1.69 | 0.2 | $14,000 | 19,395 | 100 | 0% | 0% | |
| **Max** | | | $7,150.0 | 664.4 | $ 22.06 | 146.7 | $83,071 | 1,695,636 | 2,800 | 58% | 49% | |
| **Mean** | | | $ 416.0 | 47.0 | $ 8.89 | 9.8 | $39,188 | 287,256 | 1,190 | 16% | 16% | |
| **Median** | | | $ 158.4 | 17.3 | $ 7.91 | 3.4 | $34,902 | 65,758 | 628 | 15% | 15% | |

**Note:**

(1)    Proved Reserves (%Oil) and Production (%Oil) includes oil and NGLs.

The selected asset transaction analysis showed that, based on the estimates and assumptions used in the analysis, the transactions had a mean production value of USD$39,188 per daily BOE (median value of $34,902 per daily BOE) and mean proved reserves value of USD$8.89 per BOE (median value of $7.91 per BOE). The mean and median implied enterprise values of Equal, using its proved reserves of 24.3 MMBOE, as stated in the independent engineering evaluation of certain oil, NGL and natural gas interests of Equal prepared by Haas Petroleum Engineering Services, Inc. ("**HAAS**") dated February 4, 2014 and effective January 1, 2014, prepared in accordance with SEC guidelines (the "**Reserves Evaluation**"), and applying the selected transactions information above, are USD$216.4 million and USD$192.6 million respectively. The mean and median implied value

Case 5:14-cv-00087-C    Document 60-1    Filed 11/14/14    Page 70 of 135

of Equal, using its production, 7.0 MBOE/D as of March 31, 2014, and applying the selected transaction information above, is USD$273.3 million and USD$243.4 million respectively.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 54 )

Table of Contents

*Implied Shareholder Rate of Return Analysis*

Equal does not as a matter of course make long-term projections, but as part of the process of evaluating alternatives, Equal management provided selected information necessary to evaluate certain scenarios. Such information is further described in the section of this Circular entitled "*Certain Unaudited Prospective Financial and Operating Information*" beginning on page 58.

Using such information, two ranges of future well performance (estimated ultimate recoveries ("**EUR**") of 517 MBOE and 600 MBoe) and the forward pricing curves of oil and gas commodity prices as reported on the NYMEX as of May 15, 2014, with a range of realizations as to the pricing of NGLs relative to West Texas Intermediate ("**WTI**") as indicated in the table below, GHS then calculated what price per Equal Share an Equal Shareholder would be willing to pay if a 10-25% range of returns were to be required. GHS chose this range of required returns based on its judgment and experience in working with energy investors and buyers, and considering Equal's financial, operating and other characteristics. Future returns to Equal Shareholders were calculated through July 31, 2017, to include a $0.05 per share per quarter dividend plus a terminal net asset value per share. GHS projected financials and proved reserves through 2017 based on a forecasted drilling program, NYMEX strip pricing, and combined with Equal's management's estimates of costs and expenses. Sensitivities to the model included a range of EURs and NGL realizations. The projected mid-year 2017 balance sheet and value of proved reserves provided the estimated future net asset value that was then discounted three years to provide the range of values in the table below. The range of returns evaluated reflects GHS' experience for companies of similar size and risk, and considering the aggressiveness of the projected information and assumptions used.

| | | | | | | Implied Share Price Based on ROR% | | | |
|---|---|---|---|---|---|---|---|---|---|
| Scenario | EUR[1] (MBOE) | NGL % of WTI | Realized Oil[2] | Realized NGL[2] | Realized Gas[2] | 10% (USD$) | 15% (USD$) | 20% (USD$) | 25% (USD$) |
| 1 | 517 | 35.0% | 96.0% | 89.0% | 87.0% | 4.57 | 4.03 | 3.58 | 3.20 |
| 2 | 517 | 38.5% | 96.0% | 87.5% | 87.0% | 5.18 | 4.57 | 4.05 | 3.62 |
| 3 | 517 | 43.0% | 96.0% | 89.0% | 87.0% | 6.09 | 5.36 | 4.75 | 4.23 |
| 4 | 517 | 53.0% | 96.0% | 89.0% | 87.0% | 7.96 | 7.00 | 6.19 | 5.51 |
| 5 | 600 | 35.0% | 96.0% | 89.0% | 87.0% | 5.20 | 4.58 | 4.06 | 3.63 |
| 6 | 600 | 38.5% | 96.0% | 87.5% | 87.0% | 5.86 | 5.16 | 4.57 | 4.07 |
| 7 | 600 | 43.0% | 96.0% | 89.0% | 87.0% | 6.82 | 6.00 | 5.31 | 4.73 |
| 8 | 600 | 53.0% | 96.0% | 89.0% | 87.0% | 8.81 | 7.74 | 6.85 | 6.09 |

**Notes:**

(1)   As indicated by the footnote in the section of this Circular entitled "*Certain Unaudited Prospective Financial and Operating Information*" beginning on page 58, the 517 MBOE EUR matches the average gross well EUR as estimated in the Reserves Evaluation; the 600 MBOE EUR scenarios represent top decile performance sensitivities and are not representative of historic average well performance.

(2)   Realized Oil percentage provided by Equal based on the percentage of NYMEX WTI strip pricing, Realized NGL range provided by Equal as a percentage of NYMEX WTI strip pricing and Realized Gas percentage provided by Equal based on NYMEX Henry Hub strip pricing.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 55 )

Table of Contents

The table below shows the ending Net Debt balance per year by scenario using the same assumptions used in the table above.

| Scenario | Beginning[1] Net Debt (MM USD$) | 2014 Net Debt (MM USD$) | 2015 Net Debt (MM USD$) | 2016 Net Debt (MM USD$) | 2017 Net Debt (MM USD$) |
|---|---|---|---|---|---|
| 1 | 24.3 | 39.6 | 56.1 | 69.4 | 77.1 |
| 2 | 24.3 | 37.4 | 50.7 | 60.5 | 64.4 |
| 3 | 24.3 | 33.4 | 40.9 | 44.4 | 41.4 |
| 4 | 24.3 | 25.6 | 22.4 | 14.2 | -1.2 |
| 5 | 24.3 | 39.3 | 53.8 | 63.3 | 65.8 |
| 6 | 24.3 | 37.0 | 48.2 | 54.1 | 52.4 |
| 7 | 24.3 | 33.0 | 38.3 | 37.5 | 28.5 |
| 8 | 24.3 | 25.2 | 19.3 | 6.3 | -16.0 |

**Note:**

(1)    Beginning Net Debt provided by Equal as of March 31, 2014.

(2)    Net Debt is calculated by subtracting cash and equivalents from the total debt outstanding.

As discussed, Equal does not as a matter of course make long-term projections, and no such projections were available to be utilized in a discounted cash flow ("DCF") analysis. A DCF analysis would typically require additional, unavailable information. For example, given Equal's limited number of proven undeveloped net drilling locations, a projection useful for a DCF would require unavailable information regarding acreage availability and acquisition and development costs for future drilling locations.

*Miscellaneous*

The summary set forth above does not contain a complete description of the analyses performed by GHS, but does, together with GHS' involvement in Equal's strategic process, summarize the material analyses performed by GHS in rendering the Fairness Opinion. The preparation of a Fairness Opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. GHS believes that its analyses and the summary set forth above must be considered as a whole and that selecting portions of its analyses or of the summary, without considering the analyses as a whole or all of the factors included in its analyses, would create an incomplete view of the processes underlying the analyses set forth in the Fairness Opinion. In arriving at the Fairness Opinion, GHS considered the results of all of its analyses (including the Equal's strategic process) and did not attribute any particular weight to any factor or analysis. Instead, GHS made its determination as to fairness on the basis of its experience and financial judgment after considering the results of all of its analyses. The fact that any specific analysis (including Equal's strategic process) has been referred to in the summary above is not meant to indicate that this analysis was given greater weight than any other analysis. In addition, the ranges of valuations resulting from any particular analysis described above should not be taken to be GHS' view of the actual value of the Equal Shares.

None of the selected companies or transactions used in the analyses above is directly comparable to Equal or the Arrangement. Accordingly, an analysis of the results of the comparisons is not purely mathematical; rather, it involves complex considerations and judgments concerning differences in historical and projected financial and operating characteristics of the selected companies and target companies in the selected transactions and other factors that could affect the public trading value or transaction value of the companies involved.

GHS performed its analyses solely for purposes of providing the Fairness Opinion to our Board. In performing its analyses, GHS made numerous assumptions with respect to industry performance, general business and economic conditions and other matters. Certain of the analyses performed by GHS are based upon financial projections of future results, which are not necessarily indicative of actual future results and may be significantly more or less favorable than actual future results. These

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 56 )

Table of Contents

financial projections are inherently subject to uncertainty because, among other things, they are based upon numerous factors or events beyond the control of the parties or their respective advisors. GHS does not assume responsibility if future results are materially different from projected financial results.

- While GHS provided advice to our Board during its negotiations with Petroflow, GHS did not recommend any specific Arrangement Consideration.

- GHS assumed and relied upon, without assuming liability or responsibility for independent verification, the accuracy and completeness of all the information that was publicly available, and information supplied or otherwise made available to it by management or from others, discussed with management, or reviewed by GHS. GHS further relied upon the assurances of the management of Equal that the financial information provided to GHS was prepared on a reasonable basis in accordance with industry practice, and that the management of Equal was not aware of any information or facts that would make any information provided to GHS incomplete or misleading. Without limiting the generality of the foregoing, for the purpose of the Fairness Opinion, GHS assumed that with respect to financial projections, estimates and other forward-looking information reviewed by GHS, that such information was reasonably prepared based on assumptions reflecting the best currently available estimates and judgments as to the expected future results of operations and financial condition of Equal to which such financial projections, estimates and other forward-looking information relate. GHS expressed no opinion as to any such financial projections, estimates or forward-looking information or the assumptions on which they were based. GHS relied, with Equal's consent, on advice of the outside counsel to Equal, and on the assumptions of the management of Equal, as to all accounting, legal, regulatory, tax and financial reporting matters with respect to Equal and the Arrangement Agreement. The Fairness Opinion does not address any accounting, legal, regulatory, tax and financial reporting matters.

In arriving at its opinion, GHS assumed that the executed copy of the Arrangement Agreement, as amended, that it reviewed was in all material respects the final Arrangement Agreement with respect to the Transaction. GHS relied upon and assumed, without independent verification, that (i) the representations and warranties of all parties to the Arrangement Agreement and all other documents and instruments that are referred to therein were true and correct, (ii) each party to such agreements would fully and timely perform all of the covenants and agreements required to be performed by such party, (iii) the Arrangement would be consummated pursuant to the terms of the Arrangement Agreement without further amendments thereto, and (iv) all conditions to the consummation of the Arrangement would be satisfied without waiver by any party of any conditions or obligations thereunder. Additionally, GHS assumed that all the necessary regulatory approvals and consents (including any consents required under applicable state corporate laws) required for the Arrangement would be obtained in a manner that would not adversely affect Equal or the contemplated benefits of the Arrangement.

In arriving at its opinion, GHS did not perform any appraisals or valuations nor did GHS evaluate the solvency of Equal under any state or federal law relating to bankruptcy, insolvency or similar matters. The analyses performed by GHS in connection with the Fairness Opinion were going concern analyses, and GHS expressed no opinion regarding the liquidation value of Equal or any other entity. Without limiting the generality of the foregoing, GHS undertook no independent analysis of any pending or threatened litigation, regulatory action, possible unasserted claims or other contingent liabilities, to which Equal or any of its affiliates was a party or may be subject, and made no assumption concerning, and therefore did not consider, the possible assertion of claims, outcomes or damages arising out of any such matters. GHS also assumed that Equal is not party to any material pending transaction, including without limitation any financing, recapitalization, acquisition or merger, divestiture or spin-off, other than the Arrangement.

The Fairness Opinion was necessarily based upon the information available to it and facts and circumstances as they existed and were subject to evaluation on the date of the Fairness Opinion. Events occurring after the date of its opinion could materially affect the assumptions used in preparing its opinion. GHS did not express any opinion as to the price at which the Equal Shares have traded or such stock may trade at any future time. GHS did not undertake to reaffirm or revise its opinion or otherwise comment upon any events occurring after the date of the Fairness Opinion and does not have any obligation to update, revise or reaffirm the Fairness Opinion.

The Fairness Opinion addressed solely the fairness, from a financial point of view, to Equal Shareholders (excluding holders exercising Dissent Rights and Excluded Holders) of the sum of the per share Arrangement Consideration and the

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 57 )

Table of Contents

Arrangement Dividend, as set forth in the Arrangement Agreement, and did not address any other terms or agreement relating to the Arrangement or any other terms of the Arrangement Agreement. GHS was not requested to opine as to, and the Fairness Opinion does not address, the basic business decision to proceed with the Arrangement, the merits of the Arrangement relative to any alternative transaction or business strategy that may be available to Equal, Petroflow or Petroflow Sub's ability to fund the Arrangement Consideration, any other terms contemplated by the Arrangement Agreement, the fairness of the Arrangement to any other class of securities, creditor or other constituency of Equal, or the fairness of the amount or nature of compensation to our officers, directors or employees, or any class of such persons, relative to the sum of the per Equal Share Arrangement Consideration and Arrangement Dividend proposed to be paid to Equal Shareholders (excluding holders exercising Dissent Rights and Excluded Holders). GHS expressed no opinion as to whether any alternative transaction might produce consideration for Equal's Shareholders in excess of the amount contemplated in the Arrangement.

*Information About GHS*

As a part of its investment banking business, GHS is regularly engaged in the valuation of businesses in the energy industry and other industries and their securities in connection with mergers and acquisitions, underwritings, secondary distributions of listed and unlisted securities, private placements, and valuations for corporate and other purposes. Our Board selected GHS to be its financial advisor in connection with the Transaction and, subsequently selected GHS to render the Fairness Opinion in connection with the Transaction on the basis of such experience and knowledge of Equal.

GHS acted as financial advisor to our Board in connection with the Transaction. In connection with those services, GHS received a monthly advisory fee of USD$25,000 per month (in aggregate USD$338,750 through May 28, 2014), creditable against the Transaction fee, and will receive an estimated additional fee upon consummation of the Transaction of approximately USD$2 million (less the aggregate amount of monthly advisory fees paid through consummation). In addition, GHS received a fixed fee of US $150,000 in connection with a prior fairness opinion issued to the Board on December 6, 2013. With respect to the Fairness Opinion, GHS received a fixed fee of USD$100,000, which was payable upon rendering the Fairness Opinion, regardless of the conclusions contained in the Fairness Opinion or whether or not the Arrangement is consummated. Also in connection with the above, Equal has agreed to reimburse GHS for its out-of-pocket and incidental expenses and indemnify GHS for certain liabilities arising out of it being so engaged. To the extent that Equal requests GHS to perform additional services not contemplated by the above-referenced agreements, additional fees may be mutually agreed upon by GHS and Equal.

In the ordinary course of its business, GHS and its affiliates may actively trade securities of Equal for their own accounts or the accounts of their customers and, accordingly, may at any time hold a long or short position in such securities. GHS may also, in the future, provide investment banking and financial advisory services to Equal or Petroflow or entities that are affiliated with Equal or Petroflow, for which GHS would expect to receive compensation.

Consistent with applicable legal and regulatory requirements, GHS has adopted policies and procedures to establish and maintain the independence of GHS' research department and personnel. As a result, GHS' research analysts may hold opinions, make statements or investment recommendations and/or publish research reports with respect to Equal and the Arrangement and other participants in the Arrangement (including Petroflow) that differ from the opinions of GHS' investment banking personnel.

**Certain Unaudited Prospective Financial and Operating Information**

Equal does not as a matter of course make long-term projections as to its future revenues, production, earnings or other results due to, among other reasons, the uncertainty of the underlying assumptions and estimates. However, Equal is including the following summary of the unaudited prospective financial and operating information because it was made available to the Board and GHS, in connection with their respective evaluations of the Arrangement as of May 29, 2014, and GHS was authorized to rely upon such information for purposes of its analysis and opinion. The inclusion of this information should not be regarded as an indication that any of Equal, GHS or any other recipient of this information considered, or now considers, it to be necessarily predictive of actual future results.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

Table of Contents

The unaudited prospective financial and operating information prepared by the management of Equal was, in general, prepared solely for their internal use and is subjective in many respects. As a result, there can be no assurance that the prospective results will be realized or that actual results will not be significantly higher or lower than estimated. Since the unaudited prospective financial and operating information covers multiple years, such information by its nature becomes less predictive with each successive year. Equal Shareholders are urged to review Equal's public filings for a description of risk factors with respect to Equal's business, as well as the section of this Circular entitled "*Risk Factors*" beginning on page 108; see also "*Cautionary Statement Regarding Forward-Looking Information and Statements*" beginning on page 23 and "*Where You Can Find Additional Information*" beginning on page 119. The unaudited prospective financial and operating information was not prepared with a view toward public disclosure, nor was it prepared with a view toward compliance with GAAP, published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial and operating information. In addition, the unaudited prospective financial and operating information requires significant estimates and assumptions that make it inherently less comparable to the similarly titled GAAP measures in the historical GAAP financial statements of Equal. Neither Equal's independent registered public accounting firm nor any other independent accountant has compiled, examined or performed any procedures with respect to the unaudited prospective financial and operating information contained herein, nor expressed any opinion or any other form of assurance on such information or its achievability. The report of the independent registered public accounting firm to Equal contained in Equal's Annual Report on Form 10-K and in the annual information form for the fiscal year ended December 31, 2013, relates to Equal's historical financial information. That report does not extend to the unaudited prospective financial and operating information and should not be read to do so. Furthermore, the following unaudited prospective financial and operating information does not take into account any circumstances or events occurring after the date it was prepared. For the purposes of the tables set forth below, EBITDA is generally the amount of the relevant company's earnings before interest, taxes, depreciation, depletion, amortization and exploration expenses for a specified time period.

The following tables reflect the material unaudited prospective financial and operating data regarding Equal provided to the Board in connection with its evaluation of the Arrangement and provided to GHS, which were authorized to rely upon such data for purposes of their respective analyses and opinion. The data reflects certain oil and gas pricing assumptions and operational results reviewed and discussed with Equal management. The following information has been updated as of May 29, 2014:

| Selected Financial Information Provided by Management (1) *(USD$ in millions)* | Last 12 Months ending March 31, 2014 | 2013 | 2014(1) |
|---|---|---|---|
| Revenues | 70.4 | 61.9 | 79.5 |
| EBITDA | 38.8 | 33.8 | 47.2 |

**Note:**

(1)    Management financial estimates based on NYMEX forward strip pricing as of April 23, 2013

| Ranges Across Implied Shareholder Rate of Return Scenario* *(USD$ in millions)* | 2014 Low | 2014 High | 2015 Low | 2015 High | 2016 Low | 2016 High | 2017 Low | 2017 High |
|---|---|---|---|---|---|---|---|---|
| *Assuming 517 MBOE EURs:* | | | | | | | | |
| Equivalent daily production (Boe/day) | 6,915 | 6,915 | 7,730 | 7,730 | 8,708 | 8,708 | 9,630 | 9,630 |
| Net cash flow | (14.5) | (0.5) | (5.6) | 3.2 | (0.2) | 8.2 | 1.2 | 15.4 |
| PV-10 of Reserves at end of period | 212.3 | 298.9 | 235.8 | 328.3 | 261.7 | 361.4 | 286.3 | 392.7 |
| Revenues | 73.7 | 88.5 | 77.7 | 98.1 | 84.0 | 105.7 | 92.1 | 115.2 |
| EBITDA | 42.5 | 56.4 | 43.4 | 62.6 | 46.9 | 67.2 | 52.1 | 73.8 |
| *Assuming 600 MBOE EURs:* | | | | | | | | |
| Equivalent daily production (Boe/day) | 6,957 | 6,957 | 8,029 | 8,029 | 9,270 | 9,270 | 10,428 | 10,428 |
| Net cash flow | (14.2) | (0.1) | (4.2) | 5.9 | 0.5 | 13.1 | 4.5 | 22.2 |
| PV-10 of Reserves at end of period | 221.2 | 310.8 | 252.8 | 350.8 | 281.7 | 387.6 | 314.0 | 429.0 |
| Revenues | 74.1 | 89.1 | 80.6 | 101.8 | 89.3 | 112.4 | 99.6 | 124.6 |
| EBITDA | 42.8 | 56.9 | 45.4 | 65.3 | 50.5 | 72.1 | 57.1 | 80.6 |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

Table of Contents

\* Assumes that (1) Equal drills 15 wells per year (11 wells in 2014) and (2) through forced pooling, Equal is able to increase its working interest from approximately 35% on average (used in Equal's Reserves Evaluation) to an assumed 95%. Production forecast is based on the Reserves Evaluation for producing reserves plus new wells which produce based on the forecasted EUR well production performance. The 517 MBOE EUR matches the average gross well EUR as estimated in the Reserves Evaluation. The 600 MBOE EUR scenarios represent top decile performance sensitivities and are not representative of historic average well performance. The ranges shown also reflect the NGL pricing variations (35-53% of WTI) shown in the section of this Circular entitled "*The Arrangement – Fairness Opinion - Implied Shareholder Rate of Return Analysis*".

| Realized Pricing Assumptions* | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Oil Price (USD$/bbl) | 93.06 | 89.73 | 84.45 | 81.66 |
| Gas Price (USD$/Mcf) | 3.80 | 3.70 | 3.71 | 3.83 |

\* Based on Equal realized forward pricing curve of oil and gas commodity prices as reported on the NYMEX as of May 27, 2014.

**Financing of the Arrangement**

It is a condition to the obligations of Petroflow and Petroflow Sub to complete the Arrangement that either Petroflow or Petroflow Sub has received the proceeds of Financing for the purposes of financing the transactions contemplated by the Arrangement Agreement and related fees and expenses. If the Financing is not completed due to Petroflow's breach of its covenant to use its commercially reasonable efforts to obtain the Financing and Equal is not then in breach of the Arrangement Agreement in a manner that would cause the conditions to the obligations of Petroflow Sub and Petroflow under the Arrangement Agreement to not be satisfied, the Arrangement may not be completed, in which case Petroflow would be required to pay a reverse termination payment to Equal in the amount of USD$2,000,000, pursuant to the Arrangement Agreement.

See Section 10.2(f) of the Arrangement Agreement, which is attached as Appendix A to this Circular, for full particulars relating to the Reverse Termination Payment.

See "*The Plan of Arrangement - Sources of Funds for the Arrangement*" on page 63.

**Lock-Up Agreements**

The directors and officers of Equal and its subsidiaries have entered into Lock-Up Agreements with Petroflow and Petroflow Sub pursuant to which they have agreed, among other things, to vote the Equal Shares beneficially owned or controlled by them in favour of the Arrangement Resolution. At May 15, 2014, the latest practicable date prior to the date of the Circular, the directors and officers of Equal and its subsidiaries beneficially owned or controlled 848,814 Equal Shares, representing approximately 2.4% of the Equal Shares outstanding. The form of Lock-Up Agreement is attached to the Circular as Appendix E.

Among other things, pursuant to the Lock-Up Agreements, the directors and officers of Equal and its subsidiaries have agreed:

- to vote all of the Equal Shares owned or over which control is exercised, on or before the tenth business day prior to the date of the Meeting, in support of the Arrangement Resolution and any other matter to be considered at the Meeting, which is reasonably necessary for the consummation of the Arrangement;

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 60 )

Table of Contents

- not to directly or indirectly solicit, approve or do certain other things in relation to an Acquisition Proposal (as described below under the section of this Circular entitled "*The Arrangement Agreement*" beginning on page 66);

- not to take any action of any kind which could reasonably be expected to delay or interfere with the completion of the Arrangement and the other transactions contemplated by the Arrangement Agreement or the Lock-Up agreement;

- to waive any rights to dissent with respect to the Arrangement Resolution;

- in the event that any transaction other than the Arrangement is presented for approval of or acceptance by the securityholders of Equal by a person other than Petroflow Sub or its associates or affiliates, to cause its Equal Shares to be voted against such transaction; and

- to enter into an option cancellation agreement with Equal in respect of any Options it holds.

Despite the provisions of the Lock-up Agreements described above, the Lock-up Agreements provide that nothing in such provisions will prevent a director or officer of Equal in his or her capacity as such director or officer, (i) from acting in accordance with the exercise of his or her fiduciary duties or other legal obligation to act in the best interests of Equal or (ii) from taking certain actions pursuant to the Arrangement Agreement if such actions should be taken to properly discharge his or her fiduciary duty as a director and/or officer of Equal.

The directors and officers of Equal and its subsidiaries on one hand, and Petroflow and Petroflow Sub, on the other hand, may terminate the Lock-Up Agreements in certain circumstances pursuant to the terms of the Lock-up Agreements.

The description of the terms of the Lock-up Agreements above is a summary only and does not purport to be a comprehensive description of all of the terms of the Lock-up agreement. The form of Lock-Up Agreement is attached to the Circular as Appendix E, which should be read in its entirety.

### Board Resignations

It is anticipated that all of the current members of the Board will resign effective as of the Effective Date and Petroflow and/or Petroflow Sub will fill the vacancies created by such resignations.

**THE PLAN OF ARRANGEMENT**

### Arrangement Steps

*The following summarizes the steps that will occur under the Plan of Arrangement on the Effective Date, if all conditions to the completion of the Arrangement have been satisfied or waived. The following description is qualified in its entirety by reference to the full text of the Plan of Arrangement attached as Schedule "A" to the Arrangement Agreement which is attached to this Circular as Appendix A, as amended by the Amending Agreement. Equal Shareholders should read the Plan of Arrangement, Arrangement Agreement and Amending Agreement, each in its entirety.*

Commencing at the Effective Time, each of the events or transactions set out below will occur, and will be deemed to occur, consecutively in the following order, without any further authorization, act or formality, except as otherwise provided in the Plan of Arrangement:

- Equal will pay a dividend in the amount of USD$0.05 per Equal Share (other than on those Equal Shares held by Dissenting Shareholders) to the holders thereof (subject to applicable tax witholdings);

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 61 )

Case 5:14-cv-00087-C    Document 60-1    Filed 11/14/14    Page 78 of 135

Table of Contents

- notwithstanding Equal's stock option plan or any agreements or other arrangements relating to the Options, each Option outstanding immediately prior to the Effective Time (whether vested or unvested) will be transferred from the Optionholder to Equal in consideration for a cash payment by or on behalf of Equal, which will be equal to the amount, if any, by which the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, exceeds the exercise price per Equal Share of such Option, subject to applicable tax withholdings and other source deductions, and such Option shall be cancelled immediately after its transfer to Equal and where such amount is a negative, none of Equal, Petroflow Sub or any other person will be obligated to pay any amount in respect of such Option;

- (i) each Optionholder will cease to be a holder of such Options, (ii) such Optionholder's name will be removed from each applicable register, (iii) Equal's stock option plan and all agreements and other arrangements relating to the Options will be terminated and will be of no further force and effect, and (iv) such Optionholder will thereafter have only the right to receive a cash payment by or on behalf of Equal, which will be equal to the amount, if any, by which the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, exceeds the exercise price per Equal Share of such Option, subject to applicable tax withholdings and other source deductions at the time and in the manner specified in the Plan of Arrangement;

- notwithstanding the terms of the RSP Plan, all unvested Equal Shares issuable thereunder to RSP Plan participants will be issued, subject to Equal taking such steps as are required to satisfy applicable tax withholdings and other source deductions, to those RSP Plan participants, respectively, and the RSP Plan will be terminated and be of no further force and effect;

- each Equal Share issued and outstanding at the Effective Time (other than those held by Dissenting Shareholders) will be transferred to and acquired by Petroflow Sub in exchange for the Arrangement Consideration for each Equal Share; provided that Equal Shares then held by or on behalf of RSP Plan participants will be subject to applicable tax withholdings and other source deductions; and

- (i) the name of each Equal Shareholder (including Dissenting Shareholders) will be removed from the register of Equal Shareholders, (ii) the holders of Equal Shares (A) that are not Dissenting Shareholders will cease to have any rights of holders of such Equal Shares other than the right to be paid the Arrangement Consideration per Equal Share in accordance with the Plan of Arrangement and (B) that are Dissenting Shareholders will cease to have any rights of holders of such Equal Shares other than the right to be paid fair value for such Equal Shares, and (iii) Petroflow Sub will be deemed to be the holder of all of the Equal Shares (free and clear of any encumbrances) and will be entered as the holder of such Equal Shares in the register of Equal Shares maintained on behalf of Equal and will be deemed to be the legal and beneficial holder of such Equal Shares (free and clear of all encumbrances).

*Exchange of Certificates for Cash*

Not more than one business day prior to the Effective Date, Petroflow Sub will deposit, or arrange to be deposited, for the benefit of Equal Shareholders, cash with the Depositary in the aggregate amount equal to the payments in respect thereof required by the Plan of Arrangement, with the amount per Equal Share in respect of which Dissent Rights have been exercised being deemed to be the Arrangement Consideration per Equal Share for this purpose, net of applicable withholdings. The cash deposited with the Depositary by or on behalf of Petroflow Sub shall be held in an interest bearing account, and any interest earned on such funds shall be for the account of Petroflow Sub.

On, or as soon as practicable after, the Effective Date, Equal shall pay the amounts, net of applicable withholdings, to be paid to Optionholders, either (i) pursuant to the normal payroll practices and procedures of Equal, or (ii) in the event that payment pursuant to the normal payroll practices and procedures of Equal is not practicable for any such Optionholder, by check (delivered to such Optionholders, as applicable, as reflected on the register maintained by or on behalf of Equal in respect of the Options).

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 62 )

Table of Contents

Upon surrender to the Depositary for cancellation of a certificate which immediately prior to the Effective Time represented outstanding Equal Shares that were transferred pursuant to the Plan of Arrangement, together with a duly completed and executed Letter of Transmittal and such additional documents and instruments as the Depositary may reasonably require, the Equal Shareholder represented by such surrendered certificate shall be entitled to receive in exchange therefor, and the Depositary shall deliver to such Equal Shareholder, the cash which such Equal Shareholder has the right to receive under the Arrangement for such Equal Shares less any amounts withheld pursuant to the Plan of Arrangement, and any certificate so surrendered shall forthwith be cancelled.

Until surrendered as contemplated by the Plan of Arrangement, each certificate that immediately prior to the Effective Time represented Equal Shares shall be deemed after the Effective Time to represent only the right to receive upon such surrender a cash payment in lieu of such certificate as contemplated in the Plan of Arrangement, less any amounts withheld pursuant to the Plan of Arrangement.

No Equal Shareholder or Optionholder shall be entitled to receive any consideration with respect to Equal Shares or Options other than any cash payment to which such holder is entitled to receive in accordance with the Plan of Arrangement and for greater certainty, no such holder will be entitled to receive any interest, dividends (other than a Permitted Dividend), premium or other payment in connection therewith.

*Extinction of Rights*

The Plan of Arrangement provides that, subject to any applicable laws governing unclaimed personal property, if any Equal Shareholder fails for any reason to deliver to the Depositary for cancellation the certificates formerly representing Equal Shares (or an affidavit of loss and bond or other indemnity as applicable), together with such other documents or instruments required to effect the transfer of Equal Shares, on or before the last business day before the third anniversary of the Effective Date, such Equal Shareholder shall be deemed to have donated and forfeited to Petroflow Sub any cash, net of any applicable withholding or other taxes, held by the Depositary in trust for such Equal Shareholder to which such Equal Shareholder is entitled. At and after the Effective Time, any certificate formerly representing Equal Shares shall represent only the right to receive consideration in accordance with the Plan of Arrangement; provided that such certificates shall, on the sixth anniversary of the Effective Date, cease to represent a claim of any nature whatsoever and shall be deemed to have been surrendered to Petroflow Sub and shall be cancelled.

**Sources of Funds for the Arrangement**

The completion of the Arrangement is subject to a financing condition. See "*Financing of the Arrangement*" beginning on page 60. Petroflow Sub is expected to pay an aggregate amount of approximately USD$199.7 million (approximately CDN$217.4 million based on the Bank of Canada noon rate on May 15, 2014), subject to adjustment in accordance with the Arrangement Agreement, to acquire all of the outstanding Equal Shares assuming that no Equal Shareholders validly exercise their right to dissent. Petroflow Sub has no material assets other than the Arrangement Agreement. Petroflow's historical and current assets and cash flow from operations are insignificant relative to the size of the transaction and as such they are insufficient to fund the cost of the acquisition contemplated by the Arrangement and immaterial to your consideration of the Arrangement Resolution. The funding of the payment to you for your Equal Shares will be derived entirely from third-party financing. The Board did not consider the financial statements of Petroflow or Petroflow Sub or rely on the financial condition of Petroflow or Petroflow Sub in determining that the transaction is in the best interests of Equal Shareholders. The Board relied upon the reverse termination payment as adequate assurance for Equal Shareholders and a sufficient inducement to Petroflow to obtain the Financing for the transaction and close the acquisition.

*Debt Commitment Letters*

On April 30, 2014, Petroflow entered into a first lien debt financing commitment letter with Credit Suisse Securities (USA) LLC and Credit Suisse AG and a second lien debt financing commitment letter with Sankaty Credit Opportunities Fund V-A, L.P., Sankaty Credit Opportunities Fund V-B, L.P., Sankaty Middle Market Opportunities Fund II-F, L.P., Sankaty Middle Market Opportunities Fund II, L.P., and Sankaty Middle Market Opportunities Fund II-A, L.P. Under such commitment letters, the applicable financial institutions party thereto have committed, subject to certain terms and conditions, to provide or syndicate a $235 million first lien term loan (the "**First Lien Facility**") and a $100 million second lien term loan (the "**Second Lien Facility**" and collectively with the First Lien Facility the "**Credit Facilities**") for the transactions contemplated by the Arrangement Agreement.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 63 )

Table of Contents

The debt commitment letters are subject to various terms and conditions, including: (a) the financial institutions' satisfactory completion of due diligence, (b) the absence of a "material adverse effect" as specified in the terms of such debt commitment letters, (c) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facilities and (d) the borrowers' compliance with the terms of the debt commitment.

Equal and Petroflow expect that the debt commitment letters, upon satisfaction of the conditions therein, will provide funds sufficient to satisfy Petroflow's payment obligations under the Arrangement Agreement required to be paid at the closing of the Arrangement. Subject to satisfaction of the terms and conditions of the debt commitment letters, Petroflow will be entitled to use proceeds from the Credit Facilities to finance the acquisition of Equal, including with respect to Equal's existing indebtedness and fees and expenses incurred in connection with the Arrangement.

**Stock Exchange Delisting**

If the Arrangement is completed, it is expected that the Equal Shares will be delisted from the TSX and NYSE in the days following its completion. It is expected that the Convertible Debentures will remain listed on the TSX immediately after the completion of the Arrangement, to the extent that Convertible Debentures remain outstanding following completion of the Arrangement. See the section of this Circular entitled "*The Arrangement – Treatment of Equal Securities Pursuant to the Arrangement - Convertible Debentures*" beginning on page 32**.**

**Procedure for the Arrangement Becoming Effective**

The Arrangement is proposed to be carried out pursuant to section 193 of the ABCA. The following procedural steps must be taken for the Arrangement to become effective:

- the Arrangement must be approved by the Equal Shareholders in the manner set forth in the Interim Order;

- the Court must grant the Final Order approving the Arrangement;

- all conditions precedent to the Arrangement, as set forth in the Arrangement Agreement, must be satisfied or waived by the appropriate party; and

- the Final Order and Articles of Arrangement in the form prescribed by the ABCA must be filed with the Registrar.

*Equal Shareholder Approval*

At the Meeting, pursuant to the Interim Order, the Equal Shareholders will be asked to approve the Arrangement Resolution. Each Equal Shareholder shall be entitled to vote on the Arrangement Resolution, with the Equal Shareholders entitled to one vote per Equal Share. The requisite approval for the Arrangement Resolution is at least (i) 66 ⅔% of the votes cast on the Arrangement Resolution by the Equal Shareholders present in person or represented by proxy at the Meeting and (ii) a simple majority of the votes cast on the Arrangement Resolution by the Equal Shareholders, excluding the votes of those persons whose votes may not be included in determining minority approval of a business combination under MI 61-101. The Arrangement Resolution must receive Equal Shareholder approval in order for Equal to seek the Final Order and implement the Arrangement on the Effective Date in accordance with the terms of the Final Order.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 64 )

Table of Contents

*Court Approval*

Interim Order

On June 10, 2014, the Court granted the Interim Order directing the calling of the Meeting and prescribing the conduct of the Meeting and other matters. The Interim Order is attached as Appendix B to this Circular.

Final Order

The ABCA provides that a plan of arrangement requires court approval. Subject to the terms of the Arrangement Agreement, and if the Arrangement Resolution is approved by the Equal Shareholders at the Meeting in the manner required by the Interim Order, Equal will make an application to the Court for the Final Order.

The application for the Final Order approving the Arrangement is scheduled for July 9, 2014, at 4:00 p.m. (Calgary time), or as soon thereafter as counsel may be heard, at the Calgary Courts Centre, 601 - 5th Street S.W., Calgary, Alberta. At the hearing, any Equal Shareholder, Optionholder, holder of Restricted Shares, Debentureholder or any other interested party who wishes to appear at the hearing is required to file with the Court and serve upon Equal, on or before 5:00 p.m. (Calgary time) on July 3, 2014, a notice of his/her/its intention to appear, including an address for service in Calgary, Alberta (or alternatively, a telecopier number for service by telecopy), indicating whether such interested party intends to support or oppose the Application or make submissions at the application, together with a summary of the position such interested party intends to advocate before the Court, and any evidence or materials which are to be presented to the Court. Service on Equal is to be effected by delivery to the solicitors for Equal at Stikeman Elliott LLP, 4300 Bankers Hall West, 888 – 3rd Street, S.W., Calgary, Alberta, T2P 5C5, Attention: Geoffrey D. Holub. See the Notice of Originating Application accompanying this Circular.

The Court has broad discretion under the ABCA when making orders with respect to plans of arrangement and the Court may consider, among other things, the fairness and reasonableness of the Arrangement, both from a substantive and a procedural point of view. The Court may approve the Arrangement either as proposed or as amended in any manner the Court may direct, subject to compliance with such terms and conditions, if any, as the Court thinks fit.

*Conditions Precedent*

The implementation of the Arrangement is subject to a number of conditions precedent being waived or satisfied by one or more of the parties to the Arrangement Agreement. See the section of this Circular entitled *"The Arrangement Agreement-Conditions"* beginning on page 73.

**Timing**

If the Meeting is held as scheduled and is not adjourned or postponed and Equal Shareholder approval is obtained, Equal will apply for the Final Order approving the Arrangement. Subject to receipt of the Final Order in form and substance satisfactory to Equal and Petroflow Sub, and satisfaction or waiver of all other conditions set forth in the Arrangement Agreement, Equal expects the Effective Date to occur before July 31, 2014. However, we cannot predict the exact timing of the completion of the Arrangement.

The Arrangement will become effective upon the sending to the Registrar of the Articles of Arrangement and a copy of the Final Order, together with such other materials as may be required by the Registrar.

**Expenses**

The estimated fees, costs and expenses of Equal in connection with the Arrangement contemplated herein including, without limitation, financial and strategic advisors' fees, filing fees, legal and accounting fees, proxy solicitation fees and printing and mailing costs are anticipated to be approximately USD$4.0 million based on certain assumptions.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 65 )

Table of Contents

## THE ARRANGEMENT AGREEMENT

*The Arrangement Agreement provides for the implementation of the Plan of Arrangement. The following is a summary only of certain provisions of the Arrangement Agreement (as amended by the Amending Agreement) and reference should be made to the full text of the Arrangement Agreement and Amending Agreement set out in Appendix A to this Circular, including the Plan of Arrangement attached to the Arrangement Agreement as Schedule "A" thereto, which is incorporated by reference into this Circular. This summary does not purport to be complete and may not contain all of the information about the Arrangement Agreement that is important to you. Equal Shareholders are encouraged to read the Arrangement Agreement and the Amending Agreement, including the Plan of Arrangement, in its entirety. This section is not intended to provide you with any factual information about us. Such information can be found elsewhere in this Circular and in our filings on EDGAR at www.sec.gov and SEDAR at www.sedar.com. See the section of this Circular entitled "Where You Can Find Additional Information" beginning on page 119.*

*The Arrangement Agreement and this summary of its terms have been included to provide you with information regarding the terms of the Arrangement Agreement. Our representations, warranties, covenants and agreements contained in the Arrangement Agreement have been made solely for the benefit of Petroflow and Petroflow Sub. In addition, these representations, warranties, covenants and agreements (i) have been made only for purposes of the Arrangement Agreement, (ii) have been qualified by confidential disclosures made to Petroflow and Petroflow Sub in the disclosure letter delivered in connection with the Arrangement Agreement, (iii) are subject to materiality qualifications contained in the Arrangement Agreement which may differ from what may be viewed as material by investors, (iv) were made only as of the date of the Arrangement Agreement or such other date as is specified in the Arrangement Agreement and (v) have been included in the Arrangement Agreement for the purpose of allocating risk between the parties rather than establishing matters as fact. Accordingly, the Arrangement Agreement and the Amending Agreement are attached in Appendix A to this Circular only to provide you with information regarding the terms of the Arrangement Agreement as amended by the Amending Agreement, and not to provide you with any other factual information regarding us or our business. You should not rely on the representations, warranties, covenants and agreements, or any descriptions thereof, as characterizations of the actual state of facts or condition of us or any of our subsidiaries or affiliates. In addition, information concerning the subject matter of the representations and warranties may change after the date of the Arrangement Agreement, which subsequent information may or may not be fully reflected in our public disclosures.*

### Covenants

*Mutual Covenants*

In the Arrangement Agreement, Equal, Petroflow and Petroflow Sub have each provided mutual covenants customarily included in arrangement agreements involving transactions similar to the Arrangement, including a covenant to use its reasonable best efforts to satisfy the conditions precedent to their respective obligations under the Arrangement Agreement to the extent the same is within their control and to consummate and make effective as promptly as is practicable the transactions contemplated in the Arrangement Agreement.

*Covenants of Petroflow*

Petroflow has provided, in favour of Equal, covenants customarily included in arrangement agreements involving transactions similar to the Arrangement, including a guarantee provided by Petroflow as parent of Petroflow Sub, that Petroflow Sub will duly perform each and every one of its obligations under the Arrangement Agreement, including all payment obligations under the Arrangement Agreement and the Plan of Arrangement.

*Covenants of Petroflow Sub*

Petroflow Sub has provided, in favour of Equal, covenants customarily included in arrangement agreements involving transactions similar to the Arrangement, including a covenant to use its reasonable best efforts to satisfy the conditions precedent to its obligations under the Arrangement Agreement.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 66 )

Table of Contents

*Covenants of Equal*

Equal has provided, in favour of Petroflow and Petroflow Sub, a number of covenants customarily included in arrangement agreements involving transactions similar to the Arrangement, covenants regarding the following, among other things:

- to use commercially reasonable efforts to obtain the requisite Equal Shareholder approval for the Arrangement Resolution at the Meeting;

- covenants relating to Acquisition Proposals (as described below);

- to conduct and preserve the business of Equal and its subsidiaries in the ordinary course and in a proper and prudent manner in accordance with good oil and gas industry practices and consistent with recent practices;

- to pay or cause to paid all obligations that become due;

- to perform and comply with all obligations under the Title and Operating Documents (each as defined in the Arrangement Agreement and as described below);

- to maintain working capital and insurance in the ordinary course;

- to not take certain actions without the consent of Petroflow Sub relating to the conduct of Equal's business from the date of the Arrangement Agreement to the Effective Time;

- to promptly inform Petroflow and Petroflow Sub of material communications with government authorities regarding the transaction and not participate in any substantive meeting or discussion without prior consultation with Petroflow and Petroflow Sub;

- to effect such reorganizations of the business, operations and assets of Equal as Petroflow Sub may request (subject to certain exceptions, including reorganizations that would materially delay the completion of the Arrangement, would expose Equal to adverse tax consequences, would violate applicable law or a material contract or could not be unwound in the case that the Arrangement is not completed without adversely affecting Equal in a material manner);

- to not effect any transaction that would be reasonably likely to prevent Petroflow Sub from obtaining the benefit of a full tax cost "bump" in respect of non-depreciable capital properties;

- to, subject to applicable laws, make any required amendments to Equal's stock option plan and the Options outstanding thereunder and to take such action necessary to allow for the termination and cancellation thereof, respectively;

- to provide Petroflow and Petroflow Sub with reasonable access to the conduct of Equal's business during normal business hours and cooperate to provide information reasonably requested;

- to promptly notify Petroflow and Petroflow Sub of any claim brought by a present, former, or purported holder of securities of Equal in connection with the transactions contemplated by the Arrangement Agreement;

- to take all actions necessary to terminate the 401(k) plans of Equal and its subsidiaries;

- to advise Petroflow of any event, change or development that has resulted in, or that to the knowledge of Equal, would reasonably be expected to constitute a Material Adverse Change (as defined in the Arrangement Agreement and described below) or upon receiving written notice alleging any material breach or default under a material contract or certain other contracts or that a consent or waiver is required in connection with the Arrangement;

- to use commercially reasonable efforts to assist in effecting the resignation of the Equal directors; and

- at the request of Petroflow, to use commercially reasonable efforts to obtain all other third person consents, waivers, permits, exemptions, orders, approvals, agreements, amendments and modifications to the material contracts that are necessary to permit consummation of the transactions contemplated by the Arrangement Agreement.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 67 )

Table of Contents

The Arrangement Agreement defines Title and Operating Documents to mean (a) petroleum and natural gas leases, permits (whether freehold or governmental), rights in petroleum, oil, and natural gas acquired under (pooling) orders issued by the Oklahoma Corporation Commission or any other governmental authority and similar instruments; (b) agreements relating to the ownership, operation or development of petroleum and natural gas properties and facilities used in connection therewith and to the sale of the petroleum substances produced therefrom entered into in the normal course of the petroleum and natural gas business, including: operating procedures; unit agreements; unit operating agreements; agreements for the construction, ownership and operation of gas plants, batteries, pipelines, gas gathering systems and similar facilities; pooling and/or unitization agreements; communitization agreements, royalty agreements; overriding royalty agreements, farmin and farmout agreements; joint operating agreements, participation and subparticipation agreements; trust declarations and agreements; purchase and sale agreements, asset exchange agreements; agreements providing for the gathering, measurement, processing, compression, transportation or sale of petroleum substances; common stream agreements; well operating contracts and surface leases, pipeline easements, road use agreements and other contracts granting surface interests; (c) orders of the Oklahoma Corporation Commission or similar local government authority affecting lands wherein the assets of Equal or any of its subsidiaries are located; and (d) permits pertaining to the ownership of petroleum and natural gas properties, facilities used in connection therewith or to operations in respect thereof;

*Covenants Relating to Acquisition Proposals*

Except as otherwise provided for in the Arrangement Agreement, Equal agreed to not, directly or indirectly through any representative of Equal, and to cause each of its subsidiaries not to, directly or indirectly through any representative:

- make, solicit, assist, encourage, initiate, promote or otherwise facilitate (including by way of furnishing non-public information, permitting any visit to any facilities or properties of Equal or any of its subsidiaries or entering into any form of written or oral agreement, arrangement or understanding) any inquiries, proposals, offers or expressions of interest regarding or constituting any Acquisition Proposal (as defined in the Arrangement Agreement and described below) or which could reasonably be expected to lead to an Acquisition Proposal;

- encourage or engage in any discussions or negotiations (other than with Petroflow, Petroflow Sub or any of their respective representatives) regarding, or provide any information with respect to, any Acquisition Proposal or potential Acquisition Proposal;

- make a Change in Recommendation (as defined in the Arrangement Agreement and described below);

- withdraw, modify, change or qualify (or publicly propose to or publicly state an intention to withdraw, modify or qualify), in any manner adverse to Petroflow or Petroflow Sub, the approval or recommendation of the Board or any committee thereof of the Arrangement Agreement or the Arrangement, including, without limitation, failing to include in the Circular the approval or recommendation of the Arrangement by the Board;

- release any person from, terminate, waive amend or modify any provision of, or otherwise forbear the enforcement of, any confidentiality or standstill agreement to which it or any of its subsidiaries is a party, provided that, for avoidance of doubt, any release or deemed waiver from the standstill provisions of any such agreement in accordance with its terms without further agreement or action by Equal or any of its subsidiaries will not constitute a breach of the Arrangement Agreement; or

- accept, approve, endorse, recommend or enter into a letter of intent, agreement in principle, agreement, arrangement, understanding or undertaking related to any Acquisition Proposal (other than a confidentiality agreement as contemplated by the Arrangement Agreement).

The Arrangement Agreement defines an Acquisition Proposal as any inquiry, indication of interest, request for information, proposal or offer, or any public announcement of an intention with respect thereto, whether or not in writing and other than a

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 68 )

Table of Contents

transaction involving Petroflow or Petroflow Sub, with respect to (a) any merger, amalgamation, plan of arrangement, exchange, consolidation, business combination, issuance of securities, acquisition of securities, sale of securities, reorganization, recapitalization, takeover bid, tender offer, exchange offer or other similar transaction: (i) in which Equal or any of its subsidiaries is a constituent corporation and which would result in a third party, or the shareholders of that third party, beneficially owning 20% or more of any class of equity or voting securities of Equal or any of its subsidiaries, or the person resulting from such transaction or the parent of such person; (ii) in which a person or "group" (as defined in the Securities and Exchange Act of 1934) of persons directly or indirectly acquires beneficial or record ownership of securities representing more than 20% of the outstanding securities of any class of voting securities of Equal or any of its subsidiaries; or (iii) in which Equal or any of its subsidiaries issues securities representing (or rights convertible into or exercisable for such interests) more than 20% of the issued and outstanding voting or equity interests securities of any class of voting securities of Equal or any of its subsidiaries, (b) any sale, lease, exchange, transfer, license, acquisition or disposition of any business or businesses or assets of Equal or its subsidiaries that constitute or account for 20% or more of the consolidated net revenues, or consolidated net income, for the 12 full months immediately prior to the Acquisition Proposal or 20% or more of the fair market value of the consolidated assets of Equal and its subsidiaries, (c) any liquidation, dissolution, recapitalization or other reorganization (other than a Pre-Acquisition Reorganization (as defined in the Arrangement Agreement)) of Equal or any of its subsidiaries, or (d) any similar transaction or series of transactions involving Equal or any of its subsidiaries which could impede or delay the completion of the Arrangement or any part thereof.

The Arrangement Agreement defines a Change in Recommendation as follows:

- any withholding, amendment, withdrawal, modification or qualification in any manner adverse to Petroflow Sub, Petroflow or the likelihood of consummation of the Arrangement of the recommendation of the Board in favour of the Arrangement Resolution, including any failure to include such recommendation in the Circular;

- any approval, acceptance, recommendation or endorsement by the Board of, or public proposal by the Board to approve, accept, recommend or endorse, or publicly taking no position or a neutral position with respect to, any Acquisition Proposal (it being understood that publicly taking a neutral position or no position with respect to an Acquisition Proposal until the earlier to occur of (i) ten business days following the earlier of the receipt of and the public announcement of such Acquisition Proposal and (ii) two business days prior to the Meeting, will not constitute a Change in Recommendation)

- Equal entering into a written agreement in respect of an Acquisition Proposal (other than a confidentiality and standstill agreement permitted by the Arrangement Agreement); or

- Equal having publicly announced the intention to, or the Board having resolved to, do any of the foregoing;

The Arrangement Agreement provides that Equal must immediately cease, and ensure that its representatives cease, and cause to be terminated, any existing solicitation, assistance, activity, discussion, encouragement, process or negotiation, with any person (other than Petroflow, Petroflow Sub or any of their representatives) by Equal, any of its subsidiaries or any of their respective representatives with respect to or that could reasonably be expected to lead to an actual or potential Acquisition Proposal, whether or not initiated by Equal, and, in connection therewith, Equal must discontinue access to any data rooms (virtual and otherwise) previously provided to any such person and will immediately request the return or destruction of all information regarding Equal and its subsidiaries previously provided to any such person and must use commercially reasonable efforts to ensure that such requests are honored.

The Arrangement Agreement provides that Equal must enforce the provisions of any confidentiality and standstill agreement to which it or any of its subsidiaries is a party, including by seeking injunctions to prevent any such breaches and to enforce specifically the terms and provisions thereof.

From and after the date of the Arrangement Agreement, Equal must promptly (but, in any event within 24 hours) notify Petroflow Sub, at first orally and then in writing, of any proposal, inquiry, offer, expression of interest or request relating to or constituting an Acquisition Proposal or which could reasonably be expected to result in an Acquisition Proposal, any request for discussions or negotiations or any request for non-public information relating to Equal or any of its subsidiaries or for access to the properties, books or records (including any request for a list of securityholders) of Equal or any of its

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 69 )

Table of Contents

subsidiaries received by Equal's or any of its subsidiaries' representatives, or any request for representation on the Board, or any amendments to the foregoing. Such notice is required to include a description of the terms and conditions of, and the identity of the person making, any proposal, inquiry, offer or request, and such other details of the proposal, inquiry, offer or request known to Equal as Petroflow Sub may reasonably request, and must include copies of any such proposal, inquiry, offer or request (including all correspondence related thereto), or any amendment to any of the foregoing. The Arrangement Agreement provides that Equal is required to keep Petroflow promptly and fully informed of the status of any such proposal, inquiry, offer or request, or any amendment to the foregoing (including any changes to the price offered or any other material terms), and will respond promptly to all inquiries by Petroflow Sub with respect thereto.

If, after the date of the Arrangement Agreement and prior to obtaining the approval of the Arrangement Resolution from the requisite Equal Shareholders at the Meeting, provided that Equal is then in compliance with its obligations under the Arrangement Agreement, Equal receives a *bona fide* written Acquisition Proposal that provides for consideration per Equal Share that is greater than the Arrangement Consideration and that was not solicited after the date of the Arrangement Agreement, the Board is permitted to engage in discussions or negotiations, and provide information with respect to Equal and its subsidiaries to the person making such Acquisition Proposal for the purpose of explaining or supplementing Equal's due diligence materials, if and only to the extent that:

- Equal has provided Petroflow Sub with the notice (in accordance with the notice provisions contained in the Arrangement Agreement) in respect of such Acquisition Proposal and with at least 48 hours prior written notice of its decision to engage in any such discussions or negotiations or to provide any such information;

- the Board determines in good faith, after consultation with its outside legal and financial advisors, that such Acquisition Proposal constitutes, or is reasonably likely to lead to, a Superior Proposal (as defined in the Arrangement Agreement and described below) and that the failure to take such action would be inconsistent with its fiduciary duties under applicable laws;

- prior to providing any information or data, the Board receives from such person an executed non-disclosure and standstill agreement that contains provisions that are not less favorable to Equal than those contained in the confidentiality agreement dated September 18, 2013 between Equal and Petroflow (the "**Confidentiality Agreement**") and not more favorable to the person making such Acquisition Proposal than those which apply to Petroflow Sub under the Confidentiality Agreement, and Equal sends an executed copy of any such non-disclosure agreement to Petroflow Sub promptly upon its execution and prior to any non-public information being provided to such person;

- prior to providing any information or data that has not been provided to Petroflow, Equal provides such information to Petroflow;

- Petroflow Sub is provided promptly with a list of any information provided to such person; and

- access to information with respect to Equal and its subsidiaries in respect of one or more Acquisition Proposals made by that person or persons acting jointly or in concert with such person will not continue for a period in excess of thirty days in the aggregate.

The Arrangement Agreement defines a Superior Proposal as a *bona fide* Acquisition Proposal made by any person other than Petroflow or Petroflow Sub that:

- is made in writing to the Board after the date of the Arrangement Agreement;

- did not result from the breach of the non-solicitation provisions of the Arrangement Agreement by Equal, any of its affiliates or any of their respective representatives;

- is made for all or substantially all of the assets of Equal and its subsidiaries or all of the Equal Shares, on a fully-diluted basis, and Convertible Debentures not owned by the person making such Acquisition Proposal;

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 70 )

Table of Contents

- is reasonably likely to be completed on a timely basis after taking into account all the terms and conditions of such proposal and the Arrangement Agreement (including any required approvals and any proposal by either party to amend the terms of the Arrangement Agreement);

- is not subject to a due diligence condition;

- in the good faith determination of the Board, after receipt of advice from its financial and legal advisors:

    - failure to recommend to the Equal Shareholders that they accept such Acquisition Proposal would be inconsistent with the Board's fiduciary duties; and

    - would, if consummated in accordance with its terms (but expressly taking into account any risk of non-completion), result in a transaction that provides for greater consideration per Equal Share and would be more favorable to the Equal Shareholders, from a financial point of view, than the Arrangement; and

- is not conditional on obtaining financing, and for which financing is then available to the person making such Acquisition Proposal, and is committed, at least to the extent that the financing for the transactions contemplated by the Arrangement Agreement is so available and committed as at the date of the Arrangement Agreement;

The Arrangement Agreement provides that Equal may (i) enter into an agreement with respect to an Acquisition Proposal that is a Superior Proposal, and/or (ii) withdraw, modify or qualify its approval or recommendation of the Arrangement and recommend or approve an Acquisition Proposal that is a Superior Proposal, provided in each case:

- the Meeting has not occurred and Equal will have complied with all of its obligations under the covenants of the Arrangement Agreement dealing with Acquisition Proposals (including having provided Petroflow Sub with the notice required under the Arrangement Agreement in respect of such Acquisition Proposal);

- such Acquisition Proposal is a Superior Proposal;

- Equal has delivered written notice to Petroflow Sub of the determination of the Board that the Acquisition Proposal is a Superior Proposal and of the intention of the Board to approve or recommend such Superior Proposal and Equal to enter into an agreement with respect to such Superior Proposal, together with a copy of such agreement and all other documentation comprising the Acquisition Proposal to the extent not previously provided and all documentation relating to Equal's valuation of any non-cash consideration included in the Acquisition Proposal (the "**Superior Proposal Notice**");

- at least five business days have elapsed since the date the Superior Proposal Notice was received by Petroflow Sub which five business day period is referred to in the Arrangement Agreement as the "**Match Period**";

- if Petroflow Sub has offered to amend the provisions of the Arrangement and the Arrangement Agreement during the Match Period, the Acquisition Proposal continues to be a Superior Proposal compared to the Arrangement and the Arrangement Agreement as proposed to be amended by Petroflow Sub as of immediately prior to the termination of the Match Period; and

- Equal terminates the Arrangement Agreement and Equal concurrently makes the Termination Payment (as defined in the Arrangement Agreement and described in this Circular under the heading "*The Arrangement Agreement - Termination*") to Petroflow Sub (with the receipt by Petroflow Sub of such Termination Payment being a condition to the effectiveness of any such termination).

The Arrangement Agreement provides that, during the Match Period, Petroflow and Petroflow Sub have the right, but not the obligation, to offer to amend the provisions of the Arrangement and the Arrangement Agreement. Equal must cooperate with Petroflow and Petroflow Sub with respect to any such offer and must negotiate in good faith to make such adjustments to the terms and conditions of the Arrangement Agreement as would enable Petroflow and Petroflow Sub to proceed with the

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 71 )

Table of Contents

Arrangement and any related transactions on such adjusted terms. The Board is required to review any such offer by Petroflow and Petroflow Sub to amend the provisions of the Arrangement and the Arrangement Agreement in order to determine whether Petroflow and Petroflow Sub's offer to amend the provisions of the Arrangement and the Arrangement Agreement, upon its acceptance, would result in the Acquisition Proposal ceasing to be a Superior Proposal compared to the amendment to the provisions of the Arrangement and the Arrangement Agreement offered by Petroflow and Petroflow Sub. If the Acquisition Proposal would cease to be a Superior Proposal, Equal, Petroflow and Petroflow Sub must enter into an amendment to the Arrangement Agreement reflecting the offer by Petroflow or Petroflow Sub to amend the provisions of the Arrangement and the Arrangement Agreement.

The Arrangement Agreement provides that, nothing in the Arrangement Agreement prevents the Board from responding through a directors' circular or otherwise as required by applicable laws to an Acquisition Proposal that it determines is not a Superior Proposal, including to the extent the Board determines in good faith (after consultation with its outside counsel) that the failure to make such disclosure is reasonably likely to result in a breach of its fiduciary duties to the Equal Shareholders under applicable laws. In addition, nothing in the Arrangement Agreement is deemed to prohibit Equal or the Board from (i) taking and disclosing to the Equal Shareholders a position contemplated by Rule 14d-9 or Rule 14e-2 under the United States Securities Exchange Act of 1934 or (ii) making any "stop-look-and-listen" communication to the Equal Shareholders pursuant to Rule 14d-9(f) under the States Securities Exchange Act of 1934, provided that, in the case of a disclosure pursuant to (A) clause (i) of this paragraph that is not a "stop-look-and-listen" communication to the Equal shareholders pursuant to Rule 14d-9(f) under the United States Securities Exchange Act of 1934 or (B) the first sentence of this paragraph, the Board must expressly reaffirm its recommendation of the Arrangement in such disclosure unless its approval or recommendation has been withdrawn, modified or qualified in accordance with the Arrangement Agreement.

If Equal provides Petroflow Sub with notice of a Superior Proposal on a date that is less than five business days prior to the Meeting, Equal will, at the request of Petroflow Sub, adjourn the Meeting to a date specified by Petroflow Sub that is not less than five business days and not more than 10 business days after the date such notice is provided to Petroflow Sub.

The Arrangement Agreement provides that each successive modification of any Acquisition Proposal will constitute a new Acquisition Proposal for the purpose of the foregoing and all of the above stated provisions will apply again to such new Acquisition Proposal.

The Arrangement Agreement provides that the Board will promptly reaffirm its recommendation of the Arrangement Resolution and the Arrangement by press release after any of (i) an Acquisition Proposal is publicly announced or made and the Board determines it is not a Superior Proposal, (ii) the Board determines that a proposed amendment to the terms of the Arrangement would result in an Acquisition Proposal not being a Superior Proposal when assessed against the Arrangement as it is proposed to be amended as of immediately prior to the termination of the Match Period, and (iii) except in the case of a Superior Proposal, Petroflow, acting reasonably, requests reaffirmation of such recommendation by the Board. Petroflow and Petroflow Sub will be given a reasonable opportunity to review and comment on the form and content of any such press release.

Pursuant to the Arrangement Agreement, Equal agreed to ensure that Equal's subsidiaries and its and their representatives are aware of the non-solicitation covenants set out in the Arrangement Agreement. Equal will be responsible for any breach of the non-solicitation covenants as set out in the Arrangement Agreement by its subsidiaries and Equal's and its subsidiaries' representatives.

See Article 6 of the Arrangement Agreement, which is attached as Appendix A to this Circular, for the full text of the covenants relating to acquisition proposals.

*Representations and Warranties*

In the Arrangement Agreement each of Petroflow, Petroflow Sub and Equal made certain representations and warranties in favour of the other parties, which Equal believes are customary in transactions of this nature. The representations and warranties are, in some cases, subject to specified exemptions and qualifications. In the Arrangement Agreement, Equal has made representations and warranties to Petroflow and Petroflow Sub with respect to, among other things:

•    The valid existence of Equal;

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 72 )

Table of Contents

- The power and authority of Equal to enter into the Arrangement Agreement;

- The approval and authorization of the Arrangement Agreement by any and all requisite actions of Equal;

- The capital structure of Equal, including the particular number of outstanding Equal Shares;

- The subsidiaries of Equal and the due authorization and valid issuance of their outstanding shares;

- The absence of conflicts or creation of encumbrances as a result of entering into the Arrangement Agreement;

- The absence of undisclosed unsatisfied judgments or claims;

- Equal's (or its applicable subsidiaries) possession of applicable permits, authorizations, licenses and other approvals in order to operate its assets, properties and other assets;

- The fee and leased property of Equal;

- Compliance with agreements;

- Undisclosed defaults, financial commitments or royalties;

- Environmental matters;

- The absence of any rights of first refusal;

- Employee benefits and labor matters;

- Intellectual property matters; and

- Related party transaction matters.

**Conditions**

*Reciprocal Conditions*

The Arrangement Agreement provides that the obligations of Petroflow, Petroflow Sub and Equal to complete the transactions contemplated by the Arrangement Agreement, including the Arrangement, are subject to fulfillment of the following conditions on or before the Effective Time:

- the Interim Order and the Final Order will each have been obtained and will not have been set aside or modified in a manner unacceptable to any of Equal, Petroflow or Petroflow Sub, acting reasonably, on appeal or otherwise;

- the Arrangement Resolution will have been approved by the Equal Shareholders at the Meeting in accordance with the Interim Order;

- no government authority will have after the date of the Arrangement Agreement enacted, issued, promulgated, made, enforced or entered, any applicable law (whether temporary, preliminary or permanent) that restrains, enjoins or otherwise prohibits consummation of, or dissolves, the Arrangement; and

- the Arrangement Agreement will not have been terminated.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 73 )

Table of Contents

The Arrangement Agreement provides that the foregoing conditions are for the benefit of each of Equal, Petroflow and Petroflow Sub and may be waived, in whole or in part, only in writing by Equal, Petroflow and Petroflow Sub at any time.

*Equal Conditions*

The obligations of Equal to complete the Arrangement and to consummate the transactions contemplated by the Arrangement Agreement are subject to the fulfillment of each of the following conditions on or before the Effective Time or such other time as is specified below:

- each of Petroflow and Petroflow Sub will have performed or complied in all material respects with all of its respective obligations, covenants and agreements contained in the Arrangement Agreement to be performed or complied with by it at or prior to the Effective Time, including obtaining the Financing or alternative financing allowing it to pay the Arrangement Consideration, except to the extent that such non-compliance does not have an adverse effect on the Petroflow and Petroflow Sub's ability to complete the transactions in accordance with the provisions of the Arrangement Agreement;

- the representations and warranties of Petroflow and Petroflow Sub in the Arrangement Agreement qualified by materiality will be true and correct in all respects when made and as of the Effective Time (or in the case of representations and warranties made only as of a specified date, such representations and warranties will be true and correct as of such specified date) and the representations and warranties of Petroflow and Petroflow Sub in the Arrangement Agreement not so qualified by materiality must be true and correct in all material respects when made and as of the Effective Time (or in the case of representations and warranties made only as of a specified date, such representations and warranties shall be true and correct as of such specified date); and

- each of Petroflow and Petroflow Sub must have provided a certificate of an executive officer confirming that the foregoing conditions have been satisfied;

See Section 9.2 of the Arrangement Agreement, which is attached as Appendix A to this Circular, for full particulars of the foregoing conditions in favour of Equal.

*Petroflow and Petroflow Sub Conditions*

The obligations of Petroflow and Petroflow Sub to complete the transactions contemplated herein are subject to the fulfillment of each of the following conditions on or before the Effective Time or such other time as specified below:

- Equal will have performed or complied in all material respects with all of its obligations, covenants and agreements contained in the Arrangement Agreement to be performed or complied with by Equal at or prior to the Effective Time;

- the representations and warranties of Equal contained in the Arrangement Agreement will be true and correct in all respects (except for any de minimis inaccuracy) as of the date of the Arrangement Agreement and as of the Effective Time as though made on and as of such date (except to the extent that any such representation or warranty speaks as of an earlier date, in which case, such representation and warranty shall be true and correct in all respects as of such earlier date) and (ii) the other representations and warranties of Equal in the Arrangement Agreement and the Plan of Arrangement qualified by materiality or Material Adverse Effect (as defined in the Arrangement Agreement and described below) will be true and correct in all respects when made and as of the Effective Time (or in the case of representations and warranties made only as of a specified date, such representations and warranties shall be true and correct as of such specified date) and the representations and warranties of Equal not so qualified by materiality or Material Adverse Effect will be true and correct in all material respects when made and as of the Effective Time (or in the case of representations and warranties made only as of a specified date, such representations and warranties shall be true and correct as of such specified date);

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 74 )

Table of Contents

- from the date of the Arrangement Agreement and up to and including the Effective Date, there will have been no fact, event, change, development, circumstance or effect that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

- Dissent Rights will not have been exercised in respect of more than 5% of the Equal Shares calculated on a fully-diluted basis;

- the Board will (i) have adopted all necessary resolutions, and all other necessary corporate action shall been taken by Equal and its Subsidiaries to permit the consummation of the Arrangement, and (ii) the Board will not have approved or recommended any Acquisition Proposal;

- subject to the terms of the Arrangement Agreement, the Board will not have withdrawn, modified, qualified or changed in a manner adverse to Petroflow Sub, or publicly stated that it intends to withdraw, modify, qualify or change in a manner adverse to Petroflow Sub its recommendation to Equal Shareholders that they vote in favor of the Arrangement Resolution;

- no make whole premium (as defined in the Indenture) pursuant to the Indenture in respect of the Convertible Debentures will be payable (or would be payable if any Convertible Debentures were converted into Equal Shares in accordance with their terms whether or not such conversion right is actually exercised) in respect of any Convertible Debentures at any time from the date of the Arrangement Agreement through the Effective Date;

- Option cancellation agreements with each Optionholder in respect of all of the Options will be valid and in full force and effect, without any amendment, modification or waiver thereto;

- Equal will have provided a certificate to Petroflow and Petroflow Sub of an executive officer confirming that each of the conditions described above have been satisfied;

- the proceeds of the Financing will have been received by Petroflow or Petroflow Sub;

- Equal shall have performed or complied in all respects with all of its obligations, covenants and agreements relating to refraining from making certain commitments, proposals or authorizations of costs or expenditures in excess of USD$200,000, between the date of the Arrangement Agreement and the Effective time, except in certain circumstances; and

- at the Effective Time, no claim shall be pending before any government authority seeking to restrain or prohibit the transactions contemplated by the Arrangement Agreement or to obtain material damages or other relief in connection with the consummation of the transactions contemplated by the Arrangement Agreement and no such claim by any other person shall be pending if such claim would be reasonably likely to be successful.

The foregoing conditions precedent are for the benefit of the Petroflow Sub and the Petroflow and may be waived, in whole or in part, only by the Petroflow Sub and Petroflow in writing at any time. Petroflow Sub and Petroflow may not rely on the failure to satisfy any of the conditions set out above if the condition was not satisfied solely as a result of a material default by Petroflow Sub or Petroflow in complying with their obligations under the Arrangement Agreement.

Material Adverse Effect is defined in the Arrangement Agreement to mean, in respect of Equal, any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate with all other changes, effects, events, occurrences, states of facts or developments, (i) would, or would reasonably be expected to, prevent or materially delay the ability of Equal to consummate the transactions contemplated by the Arrangement Agreement or (ii) has, or would reasonably be expected to have, an impact that is both material and adverse to the business, assets, liabilities, condition (financial or otherwise) or results of operations of Equal and its subsidiaries taken as a whole, other than, with respect to this clause (ii), any change, effect, event, occurrence, state of facts or development set out below:

- any change in oil and gas prices;

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 75 )

Table of Contents

- any change in industry, economic or political conditions;

- any change in conditions or developments generally applicable to the oil and gas industry in any area or areas where Equal carries on business;

- any natural disaster;

- civil unrest or similar disorder or terrorist acts;

- any change in United States generally accepted accounting principles, consistently applied or International Financial Reporting Standards as issued by the International Accounting Standards Board in effect for the relevant time period, applied on a consistent basis;

- any actions taken (or omitted to be taken) upon express written request of Petroflow or Petroflow Sub;

- any change in applicable law;

- effects or changes that are cured or no longer exist by the earlier of the Effective Time or the termination of the Arrangement Agreement in accordance with its terms; or

- changes resulting from the announcement of the transactions contemplated by the Arrangement Agreement or the performance of the covenants set forth herein;

provided that any such event, change, effect or act referred to in the first three clauses listed above shall not be excluded from the definition of "Material Adverse Effect" to the extent such event, change, effect or act disproportionately affects Equal and its subsidiaries (or the assets thereof) relative to other oil and gas exploration and production companies, facilities and properties located in Oklahoma and Texas.

See Section 9.3 of the Arrangement Agreement, which is attached as Appendix A to this Circular, for full particulars of the foregoing conditions in favour of Petroflow and Petroflow Sub.

**Termination**

*Termination*

The Arrangement Agreement may be terminated at any time prior to the Effective Time:

- by mutual written agreement of Petroflow Sub, Petroflow and Equal;

- by Petroflow Sub or Equal, if:

  - the Equal Shareholders do not approve the Arrangement Resolution at the Meeting in the manner required by the Interim Order;

  - the Effective Date has not occurred on or prior to July 31, 2014, other than as a result of (A) the breach by such party (or by Petroflow if such party is Petroflow Sub) of any covenant or obligation under the Arrangement Agreement, (B) any representation or warranty of such party (or by Petroflow if such party is Petroflow Sub) in the Arrangement Agreement being untrue or incorrect or (C) the operation of the notice and cure provisions provided for in the Arrangement Agreement; or

  - any government authority shall have issued an order, decree or ruling permanently restraining or enjoining or otherwise prohibiting any of the transactions contemplated by the Arrangement Agreement (unless such order, decree or ruling has been withdrawn, reversed or otherwise made inapplicable) which order, decree or ruling is final and non-appealable.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 76 )

Table of Contents

- by Petroflow Sub, if:

    - Equal does not mail the Circular in accordance with the Arrangement Agreement and the Interim Order on or before January 15, 2014, or, if later, fifteen Business Days after the date on which the United States Security and Exchange Commission's comments on the Circular, if any, are resolved; or

    - there is a Change in Recommendation;

    - subject to the notice and cure provisions provided for in the Arrangement Agreement, Equal is in default of a covenant or obligation under the Arrangement Agreement, such that the reciprocal conditions of the parties or the conditions to the obligations of Petroflow and Petroflow Sub contained in the Arrangement Agreement would be incapable of satisfaction, provided that neither Petroflow nor Petroflow Sub is then in breach of the Arrangement Agreement in a manner that would cause the conditions to the obligations of Equal under the Arrangement Agreement to not be satisfied; or

    - subject to the notice and cure provisions provided in the Arrangement Agreement, any representation or warranty of Equal under the Arrangement Agreement is untrue or incorrect or shall have become untrue or incorrect such that the conditions to the obligations of Petroflow and Petroflow Sub relating to the accuracy of representations and warranties of Equal, would be incapable of satisfaction, provided neither Petroflow Sub nor Petroflow is then in breach of the Arrangement Agreement in a manner that would cause any of the conditions in favor of Equal not to be satisfied.

- by Equal, if:

    - subject to the notice and cure provisions provided for in the Arrangement Agreement, Petroflow Sub or Petroflow is in default of a covenant or obligation under the Arrangement Agreement, such that the reciprocal conditions of the parties or the conditions of to the obligations of Equal would be incapable of satisfaction, provided that Equal is not then in breach of the Arrangement Agreement in a manner that would cause the conditions to the obligations of Petroflow Sub and Petroflow under the Arrangement Agreement to not be satisfied;

    - subject to the notice and cure provisions provided for in the Arrangement Agreement, any representation or warranty of Petroflow Sub or Petroflow under the Arrangement Agreement is untrue or incorrect or shall have become untrue or incorrect such that the condition to the obligations of Equal relating to the accuracy of representations and warranties of Petroflow and Petroflow Sub, would be incapable of satisfaction, provided Equal is not then in breach of the Arrangement Agreement in a manner that would cause any conditions to the obligations of Petroflow Sub or Petroflow not to be satisfied; or

    - if prior to the approval of the Arrangement Resolution by the Equal Shareholders, the Board authorizes Equal, subject to complying with the covenants of the Arrangement Agreement relating to Acquisition Proposals, to approve, accept and enter into a definitive agreement (other than a confidentiality agreement) with respect to a Superior Proposal.

See Section 10.1 of the Arrangement Agreement, which is attached as Appendix A to this Circular, for full particulars of the termination provisions of the Arrangement Agreement.

*Termination Payment*

The Arrangement Agreement provides that, Petroflow will be entitled to a payment of USD2,000,000 (the "**Termination Payment**") upon the occurrence of any of the following events (each a "**Termination Payment Event**") which must be paid by Equal within the time specified in respect of each such Termination Payment Event:

- the Arrangement Agreement is terminated by Equal as a result of Equal entering into a definitive agreement (other than a confidentiality agreement) with respect to a Superior Proposal, in which case the Termination Payment will be paid contemporaneously with, and as a condition to, such termination;

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 77 )

Table of Contents

- the Arrangement Agreement is terminated by Petroflow Sub as a result of Equal failing to mail the Circular in accordance with the terms of the Arrangement Agreement and the Interim Order or as a result of a Change in Recommendation, or as a result of Equal being in default of a covenant or obligation, in certain circumstances, as described above, or as a result of representations and warranties of Equal being untrue or incorrect, in certain circumstances, as described above, in which case the Termination Payment will be paid on the first business day immediately following such termination by Petroflow Sub; or

- the Arrangement Agreement is terminated by Equal or Petroflow Sub because (i) the Equal Shareholders have not approved the Arrangement Resolution at the Meeting in the manner required by the Interim Order or (ii) the Effective Date has not occurred on or prior to July 31, 2014, other than as a result of (A) the breach by such party (or by Petroflow if such party is Petroflow Sub) of any covenant or obligation under the Arrangement Agreement (B) any representation or warrant of such party (or by Petroflow if such party is Petroflow Sub) in the Arrangement Agreement being untrue or incorrect or (C) the operation of the notice and cure provisions of the Arrangement Agreement, in each case if on or after the date of the Arrangement Agreement and prior to the termination of the Arrangement Agreement, an Acquisition Proposal is publicly announced or otherwise publicly disclosed and not publicly withdrawn or abandoned within five business days prior to the Meeting, and within twelve months following the termination of the Arrangement Agreement (A) any Acquisition Proposal is consummated, (B) an agreement to consummate any Acquisition Proposal is entered into or (C) the Board approves or recommends any Acquisition Proposal, and in the case of (B) or (C), such Acquisition Proposal is consummated, in which case the Termination Payment shall be paid promptly on the date such Acquisition Proposal is consummated.

In the event that, prior to a Termination Payment Event, the Arrangement Agreement is terminated by Equal due to the fact that (i) subject to the notice and cure provisions provided for in the Arrangement Agreement, Petroflow Sub or Petroflow is in default of a covenant or obligation, including its covenant with respect to obtaining the Financing, under the Arrangement Agreement, such that the reciprocal conditions of the parties or the conditions to the obligations of Equal would be incapable of satisfaction, provided that Equal is not then in breach of the Arrangement Agreement in a manner that would cause the conditions to the obligations of Petroflow Sub and Petroflow under the Arrangement Agreement to not be satisfied or (ii) subject to the notice and cure provisions provided for in the Arrangement Agreement, any representation or warranty of Petroflow Sub or Petroflow under the Arrangement Agreement is untrue or incorrect or shall have become untrue or incorrect such that the condition to the obligations of Equal relating to the accuracy of representations and warranties of Petroflow and Petroflow Sub, would be incapable of satisfaction, provided Equal is not then in breach of the Arrangement Agreement in a manner that would cause any conditions to the obligations of Petroflow Sub or Petroflow not to be satisfied, then Petroflow must pay or cause to be paid to Equal by wire transfer in immediately available funds to an account designated by Equal an amount equal to USD$2,000,000 (the "**Reverse Termination Payment**") on the first business day immediately following such termination by Equal.

See Section 10.2 of the Arrangement Agreement, which is attached as Appendix A to this Circular, for full particulars relating to the Termination Payment and Reverse Termination Payment.

*Amendment*

The Arrangement Agreement provides that it shall not be varied in its terms or amended by oral agreement or otherwise other than by an instrument in writing dated subsequent to the date of the Arrangement Agreement executed by a duly authorized representative of each party.

*Governing Law*

The Arrangement Agreement is governed by and construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 78 )

Table of Contents

## MINORITY APPROVAL

MI 61-101 is intended to regulate certain transactions to ensure equality of treatment among securityholders, generally requiring enhanced disclosure, approval by a majority of securityholders excluding interested or related parties, independent valuations and, in certain instances, approval and oversight of the transaction by a special committee of independent directors. The protections of MI 61-101 generally apply to "business combinations" that terminate the interests of securityholders without their consent. MI 61-101 provides that, in certain circumstances, where a related party of an issuer is entitled to receive a "collateral benefit" in connection with an arrangement transaction (such as the Arrangement), such transaction may be considered a "business combination" for the purposes of MI 61-101 and subject to minority approval requirements.

MI 61-101 excludes from the meaning of "collateral benefit" certain benefits to a related party received solely in connection with the related party's services as an employee or director of an issuer where (a) the benefit is not conferred for the purpose, in whole or in part, of increasing the value of the consideration paid to the related party for securities relinquished under the transaction; (b) the conferring of the benefit is not, by its terms, conditional on the related party supporting the transaction in any manner; (c) full particulars of the benefit are disclosed in the disclosure document for the transaction; and (d) either (i) the related party and his or her associated entities beneficially own, or exercise control or direction over, less than 1% of the outstanding securities of each class of equity securities of the issuer, or (ii) the related party discloses to an independent committee of the issuer the amount of consideration that he or she expects to be beneficially entitled to receive, under the terms of the transaction, in exchange for the equity securities he or she beneficially owns and the independent committee acting in good faith determines that the value of the benefit, net of any offsetting costs to the related party, is less than 5% of the value of the consideration the related party will receive pursuant to the terms of the transaction for the equity securities it beneficially owns, and the independent committee's determination is disclosed in the disclosure document for the transaction.

Under the Arrangement, Optionholders will receive consideration for their Options (whether vested or unvested) in the amount, if any, by which the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, exceeds the exercise price per Equal Share of such Option.

At the Effective Time, each Equal Share in respect of any unvested Restricted Share, not already issued, will be issued (subject to applicable tax withholdings and other source deductions) to the RSP Plan participants, and any share grant agreement under the RSP Plan and the RSP Plan will be terminated notwithstanding the terms thereof. RSP Plan participants who are holders of Restricted Shares at the Effective Time will be entitled to receive the Arrangement Consideration in exchange for their Equal Shares issued pursuant to Restricted Shares on the same basis as other Equal Shareholders.

Pursuant to the Arrangement Agreement, Petroflow Sub has agreed to satisfy, or cause Equal to satisfy, all of Equal's obligations under the Indenture in respect of the Debentures arising in connection with or at any time following the implementation of the Arrangement, including complying with Equal's obligations under the Indenture to make offers to Debentureholders to purchase the Convertible Debentures as required in connection with a "change of control" or "cash change of control" (as such terms are defined in the Indenture), pursuant to the terms of the Indenture.

Pursuant to the Indenture, following the Arrangement, Equal will be required to make an offer to purchase any Convertible Debentures that remain outstanding in the amount of 101% of the principal amount of the Convertible Debentures plus accrued and unpaid interest up to a date that is 30 business days after the offer is mailed to Debentureholders in accordance with the terms of the Indenture.

Pursuant to the Indenture, following the Arrangement, each Debentureholder will no longer have the right to receive Equal Shares on conversion of its Convertible Debentures, but will have the right to receive in lieu of such Equal Shares, the Arrangement Consideration which such Debentureholder would have been entitled to receive had it been the holder of such number of Equal Shares at the Effective Time that it was entitled to acquire pursuant to its conversion right. The Convertible Debentures have a conversion price of CDN$8.47 per Equal Share as of May 15, 2014, the latest practicable date prior to the date of the Circular, which is greater than the Arrangement Consideration expressed in Canadian dollars of CDN$5.91 (based on the Bank of Canada noon rate on such date).

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 79 )

Table of Contents

Pursuant to the Arrangement Agreement, Equal has agreed, if requested by Petroflow Sub prior to the Effective Date, to use its commercially reasonable efforts to obtain, at Petroflow Sub's expense, all waivers, consents and approvals from the Debentureholders to amend the obligations of Equal under the Indenture by way of a consent solicitation or otherwise. As at the date of the Circular, Petroflow and Petroflow Sub have not advised Equal of any intention to make a request that Equal take a specific action with respect to the Convertible Debentures and there is no certainty that any action or any particular action will be taken with respect to the Convertible Debentures prior to the Effective Time.

Don Klapko, John Chimahusky, Scott Smalling, Mark Rupert and Richard Dixon, all officers of Equal, are parties to employment agreements pursuant to which they may receive severance and other benefits in the event that their employment is terminated under certain circumstances in connection with the Arrangement.

Except as disclosed in the following paragraph, the directors and officers of Equal, each beneficially own, or exercise control or direction over, less than 1% of the outstanding Equal Shares. Accordingly, such directors and officers of Equal will not be considered to have received a "collateral benefit" under MI 61-101 as a result of the consideration they may receive for their Options or Restricted Shares or as a result of any benefit they may receive in connection with the Arrangement relating to their Debentures or receipt of severance or other change of control payments, (or a combination of the foregoing).

Don Klapko, who is President and Chief Executive Officer of Equal, beneficially owns, or exercises control or direction over, more than 1% of the outstanding Equal Shares based on there being 36,100,788 Equal Shares outstanding as of May 15, 2014, the latest practicable date prior to the date of the Circular. Mr. Klapko beneficially owned, or exercised control or direction over, an aggregate of 438,098 Equal Shares as of May 15, 2014, the latest practicable date prior to the date of the Circular. The value of the consideration Mr. Klapko may receive for his Options and Restricted Shares, any benefits he may receive in connection with his ownership of Convertible Debentures and severance and change of control payments which Mr. Klapko may receive in connection with the Arrangement are expected to be greater than 5% of the value of the consideration Mr. Klapko will receive pursuant to the terms of the Arrangement for the Equal Shares Mr. Klapko beneficially owns or controls, and therefore may be considered "collateral benefits" under MI 61-101. As a result, the votes attaching to Equal Shares beneficially owned, or over which control or direction is exercised, by Mr. Klapko will be excluded in determining whether minority approval of the Arrangement Resolution has been obtained.

No formal valuation is required in respect of the Arrangement under MI 61-101, as no "interested party" (as defined in MI 61-101), whether alone or with joint actors, would, as a consequence of the Arrangement, directly or indirectly, acquire Equal and no interested party is a party to any connected transaction to the Arrangement that is a related party transaction for which Equal is required to obtain a formal valuation.

The section of this Circular entitled "*Interests of Our Directors and Executive Officers in the Arrangement*" beginning on page 80 sets out the interests of the directors and executive officers of Equal who have held such positions at any time since January 1, 2013 in the Arrangement. The Board and the Special Committee were aware of these interests and considered them, among other matters, when recommending approval of the Arrangement to the Equal Shareholders.

## INTERESTS OF OUR DIRECTORS AND EXECUTIVE OFFICERS IN THE ARRANGEMENT

In considering the recommendation of our Board and the Special Committee in favour of the approval of the Arrangement Resolution, you should be aware that members of our Board and our executive officers since January 1, 2013 have interests in the Arrangement, including interest that may be different from, or in addition to, yours.

All such interests are described herein (including those of associates of the foregoing to the extent requires by Section 14A of the Securities and Exchange Act of 1934), to the extent material, and except as described herein, such persons have, to our knowledge, no material interest in the Arrangement different from those of Equal Shareholders generally. The Board and Special Committee were aware of these interests and considered them, among other matters, when recommending approval of the Arrangement. All information regarding the security holdings of directors and executive officers of Equal provided herein is based on information provided by such persons.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 80 )

Table of Contents

**Equal Shares**

As of May 15, 2014, our directors and executive officers and their affiliates beneficially owned or controlled approximately 2.4% of the outstanding Equal Shares, excluding Equal Shares that may be acquired through the exercise of Options, vesting of Restricted Shares and conversion of Convertible Debentures. The following table summarizes the Equal Shares beneficially owned or controlled as of May 15, 2014, by our executive officers and directors who have held such positions at any time since January 1, 2013, excluding Equal Shares that may be acquired through the exercise of Options, vesting of Restricted Shares and conversion of Convertible Debentures, and the consideration that each of them would receive pursuant to the Arrangement in connection with the ownership of their Equal Shares as at May 15, 2014, the latest practicable date prior to the date of the Circular.

| Name, Place of Residence and Position | Equal Shares Owned (#) | Arrangement Consideration to be Paid in Exchange for Equal Shares (USD$)(1) |
|---|---|---|
| **Executive Officers:** | | |
| Don Klapko | | |
| *President, Chief Executive Officer and Director* | | |
| Calgary, Alberta | 438,098(2) | 2,378,872 |
| John Chimahusky | | |
| *Senior Vice President and Chief Operations Officer* | | |
| Oklahoma City, Oklahoma | 71,927 | 390,564 |
| Scott Smalling | | |
| *Senior Vice President and Chief Financial Officer* | | |
| Edmond, Oklahoma | 39,231 | 213,024 |
| Mark Rupert | | |
| *Petroleum Engineer, Vice President* | | |
| Edmond, Oklahoma | 30,989 | 168,270 |
| Richard Dixon | | |
| *Vice President, Land* | | |
| Edmond, Oklahoma | 57,622 | 312,887 |
| Wendell Chapman | | |
| *Former Senior Vice President Finance & Chief Financial Officer* | | |
| Calgary, Alberta | Nil | N/A |
| **Directors Who are Not Executive Officers:** | | |
| Michael Doyle | | |
| *Director, Chairman* | | |
| Calgary, Alberta | 64,600(3) | 350,778 |
| Victor Dusik | | |
| *Director* | | |
| Halfmoon Bay, BC | 2,925 | 15,882 |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 81 )

Table of Contents

| Name, Place of Residence and Position | Equal Shares Owned (#) | Arrangement Consideration to be Paid in Exchange for Equal Shares (USD$)(1) |
|---|---|---|
| Robert Wilkinson *Director* Calgary, Alberta | 130,200(4) | 706,986 |
| Kyle Travis *Director* Tulsa, Oklahoma | 3,000 | 16,290 |
| Lee Canaan *Director* Pinckney, Michigan | 6,622 | 35,957 |
| Michael Coffman *Director* Edmond, Oklahoma | 3,600 | 19,584 |
| Daniel Botterill *Former Director* Calgary, Alberta | Nil. | N/A |
| Peter Carpenter *Former Director* Toronto, Ontario | 3,209 | 17,424 |
| Roger Giovanetto *Former Director* Calgary, Alberta | 11,270(5) | 61,196 |

**Notes:**

(1)    Assumes that no adjustment is made to the Arrangement Consideration, pursuant to the terms of the Arrangement Agreement.
(2)    Includes 12,500 Equal Shares registered in the name of Maureen Klapko, the spouse of Mr. Klapko.
(3)    Includes 4,100 Equal Shares registered in the name of Anna May Doyle, the spouse of Mr. Doyle and 42,000 Equal Shares registered in the name of CanPetro International Ltd. a company wholly owned by Mr. Doyle and Ms. Doyle.
(4)    Includes 25,000 Equal Shares registered in the name of Farmers Implement Company Limited a company wholly owned by Mr. Wilkinson, 40,000 Equal Shares registered to an RRSP account in the name of Robert Wilkinson, 25,200 Equal Shares registered to an RRSP account in the name of Terri Illingworth, Mr. Wilkinson's spouse and 15,000 Equal Shares registered in the name of the Wilkinson Family Trust of which Mr. Wilkinson is the trustee.
(5)    Based on SEDI filings only. Equal has not received any confirmation of such holdings from Mr. Giovanetto.

In addition to the amounts set out in the table above, our executive officers and directors who have held such positions at any time since January 1, 2013, would also receive the Arrangement Dividend in the amount of $USD0.05 per Equal Share on each Equal Share held at the Effective Time.

**Options**

As of May 15, 2014, our executive officers and directors as a group held 53,500 Options with an exercise price less than the Arrangement Consideration expressed in Canadian Dollars (based on the Bank of Canada noon rate on such date), having a weighted average exercise price of CDN$3.59 per Equal Share. Pursuant to the Arrangement Agreement and the Plan of Arrangement, at the Effective Time, Optionholders will receive consideration for their Options (whether vested or unvested) in the amount, if any, by which the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, exceeds the exercise price per Equal Share of such Option. Pursuant to the Arrangement Agreement, Equal has agreed to take

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 82 )

Table of Contents

all steps necessary or desirable to give effect to the foregoing, including entering into option cancellation agreements with each Optionholder in respect of all Options and to obtain necessary consents from Optionholders to the transfer and cancellation of the Options.

The following table summarizes the Options held as of May 15, 2014 by our executive officers and directors who have held such positions at any time since January 1, 2013, and the consideration that each of them would receive pursuant to the Arrangement in connection with the ownership of their Options as at May 15, 2014, the latest practicable date prior to the date of the Circular.

| Name, Place of Residence and Position | Number of Equal Shares Underlying Options | Number of Equal Shares Underlying Options with an Exercise Price Less than the Arrangement Consideration | Weighted Average Exercise Price of Options with an Exercise Price Less than the Arrangement Consideration (CDN$) | Consideration to be Paid at Completion of Arrangement in Exchange for Options (CDN$)(1)(2) |
|---|---|---|---|---|
| **Executive Officers:** | | | | |
| Don Klapko | | | | |
| *President, Chief Executive Officer and Director* | | | | |
| Calgary, Alberta | 150,000 | Nil | N/A | Nil. |
| John Chimahusky | | | | |
| *Senior Vice President and Chief Operations Officer* | | | | |
| Oklahoma City, Oklahoma | 27,145 | 9,000 | 4.66 | 11,250 |
| Scott Smalling | | | | |
| *Senior Vice President and Chief Financial Officer* | | | | |
| Edmond, Oklahoma | 34,500 | 34,500 | 3.00 | 100,395 |
| Mark Rupert | | | | |
| *Petroleum Engineer, Vice President* | | | | |
| Edmond, Oklahoma | 18,377 | 5,000 | 4.66 | 6,250 |
| Richard Dixon | | | | |
| *Vice President, Land* | | | | |
| Edmond, Oklahoma | 18,170 | 5,000 | 4.66 | 6,250 |
| Wendell Chapman | | | | |
| *Former Senior Vice President Finance & Chief Financial Officer* | | | | |
| Calgary, Alberta | Nil. | Nil | N/A | Nil. |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:* *contactus@kingsdaleshareholder.com*

( 83 )

Table of Contents

| Name, Place of Residence and Position | Number of Equal Shares Underlying Options | Number of Equal Shares Underlying Options with an Exercise Price Less than the Arrangement Consideration | Weighted Average Exercise Price of Options with an Exercise Price Less than the Arrangement Consideration (CDN$) | Consideration to be Paid at Completion of Arrangement in Exchange for Options (CDN$)(1)(2) |
|---|---|---|---|---|
| **Directors Who are Not Executive Officers:** | | | | |
| Michael Doyle<br>*Director, Chairman*<br>Calgary, Alberta | Nil. | Nil | N/A | Nil. |
| Victor Dusik<br>*Director*<br>Halfmoon Bay, BC | Nil. | Nil | N/A | Nil. |
| Robert Wilkinson<br>*Director*<br>Calgary, Alberta | Nil. | Nil | N/A | Nil. |
| Kyle Travis<br>*Director*<br>Tulsa, Oklahoma | Nil. | Nil | N/A | Nil. |
| Lee Canaan<br>*Director*<br>Pinckney, Michigan | Nil. | Nil | N/A | Nil. |
| Michael Coffman<br>*Director*<br>Edmond, Oklahoma | Nil. | Nil | N/A | Nil. |
| Daniel Botterill<br>*Former Director*<br>Calgary, Alberta | Nil. | Nil | N/A | Nil. |
| Peter Carpenter<br>*Former Director*<br>Toronto, Ontario | Nil. | Nil | N/A | Nil. |
| Roger Giovanetto<br>*Former Director*<br>Calgary, Alberta | Nil. | Nil | N/A | Nil. |

**Notes:**

(1)    Pursuant to the Plan of Arrangement, Optionholders will receive in exchange for their Options, consideration in the amount, if any, by which the Arrangement Consideration, expressed in Canadian dollars, in respect of each Option, exceeds the exercise price per Equal Share of such Option. For the purposes of this calculation pursuant to the Arrangement Agreement, the amount of the Arrangement Consideration in U.S. dollars will be converted to Canadian dollars as of the date that is one business day immediately prior to the Effective Date of the Arrangement. The amount of consideration due to Optionholders pursuant to the Arrangement has been calculated for the purposes of the table above based on the Bank of Canada noon rate on May 15, 2014.

(2)    Assumes that no adjustment is made to the Arrangement Consideration, pursuant to the terms of the Arrangement Agreement.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 84 )

Case 5:14-cv-00087-C    Document 60-1    Filed 11/14/14    Page 101 of 135

Table of Contents

**Restricted Shares**

As of May 15, 2014, our executive officers and directors as a group held 501,694 Restricted Shares. Under the Arrangement, each Equal Share in respect of any unvested Restricted Share, not already issued, will be issued (subject to applicable tax withholdings and other source deductions) to the RSP Plan participants, and any share grant agreement under the RSP Plan and the RSP Plan will be terminated notwithstanding the terms thereof. RSP Plan participants who are holders of Restricted Shares at the Effective Time will be entitled to receive the Arrangement Consideration in exchange for their Equal Shares issued pursuant to Restricted Shares on the same basis as other Equal Shareholders.

The following table summarizes the Restricted Shares held as of May 15, 2014 by our executive officers and directors who have held such positions at any time since January 1, 2013, and the consideration that each of them would receive pursuant to the Arrangement in connection with the ownership of their Restricted Shares as at May 15, 2014, the latest practicable date prior to the date of the Circular.

| Name, Place of Residence and Position | Restricted Shares (#) | Consideration to be Paid at Completion of Arrangement in Exchange for Equal Shares Issued In Respect of Restricted Shares (USD$)[1] |
|---|---|---|
| **Executive Officers:** | | |
| Don Klapko<br>*President, Chief Executive Officer and Director*<br>Calgary, Alberta | 245,646 | 1,333,860 |
| John Chimahusky<br>*Senior Vice President and Chief Operations Officer*<br>Oklahoma City, Oklahoma | 84,883 | 460,916 |
| Scott Smalling<br>*Senior Vice President and Chief Financial Officer*<br>Edmond, Oklahoma | 59,506 | 323,118 |
| Mark Rupert<br>*Petroleum Engineer, Vice President*<br>Edmond, Oklahoma | 57,027 | 309,657 |
| Richard Dixon<br>*Vice President, Land*<br>Edmond, Oklahoma | 54,632 | 296,651 |
| Wendell Chapman<br>*Former Senior Vice President Finance & Chief Financial Officer*<br>Calgary, Alberta | Nil. | N/A |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 85 )

Table of Contents

| Name, Place of Residence and Position | Restricted Shares (#) | Consideration to be Paid at Completion of Arrangement in Exchange for Equal Shares Issued In Respect of Restricted Shares (USD$)[1] |
|---|---|---|
| **Directors Who are Not Executive Officers:** | | |
| Michael Doyle *Director, Chairman* Calgary, Alberta | Nil. | N/A |
| Victor Dusik *Director* Halfmoon Bay, BC | Nil. | N/A |
| Robert Wilkinson *Director* Calgary, Alberta | Nil. | N/A |
| Kyle Travis *Director* Tulsa, Oklahoma | Nil. | N/A |
| Lee Canaan *Director* Pinckney, Michigan | Nil. | N/A |
| Michael Coffman *Director* Edmond, Oklahoma | Nil. | N/A |
| Daniel Botterill *Former Director* Calgary, Alberta | Nil. | N/A |
| Peter Carpenter *Former Director* Toronto, Ontario | Nil. | N/A |
| Roger Giovanetto *Former Director* Calgary, Alberta | Nil. | N/A |

**Note:**

(1)    Assumes that no adjustment is made to the Arrangement Consideration pursuant to the terms of the Arrangement Agreement.

**Convertible Debentures**

As of May 15, 2014, our executive officers and directors as a group held CDN$675,000 principal amount of Convertible Debentures.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 86 )

Table of Contents

*Change of Control Payments*

Pursuant to the Indenture, following the Arrangement, Equal will be required to make an offer to purchase any Convertible Debentures that remain outstanding in the amount of 101% of the principal amount of the Convertible Debentures plus accrued and unpaid interest up to a date that is 30 business days after the offer is mailed to Debentureholders in accordance with the terms of the Indenture. The amounts that each director and officer of Equal would receive following the completion of the Arrangement for their Convertible Debentures held at May 15, 2014 pursuant to an offer by Equal in accordance with the terms of the Indenture to purchase the outstanding Convertible Debentures are set out below, assuming interest calculated up to May 15, 2014.

| Name, Place of Residence and Position | Principal Amount of Convertible Debentures (CDN$) | Consideration to be Received Pursuant to a Change of Control Offer (CDN$)(1) |
|---|---|---|
| **Executive Officers:** | | |
| Don Klapko | | |
| *President, Chief Executive Officer and Director* | | |
| Calgary, Alberta | 525,000(2) | 534,619 |
| John Chimahusky | | |
| *Senior Vice President and Chief Operations Officer* | | |
| Oklahoma City, Oklahoma | Nil. | N/A |
| Scott Smalling | | |
| *Senior Vice President and Chief Financial Officer* | | |
| Edmond, Oklahoma | Nil. | N/A |
| Mark Rupert | | |
| *Petroleum Engineer, Vice President* | | |
| Edmond, Oklahoma | Nil. | N/A |
| Richard Dixon | | |
| *Vice President, Land* | | |
| Edmond, Oklahoma | Nil. | N/A |
| Wendell Chapman | | |
| *Former Senior Vice President Finance & Chief Financial Officer* | | |
| Calgary, Alberta | 45,000(3) | 45,824 |
| **Directors Who are Not Executive Officers:** | | |
| Michael Doyle | | |
| *Director, Chairman* | | |
| Calgary, Alberta | 150,000(4) | 152,748 |
| Victor Dusik | | |
| *Director* | | |
| Halfmoon Bay, BC | Nil. | N/A |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 87 )

Table of Contents

| Name, Place of Residence and Position | Principal Amount of Convertible Debentures (CDN$) | Consideration to be Received Pursuant to a Change of Control Offer (CDN$)(1) |
|---|---|---|
| Robert Wilkinson<br>*Director*<br>Calgary, Alberta | Nil. | N/A |
| Kyle Travis<br>*Director*<br>Tulsa, Oklahoma | Nil. | N/A |
| Lee Canaan<br>*Director*<br>Pinckney, Michigan | Nil. | N/A |
| Michael Coffman<br>*Director*<br>Edmond, Oklahoma | Nil. | N/A |
| Daniel Botterill<br>*Former Director*<br>Calgary, Alberta | Nil. | N/A |
| Peter Carpenter<br>*Former Director*<br>Toronto, Ontario | Nil. | N/A |
| Roger Giovanetto<br>*Former Director*<br>Calgary, Alberta | Nil.(5) | N/A |

**Notes:**

(1) Amounts in this column are equal to 101% of the principal amount of the Convertible Debentures plus accrued interest as of May 15, 2014.
(2) Includes CDN$313,000 principal amount in Convertible Debentures in the name of Maureen Klapko.
(3) All CDN$45,000 principal amount of the Convertible Debentures are in the name of Claudette Chapman, the spouse of Mr. Chapman.
(4) Includes CDN$75,000 principal amount in Convertible Debentures in the name of Anna Mae Doyle, the spouse of Mr. Doyle.
(5) Based on SEDI filings only. Equal has not received any confirmation of such holdings from Mr. Giovanetto.

*Make Whole Premium*

The Indenture contains provisions relating to a "Make Whole Premium" which must be paid to Debentureholders in certain circumstances in connection with the conversion of the Convertible Debentures in the case of a "Cash Change of Control" (as such terms are defined in the Indenture). However, the Arrangement Consideration, expressed in Canadian Dollars (CDN$5.91 based on the Bank of Canada noon rate on May 15, 2014) is lower than the Equal Share price threshold at which the Make Whole Premium would be triggered of CDN$6.51. In addition, it is a condition to the obligations of Petroflow and Petroflow Sub under the Arrangement Agreement that no Make Whole Premium will be payable (or would be payable if any Convertible Debentures were converted into Equal Shares in accordance with their terms whether or not such conversion right is actually exercised) in respect of any Convertible Debentures at any time from the date of the Arrangement Agreement through the Effective Date.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 88 )

Case 5:14-cv-00087-C     Document 60-1     Filed 11/14/14     Page 105 of 135

Table of Contents

*Consent Solicitation*

Pursuant to the Arrangement Agreement, Equal has agreed, if requested by Petroflow Sub prior to the Effective Date, to use its commercially reasonable efforts to obtain, at Petroflow Sub's expense, all waivers, consents and approvals from the Debentureholders to amend the obligations of Equal under the Indenture by way of a consent solicitation or otherwise. As at the date of the Circular, Petroflow and Petroflow Sub have not advised Equal of any intention to make a request that Equal take a specific action with respect to the Convertible Debentures and there is no certainty that any action or any particular action will be taken with respect to the Convertible Debentures prior to the Effective Time.

*Conversion Rights*

Pursuant to the Indenture, following the Arrangement, each Debentureholder will no longer have the right to receive Equal Shares on conversion of its Convertible Debentures, but will have the right to receive in lieu of such Equal Shares, the Arrangement Consideration which such Debentureholder would have been entitled to receive had it been the holder of such number of Equal Shares at the Effective Time that it was entitled to acquire pursuant to its conversion right. The Convertible Debentures have a conversion price of CDN$8.47 per Equal Share as of May 15, 2014, the latest practicable date prior to the date of the Circular, which is greater than the Arrangement Consideration expressed in Canadian dollars of CDN$5.91 (based on the Bank of Canada noon rate on such date).

**Change in Control Agreements with Executive Officers**

All of our current executive officers have entered into employment agreements with Equal, pursuant to which, in the event of a change of control of Equal, such as the Arrangement, change of control benefits including severance and other payments may become payable to the executive officers. The change of control provisions in each current executive officer's employment contract are summarized below.

The amounts that may become payable to our executive officers under the terms described below are summarized in the "Cash" and "Benefits" columns of the table provided in the section of this Circular entitled "*Golden Parachute Compensation*" beginning on page 92.

*Don Klapko, President and Chief Executive Officer*

In the event of a change of control of Equal, such as the Arrangement, Equal may terminate the employment contract with Mr. Klapko. If Equal does not terminate the employment contract, Mr. Klapko may terminate the employment contract at any time within sixty days of the change of control. In either of these cases, Mr. Klapko will be entitled to the following amounts:

- all accrued salary;

- all accrued vacation pay and out-of-pocket expenses;

- accrued annual cash bonus to the date of termination of employment, which shall be the greater of: (i) 10% of annual salary, pro-rated for the number of days that Mr. Klapko was employed in the year, and (ii) the forward looking bonus percentage of annual salary pro-rated for the number of days Mr. Klapko was employed in the year where "forward-looking bonus percentage" is the estimated bonus percentage for Mr. Klapko for the year established in the first quarter of such year pursuant to the annual cash bonus plan of Equal;

- an amount equal to 24 months' salary; and

- an amount equal to the actual cost that would have been incurred by Equal in maintaining group health and other benefits for Mr. Klapko for 24 months following the change of control.

To receive the payments listed above, Mr. Klapko must execute a release in favour of Equal.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 89 )

Table of Contents

Pursuant to Mr. Klapko's employment contract, Mr. Klapko is entitled to receive a grant of Restricted Shares each year valued at 150% of Mr. Klapko's salary (which grant amount in 2014 will equal CDN$525,000). As no additional Restricted Shares may be granted pursuant to the RSP Plan, allowance has been made for this amount to be paid to Mr. Klapko by Equal in cash at completion of the Arrangement.

*Scott Smalling, Senior Vice President and Chief Financial Officer*

In the event of a change of control of Equal, such as the Arrangement, Equal may terminate the employment contract with Mr. Smalling. If Equal does not terminate the employment contract, Mr. Smalling may terminate the employment contract at any time within sixty days of the change of control. In either of these cases, Mr. Smalling will be entitled to the following amounts:

- all accrued salary;

- all accrued vacation pay and out-of-pocket expenses;

- accrued annual cash bonus to the date of termination of employment, which shall be the greater of (i) 10% of annual salary, pro-rated for the number of days that Mr. Smalling was employed in the year and (ii) the forward looking bonus percentage of annual salary pro-rated for the number of days Mr. Smalling was employed in the year where "forward-looking bonus percentage" is the estimated bonus percentage for Mr. Smalling for the year established in the first quarter of such year pursuant to the annual cash bonus plan of Equal;

- an amount equal to 18 months' salary; and

- an amount equal to the actual cost that would have been incurred by Equal in maintaining group health benefits for Mr. Smalling for 18 months following the change of control.

To receive the payments listed above, Mr. Smalling must execute a release in favour of Equal.

*John Chimahusky, Senior Vice President and Chief Operations Officer*

In the event of a change of control of Equal, such as the Arrangement, Equal may terminate the employment contract with Mr. Chimahusky. If Equal does not terminate the employment contract, Mr. Chimahusky may terminate the employment contract within six months of the change of control by giving three months' notice. In either of these cases, Mr. Chimahusky will be entitled to the following amounts:

- all accrued salary;

- all accrued vacation pay and out-of-pocket expenses;

- accrued annual cash bonus to the date of termination of employment;

- an amount equal to 18 months' salary; and

- an amount equal to the actual cost that would have been incurred by Equal in maintaining group health benefits for Mr. Chimahusky for 18 months following the change of control.

To receive the payments listed above, Mr. Chimahusky must execute a release in favour of Equal.

*Mark Rupert, Petroleum Engineer, Vice President*

In the event of a change of control of Equal, such as the Arrangement, Equal may terminate the employment contract with Mr. Rupert. If Equal does not terminate the employment contract, Mr. Rupert may terminate the employment contract within six months of the change of control by giving three months' notice. In either of these cases, Mr. Rupert will be entitled to the following amounts:

- all accrued salary;

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 90 )

Table of Contents

- all accrued vacation pay and out-of-pocket expenses;

- accrued annual cash bonus to the date of termination of employment;

- an amount equal to 12 months' salary; and

- an amount equal to the actual cost that would have been incurred by Equal in maintaining group health benefits for Mr. Rupert for 12 months following the change of control.

To receive the payments listed above, Mr. Rupert must execute a release in favour of Equal.

*Richard Dixon, Vice President, Land*

In the event of a change of control of Equal, such as the Arrangement, Equal may terminate the employment contract with Mr. Dixon. If Equal does not terminate the employment contract, Mr. Dixon may terminate the employment contract within six months of the change of control by giving three months' notice. In either of these cases, Mr. Dixon will be entitled to the following amounts:

- all accrued salary;

- all accrued vacation pay and out-of-pocket expenses;

- accrued annual cash bonus to the date of termination of employment;

- an amount equal to 12 months' salary; and

- an amount equal to the cost that could be incurred by Mr. Dixon for benefits that may be available pursuant to the Consolidated Omnibus Budget Reconciliation Act for a period of up to 12 months, to the extent that Mr. Dixon is eligible and signed up for such benefits.

To receive the payments listed above, Mr. Dixon must execute a release in favour of Equal.

**New Arrangements with Petroflow**

Pursuant to the Arrangement Agreement, each of the Petroflow and Petroflow Sub have agreed that, immediately after the Effective Time, Petroflow and Petroflow Sub will cause Equal and any successor to Equal, to honor and comply in all material respects with the terms of those existing employment agreements, termination, severance and retention agreements of Equal that Equal has disclosed to Petroflow and Petroflow Sub.

**Indemnification; Insurance**

Pursuant to the Arrangement Agreement, prior to the Effective Time, Equal is entitled to obtain directors' and officers' insurance for all present and former directors and officers of Equal and its subsidiaries that are covered under Equal's current director' and officers' insurance policies, covering claims in respect of acts or omission in their capacity as directors and officers of Equal occurring prior to the Effective Date made prior to or within six years after the Effective Date.

Pursuant to the Arrangement Agreement, Petroflow Sub agreed that all rights to indemnification or exculpation existing in favor of the directors or officers of Equal or any of its subsidiaries as provided in Equal's articles or by-laws or any indemnification agreement as at the date of the Arrangement Agreement will survive the Arrangement and will continue in full force and effect for a period of six years from the Effective Date.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 91 )

Table of Contents

**GOLDEN PARACHUTE COMPENSATION**

**Golden Parachute Compensation Table**

The following table sets forth the information required by Item 402(t) of Regulation S-K promulgated by the SEC regarding the compensation that may become payable to officers of Equal who have held such positions at any time since January 1, 2013 in connection with the completion of the Arrangement, assuming:

- the price per Equal Share was USD$5.43, the per Equal Share Arrangement Consideration;

- the Arrangement was completed on May 15, 2014, which is the latest practicable date prior to the filing of this Circular with the SEC and on SEDAR; and

- the employment of each of the executive officers was terminated immediately following the completion of the Arrangement, either by Equal or by the executive officer.

**Golden Parachute Compensation**

| Name (1) | Cash (USD$)(2) | Equity (USD$)(3) | Pension/ NQDC (USD$) | Perquisites/ Benefits (USD$)(4) | Tax Reimbursement (USD$) | Other (USD$)(5) | Total (USD$) |
|---|---|---|---|---|---|---|---|
| Don Klapko<br>*President, Chief Executive Officer and Director* | 1,143,949(6) | 1,333,860(11) | N/A | 146,843 | N/A | 198,295 | 2,822,947 |
| John Chimahusky<br>*Senior Vice President and Chief Operations Officer* | 384,908(7) | 473,164(12) | N/A | 2,042 | N/A | N/A | 860,114 |
| Scott Smalling<br>*Senior Vice President and Chief Financial Officer* | 358,417(8) | 423,513(13) | N/A | 14,580 | N/A | N/A | 796,510 |
| Mark Rupert<br>*Petroleum Engineer, Vice President* | 250,825(9) | 316,461(14) | N/A | 17,280 | N/A | N/A | 584,566 |
| Richard Dixon<br>*Vice President, Land* | 240,242(10) | 303,455(15) | N/A | 12,420 | N/A | N/A | 556,117 |
| Wendell Chapman<br>*Former Senior Vice President Finance & Chief Financial Officer* | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 92 )

Table of Contents

**Notes:**

(1)    For the purposes of calculating amounts related to ownership of Options and Convertible Debentures in the table above, amounts in Canadian dollars were converted into U.S. dollars based on the Bank of Canada noon rate on May 15, 2014.

(2)    Represents the estimated value of cash severance payments including any amounts in lieu of bonuses and cash amounts in lieu of Restricted Share grants, as applicable, upon termination of employment following completion of the Arrangement. The terms of these payments to our executive officers are summarized in the section of this circular entitled "*Interests of Our Directors and Officers in the Arrangement - Change in Control Agreements with Executive Officers*" beginning on page 89.

(3)    Represents the total consideration to be received in connection with ownership of Restricted Shares and Options in connection with the Arrangement.

(4)    Represents amounts to be received in lieu of benefits on termination following the Arrangement.

(5)    Represents the total consideration to be received in connection with ownership of Convertible Debentures in connection with the Arrangement. Calculation of amounts to be received in connection with ownership of Convertible Debentures assumes that an offer to acquire such Convertible Debentures is made by Equal following the Arrangement in accordance with the terms of the Indenture in the amount of 101% of the principal of the Convertible Debentures plus accrued interest. Amounts of accrued interest were calculated as of May 15, 2014, for the purposes of this table only.

(6)    Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 60 days of the completion of the Arrangement. Includes a USD$482,227 cash amount in lieu of a grant of Restricted Shares, which Mr. Klapko is entitled to receive each year pursuant to his employment contract valued at 150% of Mr. Klapko's salary. As no additional Restricted Shares may be granted pursuant to the RSP Plan, allowance has been made for this amount to be paid to Mr. Klapko by Equal in cash at completion of the Arrangement.

(7)    Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 6 months of the completion of the Arrangement by giving three months' notice.

(8)    Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 60 days of the completion of the Arrangement.

(9)    Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 6 months of the completion of the Arrangement by giving three months' notice.

(10)    Severance payments are based on a double trigger provision whereby the employee will receive severance if terminated by Equal following the Arrangement or if the employee terminates his employment within 6 months of the completion of the Arrangement by giving three months' notice.

(11)    Represents payments of nil on account of vested Options, payments of nil on account of unvested Options and payments of USD$1,333,860 on account of Restricted Shares.

(12)    Represents payments of USD$11,250 on account of vested Options, payments of nil on account of unvested Options and payments of USD$460,916 on account of Restricted Shares.

(13)    Represents payments of nil on account of vested Options, payments of USD$92,215 on account of unvested Options and payments of USD$323,118 on account of Restricted Shares.

(14)    Represents payments of USD$6,250 on account of vested Options, payments of nil on account of unvested Options and payments of USD$309,657 on account of Restricted Shares.

(15)    Represents payments of USD$6,250 on account of vested Options, payments of nil on account of unvested Options and payments of USD$296,651 on account of Restricted Shares.

Any changes in the assumptions or estimates above would affect the amounts shown in the table. In addition, a portion of the equity awards represented in the equity column is expected to vest in the ordinary course prior to the actual date that the Arrangement is completed. Amounts in the benefits column may change prior to the completion of the Arrangement.

**Narrative to Golden Parachute Compensation Table**

The terms of employment agreements pursuant to which compensation may become payable to our executive officers in connection with the completion of the Arrangement are summarized in the section of this Circular entitled *"Interests of our Directors and Officers in the Arrangement"* beginning on page 80.

**INTERESTS OF CERTAIN PERSONS OR COMPANIES IN MATTERS TO BE ACTED UPON**

Other than as disclosed herein, management of Equal is not aware of any material interest, direct or indirect, by way of beneficial ownership of securities or otherwise, of any director or executive officer of Equal that held such a position since January 1, 2013, proposed nominee for election as a director of Equal, or any associate or affiliate of the aforementioned individuals, in any matter to be acted on at the Meeting. See the sections of this Circular entitled *"Interests of our Executive Directors and Officers in the Arrangement"* beginning on page 80 and "*Minority Approval*" beginning on page 79.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 93 )

Table of Contents

## MARKET PRICE AND DIVIDEND DATA

*Trading Price and Volume on the TSX (Equal Shares)*

The Equal Shares are listed on the TSX and trade under the symbol "EQU". The following tables sets out the high and low prices of the Equal Shares on the TSX for each of the twelve months prior to May 15, 2014 the latest practicable date prior to the date of this Circular and for each full quarterly period within the two most recent fiscal years and the subsequent interim periods, and the number of Equal Shares traded through the facilities of the TSX for each such month and quarterly period.

|  | High (CDN$) | Low (CDN$) | Volume |
|---|---|---|---|
| May 2013 | 3.85 | 3.71 | 286,393 |
| June 2013 | 4.21 | 3.61 | 720,459 |
| July 2013 | 4.62 | 4.06 | 551,629 |
| August 2013 | 5.07 | 4.37 | 540,390 |
| September 2013 | 4.99 | 4.71 | 712,545 |
| October 2013 | 5.13 | 4.68 | 1,306,502 |
| November 2013 | 5.45 | 4.50 | 2,032,379 |
| December 2013 | 5.86 | 5.45 | 1,536,605 |
| January 2014 | 5.92 | 5.60 | 927,437 |
| February 2014 | 6.00 | 5.80 | 427,636 |
| March 2014 | 5.91 | 4.94 | 436,438 |
| April 2014 | 5.27 | 4.75 | 538,159 |
| May 2014 (1-15) | 5.75 | 4.85 | 83,029 |

|  | High (CDN$) | Low (CDN$) | Volume |
|---|---|---|---|
| First Quarter 2012 | 5.05 | 3.75 | 2,336,572 |
| Second Quarter 2012 | 3.80 | 2.47 | 6,990,941 |
| Third Quarter 2012 | 3.90 | 2.67 | 1,667,099 |
| Fourth Quarter 2012 | 3.63 | 3.00 | 2,529,625 |
| First Quarter 2013 | 3.92 | 2.86 | 2,858,370 |
| Second Quarter 2013 | 4.21 | 3.61 | 1,470,142 |
| Third Quarter 2013 | 5.07 | 4.06 | 1,804,564 |
| Fourth Quarter 2013 | 5.86 | 5.45 | 4,793,142 |
| First Quarter 2014 | 6.00 | 4.94 | 1,791,511 |

*Trading Price and Volume on the TSX (Convertible Debentures)*

The Convertible Debentures are listed on the TSX and trade under the symbol "EQU.DB.B". The following table sets out the high and low prices of the Convertible Debentures on the TSX for each of the twelve months prior to May 15, 2014 the latest practicable date prior to the date of this Circular and for each full quarterly period within the two most recent fiscal years and the subsequent interim periods, and the face value of Convertible Debentures traded through the facilities of the TSX for each such month and quarterly period.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 94 )

Table of Contents

| | High (CDN$) | Low (CDN$) | Volume (CDN$) |
|---|---|---|---|
| May 2013 | 101.50 | 100.96 | 492,000 |
| June 2013 | 101.30 | 99.79 | 2,294,000 |
| July 2013 | 100.50 | 99.30 | 210,000 |
| August 2013 | 100.75 | 100.00 | 226,000 |
| September 2013 | 101.01 | 99.85 | 331,000 |
| October 2013 | 101.75 | 100.25 | 303,000 |
| November 2013 | 101.00 | 100.20 | 2,355,000 |
| December 2013 | 101.50 | 100.51 | 6,222,000 |
| January 2014 | 102.00 | 101.05 | 229,000 |
| February 2014 | 102.00 | 101.04 | 44,000 |
| March 2014 | 102.00 | 100.75 | 1,435,000 |
| April 2014 | 101.00 | 99.00 | 295,000 |
| May 2014 (1-15) | 101.00 | 100.50 | 228,000 |

| | High (CDN$) | Low (CDN$) | Volume (CDN$) |
|---|---|---|---|
| First Quarter 2012 | 100.00 | 97.00 | 6,229,000 |
| Second Quarter 2012 | 100.00 | 90.00 | 3,890,000 |
| Third Quarter 2012 | 99.90 | 96.00 | 2,959,000 |
| Fourth Quarter 2012 | 100.99 | 98.00 | 3,971,000 |
| First Quarter 2013 | 101.50 | 99.50 | 2,768,000 |
| Second Quarter 2013 | 101.60 | 100.00 | 3,104,000 |
| Third Quarter 2013 | 101.01 | 99.30 | 767,000 |
| Fourth Quarter 2013 | 101.75 | 100.51 | 8,820,000 |
| First Quarter 2014 | 102.00 | 100.75 | 1,708,000 |

*Trading Price and Volume on the NYSE (Equal Shares)*

The Equal Shares are listed on the NYSE and trade under the symbol "EQU". The following table sets out the high and low prices of the Equal Shares on the NYSE for each of the twelve months prior to May 15, 2014 the latest practicable date prior to the date of this Circular and for each full quarterly period within the two most recent fiscal years and the subsequent interim periods, and the number of Equal Shares traded through the facilities of the NYSE for each such month and quarterly period.

| | High (USD$) | Low (USD$) | Volume |
|---|---|---|---|
| May 2013 | 3.80 | 3.64 | 1,287,521 |
| June 2013 | 4.04 | 3.57 | 5,833,717 |
| July 2013 | 4.49 | 3.95 | 2,911,118 |
| August 2013 | 4.80 | 4.22 | 2,857,396 |
| September 2013 | 4.81 | 4.61 | 2,715,031 |
| October 2013 | 4.90 | 4.62 | 3,402,244 |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 95 )

Table of Contents

|  | High (USD$) | Low (USD$) | Volume |
|---|---|---|---|
| November 2013 | 5.13 | 4.29 | 4,472,806 |
| December 2013 | 5.50 | 5.11 | 14,518,941 |
| January 2014 | 5.33 | 5.21 | 6,079,457 |
| February 2014 | 5.40 | 5.26 | 4,787,407 |
| March 2014 | 5.33 | 4.47 | 5,704,911 |
| April 2014 | 4.80 | 4.31 | 5,912,283 |
| May 2014 (1-15) | 5.29 | 4.43 | 4,095,025 |

|  | High (USD$) | Low (USD$) | Volume |
|---|---|---|---|
| First Quarter 2012 | 4.89 | 3.73 | 4,637,290 |
| Second Quarter 2012 | 3.85 | 2.39 | 8,583,199 |
| Third Quarter 2012 | 4.05 | 2.58 | 7,766,442 |
| Fourth Quarter 2012 | 3.69 | 3.08 | 6,969,884 |
| First Quarter 2013 | 3.85 | 2.98 | 5,851,688 |
| Second Quarter 2013 | 4.04 | 3.57 | 8,477,171 |
| Third Quarter 2013 | 4.81 | 3.95 | 8,483,545 |
| Fourth Quarter 2013 | 5.50 | 4.29 | 21,998,148 |
| First Quarter 2014 | 5.40 | 4.47 | 16,571,775 |

The following table sets forth the closing per share sales price of the Equal Shares, as reported on the TSX on December 6, 2013, the last full trading day before the public announcement of the execution of the Arrangement Agreement, and on May 15, 2014 the latest practicable trading day prior to the printing of this Circular:

| Date | Equal Share Closing Price | |
|---|---|---|
| December 6, 2013 | CDN$ | 5.74 |
| May 15, 2014 | CDN$ | 5.73 |

The following table sets forth the closing per share sales price of the Equal Shares, as reported on NYSE on December 6, 2013, the last full trading day before the public announcement of the execution of the Arrangement Agreement, and on May 15, 2014, the latest practicable trading day prior to the printing of this Circular:

| Date | Equal Share Closing Price | |
|---|---|---|
| December 6, 2013 | USD$ | 5.37 |
| May 15, 2014 | USD$ | 5.18 |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 96 )

Table of Contents

The following table sets forth the cash dividends declared on the Equal Shares:

| Year Ended December 31 | | | Three Months Ended March 31 | |
| --- | --- | --- | --- | --- |
| 2013 (USD$) | 2012 (USD$) | 2011 (USD$) | 2014 (USD$) | 2013 (USD$) |
| 0.20 | 0.00 | 0.00 | 0.00 | 0.05 |

Equal did not pay any dividends on the Equal Shares during calendar years 2010, 2011 or 2012. On November 27, 2012, Equal announced the initiation of a USD$0.20 per Equal Share annual dividend beginning January 1, 2013, payable at the end of each calendar quarter. A cash dividend of USD$0.05 per Equal Share was paid on March 31, 2013 to Equal Shareholders of record at the close of business on March 1, 2013. A cash dividend of USD$0.05 per Equal Share was paid on June 28, 2013 to Equal Shareholders of record at the close of business on June 3, 2013. A cash dividend of USD$0.05 per Equal Share was paid on September 25, 2013 to Equal Shareholders of record at the close of business on September 2, 2013. In accordance with the terms of the Arrangement Agreement, Equal declared a USD$0.05 per Equal Share Permitted Dividend on November 14, 2013 and paid such Permitted Dividend on December 20, 2013 to Equal Shareholders of record on December 2, 2013.

Pursuant to the Arrangement Agreement, if, on or after the date of the Arrangement Agreement, Equal declares, sets aside or pays any dividend or other distribution, other than a Permitted Dividend, or sets a record date therefor that is prior to the Effective Time, then the Arrangement Consideration will be adjusted to reflect each such dividend or other distribution by way of a reduction in the Arrangement Consideration by an amount equal to the amount of such dividend or distribution per Equal Share. Pursuant to the Arrangement Agreement, a Permitted Dividend means any of (a) the USD$0.05 per Equal Share ordinary course dividend declared on November 14, 2013 and paid on December 20, 2013 to holders of record on December 2, 2013, (b) a the USD$0.05 per Equal Share dividend declared on May 1, 2014 and paid on May 28, 2014 to Equal Shareholders of record at the close of business on May 15, 2014, and (c) the Arrangement Dividend.

Under the Arrangement, pursuant to the terms of the Arrangement Agreement, Equal will pay the Arrangement Dividend to Equal Shareholders on the Equal Shares they hold at the Effective Time.

REGULATORY MATTERS

Pursuant to the Arrangement Agreement, Equal has represented that the Arrangement is exempt from the HSR Act as a result of the aggregate fair market value of the non-exempt assets (as described therein) of Equal and its subsidiaries not exceeding USD$70.9 million.

The Arrangement is exempt from a mandatory filing requirement under the merger notification provisions of the *Competition Act* (Canada), on the basis that the relevant thresholds contained in Part IX of *Competition Act* (Canada) are not exceeded in the case of the Arrangement.

DISSENT RIGHTS

The following description of the rights of Dissenting Shareholders is not a comprehensive statement of the procedures to be followed by a Dissenting Shareholder who seeks payment of the fair value of Equal Shares and is qualified in its entirety by the reference to the full text of the Interim Order, which is attached to this Circular as Appendix B, and the text of section 191 of the ABCA, which is attached to this Circular as Appendix D. Pursuant to the Interim Order, Dissenting Shareholders are given rights of Dissenting Shareholders under the ABCA, as modified or supplemented by the Interim Order and Plan of Arrangement. Dissenting Shareholders should carefully consider and comply with the provisions of section 191 of the ABCA, as modified or supplemented by the Interim Order and Plan of Arrangement. Failure to comply with the provisions of that section, as modified or supplemented by the Interim Order and Plan of Arrangement, and to adhere to the procedures established therein may result in the loss of all rights thereunder.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 97 )

Table of Contents

Under the Interim Order, each registered Equal Shareholder is entitled, in addition to any other rights the Equal Shareholder may have, to dissent and to be paid by Petroflow Sub the fair value of the Equal Shares held by the Equal Shareholder in respect of which the Equal Shareholder dissents, determined as of the close of business on the last business day before the day on which the resolution from which such Equal Shareholder dissents was adopted. Only registered Equal Shareholders may dissent. Persons who are beneficial owners of Equal Shares in each case registered in the name of a broker, custodian, nominee or other intermediary who wish to dissent should be aware that they may only do so through the registered owner of such Equal Shares. Accordingly, a non-registered owner of Equal Shares desiring to exercise Dissent Rights must make arrangements for the Equal Shares beneficially owned by that Equal Shareholder to be registered in the name of the Equal Shareholder prior to the time the written objection to the Arrangement Resolution is required to be received by Equal or, alternatively, make arrangements for the registered holder of such Equal Shares to dissent on behalf of the beneficial Equal Shareholder.

The dissent procedures require that a registered Equal Shareholder who wishes to dissent must send to Equal a written objection to the Arrangement Resolution, which written objection must be received by Equal, c/o Stikeman Elliott LLP, 4300 Bankers Hall West, 888 – 3rd Street S.W., Calgary, AB, T2P 5C5, Attention: Geoffrey D. Holub, not later than 5:00 p.m. (Calgary time) on June 27, 2014, or the day that is five business days (as such term is defined in the Plan of Arrangement) immediately preceding the date that any adjournment or postponement of the Meeting is reconvened or held, as the case may be. No Equal Shareholder who has voted Equal Shares in favour of the Arrangement Resolution shall be entitled to exercise Dissent Rights with respect to such Equal Shares. Pursuant to the Interim Order, a registered Equal Shareholder may not exercise the right to dissent in respect of only a portion of such holder's Equal Shares.

It is a condition to Petroflow's and Petroflow Sub's obligation under the Arrangement Agreement to complete the Arrangement that Equal Shareholders holding no more than 5% of the Equal Shares on a fully diluted basis shall have exercised Dissent Rights as at the Effective Time.

An application may be made to the Court by Petroflow Sub or by a Dissenting Shareholder to fix the fair value of the Dissenting Shareholder's Equal Shares as applicable. If such an application to the Court is made by either Petroflow Sub or a Dissenting Shareholder, Petroflow Sub must, unless the Court otherwise orders, send to each Dissenting Shareholder a written offer to pay such person an amount considered by Petroflow Sub to be the fair value of the Equal Shares held by such Dissenting Shareholders. The offer, unless the Court otherwise orders, will be sent to each Dissenting Shareholder at least 10 days before the date on which the application is returnable, if Petroflow Sub is the applicant, or within 10 days after Equal is served with notice of the application, if a Dissenting Shareholder is the applicant. The offer will be made on the same terms to each Dissenting Shareholder and will be accompanied by a statement showing how the fair value was determined.

In such circumstances, a Dissenting Shareholder may make an agreement with Petroflow Sub for the purchase of its Equal Shares in the amount of Petroflow Sub's offer (or otherwise) at any time before the Court pronounces an order fixing the fair value of the Equal Shares, as applicable.

A Dissenting Shareholder is not required to give security for costs in respect of an application and, except in special circumstances, will not be required to pay the costs of the application or appraisal. On the application, the Court will make an order fixing the fair value of the Equal Shares of all Dissenting Shareholders who are parties to the application, giving judgment in that amount against Petroflow Sub and in favour of each of those Dissenting Shareholders, and fixing the time within which Petroflow Sub must pay that amount payable to the Dissenting Shareholders.

On the Arrangement becoming effective, or upon the making of an agreement between Petroflow Sub and the Dissenting Shareholder as to the payment to be made by Petroflow Sub to the Dissenting Shareholder, or the pronouncement of a Court order, whichever first occurs, the Dissenting Shareholder will cease to have any rights as an Equal Shareholder other than the right to be paid the fair value of such Equal Shareholder's Equal Shares in the amount agreed to between Petroflow Sub and the Equal Shareholder or in the amount of the judgment, as the case may be. Until one of these events occurs, the Equal Shareholder may withdraw its dissent or if the Arrangement has not yet become effective Equal may rescind the Arrangement Resolution. In either event, the dissent and appraisal proceedings in respect of that Equal Shareholder will be discontinued.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 98 )

Table of Contents

Petroflow Sub shall not make a payment to a Dissenting Shareholder if there are reasonable grounds for believing that Petroflow Sub is or would after the payment be unable to pay its liabilities as they become due, or that the realizable value of the assets of Petroflow Sub would thereby be less than the aggregate of its liabilities. In such event, Petroflow Sub shall notify each Dissenting Shareholder that it is lawfully unable to pay Dissenting Shareholders for their Equal Shares in which case the Dissenting Shareholder may, by written notice to Equal and Petroflow Sub within 30 days after receipt of such notice, withdraw its written objection, in which case such Equal Shareholder shall, in accordance with the Interim Order, be deemed to have participated in the Arrangement as an Equal Shareholder. If the Dissenting Shareholder does not withdraw its written objection, it retains its status as a claimant against Petroflow Sub to be paid as soon as Petroflow Sub is lawfully entitled to do so or, in a liquidation, to generally be ranked subordinate to creditors but prior to its common shareholders.

All Equal Shares held by registered Equal Shareholders who exercise their Dissent Rights will, if the Equal Shareholders are ultimately entitled to be paid the fair value thereof, be deemed to be transferred to Petroflow Sub and the Equal Shareholders will receive the fair value of such Equal Shares which fair value shall be determined as of the close of business on the last business day before the Arrangement Resolution was adopted. If such Equal Shareholders ultimately are not entitled, for any reason, to be paid fair value for such Equal Shares they shall be deemed to have participated in the Arrangement on the same basis as a non-dissenting holder of Equal Shares, as applicable.

The above summary does not purport to provide a comprehensive statement of the procedures to be followed by Dissenting Shareholders who seeks payment of the fair value of their Equal Shares. Section 191 of the ABCA requires adherence to the procedures established therein and failure to do so may result in the loss of all rights thereunder. **Accordingly, each dissenting Equal Shareholder who is considering exercising Dissent Rights should carefully consider and comply with the provisions of that section, the full text of which is set out in Appendix D to this Circular, as modified or supplemented by the Interim Order and Plan of Arrangement, and consult its own legal advisor**.

## CERTAIN CANADIAN FEDERAL INCOME TAX CONSIDERATIONS

The following is, as at the date of this Circular, a summary of the principal Canadian federal income tax considerations generally applicable under the Tax Act to an Equal Shareholder who receives the Arrangement Dividend and disposes of Equal Shares under the Arrangement and who, at all relevant times, for the purposes of the Tax Act, deals at arm's length and is not affiliated with Equal, Petroflow or Petroflow Sub and holds any Equal Shares owned before the Arrangement as capital property (a "**Holder**"). Generally, the Equal Shares will be considered capital property to a Holder for the purposes of the Tax Act provided the Holder does not hold those Equal Shares in the course of carrying on a business and has not acquired such Equal Shares in one or more transactions considered to be an adventure or concern in the nature of trade.

This summary is not applicable to a Holder: (i) that is a "financial institution" as defined in the Tax Act for the purposes of the "mark to market property" rules contained in the Tax Act; (ii) that is a "specified financial institution" or "restricted financial institution", each as defined in the Tax Act; (iii) who has acquired Equal Shares on the exercise of an employee stock option or under the terms of the RSP Plan; (iv) an interest in which is, or whose Equal Shares are, a "tax shelter" or "tax shelter investment", each as defined in the Tax Act; (v) whose "functional currency" for the purposes of the Tax Act is the currency of a country other than Canada; or (vi) that has or will enter into a "derivative forward agreement" or a "synthetic disposition agreement" as such terms are defined in the Tax Act, in respect of the Equal Shares. **Such Holders should consult their own tax advisors.**

This summary is based on representations from Equal as to certain factual matters, the provisions of the Tax Act and the regulations thereunder (the "**Regulations**") in force as at the date hereof, all specific proposals to amend the Tax Act and the Regulations that have been publicly announced prior to the date hereof by the Minister of Finance (Canada) ("**Proposed Amendments**") and the generally understood application of current published administrative and assessing practices and policies of the Canada Revenue Agency ("**CRA**"). This summary is not exhaustive of all possible Canadian federal income tax considerations and, except for the Proposed Amendments, does not take into account or anticipate any changes in the law or any changes in the CRA's administrative or assessing practices or policies, whether by way of legislative, governmental or judicial action or decision, nor does it take into account provincial, territorial or foreign tax considerations, which may differ significantly from the Canadian federal income tax considerations discussed herein. This summary assumes that the Proposed Amendments will be enacted as proposed, although no assurance can be given that the Proposed Amendments will be enacted as currently proposed or at all. This summary further assumes that no dividends other than Permitted Dividends will have been declared or paid by Equal prior to the Effective Date.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 99 )

Table of Contents

This summary is of a general nature only and neither is intended to be, nor should be construed to be, legal, tax or business advice to any particular Holder. Consequently, **Holders should consult their own tax advisors regarding the tax consequences applicable to them in their particular circumstances**.

### Holders Resident in Canada

This section of the summary is applicable to a Holder who, at all relevant times, is, or is deemed to be, resident in Canada for the purposes of the Tax Act (a "**Resident Holder**"). Certain Resident Holders whose Equal Shares otherwise might not qualify as capital property may be entitled to make an irrevocable election in accordance with subsection 39(4) of the Tax Act to have those shares, and any other "Canadian security", as defined in the Tax Act, owned in the year of the election and any subsequent taxation year, deemed to be capital property. Resident Holders contemplating making such election should first consult their own tax advisors.

#### Currency Conversion

Generally, for purposes of the Tax Act, all amounts relating to the acquisition, holding or disposition of the Equal Shares must be converted into Canadian dollars based on the exchange rates as determined in accordance with the Tax Act. The amount of dividends required to be included in the income of, and capital gains or capital losses realized by, a Holder may be affected by fluctuations in the Canadian / U.S. dollar exchange rate.

#### Arrangement Dividend

A Holder will be required to include the Arrangement Dividend in computing its income for its taxation year which includes the Effective Date as a taxable dividend. In the case of a Holder that is an individual (other than certain trusts), the Arrangement Dividend will be subject to the gross-up and dividend tax credit rules applicable to taxable dividends received from a taxable Canadian corporations. Taxable dividends received from a taxable Canadian corporation which are designated by such corporation as "eligible dividends" are subject to an enhanced gross-up and dividend tax credit regime in accordance with the rules in the Tax Act. At the date of this Circular, Equal discloses on its website that it expects all dividends issued by it will be "eligible dividends". In the case of a Holder that is a corporation, the amount of the Arrangement Dividend that is included in its income for a taxation year will generally be deductible in computing its taxable income for that taxation year.

The Tax Act also imposes a 33 ⅓% refundable tax on dividends received by a corporation that is a "private corporation" or "subject corporation" for purposes of Part IV of the Tax Act to the extent that such dividends are deductible in computing the corporation's taxable income. This tax will generally be refunded to the corporation at a rate of $1.00 for every $3.00 of taxable dividends paid while it is a private corporation.

#### Disposition of Equal Shares Pursuant to the Arrangement

Under the Arrangement, Resident Holders will transfer their Equal Shares to Petroflow Sub in consideration for Arrangement Consideration paid by the Petroflow Sub and will realize a capital gain (or a capital loss) equal to the amount by which the cash payment exceeds (or is exceeded by) the aggregate of the adjusted cost base to the Resident Holder of such Equal Shares and any reasonable costs of the disposition. The taxation of capital gains and capital losses is discussed below under "*Certain Canadian Federal Income Tax Considerations – Holders Resident in Canada - Taxation of Capital Gains and Capital Losses*".

#### Taxation of Capital Gains and Capital Losses

Generally, one half of any capital gain (a "**taxable capital gain**") realized by a Resident Holder in a taxation year must be included in the income of the Resident Holder for that year, and one half of any capital loss (an "**allowable capital loss**") realized by a Resident Holder in a taxation year must be deducted from taxable capital gains realized by the Resident Holder

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 100 )

Table of Contents

in that year, to the extent and under the circumstances described in the Tax Act. Allowable capital losses for a taxation year in excess of taxable capital gains for that year generally may be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any subsequent taxation year against taxable capital gains realized in such years, to the extent and under the circumstances described in the Tax Act.

The amount of any capital loss realized on the disposition or deemed disposition of Equal Shares by a Resident Holder thereof that is a corporation may be reduced by the amount of dividends received or deemed to have been received by it on such Equal Shares to the extent and in the circumstances prescribed in the Tax Act. Analogous rules may apply where a corporation is, directly or through a trust or partnership, a beneficiary of a trust or a member of a partnership that owns such Equal Shares.

A Resident Holder that is throughout the relevant taxation year a "Canadian-controlled private corporation", as defined in the Tax Act, may be liable to pay an additional refundable tax of $6\frac{2}{3}\%$ on its "aggregate investment income", as defined in the Tax Act, including taxable capital gains.

*Resident Holders Who Exercise Dissent Rights*

A Resident Holder who exercises Dissent Rights (a "**Dissenting Resident Holder**") will be deemed to transfer such Dissenting Resident Holder's Equal Shares to the Petroflow Sub in exchange for payment by Petroflow Sub of the fair value of such Common Shares. In general, a Dissenting Resident Holder will realize a capital gain (or capital loss) equal to the amount by which the cash received in respect of the fair value of the Dissenting Resident Holder's Equal Shares (other than in respect of interest awarded by a court) exceeds (or is exceeded by) the aggregate of the adjusted cost base of such Dissenting Resident Holder's Equal Shares and any reasonable costs of disposition. Interest awarded by a court to a Dissenting Resident Holder will be included in the Dissenting Resident Holder's income for the purposes of the Tax Act. The taxation of capital gains and capital losses is discussed above under "*Certain Canadian Federal Income Tax Considerations – Holders Resident in Canada - Taxation of Capital Gains and Capital Losses*". **Dissenting Resident Holders should consult their own tax advisors**.

*Alternative Minimum Tax on Individuals*

Capital gains realized (or deemed to be realized) and taxable dividends received (or deemed to be received) by a Resident Holder who is an individual (including certain trusts and estates) may give rise to liability for alternative minimum tax under the Tax Act. Any additional tax payable by an individual under the alternative minimum tax provisions may be carried forward and applied against certain tax otherwise payable in any of the seven immediately following taxation years, to the extent specified by the Tax Act. Holders who are individuals should consult their own tax advisors in this regard.

**Holders Not Resident in Canada**

This portion of the summary is generally applicable to a Holder who, at all relevant times, for the purposes of the Tax Act, is not, and is not deemed to be, resident in Canada, does not and will not use or hold, and is not deemed to use or hold, the Equal Shares in the course of, or in connection with, a business carried on in Canada and is not an insurer who carries on an insurance business in Canada and elsewhere (a "**Non-Resident Holder**").

*Arrangement Dividend*

The Arrangement Dividend paid under the terms of the Arrangement to a Non-Resident Holder will generally be subject to Canadian withholding tax of 25% unless such rate is reduced by an applicable tax treaty or convention. For a Non-Resident Holder that is a resident of the United States for the purposes of the Canada-U.S. Tax Convention, and entitled to the benefits of such convention, this rate is generally reduced to 15%.

*Disposition of Equal Shares Pursuant to the Arrangement*

Under the Arrangement, Non-Resident Holders will transfer their Equal Shares to Petroflow Sub in consideration for Arrangement Consideration paid by Petroflow Sub and will realize a capital gain (or a capital loss) equal to the amount by which the Arrangement Consideration exceeds (or is less than) the aggregate of the adjusted cost base to the Non-Resident Holder of such Equal Shares and any reasonable costs of the disposition.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 101 )

Table of Contents

A Non-Resident Holder will be taxable on a capital gain only if the Equal Shares are, or are deemed to be, "taxable Canadian property" of the Non-Resident Holder at the time of the disposition and the Non-Resident Holder is not entitled to relief under an applicable income tax treaty or convention between Canada and the Non-Resident Holder's country of residence. For a discussion of the circumstances in which the Equal Shares will constitute "taxable Canadian property" of the Non-Resident Holder, see below under "*Certain Canadian Federal Income Tax Considerations – Holders Not Resident in Canada - Taxable Canadian Property*".

*Taxable Canadian Property*

Provided that the Equal Shares are listed on a "designated stock exchange" (which currently includes the TSX and the NYSE) at the time of disposition, the Equal Shares generally will not be "taxable Canadian property" of a Non-Resident Holder at the time of disposition, unless, at any time during the 60-month period immediately preceding the disposition:

(i)     (A)   the Non-Resident Holder,

(B)   persons with whom the Non-Resident Holder did not deal at arm's length,

(C)   pursuant to certain Proposed Amendments released on July 12, 2013, partnerships in which the Non-Resident Holder or a person described in (B) holds a membership interest, directly or indirectly through one or more partnerships, or

(D)   the Non-Resident Holder together with all such persons,

owned 25% or more of the issued shares of any class or series of shares of the capital stock of Equal, and

(ii)    more than 50% of the fair market value of the Equal Shares was derived directly or indirectly from one or any combination of real or immovable property situated in Canada, "Canadian resource property", as defined in the Tax Act, "timber resource property", as defined in the Tax Act, and options in respect of, or interests in, or for civil law rights in, any such properties (whether or not such property exists).

The management of Equal has advised that it believes that less than 50% of the fair market value of the Equal Shares should currently, and for the 60 months prior to the date of this Circular, be considered to be derived from any of the property described in (ii) above as "taxable Canadian property" . Notwithstanding the foregoing, in certain circumstances set out in the Tax Act, the Equal Shares could be deemed to be "taxable Canadian property" of the Non-Resident Holder.

Even if the Equal Shares are, or are deemed to be, "taxable Canadian property" of a Non-Resident Holder, a taxable capital gain resulting from the disposition of the Equal Shares will not be included in computing the Non-Resident Holder's income for purposes of the Tax Act provided that the Equal Shares constitute "treaty-protected property", as defined in the Tax Act. Equal Shares owned by a Non-Resident Holder will generally be "treaty-protected property" at the time of the disposition if the gain from the disposition of such Equal Shares would, because of an applicable income tax convention between Canada and the Non-Resident Holder's country of residence, be exempt from tax under the Tax Act. **Non-Resident Holders should consult their own tax advisors with respect to the availability of any relief under the terms of an applicable income tax convention between Canada and the Non-Resident Holder's country of residence in their particular circumstances.**

In the event that the Equal Shares are, or are deemed to be, "taxable Canadian property" of a Non-Resident Holder and the capital gain realized upon a disposition of such Equal Shares is not exempt from tax under the Tax Act by virtue of an applicable income tax convention, the tax consequences as described above under "*Certain Canadian Federal Income Tax Considerations -Holders Resident in Canada - Taxation of Capital Gains and Capital Losses*" will generally apply.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 102 )

Table of Contents

A Non-Resident Holder who disposes of Equal Shares and whose Equal Shares are "taxable Canadian Property" will be required to file a Canadian federal income tax return reporting the disposition of such Equal Shares in the year of disposition (unless the disposition is an "excluded disposition", as defined in the Tax Act). **Non-Resident Holders who dispose of "taxable Canadian property" should consult their own tax advisors regarding any resulting Canadian reporting requirements.**

*Non-Resident Holders Who Exercise Dissent Rights*

A Non-Resident Holder who validly exercises Dissent Rights (a "**Dissenting Non-Resident Holder**") will be deemed to have transferred such Dissenting Non-Resident Holder's Equal Shares to Petroflow Sub, and will be entitled to receive a payment from Petroflow Sub of an amount equal to the fair value of the Dissenting Non-Resident Holder's Equal Shares. The Dissenting Non-Resident Holder will realize a capital gain (or capital loss) equal to the amount by which the cash received in respect of the fair value of the Dissenting Non-Resident Holder's Equal Shares (other than in respect of interest awarded by a court) exceeds (or is exceeded by) the aggregate of the adjusted cost base of such Dissenting Non - Resident Holder's Equal Shares and any reasonable costs of disposition. Interest awarded by a court to a Dissenting Non - Resident Holder will be included in the Dissenting Non - Resident Holder's income for the purposes of the Tax Act.

The Dissenting Non-Resident Holder will be taxable on any such capital gain only if the Equal Shares are, or are deemed to be, "taxable Canadian property" of the Dissenting Non-Resident Holder and the Dissenting Non-Resident Holder is not entitled to relief under an applicable income tax treaty or convention between Canada and the Dissenting Non-Resident Holder's country of residence. In the event that the Equal Shares are, or are deemed to be, "taxable Canadian property" of a Dissenting Non-Resident Holder and the capital gain realized upon a disposition of such Equal Shares is not exempt from tax under the Tax Act by virtue of an applicable income tax convention, the tax consequences as described above under "*Certain Canadian Federal Income Tax Considerations - Holders Resident in Canada - Taxation of Capital Gains and Capital Losses*" will generally apply. **Such Dissenting Non-Resident Holders should consult their own tax advisors in this regard**. For a discussion of the circumstances in which the Equal Shares will constitute "taxable Canadian property" of the Dissenting Non-Resident Holder, see above under "*Certain Canadian Federal Income Tax Considerations – Holders Not Resident in Canada - Taxable Canadian Property*".

A Dissenting Non-Resident Holder will not be subject to Canadian withholding tax on any amount of interest that is awarded by the Court.

**Non-Resident Holders who are considering exercising their Dissent Rights should consult their own tax advisors for advice regarding their particular circumstances.**

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

NOTICE PURSUANT TO TREASURY DEPARTMENT CIRCULAR 230: NOTHING CONTAINED IN THIS SUMMARY CONCERNING ANY U.S. FEDERAL TAX ISSUE IS INTENDED OR WRITTEN TO BE USED, AND IT CANNOT BE USED, BY A HOLDER, FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES UNDER THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"). THIS SUMMARY WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS CIRCULAR. EACH HOLDER SHOULD SEEK U.S. FEDERAL TAX ADVICE, BASED ON SUCH HOLDER'S PARTICULAR CIRCUMSTANCES, FROM AN INDEPENDENT TAX ADVISOR.

The following is a general summary of certain U.S. federal income tax considerations applicable to a U.S. Holder (as defined below) with respect to the Arrangement. This summary is for general information purposes only and does not purport to be a complete analysis or listing of all potential U.S. federal income tax considerations that may apply to a U.S. Holder as a result of the Arrangement. This summary does not take into account the individual facts and circumstances of any particular U.S. Holder that may affect the U.S. federal income tax consequences to such U.S. Holder, including specific tax consequences to a U.S. Holder under an applicable tax treaty. Accordingly, this summary is not intended to be, and should not be construed as, legal or U.S. federal income tax advice with respect to any U.S. Holder. This summary does not address the U.S. federal alternative minimum, U.S. federal estate and gift, U.S. state and local, and non-U.S. tax consequences to U.S. Holders of the Arrangement. Except as discussed below, this summary does not discuss reporting requirements. Each U.S. Holder should

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

( 103 )

Table of Contents

consult its own tax advisor regarding the U.S. federal income, U.S. federal estate and gift, U.S. state and local, and non-U.S. tax consequences of the Arrangement. This summary does not address the U.S. tax consequences of the Arrangement to Optionholders with respect to their Options or holders of Restricted Shares with respect to their Restricted Shares, nor does it address any tax consequences to holders of the Convertible Debentures.

This summary assumes that, on or after the date of the Arrangement Agreement, the only dividends or distributions that Equal declares, sets aside or pays prior to the Effective Time shall be Permitted Dividends. If Equal declares, sets aside or pays a dividend or distribution other than a Permitted Dividend prior to the Effective Time, each U.S. Holder should consult its own tax advisor regarding the tax consequences of such dividend or distribution.

No legal opinion from U.S. legal counsel or ruling from the Internal Revenue Service (the "**IRS**") has been requested, or will be obtained, regarding the U.S. federal income tax consequences of the Arrangement. This summary is not binding on the IRS, and the IRS is not precluded from taking a position that is different from, and contrary to, the positions taken in this summary. In addition, because the authorities on which this summary is based are subject to various interpretations, the IRS and the U.S. courts could disagree with one or more of the positions taken in this summary.

**Scope of This Disclosure**

*Authorities*

This summary is based on the Code, U.S. Treasury Regulations (whether final, temporary, or proposed), published rulings of the IRS, published administrative positions of the IRS, the Convention Between Canada and the United States of America with Respect to Taxes on Income and on Capital, signed September 26, 1980, as amended (the "**U.S. Treaty**"), and U.S. court decisions that are applicable and, in each case, as in effect and available, as of the date of this Information Circular. Any of the authorities on which this summary is based could be changed in a material and adverse manner at any time, and any such change could be applied on a retroactive or prospective basis which could affect the U.S. federal income tax considerations described in this summary. This summary does not discuss the potential effects, whether adverse or beneficial, of any proposed legislation that, if enacted, could be applied on a retroactive or prospective basis.

*U.S. Holders*

For purposes of this summary, the term "U.S. Holder" means a beneficial owner of Equal Shares participating in the Arrangement or exercising Dissent Rights pursuant to the Arrangement that is:

- an individual who is treated as a citizen or resident of the United States for U.S. federal income tax purposes;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust that (a) is subject to the primary supervision of a court within the United States and the control of one or more U.S. persons for all substantial decisions or (b) has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a U.S. person.

*U.S. Holders Subject to Special U.S. Federal Income Tax Rules Not Addressed*

This summary does not address the U.S. federal income tax considerations of the Arrangement to U.S. Holders that are subject to special provisions under the Code, including the following U.S. Holders: (a) that are tax-exempt organizations, qualified retirement plans, individual retirement accounts, or other tax-deferred accounts; (b) that are financial institutions, underwriters, insurance companies, real estate investment trusts, or regulated investment companies; (c) that are broker-dealers, dealers, or traders in securities or currencies that elect to apply a mark-to-market accounting method; (d) that have a "functional currency" other than the U.S. dollar; (e) that own Equal Shares as part of a straddle, hedging transaction,

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 104 )

Table of Contents

conversion transaction, constructive sale, or other arrangement involving more than one position; (f) that acquired Equal Shares in connection with the exercise of employee stock options or otherwise as compensation for services; (g) that hold Equal Shares other than as a capital asset within the meaning of Section 1221 of the Code (generally, property held for investment purposes); and (h) that own, directly, indirectly, or by attribution, 5% or more, by voting power or value, of the outstanding Equal Shares. This summary also does not address the U.S. federal income tax considerations applicable to U.S. Holders who are: (a) U.S. expatriates or former long-term residents of the United States; (b) persons that have been, are, or will be a resident or deemed to be a resident in Canada for purposes of the Tax Act; (c) persons that use or hold, will use or hold, or that are or will be deemed to use or hold Equal Shares in connection with carrying on a business in Canada; or (d) persons that have a permanent establishment in Canada for the purposes of the U.S. Treaty. U.S. Holders that are subject to special provisions under the Code, including U.S. Holders described immediately above, should consult their own tax advisor regarding the U.S. and non-U.S. tax consequences relating to the Arrangement.

If an entity that is classified as a partnership (or "pass-through" entity) for U.S. federal income tax purposes holds Equal Shares, the U.S. federal income tax consequences to such partnership and the partners of such partnership of participating in the Arrangement generally will depend in part on the activities of the partnership and the status of such partners. This summary does not address the tax consequences to any such partner or partnership. Partners of entities that are classified as partnerships for U.S. federal income tax purposes should consult their own tax advisors regarding the U.S. federal income tax consequences of the Arrangement.

**U.S. Federal Income Tax Consequences of the Arrangement**

*U.S. Holders Receiving Arrangement Consideration*

Although the matter is not free from doubt, a Permitted Dividend of USD$0.05 per Equal Share paid on the Effective Date under the Plan of Arrangement ("**Effective Date Permitted Dividend**") will likely be treated as part of the consideration paid to Equal Shareholders for their Equal Shares under the Arrangement. Accordingly, this summary assumes that the Effective Date Permitted Dividend will be included as part of the consideration paid by Petroflow Sub for Equal Shares under the Arrangement. U.S. Holders should consult their own tax advisor regarding the U.S. tax consequences relating to the Effective Date Permitted Dividend.

The Arrangement will be a fully taxable event to a U.S. Holder and, subject to the PFIC (as defined below) rules discussed below, a U.S. Holder of Equal Shares will recognize gain or loss equal to the difference, if any, between (i) the aggregate Arrangement Consideration and Effective Date Permitted Dividends and (ii) the adjusted tax basis of such U.S. Holder in the Equal Shares surrendered.

Subject to the PFIC rules discussed below, any gain or loss recognized by the U.S. Holder will be short-term capital gain or loss, unless the holding period for the Equal Shares exchanged was more than one year at the closing of the Arrangement, in which case any gain or loss recognized will be long-term capital gain or loss. Preferential tax rates for long-term capital gains are generally applicable to a U.S. Holder that is an individual, estate or trust. There are no preferential tax rates for long-term capital gains for a U.S. Holder that is a corporation. The deduction of capital losses is subject to limitation.

*U.S. Holders Exercising Dissent Rights*

A U.S. Holder that exercises Dissent Rights in the Arrangement and is paid cash in exchange for all of such U.S. Holder's Equal Shares generally will recognize gain or loss in an amount equal to the difference, if any, between (a) the U.S. dollar value of the cash received by such U.S. Holder in exchange for Equal Shares (other than amounts, if any, that are or are deemed to be interest for U.S. federal income tax purposes, which amounts will be taxed as ordinary income) and (b) the adjusted tax basis of such U.S. Holder in such Equal Shares surrendered. Subject to the PFIC rules discussed below, such gain or loss generally will be capital gain or loss, which will be long-term capital gain or loss if such Equal Shares have been held for more than one year. Preferential tax rates generally apply to long-term capital gains of a U.S. Holder that is an individual, estate, or trust. Deductions for capital losses are subject to significant limitations under the Code.

The U.S. dollar value of any cash payment in Canadian dollars to a U.S. Holder will be translated into U.S. dollars calculated by reference to the exchange rate prevailing on the date of actual or constructive receipt of the dividend, regardless of

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 105 )

Table of Contents

whether the Canadian dollars are converted into U.S. dollars at that time. If the Canadian dollars received are not converted into U.S. dollars on the date of receipt, a U.S. Holder will have a basis in the Canadian dollars equal to their U.S. dollar value on the date of receipt. Any U.S. Holder who receives payment in Canadian dollars and engages in a subsequent conversion or other disposition of the Canadian dollars may have a foreign currency exchange gain or loss that will be treated as ordinary income or loss, and generally will be U.S. source income or loss for foreign tax credit purposes. Each U.S. Holder should consult its own U.S. tax advisor regarding the U.S. federal income tax consequences of receiving, owning, and disposing of Canadian dollars.

### *Tax Consequences of the Arrangement Under the Passive Foreign Investment Company Rules*

A foreign corporation generally will be considered a passive foreign investment company ("**PFIC**") if, for a given tax year, (a) 75% or more of the gross income of the corporation for such tax year is passive income or (b) 50% or more of the value of the corporation's assets either produce passive income or are held for the production of passive income, based on the quarterly average of the fair market value of such assets. With respect to sales by a corporation, "gross income" generally includes sales revenues less cost of goods sold, plus income from investments and from incidental or outside operations or sources. "Passive income" includes, for example, dividends, interest, certain rents and royalties, certain gains from the sale of stock and securities, and certain gains from commodities transactions. Active business gains arising from the sale of commodities generally are excluded from passive income if substantially all (85% or more) of a foreign corporation's commodities are stock in trade or inventory, depreciable property used in a trade or business or supplies regularly used or consumed in the ordinary course of its trade or business, and certain other requirements are satisfied.

For purposes of the PFIC income test and assets test described above, if a corporation owns, directly or indirectly, 25% or more of the total value of the outstanding shares of another corporation, the first corporation will be treated as if it (a) held a proportionate share of the assets of such other corporation and (b) received directly a proportionate share of the income of such other corporation. In addition, for purposes of the PFIC income test and assets test described above, "passive income" does not include any interest, dividends, rents, or royalties that are received or accrued by a corporation from a "related person", to the extent such items are properly allocable to the income of such related person that is not passive income.

Based on available financial information, Equal believes it has not been a PFIC for any of its prior tax years and does not expect to be a PFIC for the tax year in which the Arrangement occurs. However, PFIC status is fundamentally factual in nature, generally cannot be determined until the close of the taxable year in question and is determined annually. Additionally, the analysis depends, in part, on complex U.S. federal income tax rules which are subject to varying interpretations. Consequently, there can be no assurances regarding the PFIC status of Equal for any prior tax year or the current year. If Equal was a PFIC at any time during a U.S. Holder's holding period for the Equal Shares, then the tax consequences of disposing of such shares, as discussed above, will be significantly modified, and generally worsened, by the PFIC rules discussed below.

A U.S. Holder of Equal Shares would be subject to special, adverse tax rules in respect of the Arrangement if Equal were classified as a PFIC for any taxable year during which a U.S. Holder holds or held Equal Shares. In such event: (a) any gain on the exchange of Equal Shares for cash would be allocated ratably over such U.S. Holder's holding period for the Equal Shares; (b) the amount allocated to the current taxable year and any year prior to the first year in which Equal was classified as a PFIC would be taxed as ordinary income in the current year; (c) the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for the applicable class of taxpayer for that year; and (d) an interest charge for a deemed deferral benefit would be imposed with respect to the resulting tax attributable to each of the other taxable years, which interest charge is not deductible by non-corporate U.S. Holders.

If Equal were a PFIC, the rules described above would not apply to the disposition of Equal Shares by a U.S. Holder that had made a "mark to market" election or a qualified electing fund ("**QEF**") election with respect to its Equal Shares. It is not expected that a U.S. Holder will have made or be able to make a QEF election because Equal has not provided U.S. Holders with the information necessary to make a QEF election. The "mark to market election" is available only for "marketable stock," which is stock that is traded in other than de minimis quantities on at least 15 days during each calendar quarter on a qualified exchange or other market, as defined in applicable U.S. Treasury regulations. Any U.S. Holder that has made either such election should consult with its own tax advisor.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 106 )

Table of Contents

The PFIC rules are complex, and each U.S. Holder should consult its own tax advisor regarding the PFIC rules, the elections which may be available to it and how the PFIC rules may affect the U.S. federal income tax consequences relating to the ownership of the Equal Shares and the Arrangement.

## Other Considerations

### *Foreign Tax Credit*

A U.S. Holder that pays (whether directly or through withholding) Canadian income tax in connection with the Arrangement may be entitled, at the election of such U.S. Holder, to receive either a deduction or a credit for such Canadian income tax paid. Generally, a credit will reduce a U.S. Holder's U.S. federal income tax liability on a dollar-for-dollar basis, whereas a deduction will reduce a U.S. Holder's income subject to U.S. federal income tax. This election is made on a year-by-year basis and applies to all foreign taxes paid (whether directly or through withholding) by a U.S. Holder during a tax year.

Complex limitations apply to the foreign tax credit, including the general limitation that the credit cannot exceed the proportionate share of a U.S. Holder's U.S. federal income tax liability that such U.S. Holder's foreign source taxable income bears to such U.S. Holder's worldwide taxable income. In applying this limitation, a U.S. Holder's various items of income and deduction must be classified, under complex rules, as either "foreign source" or "U.S. source." Generally, dividends paid by a foreign corporation should be treated as foreign source for this purpose, and gains recognized on the sale of stock of a foreign corporation by a U.S. Holder should be treated as U.S. source for this purpose, except as otherwise provided in an applicable income tax treaty and if an election is properly made under the Code. In addition, this limitation is calculated separately with respect to specific categories of income. The foreign tax credit rules are complex, and each U.S. Holder should consult its own tax advisor regarding the foreign tax credit rules.

### *Additional Tax on Passive Income*

U.S. Holders that are individuals, estates or certain trusts whose income exceeds certain thresholds will be required to pay a 3.8% Medicare surtax on "net investment income" including, among other things, dividends and net gain from disposition of property (other than property held in certain trades or businesses). U.S. Holders should consult with their own tax advisors regarding the effect, if any, of this tax on their disposition of Equal Shares pursuant to the Arrangement.

### *Information Reporting and Backup Withholding Tax*

Certain U.S. Holders will be required to file information returns with the IRS with respect to the receipt of payments in connection with the Arrangement. In addition, payments made within the United States or by a U.S. payor or U.S. middleman, of any payments received in connection with the Arrangement (including, but not limited to, payments to U.S. Holders exercising Dissent Rights under the Arrangement) generally may be subject to information reporting and backup withholding tax, at the current rate of 28%, if a U.S. Holder (i) fails to furnish its correct U.S. taxpayer identification number (generally on Form W-9), (ii) furnishes an incorrect U.S. taxpayer identification number, (iii) is notified by the IRS that such U.S. Holder has previously failed to properly report items subject to backup withholding tax, or (iv) fails to certify, under penalty of perjury, that such U.S. Holder has furnished its correct U.S. taxpayer identification number and that the IRS has not notified such U.S. Holder that it is subject to backup withholding tax. However, certain exempt persons generally are excluded from these information reporting and backup withholding rules. Backup withholding is not an additional tax. Any amounts withheld under the U.S. backup withholding tax rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, or will be refunded, if such U.S. Holder furnishes required information to the IRS in a timely manner. Each U.S. Holder should consult its own tax advisor regarding the information reporting and backup withholding rules.

**THE ABOVE SUMMARY IS NOT INTENDED TO CONSTITUTE A COMPLETE ANALYSIS OF ALL TAX CONSIDERATIONS APPLICABLE TO HOLDERS OF EQUAL SHARES WITH RESPECT TO THE DISPOSITION OF THOSE SHARES PURSUANT TO THE ARRANGEMENT. U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS AS TO THE TAX CONSIDERATIONS APPLICABLE TO THEM IN THEIR PARTICULAR CIRCUMSTANCES.**

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 107 )

Table of Contents

**RISK FACTORS**

In evaluating whether to approve the Arrangement Resolution the Equal Shareholders should carefully consider the following risk factors. Additional risks and uncertainties, including those currently unknown to or considered immaterial by Equal may also adversely affect the Arrangement. The following risk factors are not a definitive list of all risk factors associated with the Arrangement.

**Risks Relating to the Arrangement**

*Completion of the Arrangement is subject to several conditions that must be satisfied or waived*

The completion of the Arrangement is subject to a number of conditions precedent, some of which are outside of the control of Equal, Petroflow and Petroflow Sub, including approval of the Equal Shareholders and the granting of the Final Order. There can be no certainty, nor can Equal, Petroflow or Petroflow Sub provide any assurance, that these conditions will be satisfied or, if satisfied, when they will be satisfied. Moreover, a substantial delay in obtaining satisfactory approvals could result in the Arrangement not being completed. If the Arrangement is not completed for any reason, there are risks that the announcement of the Arrangement and the dedication of substantial resources of Equal to the completion thereof could have a negative impact on Equal's current business relationships and could have a material adverse effect on the current and future operations, financial condition and prospects of Equal. In addition, failure to complete the Arrangement for any reason could materially negatively impact the trading price of the Equal Shares.

*The Arrangement Agreement may be terminated by Petroflow or Petroflow Sub, in which case an alternative transaction may not be available*

Petroflow and Petroflow Sub have the right to terminate the Arrangement Agreement in certain circumstances. Accordingly, there is no certainty that the Arrangement Agreement will not be terminated by Petroflow or Petroflow Sub before the completion of the Arrangement. If the Arrangement Agreement is terminated, there is no guarantee that an equivalent or greater purchase price for the Equal Shares will be available from an alternative party.

*Equal will incur costs and may have to pay a termination payment*

Certain costs relating to the Arrangement, such as legal, accounting and certain financial advisor fees, must be paid by Equal even if the Arrangement is not completed. If the Arrangement is not completed, Equal may also be required to pay a termination payment to Petroflow, in certain circumstances. If Equal is required to pay a termination payment under the Arrangement Agreement, the financial condition of Equal could be materially adversely affected.

Under the Arrangement, Equal is required to pay a termination payment in the event that the Arrangement Agreement is terminated in certain circumstances. The termination payment may discourage other parties from attempting to propose a business transaction, even if such a transaction could provide better value to Equal Shareholders than the Arrangement.

*Gains from the Arrangement will be subject to tax*

Gains from the Arrangement will be taxable to Equal Shareholders for U.S. federal and Canadian federal income tax purposes as may any gains from any proceedings arising from an assertion of Dissent Rights. See the sections entitled "*Canadian Federal Income Tax Considerations*" beginning on page 99 and "*United States Federal Income Tax Considerations*" beginning on page 103.

*The transaction may result in disruption to Equal's business*

Our business may be disrupted by the transactions contemplated by the Arrangement Agreement, including the possible effect on our ability to attract and retain key personnel that may result from the announcement of the proposed Arrangement and the resulting distraction of the attention of our management and employees.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 108 )

Table of Contents

***The Arrangement Agreement imposes interim restrictions on our business***

Pursuant to the Arrangement Agreement, we have agreed to certain interim operating provisions. These operating provisions cover a broad range of activities and business practices. Consequently, it is possible that such operating restrictions will result in effects on, or changes to, the conduct of our business and operations, which could have a negative impact on our business.

***In connection with the Arrangement, Petroflow and/or Petroflow Sub may incur debt obligations which subordinate the interests of Debentureholders to greater amounts of debt.***

Pursuant to the Arrangement Agreement, Petroflow Sub has agreed to satisfy, or cause Equal to satisfy, all of Equal's obligations under the Indenture arising in connection with or at any time following the implementation of the Arrangement. However, it is a condition to the obligations of Petroflow Sub and Petroflow to complete the Arrangement that the Financing be completed. The Financing is expected to become senior, secured indebtedness of Equal and therefore, if it is completed, the payment of the principal and premium, if any, of, and interest on, the Convertible Debentures will be subordinate in right of payment to greater amounts of debt.

### Risks Relating to Equal

If the Arrangement is not completed, Equal will continue to face the risks that it currently faces with respect to its affairs, business and operations and future prospects. Such risk factors are set forth and described in Equal's annual report to the SEC on Form 10-K for the fiscal year ended December 31, 2013 and in Equal's annual information form for the year ended December 31, 2013, which can be found at www.sec.gov and www.sedar.com, respectively.

### LEGAL PROCEEDINGS RELATED TO THE ARRANGEMENT

On December 26, 2013, Equal was served with a complaint related to a putative class action lawsuit that has been filed in the District Court of Oklahoma County in the State of Oklahoma. The complaint, which names as defendants Equal, members of the Board, Petroflow and Petroflow Sub, alleges that in connection with Arrangement, the members of the Board breached their fiduciary duties to the Equal Shareholders. The complaint further claims that Equal, Petroflow and Petroflow Sub aided and abetted those alleged breaches of fiduciary duties. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unfairly preclusive deal protection devices. The plaintiff in the action seeks injunctive relief, including to enjoin the Arrangement, and an award of attorneys' and other fees and costs. Equal and the other defendants have not yet responded to the complaint.

Subsequently, three other complaints related to putative class action lawsuits arising from the Arrangement were filed in the District Court of Oklahoma County in the State of Oklahoma.

One of these additional complaints names as defendants Equal, members of the Board, and Petroflow, and alleges that in connection with the Arrangement, the members of the Board breached their fiduciary duties to Equal's shareholders in connection with the Arrangement. The complaint further claims that Equal and Petroflow aided and abetted those alleged breaches of fiduciary duties. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unfairly preclusive deal protection devices. The plaintiff in the action seeks injunctive relief, including preliminary and final injunctions against completion of the Arrangement, compensatory damages suffered as a result of the defendants' wrongful conduct, and an award of attorneys' and other fees and costs.

The third of these additional complaints names as defendants Equal, members of Equal's Board, Petroflow and Petroflow Sub, and alleges that in connection with the Arrangement, the members of the Board (i) breached their fiduciary duties to the Equal Shareholders and (ii) "oppressed" the minority Equal Shareholders in violation of the ABCA. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unreasonable deal protection devices. The plaintiff in the action seeks injunctive relief, including preliminary and final injunctions against completion of the Arrangement or any step in furtherance of its completion, compensatory damages, and an award of attorneys' and other fees and costs.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 109 )

Table of Contents

The fourth of these additional complaints names as defendants Equal, members of Equal's Board, Petroflow and Petroflow sub, and alleges that in connection with the Arrangement, the members of the Board (i) breached their fiduciary duties to the Equal Shareholders and (ii) "oppressed" the minority Equal Shareholders in violation of the ABCA. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unreasonable deal protection devices. The plaintiff in the action seeks injunctive relief, including preliminary and final injunctions against completion of the Arrangement or any step in furtherance of its completion, compensatory damages, and an award of attorneys' and other fees and costs.

One of these four matters was voluntarily dismissed, while the other three were consolidated into one case. Equal, members of the Board, and other defendants have moved to dismiss the complaints, which motion is currently pending.

On April 24, 2014, Equal was served with four complaints related to putative class action lawsuits that had been filed in the U.S. District Court for the Western District of Oklahoma. These complaints, which name as defendants Equal, members of the Board, Petroflow and Petroflow Sub, allege that in connection with Arrangement, the members of the Board breached their fiduciary duties to the Equal Shareholders. The complaints further claim that Equal, Petroflow and Petroflow Sub aided and abetted those alleged breaches of fiduciary duties. Further, the complaints allege that Equal's Preliminary Proxy vioalted Sections 14(a) and 20(a) of the Securities Exchange Act, as well as SEC Rule 14a-9. The complaint generally alleges that the Arrangement involves an unfair price, unfair sales process, self-dealing and unfairly preclusive deal protection devices. The plaintiff in the action seeks injunctive relief, including to enjoin the Arrangement, and an award of attorneys' and other fees and costs.

The U.S. District Court for the Western District of Oklahoma has since consolidated the four complaints into one case. Equal and the other defendants have moved to dismiss the case, which motion is currently pending.

### PROCEDURES FOR THE RECEIPT OF CONSIDERATION AND ARRANGEMENT DIVIDEND PURSUANT TO THE ARRANGEMENT

**Procedures for Equal Shareholders**

Pursuant to the Arrangement Agreement, within 5 business days of the Effective Time of the Arrangement, the Depositary will mail to each holder of Equal Shares, which at the Effective Time were converted into the right to receive Arrangement Consideration and Arrangement Dividend, a Letter of Transmittal which will contain instructions for use in effecting the surrender of such Equal Shares in exchange for the Arrangement Consideration and the Arrangement Dividend.

Only registered Equal Shareholders are required to submit a Letter of Transmittal. **If you are a non-registered Equal Shareholder holding your Equal Shares through a nominee such as a broker, investment dealer, bank, trust company, custodian or other nominee, you should carefully follow any instructions provided to you by such nominee.**

Payments to the Equal Shareholders under the Arrangement will be denominated in U.S. dollars. However, Equal Shareholders who hold their Equal Shares in Canadian dollar-denominated accounts with a broker, investment dealer, bank, trust company, custodian, nominee or other intermediary may have such payments automatically exchanged into Canadian dollars based on the exchange rate available to such intermediary on the date the funds are converted. Equal Shareholders who wish to receive Canadian dollars in such circumstances are advised to contact the broker, investment dealer, bank, trust company, custodian, nominee or other intermediary through which they hold their Equal Shares to make appropriate arrangements.

The details of the procedures for the deposit of physical Equal Share certificates and the delivery by the Depositary of the Arrangement Consideration and the Arrangement Dividend payable to former registered holders of Equal Shares will be set out in the Letter of Transmittal. Once it has been sent, the Letter of Transmittal will also be filed under Equal's profile at www.sedar.com and will be available at Equal's website at www.equalenergy.ca.

Registered Equal Shareholders must validly complete, duly sign and return the Letter of Transmittal, together with the share certificate(s) representing their Equal Shares, to the Depositary as instructed in the Letter of Transmittal.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 110 )

Table of Contents

Registered Equal Shareholders who deposit a validly completed and duly signed Letter of Transmittal, together with accompanying share certificate(s), will be forwarded the Arrangement Consideration and the Arrangement Dividend to which they are entitled as soon as practicable after the date of receipt by the Depositary of the Letter of Transmittal and accompanying Equal Share certificates. Once registered Equal Shareholders surrender their share certificates, they will not be entitled to sell the Equal Shares to which those certificates relate.

If any portion of the Arrangement Consideration or the Arrangement Dividend is to be paid to any person other than the person in whose name the applicable surrendered Equal Share is registered, it will be a condition to such payment that the surrendered Equal Share be in proper form for transfer and that the person requesting such payment of the Arrangement Consideration and Arrangement Dividend pay any transfer or other similar taxes required as a result of such payment to a person other than the registered holder of such Equal Share or establish to the satisfaction of the Depositary that such tax has been paid or is not payable.

Registered Equal Shareholders who do not forward to the Depositary a validly completed and duly signed Letter of Transmittal, together with their share certificate(s), will not receive the Arrangement Consideration or the Arrangement Dividend to which they are otherwise entitled until deposit is made. Whether or not Equal Shareholders forward their share certificate(s) upon the completion of the Arrangement at the Effective Time of the Arrangement, Equal Shareholders will cease to be shareholders of Equal and will only be entitled to receive the Arrangement Consideration and Arrangement Dividend to which they are entitled under the Plan of Arrangement or, in the case of registered Equal Shareholders who properly exercise their right of dissent, the right to receive fair value for their Equal Shares in accordance with section 191 of the ABCA, as modified by the Interim Order and Plan of Arrangement.

The method of delivery of certificates representing Equal Shares and all other required documents is at the option and risk of the person depositing their Equal Shares. Any use of the mail to forward certificates representing Equal Shares and/or the related Letters of Transmittal shall be at the election and sole risk of the person depositing Equal Shares, and documents so mailed shall be deemed to have been received by Equal only upon actual receipt by the Depositary. If such certificates and other documents are to be mailed, Equal recommends that registered mail be used with proper insurance and an acknowledgement of receipt requested.

Unless otherwise specified in the Letter of Transmittal, a cheque representing the aggregate Arrangement Consideration and Arrangement Dividend payable under the Arrangement to a former registered holder of Equal Shares who has complied with the procedures set out above and in the Letter of Transmittal will be, as soon as practicable after the Effective Date and after the receipt of all required documents: (i) forwarded to the former Equal Shareholder at the address specified in the Letter of Transmittal by first-class mail; or (ii) made available at the office of the Depositary at which the Letter of Transmittal and the certificate(s) for Equal Shares were delivered for pick-up by the Equal Shareholder, as requested by the Equal Shareholder in the Letter of Transmittal. If no address is provided on the Letter of Transmittal, cheques will be forwarded to the address of the holder as shown on the register maintained by Olympia as transfer agent for Equal. Except as required by applicable laws, no interest will be paid or will accrue on any cash payable to the holders of Equal Shares pursuant to the Arrangement Agreement or Plan of Arrangement.

The materials you are sent after the completion of the Arrangement will include the procedures that you must follow if you cannot locate your Equal Share certificate. Such procedures will include signing an affidavit attesting to the loss of your Equal Share certificate. You may also be required to provide a bond in order to cover any potential loss or take such other steps as the Depositary, Petroflow or Petroflow Sub may require.

**Non-registered Equal Shareholders whose Equal Shares are registered in the name of an intermediary (a broker, investment dealer, bank, trust company, custodian or other nominee) should contact that intermediary for instructions and assistance in delivering share certificates representing those Equal Shares.**

**Procedures for Optionholders**

Pursuant to the Plan of Arrangement, on, or as soon as practicable after, the Effective Date, Equal will pay the amounts, net of applicable withholdings, to be paid to Optionholders pursuant to the Arrangement, either (i) pursuant to the normal payroll practices and procedures of Equal, or (ii) in the event that payment pursuant to the normal payroll practices and procedures of

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 111 )

Table of Contents

Equal is not practicable for any such holder, by check (delivered to such Optionholder, as applicable, as reflected on the register maintained by or on behalf of Equal in respect of the Options). As such, Optionholders do not need to take any further action with respect to the Arrangement.

### Procedures for Holders of Restricted Shares

Pursuant to the Plan of Arrangement, each Equal Share in respect of any unvested Restricted Share, not already issued, will be issued (subject to applicable tax withholdings and other source deductions) to the RSP Plan participants, and any share grant agreement under the RSP Plan and the RSP Plan will be terminated notwithstanding the terms thereof. RSP Plan participants who are holders of Restricted Shares at the Effective Time will be entitled to receive the Arrangement Consideration in exchange for their Equal Shares issued pursuant to Restricted Shares on the same basis as other Equal Shareholders. Therefore, holders of Restricted Shares should follow the instructions applicable to non-registered Equal Shareholders under the heading "*Procedures for the Receipt of Consideration Pursuant to the Arrangement – Procedures for Equal Shareholders*" above in order to receive consideration owed to them.

### Cancellation of Rights of Securityholders

The Plan of Arrangement provides that, subject to any applicable laws governing unclaimed personal property, if any Equal Shareholder fails for any reason to deliver to the Depositary for cancellation the certificates formerly representing Equal Shares (or an affidavit of loss and bond or other indemnity as applicable), together with such other documents or instruments required to effect the transfer of Equal Shares, on or before the last business day before the third anniversary of the Effective Date, such Equal Shareholder shall be deemed to have donated and forfeited to Petroflow Sub any cash, net of any applicable withholding or other taxes, held by the Depositary in trust for such Equal Shareholder to which such Equal Shareholder is entitled. At and after the Effective Time, any certificate formerly representing Equal Shares shall represent only the right to receive consideration in accordance with the Plan of Arrangement; provided that such certificates shall, on the sixth anniversary of the Effective Date, cease to represent a claim of any nature whatsoever and shall be deemed to have been surrendered to Petroflow Sub and shall be cancelled.

## INTEREST OF EXPERTS

The Fairness Opinion was prepared by GHS. As at the date of the Circular, to the knowledge of the executive officers of GHS, the principal owners, executive officers, managing directors and vice presidents of GHS, as a group, own, directly or indirectly, less than 1% of the Equal Shares. Such ownership interest excludes any investments by the above referenced person in mutual funds or other investment funds managed or sponsored by third parties.

The Reserves Evaluation was prepared by HAAS. As at the date of the Circular, the principals and employees of HAAS, as a group, own, directly or indirectly, less than 1% of the Equal Shares.

## INTEREST OF INFORMED PERSONS IN MATERIAL TRANSACTIONS

Except as otherwise disclosed in this Circular, no Informed Person (as defined below in this paragraph) (nor any associate or affiliate of any such person) had any material interest, direct or indirect, in any transaction undertaken since January 1, 2013 that was not negotiated at arm's length and that has materially affected Equal, and none of such persons has any material interest in any transaction proposed to be undertaken by Equal that will materially affect Equal. For the purposes of this paragraph, "**Informed Person**" means a director or executive officer of Equal (or of a person or company that is itself an informed person of Equal), any person who beneficially owns or controls or directs, directly or indirectly, voting securities of Equal carrying greater than 10% of the voting rights attached to all outstanding voting securities, and Equal itself, if it holds any of its own securities.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 112 )

Table of Contents

## INFORMATION CONCERNING EQUAL

### General

Equal, a corporation amalgamated under the laws of Alberta, is engaged in the exploration for, and acquisition, development and production of, petroleum and natural gas with operations in Oklahoma. Equal also reviews new drilling opportunities and potential property acquisitions in Oklahoma to supplement its exploration and development activities. Equal's head office is located at 4801 Gaillardia Parkway Suite 325 Oklahoma City, OK 73142 and its telephone number is (405) 242-6000. Equal's registered office is located at 4300 Bankers Hall West, 888 – 3rd Street S.W., Calgary, Alberta, Canada T2P 5C5. The Equal Shares are traded on the TSX and NYSE under the symbol "EQU". The Convertible Debentures are traded on the TSX under the symbol "EQU.DB.B". Additional information regarding Equal is contained in our filings on EDGAR at www.sec.gov and SEDAR at www.sedar.com. See the section of this Circular entitled "*Where You Can Find Additional Information*" beginning on page 119.

### Consolidated Capitalization

The following table sets forth the consolidated capitalization of the Equal as at May 15, 2014, the latest practicable date prior to the date of the Circular and March 31, 2014:

| Designation | Authorized | Outstanding as at March 31, 2014 | Outstanding as at May 15, 2014 |
|---|---|---|---|
| Equal Shares | Unlimited | 36,100,788 | 36,100,788 |
| Options | Up to 10% of the total number of Equal Shares issued and outstanding (when combined with all other security-based compensation arrangements) | 288,745 | 288,745 |
| Restricted Shares | Up to 10% of the total number of Equal Shares issued and outstanding (when combined with all other security-based compensation arrangements) | 669,720 | 669,270 |
| Convertible Debentures | CDN$45,000,000 | $ 45,000,000 | $ 45,000,000 |

### Voting Securities

*Share Capital*

The authorized share capital of Equal consists of an unlimited number of Equal Shares. As at May 15, 2014, there were 36,100,788 Equal Shares issued and outstanding. As at May 15, 2014, there were no outstanding securities convertible or exchangeable into Equal Shares, other than 288,745 Options, 669,720 Restricted Shares and CDN$45,000,000 face value in Convertible Debentures. The Convertible Debentures have a conversion price of CDN$8.47 per Equal Share as of May 15,

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 113 )

Table of Contents

2014, the latest practicable date prior to the date of the Circular. The total outstanding amount of CDN$45,000,000 under the Convertible Debentures as of May 15, 2014 are convertible into approximately 5,312,868 Equal Shares. Equal Shareholders are entitled to dividends as and when declared by the Board, to one vote per Equal Share at meetings of Equal Shareholders and, upon liquidation, to receive such assets of Equal as are distributable to the Equal Shareholders.

*Prior Sales*

During the twelve-month period prior to May 15, 2014, the latest practicable date prior to the date of this Circular, Equal did not issue any Equal Shares other than on the exercise of Options or vesting of Restricted Shares.

During the twelve-month period prior to May 15, 2014, the latest practicable date prior to the date of this Circular, Equal did not issue any Restricted Shares.

During the twelve-month period prior to May 15, 2014, the latest practicable date prior to the date of this Circular, Equal did not grant any Options.

During the twelve-month period prior to May 15, 2014, the latest practicable date prior to the date of this Circular, Equal issued the following Equal Shares on the vesting of Restricted Shares:

| Date of Issue | Number of Equal Shares Issued | Price per Equal Share (USD$)/($CDN)[1] |
|---|---|---|
| June 20, 2013 | 1,667 | 3.73/3.85 |
| July 16, 2013 | 10,000 | 4.08/4.24 |
| July 26, 2013 | 123,748 | 4.49/4.62 |
| August 15, 2013 | 650 | 4.56/4.69 |
| August 20, 2013 | 4,300 | 4.59/4.77 |
| September 30, 2013 | 44,350 | 4.71/4.83 |
| January 8, 2014 | 8,401 | 5.27/5.69 |
| January 10, 2014 | 255,739 | 5.23/5.68 |
| February 4, 2014 | 29,754 | 5.29/5.84 |
| March 21, 2014 | 533 | 4.66/5.22 |

**Note:**

(1)    The price per Equal Share is equivalent to the closing market price of the Equal Shares on the NYSE/TSX on the date of vesting of such Restricted Shares.

During the twelve-month period prior to May 15, 2014, the latest practicable date prior to the date of this Circular, Equal issued the following Equal Shares on the exercise of Options:

| Date of Issue | Number of Equal Shares Issued | Price per Equal Share (CDN$) |
|---|---|---|
| N/A | Nil. | N/A |

During the twelve-month period prior to May 15, 2014, the latest practicable date prior to the date of this Circular, Equal has not issued any Convertible Debentures and no Convertible Debentures have been converted into Equal Shares.

**Directors and Officers of Equal**

The names, municipality of residence and positions with Equal of the directors and executive officers of Equal and their holdings, as at May 15, 2014, of Equal Shares, Options, Restricted Shares and Convertible Debentures are set out above in the section of this Circular entitled "*Interests of Our Directors and Executive Officers in the Arrangement*" beginning on page 80.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 114 )

Table of Contents

## INFORMATION CONCERNING PETROFLOW

Petroflow, a corporation existing under the laws of Delaware, a wholly owned subsidiary of TexOak, is an oil and natural gas company involved in the exploration, development and production of oil and natural gas in Oklahoma, Texas, Kansas and Illinois. It is based in Tulsa, Oklahoma. Its focus is to apply new exploration, completion and development techniques to old fields to unlock previously untapped reserves that were either passed over or never fully exploited. Petroflow's historical and current assets and cash flow from operations are insignificant relative to the size of the transaction and as such they are insufficient to fund the cost of the acquisition contemplated by the Arrangement and immaterial to your consideration of the Arrangement Resolution. The funding of the payment to you for your Equal Shares will be derived entirely from third-party financing.

On December 30, 2013, Petroflow executed an Agreement and Plan of Merger with TexOak, TexOak Merger Sub, Inc., US Oil & Gas Co. LLC, and certain individual representatives named therein. On the same date, TexOak Merger Sub, Inc. merged with and into Petroflow, with Petroflow surviving as a wholly-owned subsidiary of TexOak. Notwithstanding this transaction, TexOak is not a party to the Arrangement Agreement, has no direct or indirect obligation with respect to efforts to obtain the-Financing and is not a guarantor of any obligation of Petroflow Sub or Petroflow under the Arrangement Agreement.

The head offices of TexOak and Petroflow are located at 525 S. Main Street, Suite 1120, Tulsa Oklahoma 74103 and the telephone number for each is (918) 592-1010.

## INFORMATION CONCERNING PETROFLOW SUB

Petroflow Sub is an Alberta corporation and a wholly owned subsidiary of Petroflow. Petroflow Sub exists solely to facilitate the Arrangement and has not engaged in any operations other than in connection with its formation and the negotiation and execution of the Arrangement Agreement and related agreements. Petroflow Sub has not conducted any activities to date other than those incident to its formation and its execution of the Arrangement Agreement and upon the completion of the Arrangement, it will be merged with and into Equal and the separate existence of Petroflow Sub will cease and Equal will continue as the surviving corporation.

The address for Petroflow Sub's head office is 525 S. Main Street, Suite 1120, Tulsa Oklahoma 74103 and its telephone number is (918) 592-1010.

## PROPOSAL NO. 1: THE ARRANGEMENT

As discussed elsewhere in this Circular, the Equal Shareholders will consider and vote on a proposal to approve the Arrangement Resolution attached to this Circular as Appendix C, which approval shall include the adoption of the Plan of Arrangement and the approval of the Arrangement Agreement. You should carefully read this Circular in its entirety for more detailed information concerning the Arrangement. In particular, you should read in its entirety the Arrangement Agreement and the Amending Agreement attached as Appendix A to this Circular and the Plan of Arrangement attached as Schedule "A" to the Arrangement Agreement.

The Board unanimously recommends that you vote "FOR" the approval of the Arrangement Resolution.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 115 )

Table of Contents

## PROPOSAL NO. 2: THE COMPENSATION PROPOSAL

As required by Section 14A of the Securities Exchange Act of 1934, as amended, and Rule 14a-21(c) under that Act, Equal is providing the Equal Shareholders with the opportunity to cast a non-binding, advisory vote on the compensation that may become payable to its Named Executive Officers in connection with the completion of the Arrangement, which is referred to herein as the Compensation Proposal. Specifically, Equal is asking the Equal Shareholders to vote on the adoption of the following resolution at the Meeting:

RESOLVED, that the compensation that may be paid or become payable to Equal's named executive officers in connection with the Arrangement, as disclosed in the table entitled "*Golden Parachute Compensation*" on page 92 of Equal's information circular and proxy statement dated June 10, 2014, including the associated narrative discussion in the section entitled "*Interests of Our Directors and Executive Officers in the Arrangement*" beginning on page 80 of Equal's information circular and proxy statement dated June 10, 2014 and the agreements and understandings pursuant to which such compensation may be paid or become payable, are hereby APPROVED.

Equal believes that the information regarding the Compensation Proposal contained in this Circular demonstrates that Equal's executive compensation program was designed appropriately and structured to ensure the retention of talented executives and a strong alignment with the long-term interests of Equal's Shareholders. This vote is not intended to address any specific item of compensation, but rather the overall compensation that may become payable to Equal's Named Executive Officers in connection with the completion of the Arrangement. In addition, this vote is separate and independent from the vote of Equal Shareholders to approve the Arrangement Resolution, and the approval of the Compensation Proposal is not a condition to the completion of the Arrangement.

The Board unanimously recommends that you vote "FOR" the Compensation Proposal.

The vote to approve the Compensation Proposal is advisory and, therefore, will not be binding on Equal. If the Arrangement is approved and completed, amounts payable to Equal's Named Executive Officers in connection with the completion of the Arrangement will be paid, regardless of whether the Compensation Proposal is passed. The Board will consider the affirmative vote of a majority of the votes cast on the Compensation Proposal by Equal Shareholders present in person or represented by proxy at the Meeting as advisory approval of the Compensation Proposal.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

An aggregate of 36,100,788 Equal Shares were issued and outstanding as of May 15, 2014. The following table sets forth information regarding the beneficial ownership of Equal Shares as of May 15, 2014, by (i) each person or group known by Equal, based on filings pursuant to Section 13(d) or 13 (g) under the Securities Exchange Act of 1934, to beneficially own more than 5% of the outstanding Equal Shares; (ii) by each person who is currently a director of Equal; (iii) by each Named Executive Officer of Equal, determined in accordance with Item 402 of Regulation S-K of the Securities Act; and (iv) by all current directors and Named Executive Officers of Equal as a group. Except to the extent indicated in the footnotes to the following table, the person or entity listed has sole voting and dispositive power with respect to the Equal Shares that are deemed beneficially owned by such person or entity, subject to community property laws, where applicable, and their address is c/o Equal Energy Ltd., 4801 Gaillardia Parkway, Oklahoma City, Oklahoma 73142.

| Name of Beneficial Owner (1) | Equal Shares Controlled or Beneficially Owned | Percentage Ownership |
|---|---|---|
| Don Klapko *President, Chief Executive Officer and Director* | 650,081 (2)(3) | 1.8% |
| John Chimahusky *Senior Vice President and Chief Operations Officer* | 99,072(4) | 0.3% |
| Scott Smalling *Senior Vice President and Chief Financial Officer* | 50,731(5) | 0.1% |

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 116 )

Table of Contents

| Name of Beneficial Owner (1) | Equal Shares Controlled or Beneficially Owned | Percentage Ownership |
|---|---|---|
| Mark Rupert | 49,366(6) | 0.1% |
| *Petroleum Engineer, Vice President* | | |
| Richard Dixon | 75,792(7) | 0.2% |
| *Vice President, Land* | | |
| Wendell Chapman | 5,312(8) | 0.4% |
| *Former Senior Vice President Finance & Chief Financial Officer* | | |
| Michael Doyle | 82,310(9) | 0.2% |
| *Director, Chairman* | | |
| Victor Dusik | 2,925 | * |
| *Director* | | |
| Robert Wilkinson | 130,200(10) | 0.4% |
| *Director* | | |
| Kyle Travis | 3,000 | * |
| *Director* | | |
| Lee Canaan | 6,622 | * |
| *Director* | | |
| Michael Coffman | 3,600 | * |
| *Director* | | |
| All directors and executive officers as a group (11 persons) | 1,153,699 | 3.1% |

\*    Less than 0.1percent

**Notes:**

(1)    Beneficial ownership is determined in accordance with the rules and regulations of the SEC, and includes general voting power and/or investment power with respect to securities. The number of Equal Shares beneficially owned by a person includes Equal Shares underlying Options, Restricted Shares, Convertible Debentures or other securities that are convertible or exchangeable for Equal Shares held by that person that are currently exercisable or convertible or that are exercisable or convertible within 60 days of May 15, 2014. The Equal Shares issuable pursuant to the exercise of those Options, Restricted Shares, Convertible Debentures or other securities are deemed outstanding for computing the percentage ownership of the person holding those Options, Restricted Shares, Convertible Debentures or other securities but are not deemed outstanding for the purposes of computing the percentage ownership of any other person or entity. Unless otherwise indicated, and except as otherwise described in the section of this Circular entitled "*The Arrangement—Lock-Up Agreement*" beginning on page 60, the persons and entities named in the table have sole voting and sole investment power with respect to the Equal Shares set forth opposite that person's or entity's name, subject to community property laws, where applicable.

(2)    Includes 150,000 shares issuable on exercise of Options, Nil Equal Shares issuable on vesting of Restricted Shares and 61,983 Equal Shares issuable on conversion of Convertible Debentures, assuming a conversion price of CDN8.47, the conversion price of the Convertible Dentures as of May 15, 2014, all of which are exercisable or convertible within 60 days of May 15, 2014.

(3)    Includes 12,500 Equal Shares and CDN$313,000 principal amount of Convertible Debentures in the name of Maureen Klapko, the spouse of Mr. Klapko.

(4)    Includes 27,145 Equal Shares issuable on exercise of Options and Nil Equal Shares issuable on vesting of Restricted Shares, all of which are exercisable or convertible within 60 days of May 15, 2014.

(5)    Includes 11,500 Equal Shares issuable on exercise of Options and Nil Equal Shares issuable on vesting of Restricted Shares, all of which are exercisable or convertible within 60 days of May 15, 2014.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 117 )

Table of Contents

(6)    Includes 18,377 Equal Shares issuable on exercise of Options, Nil Equal Shares issuable on vesting of Restricted Shares, all of which are exercisable or convertible within 60 days of May 15, 2014.

(7)    Includes 18,170 Equal Shares issuable on exercise of Options, Nil Equal Shares issuable on vesting of Restricted Shares, all of which are exercisable or convertible within 60 days of May 15, 2014.

(8)    Includes 5,312 Equal Shares issuable on conversion of Convertible Debentures, assuming a conversion price of CDN$8.47, the conversion price of the Convertible Dentures as of May 15, 2014, all of which are exercisable or convertible within 60 days of May 15, 2014.

(9)    Includes 4,100 Equal Shares registered in the name of Anna May Doyle, the spouse of Mr. Doyle and 42,000 Equal Shares and 17,710 Equal Shares issuable on conversion of Convertible Debentures, assuming a conversion price of CDN$8.47, in the name of CanPetro International Ltd., a company wholly owned by Mr. Doyle and Ms. Doyle.

(10)    Includes 25,000 Equal Shares registered in the name of Farmers Implement Company Limited, a company wholly owned by Mr. Wilkinson, 40,000 Equal Shares registered to an RRSP account in the name of Robert Wilkinson, 25,200 Equal Shares registered to an RRSP account in the name of Terri Illingworth and 15,000 Equal Shares registered in the name of the Wilkinson Family Trust of which Mr. Wilkinson is the trustee.

## SHAREHOLDER PROPOSALS

If the Arrangement is completed, we will no longer be a publicly held company with respect to the Equal Shares, and there will be no public participation in any future meetings of Equal Shareholders. However, if the Arrangement is not completed, Equal Shareholders will continue to be entitled to attend and participate in our shareholder meetings, and we will hold a 2014 annual meeting of shareholders. In that event, to be considered for inclusion in the proxy materials relating to our 2014 annual meeting of shareholders, an Equal Shareholder's proposal must be submitted in writing to Bradley Squibb at 4300 Bankers Hall West, 888-3rd Avenue, S.W., Calgary, Alberta, T2P 5C5, Canada in a reasonable amount of time prior to the date we begin to print and mail our proxy materials for our 2014 annual meeting of shareholders. You are also advised to review our by-laws, which contain additional information relating to shareholder meetings. See the section of this Circular entitled "*Where You Can Find Additional Information*" beginning on page 119.

## "HOUSEHOLDING" OF PROXY MATERIALS

SEC rules allow a single copy of this Circular to be delivered to multiple shareholders sharing the same address and who affirmatively consent, or give their implied consent, to receive a single copy of these materials in a manner provided by applicable SEC rules. This practice is referred to as "*householding*" and can result in significant savings of paper and mailing costs. Although we do not household for our registered shareholders, some brokers household Equal information circulars and proxy statements, delivering a single copy of each to multiple Equal Shareholders sharing an address unless contrary instructions have been received from the affected Equal Shareholders. Once you have received notice from your broker that they will be householding materials to your address, householding will continue until you are notified otherwise or until you revoke your consent. If, at any time, you no longer wish to participate in householding and would prefer to receive a separate copy of our information circulars and proxy statements, or if you are receiving multiple copies of our information circulars and proxy statements and wish to receive only one, please notify your broker. We will deliver promptly upon written or oral request a separate copy of this Circular to an Equal Shareholder at a shared address to which a single copy of this Circular was delivered. For copies of this Circular, Equal Shareholders should contact: Kingsdale Shareholder Services either by mail at The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by toll-free telephone in North America at 1-866-581-1479 or collect call outside North America at 416-867-2272, or by e-mail at contactus@kingsdaleshareholder.com.

## AUDITORS, TRANSFER AGENT AND REGISTRAR

On April 10, 2013, Equal changed its principal independent accountant from KPMG LLP, the Canadian member firm affiliated with KPMG International, to KPMG LLP, the United States member firm affiliated with KPMG International.

Olympia Trust Company at their principal offices at Calgary, Alberta, Canada is the transfer agent and registrar for the Equal Shares.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email:*
*contactus@kingsdaleshareholder.com*

Table of Contents

## OTHER MATTERS

Equal knows of no other matter that will be presented for consideration at the Meeting other than the matters referred to in the notice of Meeting attached hereto; however, if any other matter properly comes before the Meeting, the accompanying proxy will be voted on such matter in accordance with the best judgment of the person or persons voting the proxy.

## CERTAIN INFORMATION REGARDING EQUAL, PETROFLOW AND PETROFLOW SUB

We have supplied all information contained in this Circular relating to us, and Petroflow has supplied all information contained in this Circular relating to Petroflow and the Petroflow Sub.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We are subject to the informational requirements of the Securities Exchange Act of 1934, as amended. We file annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements and other information with the SEC. You may read and copy these reports, proxy statements and other information at the SEC's Public Reference Room located at 100 F Street, N.E., Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website at www.sec.gov that contains reports, proxy statements and other information regarding us and other companies and individuals that file electronically with the SEC. You may also obtain free copies of the documents that we file with the SEC, including this Circular, by going to our website at www.equalenergy.ca. The information provided on our website is not part of this Circular and is not incorporated herein by reference.

Information relating to Equal is also available under Equal's profile on SEDAR at www.sedar.com.

In addition, Equal will provide without charge, upon request being made to Equal, a copy of Equal`s annual report to the SEC on Form 10-K for the fiscal year ended December 31, 2013 and annual information form for the fiscal year ended December 31, 2013, together with any document, or the pertinent pages of any document, incorporated by reference therein, Equal's most recently filed comparative annual financial statements, together with the accompanying report of the auditor and Equal's most recently filed annual management's discussion and analysis relating thereto. Financial information is provided in Equal's comparative financial statements and management's discussion and analysis for the year ended December 31, 2013.

## MISCELLANEOUS

If you have any questions about this Circular, the Meeting or the Arrangement or need assistance with voting procedures, you should contact: Kingsdale Shareholder Services either by mail at The Exchange Tower, 130 King Street West, Suite 2950, P.O. Box 361, Toronto, Ontario M5X 1E2, by toll-free telephone in North America at 1-866-581-1479 or collect call outside North America at 416-867-2272, or by e-mail at contactus@kingsdaleshareholder.com.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS CIRCULAR. WE HAVE NOT AUTHORIZED ANYONE TO PROVIDE YOU WITH INFORMATION THAT IS DIFFERENT FROM WHAT IS CONTAINED IN THIS CIRCULAR. THIS CIRCULAR IS DATED JUNE 10, 2014. YOU SHOULD NOT ASSUME THAT THE INFORMATION CONTAINED IN THIS CIRCULAR IS ACCURATE AS OF ANY DATE OTHER THAN THAT DATE. NEITHER THE MAILING OF THIS CIRCULAR TO EQUAL SHAREHOLDERS NOR THE ISSUANCE OF CASH TO EQUAL SHAREHOLDERS IN CONNECTION WITH THE COMPLETION OF THE ARRANGEMENT CREATES ANY IMPLICATION TO THE CONTRARY. THIS CIRCULAR DOES NOT CONSTITUTE THE SOLICITATION OF A PROXY IN ANY JURISDICTION TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH PROXY SOLICITATION IN THAT JURISDICTION.

*If you have any questions and/or need assistance voting your shares, please call Kingsdale Shareholder Services at 1-866-581-1479 or email: contactus@kingsdaleshareholder.com*

( 119 )